SKC

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

David M Garcia,

               Plaintiff,

v.

Charles L. Ryan, et al.,

               Defendants.

No.   CV-13-01591-PHX-DJH (DMF)

**ORDER**

Plaintiff David M Garcia, who was previously confined in the Arizona State Prison Complex (ASPC)-Tucson and the ASPC-Lewis, brought this civil rights action pursuant to 42 U.S.C. § 1983 and Arizona state law.[1]  Defendants Ryan, Moody, McCutcheon, Kokemor, Thomas, Puri, Patrick, Luker, and Runge filed a Motion for Summary Judgment.  (Doc. 179).  Plaintiff filed a Response (Doc. 209), and Defendants filed a Motion for Leave to Exceed Page Limit Re Reply (Doc. 224) and lodged a proposed Reply (Doc. 225).

The Court will grant Defendants' Motion for Summary Judgment and will grant in part and deny in part Defendants' Motion for Leave to Exceed Page Limit.

. . . .

---

[1] Plaintiff filed his initial Complaint and a First Amended Complaint pro se, while he was incarcerated.  (Docs. 1, 8.)  After his release from prison, Plaintiff obtained counsel and sought and obtained leave through counsel to file his Second and Third Amended Complaints.  Plaintiff is now proceeding through counsel, and his Third Amended Complaint (Doc. 89) is the operative Complaint.

1    **I.      Background**

2           **A.      Original Complaint**

3           On August 5, 2014, Plaintiff initiated this action pro se.  (Doc. 1.)  In his original

4    two-count Complaint, Plaintiff named multiple Defendants, including the Arizona

5    Department of Corrections (ADC) Director Charles Ryan; a number of other ADC

6    officials and Correctional Officers (COs); and Corizon Health Services ("Corizon"), the

7    private company contracted to provide medical care to ADC inmates.  (*Id.* at 3−5.)

8    Plaintiff asserted Eighth Amendment threat-to-safety and medical care claims arising

9    from injuries he suffered when he was assaulted during a prisoner riot at ASPC-Tucson

10   on September 20, 2012, and from Corizon's subsequent failures to provide him adequate

11   medical treatment for his traumatic head and brain injuries, vision problems, speech

12   problems, severe headaches, loss of balance, and "not being able to clearly think out

13   problems."  (*Id.* at 6−7.)  On screening under 28 U.S.C. § 1915A(a), the Court dismissed

14   the Complaint with leave to amend for failure to state a claim.  (Doc. 6.)

15          **B.      First Amended Complaint**

16          On February 13, 2014, Plaintiff filed a First Amended Complaint (FAC), in which

17   he alleged additional facts and added several Defendants, including three fictitiously

18   named COs ("Doe Defendants").  (Doc. 8.)  On screening under 28 U.S.C. § 1915A(a),

19   the Court found that Plaintiff stated claims against the three Doe Defendants, gave

20   Plaintiff 60 days to discover the identities of those Defendants, and dismissed the

21   remaining claims and Defendants for failure to state a claim.  (Doc. 14.)

22          Plaintiff was subsequently transferred to ASPC-Lewis, and on January 21, 2015,

23   he filed a Motion for Extension of Time, requesting additional time to discover the

24   identities of the Doe Defendants on the ground that, due to e-filing issues, he had not

25   received the Court's Screening Order until January 14, 2015.  (Doc. 16.)  The Court

26   granted Plaintiff an additional 30 days "to discover by subpoena, or otherwise, the

27   identities of Defendants Doe 1, Doe 2, and Doe 3 and to file a 'notice of substitution'

28   providing the Defendants' names in place of Doe 1, Doe 2, and Doe 3."  (Doc. 17 at 3.)

On March 26, 2015, Plaintiff filed another Motion for Extension of Time, this time requesting additional time to name the Doe Defendants on the ground that he had twice attempted to serve subpoenas seeking this information—first by mistakenly e-filing only one side of the pages, and second by mailing the subpoenas absent a Court Order—both of which attempts were unsuccessful.  (Doc. 22.)  The Court granted this Motion and gave Plaintiff a 30-day extension to learn and substitute the actual names of the Doe Defendants.  (Doc. 23.)

On April 30, 2015, Plaintiff submitted subpoenas to the Court in which he requested that ADC Director Ryan produce incident reports from the riot at Santa Rita Unit on September 20, 2012 and the names and last known addresses of the COs working at Santa Rita Unit at that time.  (Doc. 26 at 7, 8.).  The Court ordered the U.S. Marshal Service to serve these subpoenas, and service was executed on June 23, 2015.  (*See* Docs. 28−30.)  On July 30, 2015, Plaintiff filed a Notice of Substitution in which he identified the three Doe Defendants as Sergeant Ian Thompson and COs Minerette Jasso and Martin Pacheco (Doc. 31), and the Court made these substitutions and ordered service on these Defendants.  (Doc. 32.)

### C.    Second Amended Complaint

On November 15, 2016, Plaintiff, acting through counsel, filed a Motion for Leave to Amend and attached a Proposed Second Amended Complaint (SAC) (Doc. 65), and Magistrate Judge Fine issued a Report and Recommendation (R&R), recommending that the Motion be granted in part and denied in part.  (Doc. 68.)  After considering Plaintiff's objections, the Court adopted the R&R in part and permitted Plaintiff to file a clean copy of his SAC consistent with the Court's Order.  (Doc. 73.)  On February 15, 2017, Plaintiff filed the SAC, in which he asserted claims against Ryan and other ADC staff, additional COs, Corizon, and Corizon staff.  (Doc. 77.)  Plaintiff subsequently moved to amend to add Wexford Health Services, Inc. ("Wexford") as a defendant on the ground that he only became aware when Corizon answered the SAC that Corizon did not start providing medical services to ADC inmates until March 4, 2013, and that Wexford had been ADC's

contracted private medical care provider at the time of Plaintiff's September 20, 2012 assault until March 3, 2013.  (Doc. 94 at 3.)  The Court granted the Motion to Amend (Doc. 97), and on June 23, 2017, Plaintiff filed his Third Amended Complaint (TAC). (Doc. 98.)

### D.  Third Amended Complaint

In his five-count TAC, Plaintiff sues ADC Director Charles Ryan and his spouse; a number of other ADC officials and COs and their spouses; Wexford; Corizon; unknown ADC employees, John and Jane Does 1−40; and unknown Corizon employees, John and Jane Does 41−80.  (Doc. 98 ¶¶ 9−34.)

In Count One, Plaintiff asserts Eighth and Fourteenth Amendment claims against Wexford, Corizon, a number of individual Corizon Defendants, and moving Defendants Ryan, CO III McCutcheon, Warden Chris Moody, CO J. Kokemor, and Deputy Warden C. Thomas based on their alleged deliberate indifference to his serious medical needs. (*Id.* ¶¶ 205−14.)   In Count Two, he asserts policy-based Eighth and Fourteenth Amendment claims against Wexford and Corizon.  (*Id.* ¶¶ 215−220.)  In Count Three, he asserts Eighth and Fourteenth Amendment threat-to-safety and failure-to-protect claims against a number of individual Defendants, including moving Defendants COs Puri, Pacheco, Runge, Patrick, and Luker.  (*Id.* ¶¶ 221−26.)   In Count Four, he asserts negligence and gross negligence claims against Wexford, Corizon, and individual Corizon Defendants.  (*Id.* ¶¶ 227−233.)  And in Count Five, he asserts negligent hiring, training, supervision, and retention claims against Wexford, Corizon, and Corizon employees Brenda Rojas, and Cameron Lewis.  (*Id.* ¶¶ 234−38.)

The Court previously granted summary judgment to Wexford on statute of limitations grounds and has entered a final judgment of dismissal only as to Wexford. (Docs. 170; 222.)

## II.  Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

1  of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

2  (1986).  The movant bears the initial responsibility of presenting the basis for its motion

3  and identifying those portions of the record, together with affidavits, if any, that it

4  believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at

5  323.

6        If the movant fails to carry its initial burden of production, the nonmovant need

7  not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d

8  1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the

9  burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that

10  the fact in contention is material, i.e., a fact that might affect the outcome of the suit

11  under the governing law, and that the dispute is genuine, i.e., the evidence is such that a

12  reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*,

13  *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d

14  1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact

15  conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-

16  89 (1968); however, it must "come forward with specific facts showing that there is a

17  genuine issue for trial."  *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475

18  U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

19        At summary judgment, the judge's function is not to weigh the evidence and

20  determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*,

21  477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and

22  draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only

23  the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P.

24  56(c)(3).

25  **III.    Facts**

26        **A.    Defendants' Failure to Comply with Local Rule 56.1**

27        Under Local Rule of Civil Procedure (LRCiv) 56.1, a party moving for summary

28  judgment must include in its required separate statement of facts "only those facts that the

Court needs to decide the motion" and should not include "[o]ther undisputed facts (such as those providing background about the case or parties)."  In their Separate Statement of Facts, Defendants provide facts almost exclusively about the prior filings and Orders in this action, which are undisputed and are already set forth on the record before the Court. (*See* Doc. 180 ¶¶ 17−79.)   Under Rule 56.1, these facts "may be included in the memorandum of law, but should not be included in the separate statement of facts."  The Court therefore will not separately set forth these facts.

The only additional facts Defendants provide pertain to ADC's prison grievance process and the grievances Plaintiff filed regarding the September 20, 2012 riot and assault.  (*Id.* ¶¶ 1−16.)  Defendants include these facts to show how long the statute of limitations was tolled while Plaintiff pursued his administrative remedies on his claims. (*See* Doc. 179 at 18.)  The Court will therefore include only the facts that are relevant to Plaintiff's completion of the administrative grievance process.   Defendants do not provide any underlying facts about the September 20, 2012 assault or Plaintiff's medical care that are the bases of Plaintiff's clams.

## B.   Defendants' Relevant Undisputed Facts

ADC has a grievance process governed by Department Order (DO) 802, which is available to inmates to grieve issues related to their conditions of confinement.  (Doc. 180 ¶¶ 3−5.)  DO 802 was in effect during the time Plaintiff filed grievances regarding his alleged injuries in the September 20, 2012 assault.  (*Id.* ¶ 3.)  For non-medical grievances, DO 802 involves up to four consecutive steps: (1) attempting informal resolution by discussing the issue with relevant staff or by filing an informal complaint resolution with the inmate's CO III; (2) filing a formal grievance with the inmate's CO IV; (3) filing a first-level appeal to the Warden; and (4) filing an appeal to the Director.  (*Id.* ¶¶ 7−11.) On January 13, 2013, Plaintiff began this process by filing an Inmate Letter, in which he complained that two CO IIs opened a locked gate during a race riot, allowing rioting inmates in a fenced-in area to rush into the adjoining fenced-in area where Plaintiff was walking and to attack and almost kill Plaintiff.   (Doc. 180 ¶ 14; Doc. 210 (Pl.'s

Controverting Statement of Facts) ¶ 14; *see* Doc. 209-1 at 13.)  Plaintiff followed this Inmate Letter with a formal Inmate Grievance on February 2, 2013 (Doc. 209-1 at 11), an Inmate Grievance Appeal on March 11, 2013 (*id.* at 9), and a final Inmate Grievance Appeal on April 11, 2013 (*id.* at 7), which the Director responded to on May 28, 2013 (*id.* at 6), thereby ending the formal grievance process.  (Doc. 180 ¶¶ 14−15; Doc. 210 ¶ 14−15.)  This entire process took a total of 136 days.  (Doc. 180 ¶ 16; Doc. 210 ¶ 16.)

### C.    Plaintiff's Additional Relevant Undisputed Facts

On September 20, 2012, COs Puri, Pacheco, and Jasso were assigned to Yard 3 when the prisoners on that yard began to fight each other.  (Doc. 211 (Pl.'s Separate Statement of Facts) ¶¶ 32, 36.)  Puri directed the other officers from the control room, and Jasso initiated an Incident Command System (ICS).  (*Id.* ¶¶ 35, 37.)  Jasso went to the gate, and when CO Runge saw Jasso at the gate, Runge told Pacheco to "get out of there," but he did not tell Jasso to open the gate.  (*Id.* ¶¶ 38−39.)  Jasso unlocked the gate, and the fighting prisoners swarmed out of the gate and into the recreation yard between the four buildings on Santa Rita Unit.  (*Id.* ¶¶ 40−41.)

At that time, Plaintiff was housed in Santa Rita Unit, Building 4, and he was walking back to Yard 4 after going to medical to receive an insulin shot for his diabetes.  (*Id.* ¶¶ 29−31, 42.)  Plaintiff witnessed inmates fighting near the Yard 3 gate and a riot break out between black, white, and Hispanic inmates in Yard 3.  (*Id.* ¶¶ 42−43, 46.)  A large group of inmates came out of Yard 3 and began to chase after Plaintiff, and Plaintiff attempted to enter Yard 4 to escape, but the gate was locked; he also attempted to climb the gate, but the inmates attacked him.  (*Id.* ¶¶ 46−48; Doc. 226 at 4, 20−21.)  CO Luker was able to see the riot from where he was stationed in the kitchen, and he saw black inmates leave Yard 3; he also saw an inmate kicking Plaintiff in the face, and he ran towards Plaintiff with gas, causing the other inmate to run away.  (*Id.* ¶¶ 49−52.)

Plaintiff was taken to the University Medical Center in Tucson for a reported "assault[] with some unknown blunt object in a prison riot."  (*Id.* ¶ 53, Doc. 226 at 47.)  According to Plaintiff's emergency room assessment, Plaintiff complained of head and

face pain but "was unclear as to what happened." (Doc. 226 at 48.) After imaging and consultation with neurosurgery, Plaintiff was taken to the operating room for an emergent craniotomy for intracranial bleeding. (*Id.*) He was diagnosed with subdural hematoma, epidural hematoma, subarachnoid hemorrhage, skull fracture, and pneumothorax. (*Id.*) Plaintiff subsequently received care and therapy at the Select Specialty Hospital from October 3, 2012 to October 25, 2012, when he was discharged back to ADC with instructions for further rehabilitation. (*Id.* at 64−65.)

On January 13, 2013, Plaintiff filed an Informal Complaint[2] regarding his assault. (*Id.* ¶ 56; Doc. 201-1 at 12.)[3] As part of his Response to this Informal Complaint, CO III Kokemor disclaimed that any officers named Alvarez and Martinez—whom Plaintiff had apparently identified as working at Santa Rita Unit and opening the gate when the riot occurred—worked at Santa Rita Unit or were involved in opening the gate. (Doc. 201-1 at 12.) Kokemor also stated that the staff who opened the gate were "not listed and so I will not pass that along." (*Id.*) In a later Response to the same Informal Complaint, Kokemor stated that he was responding to Plaintiff's "specific request for names of the officer[s] who were working at Santa Rita 09/20/2013 at 5:00 p/m [sic] this information I

_____

[2] In Defendants' facts, this same Informal Complaint is referred to as an Inmate Letter. (*See* Doc. 180 ¶ 14.)

[3] Paragraph 56 of Plaintiff's Statement of Facts states that, "[d]ue to the events of September 20, 2012, including, but not limited to the injuries Plaintiff suffered and his complete lack of knowledge as to what happened and who was involved, Plaintiff submitted an Inmate Informal Complaint on January 13, beginning the administrative grievance process." (Doc. 211 ¶ 56.) To the extent Plaintiff relies on this paragraph to show that he started the grievance process, this assertion is supported by his citation to CO III Kokemor's Response to his Informal Complaint. (*See* Doc. 201-1 at 12.) To the extent, however, that Plaintiff also relies on this paragraph to show that he was too incapacitated after his assault and surgeries to know who and/or how many officers were responsible for failing to protect him during the riot (*see* Doc. 209 at 10, 12), this paragraph is unsupported by citations to any affidavit testimony or other evidence in the record and is also too vague to show what Plaintiff knew and did not know about the relevant events of September 20, 2012. Plaintiff's counsel should be aware that arguments and statements of counsel are not evidence. *See Barcamerica Int' l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 593 n.4 (9th Cir. 2002).

am unable to accurately verify.  Therefore I am unable to resolve your issue for you at this time." (Doc. 26 at 6.)

## IV.   Discussion

### A.   Failure to State a Claim

Defendants first argue that Plaintiff's claims against Warden Moody must be dismissed because Plaintiff has not alleged any non-conclusory facts showing that Moody was personally involved in the deprivation of Plaintiff's civil rights.  (Doc. 179 at 10.)  They note that this Court found in two prior screening Orders in this case that a supervisor cannot be sued for the alleged constitutional violations of his subordinates unless he either directed or participated in the violations or knew of the violations and failed to act to prevent them.  (*Id.* at 10−11.)  From this, Defendants argue that the "law of the case" entitles Moody to summary judgment.  (*Id.*)  Similarly, with respect to Director Ryan, CO III McCutcheon, CO Kokemor, and Deputy Warden Thomas, Defendants argue that Plaintiff alleges that these Defendants responded to inmate grievances, and because the Court previously found that the denial of grievances alone does not constitute unconstitutional behavior, the "law of the case" also entitles these Defendants to summary judgment.  (*Id.*)  Finally, Defendants argue as to all moving Defendants that Plaintiff's allegations in the TAC are insufficient to state a claim.  (*Id.* at 11−17.)

All of these arguments, whether asserted as flowing from "the law of the case" or set forth with more specificity as to the particular claims, effectively argue for dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Because the Court did not specifically screen Plaintiff's SAC for failure to state a claim as to Defendants Moody, Ryan, McCutcheon, Kokemor, and Thomas when it permitted Plaintiff to file the SAC  (*see* Doc. 73 (Order accepting Magistrate Judge Fine's Report and Recommendation)), and Plaintiff's TAC relevantly reiterates the same claims against these Defendants, the Court will now screen the TAC pursuant to 28 U.S.C. § 1915A(a)

with respect to whether Plaintiff states viable claims against Defendants Moody, Ryan, McCutcheon, Kokemor, and Thomas under Rule 12(b)(6).[4]

Dismissal of the complaint, or any claim within it, under Rule 12(b)(6) may be based on either a "'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990)).  A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). But "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what . . . the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation omitted).

To state a claim under § 1983, plaintiffs must allege that they suffered a specific injury as a result of specific conduct of a defendant and show an affirmative link between the injury and the conduct of that defendant. *See Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976).  There is no respondeat superior liability under § 1983, and therefore, a defendant's position as the supervisor of persons who allegedly violated a plaintiff's constitutional rights does not impose liability. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 659 (1978); *Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  "Because vicarious liability is inapplicable to § 1983 suits, a plaintiff must plead that each Government-official

---

[4] As to the additional Defendants named for allegedly failing to protect Plaintiff during the prison riot, Magistrate Judge Fine found in her R&R that Plaintiff stated viable claims against Defendants Puri, Pacheco, Runge, Jasso, Patrick, Luker, Thompson, and Baker in Count Three and recommended that Plaintiff be permitted to file his SAC with respect to these Defendants in Count Three. (Doc. 68 at 15.)  Defendants did not file an objection to the R&R, and the Court adopted this recommendation. (Doc. 73 at 4.)  For the reasons already discussed in the R&R, the Court finds that Plaintiff states claims against these Defendants and will not repeat that analysis here or address Defendants' arguments that Plaintiff also fails to state a claim in the TAC as to moving Defendants Puri, Runge, Patrick, and Luker.  (*See* Doc. 179 at 16–17.)

1    defendant, through the official's own individual actions, has violated the Constitution."

2    *Iqbal*, 556 U.S. at 676.  "A plaintiff must allege facts, not simply conclusions, that show

3    that an individual was personally involved in the deprivation of his civil rights."  *Barren*

4    *v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).

5          Additionally, to state an Eighth Amendment medical care claim, a plaintiff must

6    allege facts showing that a defendant was deliberately indifferent to a serious medical

7    need.  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).[5]  Deliberate indifference in

8    the medical context may be shown by a purposeful act or failure to respond to a

9    prisoner's pain or possible medical need and harm caused by the indifference.  *Jett*, 439

10   F.3d at 1096.   Deliberate indifference may also be shown when a prison official

11   intentionally denies, delays, or interferes with medical treatment or by the way prison

12   medical providers respond to the prisoner's medical needs.  *Estelle v. Gamble*, 429 U.S.

13   97, 104-05 (1976); *Jett*, 439 F.3d at 1096.

14                      **1.      Defendant Moody**

15         Plaintiff alleges that Defendant Moody "was employed by the ADOC as the

16   Warden of Lewis Prison" and was responsible "for the overall management and

17   operations of Lewis Prison, including providing a safe and secure environment for

18   inmates and staff."  (Doc. 96 ¶ 19.)  Plaintiff further alleges that he was "in the care,

19   custody and control" of Moody, and that Moody and other ADC officials were aware of

20   Plaintiff's diabetes and traumatic brain injury and "deliberately failed to assure that

21   [Plaintiff] received medical evaluations and treatment" while he was under their care.

22   (*Id.* ¶¶ 208−09.)

23   _____

24         [5] Although Plaintiff purports to bring his medical care claims under both the
     Eighth and Fourteenth Amendments, because Plaintiff was serving a prison sentence, the
25   more specific Eighth Amendment prohibition against cruel and unusual punishment
     applies to his medical care claims.  Where a particular constitutional Amendment protects
26   against a particular sort of government behavior, "that Amendment, not the more
     generalized notion of substantive due process, must be the guide for analyzing such a
27   claim."  *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal quotations and citation
28   omitted).

1    Absent any facts concerning specific actions Moody took or failed to take to

2   ensure Plaintiff's proper medical treatment, these allegations are insufficient to state an

3   Eighth Amendment medical care claim against Moody.   In essence, Plaintiff seeks to

4   hold Moody liable merely for being a supervisor at ASPC-Lewis during the times

5   Plaintiff experienced medical needs and not for any alleged actions Moody personally

6   took in violation of Plaintiff's constitutional rights.   As noted, there is no vicarious

7   liability under § 1983, and merely being the Warden at ASPC-Lewis during the time of

8   Plaintiff's alleged injuries is not a sufficient basis to state a constitutional claim against

9   Moody.  *See Iqbal*, 556 U.S. at 676.

10                    **2.       Defendants Ryan, McCutcheon, Kokemor and Thomas**

11    Plaintiff initially makes the same conclusory allegations against Defendants Ryan,

12   McCutcheon, Kokemor and Thomas that he makes against Moody, whereby he attempts

13   to hold these Defendants liable solely because they are ADC officials whom he alleges

14   were responsible for his overall care at the time of his injuries.  (*Id.* ¶¶ 18, 19, 20, 28, 29,

15   208−09.)   For the reasons already discussed with respect to Moody, such general

16   allegations are insufficient to state § 1983 claims against any of these Defendants.

17    Plaintiff additionally alleges that each of these Defendants responded to

18   grievances he filed concerning his assault and injuries.  (*See id.* ¶¶ 141, 152 (Ryan),

19   ¶¶ 145−147 (McCutcheon), ¶¶ 125−28 and 133 (Kokemor), ¶¶ 135−136 (Thomas).)

20   Whether or not these Defendants can be held liable under § 1983 on the basis of their

21   grievance responses depends on whether those responses constituted a failure to act that

22   subjected Plaintiff to further harm.  Under Ninth Circuit law, a defendant can be liable for

23   failure to act, *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989), but whether a

24   defendant' s denial of administrative grievances is sufficient to state a claim for failure to

25   act depends on several factors, including whether the alleged constitutional violation was

26   ongoing, *see, e.g.*, *Flanory v. Bonn*, 604 F.3d 249, 256 (6th Cir. 2010), and whether the

27   defendant who responded to the grievance had authority to take action to remedy the

28   alleged violation, *see Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009).  A prison

administrator can be held liable for deliberate indifference to a prisoner's medical needs if he "knowingly fail[s] to respond to an inmate's requests for help." *Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014).  However, when responding to medical grievances, a non-medical administrator may rely on, and is not required to second guess, the judgments of qualified medical professionals.  (*Id.*)

Plaintiff's claim against CO III Kokemor is based solely on Kokemor's responses to Plaintiff's January 31, 2013 informal complaint and his March 11, 2013 formal grievance, in which Plaintiff alleges he requested the names of the officers who opened the gate to Yard 3 during the prison riot that caused him harm.  (*Id.* ¶¶ 125, 132.) Plaintiff alleges that Kokemor refused to provide him the names and badge numbers of the officers involved and stated that the requested information could not be verified and he could not provide the answers Plaintiff sought.  (*Id.* ¶¶ 127−128, 133.)  These allegations do not show that Kokemor knew of and failed to prevent any ongoing threats to Plaintiff's health and safety and are thereby insufficient to state a § 1983 claim.

Plaintiff next alleges that he filed a grievance appeal with Deputy Warden Thomas, and Thomas responded to that appeal by denying that ADC staff was responsible for Plaintiff's injuries and stating that Plaintiff had received medical care. (*Id.* ¶¶ 134−36.)  These allegations are insufficient to show that Thomas knew of and failed to prevent any ongoing harm and are likewise insufficient to state a § 1983 claim.

Plaintiff further alleges that he filed a final grievance appeal on the same issue with Director Ryan, and Ryan responded as follows:

> Your grievance appeal has been reviewed at Central Office and the Warden's response is affirmed.  Your injuries are unfortunate.  However, staff is not responsible for the actions of other inmates during a disturbance.  It should also be noted that staff attempted in good faith to minimize injuries and property damage during the incident.  You were provided immediate medical attention following the incident and will continue to as necessary.  No further action is warranted in this matter.

(*Id.* ¶¶ 137, 141.)  This response is similarly insufficient to show that Ryan knew of and failed to prevent any ongoing harm to Plaintiff.  The events Plaintiff complained of had already taken place, and Plaintiff alleges no facts from which to infer that Ryan's response to his grievance appeal caused him additional harm or injury upon which to base a constitutional claim.

Plaintiff's only other allegations regarding Director Ryan pertain to Ryan's answer to Plaintiff's March 8, 2014 grievance appeal regarding Plaintiff's medical treatment.  (*Id.* ¶¶ 150−152.)  Ryan's alleged response recounts Plaintiff's medical care following his assault, including that he had received a craniotomy and two facial reconstruction surgeries, he was being monitored by medical staff, he had been approved for physical therapy and was scheduled for an appointment, and he had been prescribed pain medications, but these medications had been discontinued after pain control was "no longer deemed medically necessary."  (*Id.* at 152.)  Ryan also stated that Plaintiff should "submit a Health Needs Request (HNR)" for any additional concerns he wished to discuss with a medical provider.  (*Id.*)  Under these alleged facts, whereby Ryan merely answered a medical grievance, and in so doing, permissibly relied on the decisions of qualified medical providers to address Plaintiff's complaints, Plaintiff fails to state a claim that Ryan showed deliberate indifference to his medical needs.  *See Peralta*, 744 F.3d at 1086.

Plaintiff's allegations against CO III McCutcheon pertain solely to McCutcheon's response to the initial medical grievance Plaintiff filed on January 29, 2014, which led to Plaintiff's March 12, 2014 grievance appeal to Director Ryan.  Plaintiff alleges that he requested specific relief in that grievance, including rehabilitative care, an investigation as to why he had not received follow-up care after his brain surgeries, a pain management plan, physical therapy, and a reprimand to Corizon for failing to provide him proper medical treatment.  (Doc. 98 ¶ 144.)  Plaintiff alleges that McCutcheon merely summarized Plaintiff's medical complaints and stated that Plaintiff would be scheduled to see a unit medical provider to discuss his concerns, but McCutcheon "did not address any

1    of Plaintiff David Garcia's proposed items for relief." (*Id.* ¶¶ 146−47.)  Again, as a non-

2    medical employee acting solely in an administrative role, McCutcheon permissibly relied

3    on a referral to medical staff to address Plaintiff's medical complaints.  McCutcheon's

4    alleged failure to address Plaintiff's additional requests for relief, such as for the

5    investigation and censure of Corizon for failing to provide Plaintiff appropriate follow-up

6    care for his surgeries, is also insufficient to state a constitutional claim.  Plaintiff alleges

7    no facts showing that McCutcheon had the authority to order an investigation and censure

8    of Corizon, and even if McCutcheon had this authority, McCutcheon's alleged failure to

9    do these things, when at the same time he responded to Plaintiff's medical needs by

10   stating that Plaintiff would be scheduled to see a medical provider, is insufficient to show

11   that McCutcheon acted with deliberate indifference to Plaintiff's medical needs.

12        Because Plaintiff sues each of the above Defendants in their individual capacities

13   (*see* Doc. 98 ¶¶ 18, 19, 20, 28, 29), and he fails to allege any specific actions by these

14   Defendants sufficient to state § 1983 claims against them, the Court will dismiss

15   Plaintiff's claims against these Defendants for failure to state a claim and will dismiss

16   Defendants Moody, Ryan, McCutcheon, Kokemor, and Thomas from this action.[6]

17        **B.    Statute of Limitations**

18        Defendants next argue that the statute of limitations bars Plaintiff's claims.

19   (Doc. 179 at 17−23.)   Title 42 U.S.C. § 1983 does not include its own statute of

20

21   _____

22        [6] To the extent Plaintiff may have intended to assert a claim against Ryan in his
     official capacity on the basis of Ryan's alleged role as the final policymaker for ADC
23   (*see* Doc. 98 ¶ 18), the Court will not address whether Plaintiff alleges sufficient facts to
     state such a claim because a claim against Ryan in his official capacity is no different
24   from a claim against the state, and states have Eleventh Amendment immunity to suits for
     damages.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit
25   against a state official in his or her official capacity is not a suit against the official but
     rather is a suit against the official's office.  As such, it is no different from a suit against
26   the State itself.") (internal citation omitted).  Even though state officials may be sued in
     their official capacities for claims seeking only injunctive relief, *Flint v. Dennison*, 488
27   F.3d. 816, 825 (9th Cir. 2007), Plaintiff has not sought injunctive relief and therefore
28   does not meet the narrow exception for stating such a claim.  (*See id.*)

limitations.  *TwoRivers v. Lewis*, 174 F.3d 987, 991 (1999).  Therefore, federal courts apply the statute of limitations governing personal injury claims in the forum state, "along with the forum state's law regarding tolling, including equitable tolling, except to the extent any of these laws is inconsistent with federal law."  *Butler v. Nat'l Cmty. Renaissance of Cal.*, 766 F.3d 1191, 1198 (9th Cir. 2014) (citation omitted).  In Arizona, the limitations period for personal injury claims is two years.  *TwoRivers*, 174 F.3d at 991; *see also* Ariz. Rev. Stat. § 12-542 (providing that actions for personal injury must be commenced within two years after the cause of action accrues).  "If the defendant establishes a *prima facie* case that the statute was applicable, the burden of going forward shifts to the plaintiff to show its claims fall within a recognized exception to the statute."  *Kiley v. Jennings, Strouss & Salmon*, 927 P.2d 796, 799 (Ariz. Ct. App. 1996).

Although the statute of limitations applicable to § 1983 claims is borrowed from state law, federal law continues to govern when a § 1983 claim accrues.  *Wallace v. Kato*, 549 U.S. 384, 388 (2007); *TwoRivers*, 174 F.3d at 991.  Under federal law, a claim accrues "when the plaintiff knows or has reason to know of the injury which is the basis of the action."  *TwoRivers*, 174 F.3d at 991; *Kimes v. Stone*, 84 F.3d 1121, 1128 (9th Cir. 1996).  Additionally, the statute of limitations is tolled while a prisoner plaintiff pursues the mandatory exhaustion process.  *Soto v. Sweetman*, 882 F.3d 865, 871 (9th Cir. 2018).

As to Defendants Moody, Puri, Patrick, Luker, and Runge, Defendants argue that Plaintiff's claims accrued at the time of the September 20, 2012 assault, when Plaintiff knew of his injury, and deducting 136 days for the time the statute was tolled while Plaintiff was pursuing the administrative grievance process, the statute began to run on February 3, 2013, thereby requiring Plaintiff to file his claims by February 3, 2015. (Doc. 179 at 18.)  Defendants argue that because Plaintiff did not name these Defendants until February 15, 2017, when he filed his SAC, his claims against them are untimely. (*Id.*)  They further argue that Plaintiff's claims do not relate back to when Plaintiff filed his original Complaint.  (*Id.* at 18−20.)

1    Plaintiff does not dispute that he did not name the Defendants working at Santa
2    Rita Unit on September 20, 2012 until he filed his Second Amended Complaint on
3    February 15, 2017.  (Doc. 209 at 13.)  He argues, however, that his claims against these
4    Defendants did not accrue until July 2, 2015, when he discovered their identities for the
5    first time; therefore, his claims against them in the SAC were timely filed.  (*Id.* at 11–13.)
6    He also argues that his claims against all Defendants relate back to when he filed his
7    original Complaint on August 5, 2013.  (*Id.* at 7–11.)

8                    **1.    Accrual**

9                         **a.    Legal Standard**

10    Under federal law, it is well established that a claim accrues "when the plaintiff
11    knows or has reason to know of the injury which is the basis of the action."  *TwoRivers*,
12    174 F.3d at 991; *see also Kimes* 84 F.3d at 1128; *Golden Gate Hotel Ass'n v. City &*
13    *Cnty. of San Francisco*, 18 F.3d 1482, 1486 (9th Cir. 1994).  "Because it is inequitable to
14    bar someone who has no idea he has been harmed from seeking redress, the statute of
15    limitations has generally been tolled by the 'discovery rule.'"  *Bibeau v. Pac. Nw.*
16    *Research Found. Inc.*, 188 F.3d 1105, 1108 (9th Cir. 1999), *opinion amended on denial*
17    *of reh'g,* 208 F.3d 831 (9th Cir. 2000).  "[T]he discovery rule provides that a limitations
18    period does not commence until a plaintiff discovers, or reasonably could have
19    discovered, his claim.  *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1147 (9th Cir.
20    2002).  The plaintiff has a duty, however, to "be diligent in discovering the critical facts."
21    *Bibeau*, 188 F.3d at 1108.

22    The same standard for accrual applies in prisoner civil rights cases.  *See*, *e.g.*,
23    *Gregg v. Hawaii, Dep't of Pub. Safety*, 870 F.3d 883, 885 (9th Cir. 2017).  Accrual takes
24    place even if a plaintiff does not know the full extent of the injury.  *Id.* at 887 (citing
25    *Wallace*, 549 U.S. at 391).  But mere knowledge of an injury is not enough if the plaintiff
26    does not and could not also reasonably know the cause of that injury.  Thus, for accrual to
27    take place, a plaintiff must know or be able with reasonable diligence to know "[the]
28    injuries forming the basis for her action and their cause."  *Gregg*, 870 F.3d at 887.

### b.   Defendants' Accrual Arguments

As an initial matter, Defendants do not specify which particular claims they believe accrued at the time of Plaintiff's assault.  Because only Count Three contains claims arising directly from Plaintiff's September 20, 2012 assault, and Defendants argue that Plaintiff's claims accrued at the time of that assault, the Court infers that Defendants' accrual argument applies only to Plaintiff's claims in Count Three.

In Count Three, Plaintiff names Defendants Baker, Puri, Pacheco, Runge, Jasso, Patrick, Luker, and Thompson.  (*See* Doc. 98 ¶¶ 221−26.)  Of these Defendants, Plaintiff substituted Defendants Jasso, Pacheco, and Thompson for the three Doe Defendants he named in the FAC (*see* Docs. 31, 32), and these three Defendants are not among those moving for summary judgment.  Additionally, although Defendants include Warden Moody in their argument, Warden Moody is not among the Defendants Plaintiff sues in Count Three, and the Court has already found that Plaintiff fails to state a claim against Warden Moody in Count One.  Taking all these factors into account, Defendants' argument that Plaintiff's claims accrued on September 20, 2012, when Plaintiff "knew of his injury" in the prison riot, applies, at most, to Plaintiff's claims against Defendants Puri, Patrick, Luker, and Runge.

As evidence that Plaintiff had sufficient knowledge of his injuries for these claims to accrue from the time of his assault, Defendants point to Plaintiff's January 12, 2013 Inmate Letter, in which Plaintiff relevantly stated,

> Threat to Safety (violation of the Eighth Amendment) . . . Sometime during the end of September of 2012, during the first week of my imprisonment . . . I found myself in a coma with life-threatening injuries as a result of negligence in behalf of D.O.C. Officers.  I vividly recall exiting medical and going towards my housing unit.  Inexplicably, during a full blown riot, and "ICS" initiated, I found myself in the center of it all but protected until, I seen CO II Alvarez and CO II Martinez open the gate and a multitude of blacks ran out, caught me by myself, attacked me, stomped me, and almost killed me!

(Doc. 225 at 4; Doc. 180-1 at 29.)

This evidence shows that Plaintiff knew of the injuries underlying his claims against the Defendants who allegedly failed to protect him during the September 20, 2012 riot no later than January 12, 2013 when he filed this Inmate Letter.[7]  Additionally, it is undisputed that Plaintiff did not complete the administrative grievance process until May 28, 2013, and the statute of limitations was therefore tolled until that time.  (*See* Doc. 180 ¶ 16; Doc. 210 ¶ 16.)  On the basis of these undisputed facts, Defendants make a prima facie showing that the two-year statute of limitations began to run at least by May 28, 2013, and therefore elapsed on May 28, 2015, thereby making Plaintiff's claims against Defendants Puri, Patrick, Luker, and Runge, whom Plaintiff did not name in this lawsuit until he moved to amend his First Amended Complaint nearly 18 months later on November 15, 2016 (*see* Doc. 65), untimely.

### c.    Plaintiff's Response

In light of this showing, Plaintiff bears the burden of showing or creating a genuine issue of material fact that the statute of limitations does not bar his claims. Plaintiff does not argue or point to any evidence to create a genuine issue of material fact that he did not know or have reason to know of the injuries "which are the basis of the action" as well as their cause either immediately after the riot occurred, or at least by January 12, 2013, when he stated the nature of his claims in his initial grievance.  Instead, he argues as a matter of law that, for purposes of accrual, a plaintiff must not only know of his injury but must also know the identities of those who caused the injury.  (Doc. 209

---

[7] Although Defendants ostensibly argue that the Inmate Letter shows Plaintiff knew of his injuries from the time the assault took place, they point to no evidence showing Plaintiff's level of awareness at that time, and other evidence set forth above shows that Plaintiff was not entirely cognizant of what had happened to him after the assault, he had emergency brain surgery, and he remained hospitalized outside of prison for at least one month thereafter.  Because it is not clear on these facts what Plaintiff knew when, and Defendants bear the initial burden of showing that the statute of limitations applies, Defendants have not carried their burden with respect to their claim that Plaintiff knew of the injuries that underlie his claims as far back as September 20, 2012, when his assault took place.

at 11.)   He thereby maintains that, notwithstanding his knowledge of the injuries underlying his claims against the officers who failed to protect him at the time he initiated the administrative grievance process, his claims against Puri, Patrick, Luker, and Runge did not accrue until July 2, 2015, when he was first able to discover that these individuals were working the swing shift at Santa Rita Unit at the time of his assault, thereby giving him an additional two years—until July 2, 2017—in which to name these Defendants.  (Doc. 209 at 10−13.)  He further maintains that, because he filed his SAC on February 15, 2017, his claims against these Defendants are timely.  (*Id.* at 13.)

In support of his accrual argument, Plaintiff first cites to *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of California, Inc.*, 522 U.S. 192, 193 (1997) (quoting *Rawlings v. Ray*, 312 U.S. 96, 98 (1941)), for the proposition that "[a] limitations period ordinarily does not begin to run until the plaintiff has a 'complete and present cause of action.'"  (Doc. 209 at 11.)   Plaintiff further cites without specific discussion to *Bibeau*, 188 F.3d at 1108, which in turn cites to *United States v. Kubrick,* 444 U.S. 111, 122 (1979), for the proposition that a claim accrues when "a plaintiff has knowledge of the 'critical facts' of his injury, which are 'that he has been hurt and *who has inflicted the injury*.'"  (Doc. 209 at 11.) (emphasis added).

### d.    Discussion

Defendants agree with the general proposition that a claim accrues only when a plaintiff has a complete and present cause of action, but they argue on the basis of *Soto*, 882 F.3d at 870, that Plaintiff had a complete and present cause of action when he knew of his injury, whether or not he knew the identities of all the officers involved.  (Doc. 225 at 3−4.)

In *Soto*, the Ninth Circuit addressed whether the mandatory exhaustion of administrative remedies in prisoner suits delays accrual—such that the limitations period begins to run only *after* the grievance process is finished—or whether the claims accrue when the prisoner/plaintiff knows of the injury, and exhaustion merely tolls the running of the statute.   882 F.3d at 870−71.  On this question, *Soto* declined to hold that the

1   limitations period begins only after the grievance process is done, finding that this

2   approach would potentially delay accrual in prisoner cases for years and "frustrate the

3   purpose of the limitations period," and instead held that "[t]he potential unfairness of

4   limitations running during exhaustion is better addressed by equitable tolling."[8]  *Id.*  As

5   relevant here, *Soto* also found that "[t]he courts that have addressed the issue keep the

6   accrual trigger fixed to the inmate's knowledge of the injurious event" and that "[w]hen,

7   as here, the inmate knows of the acts when they occurred and knows that he was injured,

8   the claim accrues." *Id.* at 871.  Applying this standard, the Court agrees that Plaintiff's

9   claims in Count Three accrued no later than January 12, 2013, when he clearly and

10  unequivocally demonstrated his knowledge of his injuries and the bases of his claims in

11  his Inmate Letter.  For the reasons already discussed, this makes Plaintiff's claims against

12  Puri, Patrick, Luker, and Runge untimely.

13      Plaintiff's reliance on *Bibeau* for the proposition that, for accrual purposes, a

14  plaintiff must also have knowledge of *who* caused his injury does not compel a different

15  conclusion under the facts in this case.  *Kubrick*, which *Bibeau* cited, found only that

16  accrual requires factual knowledge of the injury, but not knowledge of the specific legal

17  basis of the potential claim, *see* 444 U.S. at 122, and does not provide any discussion

18  relevant to Plaintiff's circumstances.  *Bibeau* also presents unique factual circumstances

19  that do not apply here.  In *Bibeau*, the Ninth Circuit addressed whether a prisoner who

20  had participated in testicular radiation experiments under Dr. Carl Heller ("the Heller

21  experiments") knew or should have known when he became aware of subsequent

22  physical ailments that his symptoms were the result of those experiments.  188 F. 3d. at

23  1106−10.  The Ninth Circuit declined to hold that the plaintiff's claims accrued from the

24  time he became aware of his injuries because it found there was a question of fact

25  whether the plaintiff reasonably should have known—or with due diligence could have

26

27          [8]  In this case, where Plaintiff's knowledge of his injuries is not clearly
    demonstrated on the record until he began the administrative grievance process, there is
28  no practical difference between staying accrual to the end of that process and tolling the
    running of the statute.

discovered—that the Heller experiments, and not some other medical procedure or condition, were the cause of his injuries. *Id.* at 1110. In context, the question of "who . . . inflicted the injury" in *Bibeau* was really a question of causation, not identity, because Dr. Heller's identity and involvement it the radiation experiments were already known to the plaintiff; it was only the causal link to the plaintiff's injuries that was unknown and that therefore delayed accrual.

In this case, there is no question that Plaintiff knew of the cause of his injuries and the bases of his potential claims in Count Three by at least January 13, 2013, when he filed his Inmate Letter, in which he made this knowledge explicit. Although this Inmate Letter, coupled with Kokemor's response, also shows that Plaintiff was initially mistaken as to the identities of the particular COs who allegedly opened the gate that allowed the rioting inmates access to Plaintiff, and Plaintiff was unable to obtain the correct information through his initial request, this does not mean that he lacked the basic knowledge required for his claims to accrue and for the statute of limitations to begin to run on those claims. Plaintiff was in fact able to file viable Eighth Amendment claims against three COs, whom he named only as "Doe Defendants," by February 13, 2014, when he filed his FAC, and Plaintiff could have named additional Doe Defendants, even without knowing exactly who or how many COs to name. In any case, Plaintiff points to no authority for the broad proposition that when, as here, a plaintiff knows of his injury as well as the cause of the injury and the precise nature of his potential claims, he must also know the names and number of all the individuals potentially responsible for causing or failing to prevent his injury before his claims accrue and the two-year statute of limitations begins to run on those claims.

Plaintiff elsewhere appears to argue that his claims did not accrue—or that the Court should nonetheless consider the 2-year limitations period equitably tolled—until Ryan answered Plaintiff's Court-issued subpoenas with specific information regarding who was working at the time of the riot on the ground that, up until that time, Plaintiff diligently attempted to discover this information via the prison grievance process, and

ADC failed to provide him this information.  (*See* Doc. 209 at 9−10.)  Here, Kokemor's denials of Plaintiff's initial requests for this information in February 2013 create a question of fact that ADC thwarted Plaintiff's initial attempt to identify the proper Defendants for his claims.  Plaintiff does not point to any evidence, however, that he addressed this issue in his follow-up grievances and grievance appeals or to show what, if any, additional steps he took to determine the identities of these Defendants during the year that passed between when Kokemor denied his initial request and when Plaintiff filed his FAC, naming the three Doe Defendants, on February 13, 2014.  Nor does Plaintiff expressly argue or point to any case law to support that the Court should refrain from applying the statute of limitations against Plaintiff under the relevant facts presented here.  The issue of whether and to what extent a party's conduct in initially withholding requested information prevents it from later asserting a statute of limitations defense has therefore not been fully briefed.  Accordingly, the Court will not address this issue, and will instead address Plaintiff's alternate argument that relation back applies to save his untimely claims.

## 2.  Relation Back

Under Arizona law, an amendment changing a party relates back to the date of the original pleading when (A) "the amendment asserts a claim . . . that arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading," and (B) "within the applicable limitations period—plus the period provided in Rule 4(i) for service of the summons and complaint—the party to be brought in by amendment:

> (i) has received such notice of the institution of the action that it will not be prejudiced in maintaining a defense on the merits; and
>
> (ii) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Ariz. Rule of Civ. P. 15(c).

1    The limitations period for service prescribed by Rule 4(i) is "90 days after the

2    complaint is filed." Ariz. R. Civ. P. 4(i). Hence, for relation back to apply, Plaintiff must

3    show that Defendants Puri, Patrick, Luker, and Runge received notice of this action

4    within 90 days of the expiration of the 2-year limitations period on May 28, 2015—

5    meaning by approximately August 28, 2015—such that they would not be prejudiced by

6    having to defend against Plaintiff's claims on the merits. Plaintiff must also show that

7    these Defendants either knew or had reason to know that, but for a mistake in identity,

8    Plaintiff would have named them in the original Complaint.

9    Plaintiff does not argue or point to any evidence that any of the moving

10   Defendants had actual notice of this action by August 28, 2015. Instead, he argues only

11   generally that such notice and knowledge may be imputed to them. (Doc. 209 at 10.) In

12   certain circumstances, "notice and knowledge may be imputed from an original defendant

13   to a new defendant. . . . when there is an 'identity of interest' between the two. *Pargman*

14   *v. Vickers*, 96 P.3d 571, 577 (Ariz Ct. App. 2004), *as amended on denial of*

15   *reconsideration* (Nov. 1, 2004) (internal citation omitted). This requires that the original

16   defendants be "so closely related in their business operations or other activities that the

17   institution of an action against one serves to provide notice of the litigation to the other."

18   *Id.* (internal quotation marks and citation omitted). "Notice may also be imputed when

19   the new and original defendants share the same attorney." *Id.*

20   Plaintiff argues that all moving Defendants have an "identity of interest" with

21   those named in the original Complaint, and the Court may thereby impute notice and

22   knowledge of this action to them from the time Plaintiff filed that Complaint. (Doc. 209

23   at 10.) Plaintiff does not claim or point to any evidence, however, that anyone named as

24   a Defendant in the original Complaint received notice that Plaintiff had instituted this

25   action at that time. Moreover, the record before the Court does not support that any

26   Defendants had such knowledge at that time because the original Complaint was

27   dismissed on screening (*see* Doc. 6); therefore no Defendants were ever served that

28   Complaint. Instead, the first time the record shows that any Defendants received notice

of this lawsuit was when COs Jasso and Pacheco and Sergeant Thompson, whom Plaintiff named as Doe Defendants in the FAC, were served the FAC.  This occurred after Plaintiff filed his Notice of Substitution and the Court ordered service on these Defendants on August 4, 2015.  (*See* Docs. 31, 32.)  Thereafter, Jasso and Pacheco were served on October 5, 2015, and Thompson was served on October 30, 2015.  (*See* Docs. 36−38.)

As to Defendants Puri, Patrick, Luker, and Runge, it is undisputed that, as Plaintiff argues, these Defendants were involved in the same "business operations or other activities" of providing security at ASPC-Tucson during the prisoner riot in which Plaintiff was injured on September 20, 2012.   Therefore, drawing all reasonable inferences in Plaintiff's favor, notice of this action could be imputed to these Defendants as early as October 5, 2015.  But this does not save Plaintiff's claims for two reasons. First, Rule 15(c) applies when a plaintiff substitutes a defendant for an improperly-named defendant.  In this case, Plaintiff had already substituted three named Defendants for the unnamed Doe Defendants as to whom the Court found he stated claims in his SAC. Plaintiff has not substituted Puri, Patrick, Luker, and Runge for any other erroneously or fictitiously named Defendants; rather, he added these Defendants for the first time in his SAC.   Second, even if Rule 15(c) otherwise applied, there is no evidence that these Defendants received notice of this action before Plaintiff filed his SAC, and the earliest actual notice on record that could be imputed to them occurred on October 5, 2015, after the two-year statute of limitations expired—at the latest—in August 2015.  For these reasons, relation-back does not save Plaintiff's claims against these particular Defendants, and the Court will grant summary judgment to Defendants Puri, Patrick, Luker, and Runge on statute of limitations grounds.

**V.   Defendants' Motion for Leave to Exceed Page Limit Re Reply**

Defendants move for leave to exceed the 11-page page limit for a reply brief under Local Rule 7.2(e) and to file a 25-page proposed Reply.  (Doc. 224.)  They argue that this extension is necessary because Plaintiff filed a 25-page Response to Defendants' Motion

1    for Summary Judgment, and Defendants need additional pages to adequately address the

2    facts and citations to authority Plaintiff included in that Response.  (*Id.* at 1.)  The Court

3    will grant the Motion in part to the extent that Defendants have sought to exceed the page

4    limit to address the arguments Plaintiff made in response to their Motion.  (Doc. 225.)

5           Defendants also seek to include several pages of wholly new arguments in Section

6    II.C.6 of their proposed Reply, asserting for the first time that Defendants Puri, Patrick,

7    Luker, and Runge are entitled to summary judgment on the merits of Plaintiff's claims.

8    (*Id.* at 17−24.)  Defendants initially argued in their Motion for Summary Judgement that

9    Plaintiff failed to allege sufficient facts to state claims against these Defendants, even

10   though the Court had already found on screening that Plaintiff had sufficiently stated

11   such claims.   But Defendants did not argue, as they do now, that Plaintiff lacked

12   sufficient evidence to support his claims against these Defendants; nor did they present

13   any facts or point to any evidence in their Motion for Summary Judgment bearing on the

14   merits of these claims.

15          Defendants' arguments made for the first time in their over-long Reply are not

16   well taken.  Defendants should be aware that arguments raised for the first time in a reply

17   brief are waived  *See United States v. Anderson*, 472 F.3d 662, 668 (9th Cir. 2006);

18   *Padgett v. Wright*, 587 F.3d 983, 985 n.2 (9th Cir. 2009) (per curiam) (the court will not

19   consider arguments raised for the first time in a reply brief); *Martinez-Serrano v. INS*, 94

20   F.3d 1256, 1259 (9th Cir. 1996) (arguments raised for first time in reply brief are not

21   considered).  In addition, Defendants presented no facts about the September 20, 2012

22   riot when they moved for summary judgment; accordingly, they failed to meet their

23   initial burden as movants of showing they are entitled to summary judgment on the merits

24   of Plaintiff's claims, and Plaintiff was not required to produce anything to survive

25   summary judgment.  Defendants' arguments in Section II.C.6 based on the insufficiency

26   of Plaintiff's evidence are therefore misplaced.  In light of these issues, the Court will

27   direct the Clerk of Court to file Defendants' lodged, proposed Reply, but the Court will

28   not consider any of the arguments raised in Section II.C.6.

**IT IS ORDERED**:

(1)    The reference to the Magistrate Judge is withdrawn as to Defendants Ryan, Moody, McCutcheon, Kokemor, Thomas, Puri, Patrick, Luker, and Runge's Motion for Summary Judgment (Doc. 179) and Motion for Leave to Exceed Page Limit Re Reply (Doc. 224).

(2)    Defendants' Motion for Summary Judgment (Doc. 179) is **granted**, and Defendants Ryan, Moody, McCutcheon, Kokemor, Thomas, Puri, Patrick, Luker, and Runge are **dismissed with prejudice**.

(3)    Defendants' Motion for Leave to Exceed Page Limit Re Reply (Doc. 224) is **granted in part** and **denied in part** as follows:

(a)    The Motion is **granted in part** as to Sections I, II.A−II.C.5, and III of the lodged, proposed Reply; and the Clerk of Court is directed to **file** the entire Reply.

(b)    The Motion is **denied in part** as to Section II.C.6 (Doc. 225 at 17−24) of the lodged, proposed Reply, and for the reasons discussed in this Order, the will not consider any arguments made in Section II.C.6 of the Reply.

(4)    The remaining claims in this action are Plaintiff's Eighth Amendment failure-to-protect/threat-to-safety claims against Defendants Baker, Pacheco, Jasso, and Thompson in Count Three and Plaintiff's constitutional and state law medical claims against Corizon and individual Corizon employees in Counts One, Two, Four, and Five.

Dated this 9th day of October, 2018.

_____
Honorable Diane J. Humetewa
United States District Judge