# EXHIBIT B

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


DAVID M. GARCIA,                    )
                                    )
            Plaintiff,              )
                                    )
vs.                                 )    No. 2:13-cv-1591-DJH(DMF)
                                    )
CHARLES L. RYAN, et al.,            )
                                    )
            Defendants.             )
_____)


DEPOSITION OF MINERETTE JASSO

Tucson, Arizona

November 29, 2018

9:55 a.m.


By:  Nancy P. Richmond, CSR, RPR
     Certified Court Reporter
     Certificate No. 50864

1          DEPOSITION OF MINERETTE JASSO, commenced

2     at 9:55 a.m. on November 29th, 2018, at the offices

3     of the Arizona Attorney General, 416 West Congress

4     Street, Tucson, Arizona, before Nancy P. Richmond,

5     Certified Court Reporter in and for the County of

6     Pima, State of Arizona.

7

8                          * * * * *

9

10    APPEARANCES:

11        For the Plaintiff:
              MILLS & WOODS LAW, PLLC
12            BY:     SCOTT GRIFFITHS, Esq.
                      5055 North 12th Street
13                    Suite 101
                      Phoenix, AZ  85014
14                    (480) 999-4556
                      docket@millsandwoods.com
15

16

          For the Defendants, Jasso, Pacheco, Thompson,
17    Ryan, Thomas, Moody, Runge, Puri, Luker,
      Kokemor, and McCutcheon:
18

19            MARK BRNOVICH, STATE ATTORNEY GENERAL
              BY:     MICHELLE LOMBINO, Esq.
20                    205 North Central Avenue
                      Phoenix, AZ
21                    (602) 542-7670
                      michelle.lombino@azag.gov
22

23

24

25

Minerette Jasso - November 29, 2018                    3

```
 1          For the Defendant, Corizon Health, Inc.:
                QUINTAIROS, PRIETO, WOOD & BOYER, P.A.
 2              BY:   ALYSSA R. ILLSLEY, Esq.
                     2390 East Camelback Road
 3                   Suite 440
                     Phoenix, AZ  85016
 4                   (602) 954-5605
                     alyssa.illsley@qpwblaw.com
 5

 6          For the Defendant, Thomas Rawa, M.D.:
                LEWIS BRISBOIS BISGAARD & SMITH LLP
 7              BY:   DeeAnn Barnes, Esq.
                     (Telephonically)
 8                   2929 North Central Avenue
                     Suite 1700
 9                   Phoenix, AZ  85012
                     (602) 385-7873
10                   deeann.barnes@lewisbrisbois.com

11

12          For the Defendant, Wexford Health Sources,
            Inc.:
13              HINSHAW & CULBERTSON LLP
                BY:   BRADLEY L. DUNN, Esq.
14                   (Telephonically)
                     2375 East Camelback Road
15                   Suite 750
                     Phoenix, AZ  85016
16                   (602) 337-5531
                     bdunn@hinshawlaw.com
17

18

19          Also Present:

20              Chris Dowsey, Paralegal

21

22

23

24

25
```

```
 1                    I N D E X
 2   Examinations                         Page
 3   MINERETTE JASSO
 4   By Mr. Griffiths                        5
 5   By Ms. Lombino                        112
 6   By Mr. Griffiths                      116
 7
 8                  E X H I B I T S
 9
10   No.         Description               Page
11   Exhibit 1   map of Santa Rita unit      10
12   Exhibit 2   Lieutenant Jasso's report   21
13   Exhibit 3   Sergeant Thompson's report 108
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    MINERETTE JASSO,
 2    having been first duly sworn by the Certified
 3    Reporter to tell the truth, the whole truth, and
 4    nothing but the truth, testified as follows:
 5
 6                      EXAMINATION
 7    BY MR. GRIFFITHS:
 8         Q.    Good morning, Lieutenant Jasso.  My name
 9    is Scott Griffiths, and I am an attorney.  I
10    represent the plaintiff, David Garcia, in this case.
11    I'd start with the first question we always ask.
12    Have you had your deposition taken before?
13         A.    No.
14         Q.    You've never had a deposition taken
15    before?
16         A.    No.
17         Q.    Okay.  This is -- what a deposition is is
18    opportunity for me to be able to ask questions, get
19    some information regarding what happened on the day
20    of, specifically, September 20th of 2012.  Okay?
21    And that's obviously the subject of the lawsuit with
22    David Garcia versus the State of Arizona and all the
23    other defendants.
24              Through the course of today's deposition,
25    I'm sure that there's going to be times where I'm
```

1   going to ask a question that makes no sense.  So if

2   you don't understand what I'm asking, you're more

3   than welcome to say you don't understand, and I'll

4   try to rephrase it.  There will be times where

5   counsel will probably object and throw an objection

6   in there.  If that happens, we'll let her make her

7   objection, and then I'll still ask for an answer

8   unless she's specifically directing you not to

9   answer the question.  Do you understand that?

10          A.   Yes, I understand.

11          Q.   Cool.  The next rule of depositions is

12   that it has to be yes or no answers.  I'm horrible

13   at that.  I never really comply with it, but I'm

14   going to try my very best today.  And so if I ask

15   you questions, I'll have you answer yes or no, and

16   not an uh-huh or a shrug or something.

17          A.   And I'll try to answer with a yes or no.

18          Q.   Awesome.  Thank you.  And as far as things

19   go today, if I'm asking questions, you may know

20   exactly what I'm trying to ask and you may want to

21   start into an answer.  But please let me get my

22   question out so we have a cleaner record and we're

23   not speaking over one another.  And I promise I will

24   really try to do the same for you as well.  Okay?

25          A.   Thank you.

1          Q.    If there's any need for a break

2     whatsoever, more than happy to take a break.   I

3     would only ask that you answer any questions that

4     are on the table before you take a break.   Do you

5     understand?

6          A.    Yes, I understand.

7          Q.    All right.   Thank you.   Can you state your

8     full name for the record, please?

9          A.    First name is Minerette,

10    M-I-N-E-R-E-T-T-E, last name Jasso, J-A-S-S-O.

11         Q.    And you currently work with Arizona

12    Department of Corrections?

13         A.    Yes, I do.

14         Q.    And when did you start working for the

15    Arizona Department of Corrections?

16         A.    Twelve years ago.

17         Q.    Okay.   Do you know the year and the date?

18         A.    Twelve years ago.   Let's do the math.   I

19    believe that would be 2006, in December of 2006.

20         Q.    Prior to working for the Arizona

21    Department of Corrections -- well, let's go back.

22    Did you complete high school?

23         A.    Yes, I did.

24         Q.    Where did you complete high school at?

25         A.    San Pedro High School, San Pedro,

1    California.

2         Q.    And did you do any college?

3         A.    I attended California State University,

4    Dominguez Hills in Carson, California.

5         Q.    Did you graduate?

6         A.    Yes.

7         Q.    Two-year degree or four-year degree?

8         A.    I have a bachelor's degree.

9         Q.    In what?

10        A.    Labor studies and a minor in psychology

11   and communications.

12        Q.    After you graduated, did you take any

13   other college courses --

14        A.    No.

15        Q.    -- postgraduate?

16        A.    No.  Well, actually, I was working on a

17   master's degree, a multi-cultural education master's

18   degree.

19        Q.    But you didn't get a chance to complete

20   your master's?

21        A.    No.  I moved from California to Arizona.

22        Q.    And when you moved from California to

23   Arizona, did you immediately begin working for the

24   Department of Corrections?

25        A.    No.  I was long-term substitute teacher in

1    Sierra Vista School District in Sierra Vista,

2    Arizona.

3         Q.    How long did you do that?

4         A.    For about three years.  Prior to that, I

5    was a teacher in Compton, California, Compton

6    Unified School District, in Compton, California, for

7    about six years.

8         Q.    Prior to being a lawyer, I was also a

9    teacher and an administrator in high schools here in

10   town.  Well, today I think the focus is just going

11   to be the events that happened on September 20th of

12   2012.  Do you remember that day?

13        A.    Yes.

14        Q.    Okay.  As we get going into the

15   deposition, I should ask, I don't want to know the

16   contents of any conversations you had with your

17   counsel, but did you prepare for today's deposition?

18        A.    Yes.

19        Q.    What did you do to prepare for the

20   deposition?

21        A.    Just reread my personal report.

22        Q.    Did you read the CIU report on the

23   incident?

24        A.    No.

25        Q.    Did you read a copy of the complaint?

1       A.    No, not the complaint.

2       Q.    Okay.  Have you seen the -- in this case

3    the third amended complaint, which is the operative

4    complaint in this lawsuit?

5       A.    I know he's complaining about the way

6    things happened that day, but I don't know all the

7    details or the reason why.

8       Q.    It would probably help me, if I can, to

9    provide a map to you, and maybe you can help

10   identify some of the areas that are on the map as I

11   read them in the report.  So I brought with me a

12   copy of the map of the Santa Rita unit.  Would you

13   mind, you know, putting some points on a map for me

14   so I can kind of understand where the events took

15   place?

16      A.    No, I don't mind.

17            MR. GRIFFITHS:  I'd like to have this

18   marked as Exhibit 1.

19

20       (Exhibit 1 was marked for identification.)

21

22      Q.    So I've provided a map to you.  We have

23   marked it as Exhibit 1.  I'll have you in a moment

24   maybe mark a few places that I'm curious about the

25   location of so that it can start -- for me start to

1    put this together spatially.  But before I have you

2    do that, let me just ask this question.  On

3    September 20, 2012, what was your post that day?

4         A.   I was posted as a yard officer on yard

5    three at Santa Rita unit at Tucson complex.

6         Q.   And as a yard officer, what does that post

7    entail?  What are the duties of that post?

8         A.   Conduct security check on inmates, make

9    sure that they turn out for chow, make sure they get

10   locked down for count, make sure they're accounted

11   for, make sure they receive their mail, make sure

12   they turn out for meds or insulins.

13        Q.   Were you the only yard officer on that

14   day?

15        A.   In that yard there's -- there was another

16   yard officer.  COII Pacheco was my partner for that

17   day and a control room officer, COII Puri.  The

18   control officer is not allowed to come out of the

19   control room.

20        Q.   Do you remember the time of day that the

21   disturbance broke out?

22        A.   I don't know exactly the time, but I

23   believe it was after 5:00 or so.  We had done count

24   at 4:00, and then we open up the yard for chow, so

25   around 5:30, maybe.

1      Q.    Okay.

2      A.    I know it was after count, and it was

3  during chow.

4      Q.    And you just stated that your duties as a

5  yard officer in yard three were to conduct the

6  counts?

7      A.    To conduct the count.  We count at 4:00.

8  Every unit in Tucson complex counts at 4:00.

9      Q.    And on that day --

10     A.    That's a formal count.

11     Q.    Okay.  And because I'm a little unfamiliar

12  with it, is it a count that you and COII Pacheco

13  would do?

14     A.    Yes.  I would do two runs, and he would do

15  two runs.  The yard has a total of four runs:  A

16  run, B run, C run, and D run.

17     Q.    Okay.  On the map that you have in front

18  of you there, can you identify -- I see that you

19  have a pen; I was going to provide you with mine,

20  but you can use your pen.  Can you identify which is

21  unit three and which is unit four of the Santa Rita?

22            MS. LOMBINO:  Counsel, when you

23  say -- you were talking about yards, and now you

24  you've switched to units.  Are you using those

25  interchangeably, when you say unit and yard?

1          MR. GRIFFITHS:  Yes.  In this case

2    yes, but I'll use yard three and yard four.  I'll

3    try to use that as well.

4          MS. LOMBINO:  So when you just asked

5    her about unit three, were you speaking about --

6          MR. GRIFFITHS:  Yard three.

7          MS. LOMBINO:  Okay.

8      A.    So yard three would be number twenty-five

9    on the map.

10     Q.    Then yard four?

11     A.    That would be twenty-six on the map.

12     Q.    Where is complex medical?

13     A.    It's hard to tell with the numbers, but

14   it's near twenty-one --

15     Q.    Okay.

16     A.    -- 'cause there's multiple sections in

17   that building.

18     Q.    And may I ask, what is number twenty-two?

19     A.    I wouldn't be able to tell you.  I don't

20   know if that's part of the dirt area or a programs

21   building.

22     Q.    Okay.  And then number thirty-three?

23     A.    Thirty-three might be the front, might be

24   visitation.  Like I said, it's hard to tell because

25   there were different areas in that building

Minerette Jasso - November 29, 2018                    14

1   separated differently.

2       Q.   Okay.  And I should ask, would this have

3   been the same in 2012 as it is as you're describing

4   it today?

5       A.   I haven't been to that unit for a while.

6   It should be the same unless they relocated and put

7   different areas in different buildings.

8       Q.   For the identification purposes, we'll

9   just use everything as you recall it in 2012, as

10  opposed to comparing it.  And you said you haven't

11  been there in a while.  Where are you working now?

12      A.   I work at Whetstone unit.

13              MS. ILLSLEY:  I'm sorry.  What was

14  that?

15              THE WITNESS:  Whetstone, Tucson

16  complex.

17      Q.   Using your pen, and I realize it may be a

18  little bit difficult for you, can you identify the

19  area where you were on September 20th, 2012, at the

20  moment or the time when the disturbance broke out?

21      A.   In the basketball area in yard three.

22      Q.   Can you mark that on the map?  I'm happy

23  to let you use my pen.

24      A.   No.  I'm going to use a highlighter, a

25  yellow highlighter.

1      Q.    I'm probably going to ask several

2   different places.  Could you identify that that was

3   where you were?

4      A.    (Complying.)

5      Q.    I see that you have it highlighted, and

6   thank you for that.

7      A.    So that's the -- not the baseball court,

8   basketball court.

9                MS. BARNES:  Okay.  Can you repeat

10  what area you said you were in?

11               THE WITNESS:  The basketball court on

12  yard three.

13               MS. BARNES:  Oh, thank you.

14               MS. ILLSLEY:  And I'm sorry.  Can you

15  hold that up and show me, please?

16               THE WITNESS:  (Complying.)

17               MS. ILLSLEY:  Okay.  Thank you.

18     Q.    In the report that you wrote, which we'll

19  come to in a few moments to review, you indicated

20  that -- or it's indicated that you went to a gate

21  and opened a gate.

22     A.    I unsecured the lock of the gate.

23     Q.    You unsecured the lock of the gate.  Where

24  on this map is that gate located?

25     A.    Right next to number twenty-nine.  I don't

1    know if that's the -- if number twenty-nine is -- it

2    appears to be the education building, so it's right

3    next to the education building.

4         Q.   Okay.  Can you label it with the letter G?

5         A.   (Complying.)

6         Q.   Thank you.  How long did you work at the

7    Santa Rita unit?

8         A.   I would say about maybe three years.

9         Q.   Okay.  At the Santa Rita unit you've

10   identified the gate which you've marked as the

11   letter G on that map.  Are there other points of

12   entry for staff or inmates to enter unit three?

13        A.   Yes, there are two gates.

14        Q.   Okay.  Can you mark those as G2 and G3?

15        A.   No.  I'm speaking another gate besides the

16   one I told you, so there's only two gates.

17        Q.   Okay.  Can you mark that one G2?

18        A.   (Complying.)

19        Q.   Thank you.  Are there any other doorways

20   or entryways to unit three?

21        A.   If you would go through the programs

22   building, then you would have to have a key to go

23   through the programs building.

24        Q.   And is that the building labeled number

25   twenty-nine on that map?

1      A.    According to the map, it looks like that

2    would be the building.

3      Q.    So somewhere, approximately wherever that

4    door or entry point would be, can you label that

5    with G3?

6      A.    I can't put G because it's not a gate.

7    It's actually doors.

8      Q.    Okay.  Would you consider putting D1 where

9    somebody would enter?

10     A.    There were two glass doors.

11     Q.    Okay.  So using D1, entry point of D1, if

12   I was a staff member or someone that had business in

13   unit three, I had come from complex administration

14   building or visitation room identified as number

15   thirty-three, I would walk through the yard, the

16   central yard, and then I would be able to access

17   unit three through those doors?

18     A.    No.

19     Q.    So it's not an entry point?

20     A.    No.  Those doors went into the programs

21   education building.

22     Q.    Okay.

23     A.    They didn't -- you could go -- if you are

24   in the building, you could go to the yard three, but

25   it does not get you into the yard from the outside.

Minerette Jasso - November 29, 2018                18

1    Q.   I see.  So in order to be in -- well, I

2  think I understand.  In order to be in building

3  twenty-nine, I would still need to go through gate

4  one or gate two?

5    A.   Yes, unless you went through the back

6  gate.  There was a back gate.

7    Q.   Where is the back gate on that map?

8    A.   On the back of the building.

9    Q.   Okay.  Can you mark that with G2?

10    A.   G2 or G3 or G1 --

11    Q.   Well --

12    A.   -- since it's the back of the building?

13    Q.   You already marked with G, right?

14    A.   Yeah, we got G --

15    Q.   G1 --

16    A.   -- G1 -- no, we got a G and G2.

17    Q.   Okay.  Then G3.  So as -- I know they're

18  going to look at the map, but as I understand it,

19  there are three gates that I would be able to get

20  into unit three from?

21    A.   If you had the key.

22    Q.   Okay.

23    A.   If you had a key or if the control room --

24  the control room officer secured -- unsecured the

25  door, the gate, with -- in the control room with the

Minerette Jasso - November 29, 2018                    19

1    panel.

2         Q.    Okay.  So it would be either with a key, a

3    manual key, or --

4         A.    If the gate's working.

5         Q.    If the gate's working.  We'll come back to

6    if the gate's working.  In the time that you worked

7    at the Santa Rita unit, did you only work at unit

8    three or did you work at unit four?

9         A.    I worked at unit one; I worked at unit

10   two -- correction.  I worked in yard one, yard two,

11   yard three, yard four.  I worked in the kitchen and

12   DA1 or DA2, depending what they needed.

13        Q.    On the map you identified the basketball

14   court as where you were working, but where was COII

15   Pacheco?

16        A.    COII Pacheco was with me at the basketball

17   area.

18        Q.    Do you recall approximately how many

19   inmates were on the yard at the time?

20        A.    About 180, maybe.  I know it was over a

21   hundred.

22        Q.    And for being responsible for those

23   inmates, it was you, COII Pacheco, and then is it

24   Puri --

25        A.    Puri.

```
1        Q.    -- in the control room?
2        A.    He was in the control room.
3        Q.    The three officers, okay.  Where was
4   Sergeant Thompson?
5        A.    I wouldn't be able to tell you.
6        Q.    Okay.
7        A.    He would have been in the yard office,
8   doing paperwork, or another yard, or as a
9   supervisor, you get to walk around and do different
10  checks on staff or on the inmates.
11       Q.    Okay.
12       A.    You don't have a set post where to be.
13       Q.    Okay.  And his report, and also I believe
14  in your report, it's indicated that when you started
15  to see the inmates group, you called Sergeant
16  Thompson?
17       A.    I called him on the phone.
18       Q.    Was it a cell phone or was it --
19       A.    There's no cell phones in prison.
20       Q.    So there was -- he was someplace around
21  the prison; you maybe just don't recall where?
22       A.    I believe he was in the yard office.
23       Q.    Is that number twenty-nine on this map?
24       A.    Twenty-nine?
25       Q.    You've identified -- well, we have
```

1    twenty-five is yard three.

2         A.    No.   Twenty-nine was the -- it was a

3    programs building, an education building.

4         Q.    Okay.

5         A.    He was way in the front of the unit, maybe

6    by -- the yard -- the sergeant's or lieutenant's

7    office and accountability is close to medical, which

8    is towards the front of the unit, closer to number

9    twenty-one.

10        Q.    Understood, okay.

11              MR. GRIFFITHS:  Will you mark this

12   for Exhibit 2?

13

14        (Exhibit 2 was marked for identification.)

15

16        Q.    Lieutenant Jasso, I would ask, 'cause you

17   mentioned it before, is this a document that you

18   reviewed prior to today's deposition?

19        A.    Yes.

20        Q.    Based on your review of this document, as

21   well as your memory and just living through that

22   situation, do you remember the day of September

23   20th, 2012?

24        A.    Yes.

25        Q.    You had indicated that you began working

1    for the Department of Corrections in December of

2    2006?

3         A.    Yes, I was at the academy.

4         Q.    Okay.  And since that time you've been

5    continually employed with the Department of

6    Corrections?

7         A.    Yes.

8         Q.    And prior to the events on September 20th,

9    2012, had you seen inmate fights before?

10        A.    Yes.

11        Q.    Had you seen just a few or had you seen

12   many inmate fights?

13        A.    Just one on one, one-on-one fight, four on

14   one.  That's it when it comes to fights.

15        Q.    I mean, there were just two fights before

16   then, or you're just describing the types of fights

17   that you've seen?

18        A.    Describing the types of fights that I've

19   seen.

20        Q.    But have you seen many fights in your time

21   there?

22        A.    I'm not -- I didn't count them, but yes.

23        Q.    Okay.  Prior to September 20th, 2012, had

24   you ever been involved with or had to deal with a

25   race riot?

1     A.    No.  With a disturbance, no.  We don't use
2   the word "riot."
3     Q.    Fair enough.  In your description just a
4   moment ago for the types of fights that you've seen,
5   you've seen one-on-one fights and up to four-on-one
6   fights?
7     A.    Correct.
8     Q.    In your preparation for today's
9   deposition, did you speak to anyone besides your
10  attorney or counsel about the deposition?
11    A.    My trauma counselor, Dr. Bushman.
12    Q.    It's probably the same answer, but I'm
13  going to ask it anyway.  Besides your attorneys and
14  your trauma counselor, have you spoken to anybody
15  about the events of that day?
16    A.    The events of that day?
17    Q.    Yes.
18    A.    Five years later to my parents, not the
19  details, but training purposes at work.
20    Q.    Okay.
21    A.    Inmates that recognize me for that day.
22    Q.    Sure.
23    A.    But not -- not details like for the report
24  or anything else like that.
25    Q.    Okay.  Was it a traumatic event for you?

1      A.    Yes.

2      Q.    Okay.  I want to -- I just want to

3   understand how this is for you.  So I know that

4   we're sitting across the table and I'm representing

5   a plaintiff in this case, but I actually do want to

6   learn about --

7      A.    Wouldn't it be traumatic for you if you

8   were in that situation yourself?

9      Q.    I believe so.  I've been -- on a personal

10   note, when I was teaching, I taught at a charter

11   school that was completely racially divided.  I've

12   been involved in tense situations as well.  I

13   wouldn't put it on the same level as this, but, yes,

14   it's very traumatic.

15      A.    But it's also part of the job.

16      Q.    Yes, I agree.  Well, I'm not going to

17   start asking questions on this document.  Let me

18   just ask you what happened that day in your words.

19      A.    I prefer for you to ask me questions.

20      Q.    You'd rather, okay.  Fair enough.  Then I

21   will use your report to start and be able to ask

22   questions from there.  We'll go kind of line by line

23   so that I have an understanding of what is in your

24   report and maybe what's not in your report, if

25   there's anything missing from your report.  So there

1   might be a time where I ask you to fill in the

2   blanks, and that's just for me, trying to learn.

3        Okay.  So beginning in the page section

4   that says "Summary," it says, "On the above date and

5   approximate time, I, COII Jasso, initiated ICS due

6   to grouping on yard three."  And then maybe I'll

7   have you continue with the next sentence.

8        A.    "COII Puri stated on the radio that from

9   the control room that something didn't seem right in

10  A run."

11       Q.    Lieutenant Jasso, do you recall what COII

12  Puri stated wasn't right?  Like, did he say

13  anything -- it's a he, right?

14       A.    Yeah.

15       Q.    And do you remember what he said

16  specifically?

17       A.    When I went in the control room, he was

18  the one that pointed out that the inmates were

19  starting to group racially, by race.

20       Q.    And I should ask, is that -- that's not a

21  good thing in prison, right?

22       A.    You're right; it is not a good thing in

23  prison.

24       Q.    And I'm going to ask the follow-up.  Why

25  is it not a good thing in prison?

1      A.    Because that's how problems start.

2      Q.    Problems like disturbances, race

3   disturbances?

4      A.    Not necessarily disturbances.  Fights,

5   disagreements, not wanting to lock down --

6      Q.    Okay.

7      A.    -- not wanting to go eat.  It could be

8   multiple things that could happen when they start

9   getting in groups.

10      Q.    Okay.  So when COII Puri told you that

11   something didn't seem right on A run and described

12   that the inmates were grouping by race, was that a

13   cause for concern for you?

14      A.    Yes.

15      Q.    Can you read the next sentence for me?

16      A.    "I was standing by the gate, due to the

17   fact that inmates had turned out to chow.  I started

18   walking to A run when I noticed a lot of black

19   inmates moving fast from A run direction."

20      Q.    We'll stop right there just a second.  So

21   a moment ago you had indicated that COII Puri --

22   well, your report reads that, "COII Puri stated on

23   the radio from the control room something didn't

24   seem right at A run," and then you said you were in

25   the control room with COII Puri?

1       A.    No, I was standing by the gate.

2       Q.    Okay.

3       A.    After I finished the inmates going out to

4    chow is when I went into the control room.

5       Q.    Okay.  And when you said you stayed by the

6    gate, is that the gate that we labeled G?

7       A.    G2.

8       Q.    G2.

9       A.    Which is the closest gate to yard four.

10      Q.    As you're reading this back to me, are you

11   remembering some -- like, do you remember what --

12   exactly what happened that day?

13      A.    I remember as much as I can remember.

14      Q.    So you started walking to A run when you

15   noticed a lot of black inmates moving fast from A

16   run direction.  Where were they running to?

17      A.    They were just moving to different areas

18   of the yard.

19      Q.    Okay.  One thing I didn't get on the map

20   here is which is A run, B run, C run, and D run.

21   How will I know what those -- which -- what that is,

22   which ones are which?

23      A.    A run is the one right up, the furthest

24   from the basketball area.  So that would be A run --

25      Q.    Great.

1      A.    -- which is the two, these two --

2      Q.    Okay.

3      A.    -- tiers.  This would be B run.  This

4   would be C run.  There's --

5      Q.    It's both sides, okay?

6      A.    Yes.  And D run.

7      Q.    All right.  Thank you.

8            MS. LOMBINO:  May I look at that?

9      Q.    I appreciate that.  Thank you so much.

10           MS. LOMBINO:  Give us a minute.

11           MR. GRIFFITHS:  Yes.

12           MS. LOMBINO:  Did you mark it?

13           MR. GRIFFITHS:  She did.

14     Q.    And I do appreciate, Lieutenant Jasso, you

15  describing these locations for me because I don't

16  know them and I haven't been to this yard.  Thank

17  you very much.

18     A.    You're welcome.

19           MS. LOMBINO:  Thank you.

20     Q.    When you wrote that you noticed a lot of

21  black inmates moving fast from A run direction, did

22  you begin to think that there might be a race

23  disturbance that day?

24     A.    No.

25     Q.    Did you have any -- do you recall what you

1    were thinking about those inmates moving from A run?

2         A.   I was never in a disturbance before so I

3    couldn't tell whether something like that was going

4    to happen next.

5         Q.   Okay, fair enough.  Will you read the next

6    sentence?

7         A.   What sentence are we on, the --

8         Q.   "As I was walking"?

9         A.   "As I was walking to A run, I saw the

10   inmates grouping.  I went in the control room and

11   called Sergeant Thompson.  The blacks" -- oh, that

12   was the end of the sentence.

13        Q.   Thank you.  When you went into the control

14   room, that's when you had your conversation with

15   COII Puri?

16        A.   Correct.

17        Q.   And that's when you called Sergeant

18   Thompson.  We referenced that just a few moments

19   ago?

20        A.   Yes.

21        Q.   And do you remember your conversation with

22   Sergeant Thompson?

23        A.   I just told him, "Come to the yard.  I

24   don't know what's going on.  They're starting to

25   group."

1                    And he said, "I'll be right there."

2          Q.    Okay.   In terms of the inmates starting to

3    group, is that something that you were trained or

4    taught in the academy?

5          A.    In the academy they teach you a lot of

6    different things, and I went to the academy twelve

7    years ago, so it would be hard to recall if I was

8    just -- that specific information.

9          Q.    Okay.   Let me ask you this then.   Is there

10   any follow-up training since the academy that you've

11   taken to recognize racial groupings and racial

12   disturbances?

13         A.    We were taught to look at inmate's

14   behavior.

15         Q.    And is grouping part of that teaching that

16   they give you?

17         A.    No.

18         Q.    What types of inmate behavior are you

19   taught to look for?

20         A.    Whether they're angry, whether they're

21   upset, whether they might be under the influence of

22   drugs, whether they might try to hurt someone or

23   hurt themselves.

24         Q.    Okay.   Did you recognize any of those

25   signs here in the inmate grouping or inmate

1    movements?

2          A.    The facial expressions, a lot of them

3    looked angry, upset.

4          Q.    Were they yelling or screaming at all?  Do

5    you recall?

6          A.    Not at this time, when I went in the

7    control room.

8          Q.    When they were upset, did you have any

9    idea what they were upset about?

10         A.    No.

11         Q.    All right.  How about the next sentence?

12         A.    "The blacks were grouping in front of the

13   control room.  The whites were grouping in front of

14   B run, and some of the Mexicans were grouping by the

15   staff-only ramada."

16         Q.    Okay.  Is this something that you observed

17   from the control room?

18         A.    That's what I observed as I was walking

19   out of the control room.

20         Q.    Walking out of the control room, okay.  In

21   the control room -- I've seen pictures of control

22   rooms, but I haven't been to Santa Rita so I don't

23   know this control room.  Is this control room in a

24   vantage point that you can see the entire yard?

25         A.    No.

1        Q.    Are the cameras, security cameras, used to

2    be able to watch all the different parts of the

3    yard?

4        A.    At that time I don't think they had

5    cameras.

6        Q.    Okay.  And you may not know this except

7    from what he told you, but how would COII Puri know

8    that the inmates were grouping?

9                 MS. LOMBINO:   Objection, calls for

10   speculation.

11       Q.    You can answer if you know.  This is one

12   of those times that she can put her objection in.

13       A.    Can you repeat the question?

14       Q.    Sure.  How would COII Puri know about the

15   inmates grouping?

16       A.    'Cause he could see more than half of the

17   yard.

18       Q.    So from that vantage point of the control

19   room you can see over half the yard?

20       A.    From what I recall, he could see most of

21   the yard, but not all of it.

22       Q.    Go back to the map on Exhibit Number 1.

23   Can you mark where the control room is and describe

24   it for us?

25                 MS. LOMBINO:   Counsel, by describing,

1    you mean give a number?

2              MR. GRIFFITHS:  Well, yes,

3    describe -- because not everything is with a number.

4    So maybe she could say if it's on the corner of

5    building twenty-nine, she can mark it on the map and

6    say it's on the corner of building twenty-nine, and

7    we can all look at that so we can understand what

8    vantage point COII Puri had.

9              I don't know if it's on the corner of

10   building twenty-nine.  It seems to me that's a good

11   place for a control room, but I'm not in charge of

12   that.

13        A.   I'm putting a dot.  It's on -- it is in a

14   corner --

15        Q.   Okay.

16        A.   -- at the end of the Charlie section,

17   between Charlie and the first line of D run, or dog

18   run or Delta run or whoever you want to call it.

19        Q.   Sure.  So it's between C and D runs at the

20   corner there, okay.

21             MS. LOMBINO:  Give us a minute, and

22   I'll share with --

23             MR. GRIFFITHS:  Of course.  Did you

24   get a chance to --

25             MS. ILLSLEY:  Yeah.

1          MR. GRIFFITHS:  Oh, okay.  I just
2    wanted to make sure.
3          Q.   So to go back to your description just a
4    moment ago, you said the blacks were grouping in
5    front of the control room; the whites were grouping
6    in front of B run; and some of the Mexicans were
7    grouping by the staff-only ramada.  And that's what
8    you observed personally when you walked out of the
9    control room?
10         A.   Yes.
11         Q.   Okay.  All right.  Can you read the next
12   sentence?
13         A.   "At that time I, COII Jasso, initiated ICS
14   and all the inmates started fighting."
15         Q.   I don't know if that's a comma or a period
16   or a space, but we'll stop there for a second.
17         A.   It is a comma.  "Chemical agents were
18   used."  "At that time I, COII Jasso, initiated ICS
19   and all the inmates started fighting.  Chemical
20   agents were used," period.
21         Q.   I have a question about the ICS.
22         A.   Incident command system.
23         Q.   Okay.  How does an office -- and this is
24   one I wanted to ask, because I've done these kind of
25   cases before.  How does somebody actually -- what do

1    you do to initiate an ICS?

2         A.   You go on the radio and you say, "COII

3    Jasso, Santa Rita, initiate an ICS."

4         Q.   Okay.  And do you relay information --

5         A.   And then you state where you're at, what's

6    going on, what type of respond you need.

7         Q.   Okay.  Is that anything that the inmates

8    can hear?

9         A.   They're always hearing everything via

10   radio, via conversation between officers, via TV, if

11   they're watching news, if it's something that comes

12   out on the news.  They're always listening to

13   everything.

14        Q.   So when you wrote, "At that time I, COII

15   Jasso, initiated ICS and all the inmates started

16   fighting," do you believe they started fighting

17   because you initiated ICS?

18        A.   No.

19        Q.   Why not?

20        A.   Because they were fighting before I

21   initiated.

22        Q.   All right.  The next part of that

23   sentence, "chemical agents were used," were you

24   carrying chemical agents with you at that time when

25   you first initiated ICS?

1    A.    When COII Pacheco and I walked out of the
2  control room, we started walking towards A run.  We
3  stopped in the basketball area because we were
4  surrounded by all the inmates.  In front of us there
5  were white inmates.  Behind us there were the black
6  inmates.  That's when I used the chemical agents, as
7  soon as they started fighting.
8    Q.    Okay.  So you described that you were
9  surrounded by, on one side is the black inmates, and
10 on the other side is of the white inmates?
11   A.    In front of us were the white inmates;
12 behind us were the black inmates.
13   Q.    Okay.
14   A.    We were in between the two groups in the
15 basketball area.
16   Q.    And to your recollection at that point was
17 the race disturbance between the whites and the
18 blacks?
19   A.    Yes.
20   Q.    At that time did you -- do you remember,
21 did you feel that it was dangerous for you to be
22 there, between the whites and the blacks?
23   A.    Yes.
24   Q.    Did you feel like if they started to
25 fight, you'd be caught right in the middle of it?

1        A.    I was afraid that they were going to
2   assault my partner, COII Pacheco, or assault me or
3   assault both of us.  That was the reason for using
4   the chemical agents.
5        Q.    Are chemical agents -- which chemical
6   agents were you using that day?
7        A.    I use a fogger.
8        Q.    Okay.  Is that something you carry with
9   you on your tool belt?
10        A.    No.
11        Q.    Is that something that you picked up at
12   the control room?
13        A.    Yes.
14        Q.    Okay.  So before you left the control
15   room, you had a feeling that this could be something
16   that -- a disturbance that required you to use
17   chemical agents?
18        A.    I didn't have a feeling.  COII Puri
19   suggested for us to take the fogger just in case.
20        Q.    The next part, I -- I'll have you read the
21   next sentence, please.
22        A.    "I ran to the gate to let staff in.  Some
23   inmates started to climb over the fence by the
24   programs."
25        Q.    Okay.  I think that I'm losing a little

1   bit of the sense of time here.  Do you have a

2   recollection of how much time is taking place

3   between when you leave the control room and walk

4   towards the basketball area at A run and then go to

5   the fence?

6       A.   Time -- was I supposed to look at my watch

7   at that time?  I'm not trying to be rude, but I was

8   looking at my surroundings.  I was looking at my

9   partner.  I wanted to make sure we were safe, that

10  the inmates were safe, that no one got hurt.  I was

11  not going to look at my watch at that time.

12      Q.   Okay.  So would you estimate that it was a

13  minute of time?

14      A.   I'm not going to tell you the time because

15  I don't know the time.

16      Q.   When you were -- you said you had inmates

17  behind you and you had inmates in front of you.  The

18  black and the white inmates were in front and behind

19  you, and you began using the fogger.

20      A.   They rushed against each other, and we

21  were in the middle.

22      Q.   Okay.

23      A.   That's the reason why I used the fogger,

24  to distract them so we could get away and to

25  hopefully stop them from fighting.

1    Q.    Okay.  Let me ask you about the success of

2  the fogger for just a second.  Did it stop the

3  inmates from fighting for any length of time at all?

4  Was it successful?

5    A.    It was -- it was successful in letting the

6  inmates know that we were trying to do something

7  about what was going on.

8    Q.    Okay.

9    A.    It was successful in slowing inmates down

10  from hurting each other, but it didn't completely

11  stop them from hurting each other.

12    Q.    Sure, as we'll find out, right?  You had a

13  fogger.  Did COII Pacheco also use his fogger?

14    A.    There was only one fogger.

15    Q.    Okay.  Were there any other chemical

16  agents besides the fogger -- we talked about what

17  you used, the fogger.  Did COII Pacheco have a

18  different set of chemical agents?

19    A.    He had his OC spray.  We all carry that an

20  OC sprayer our belts, but that was not used.  The

21  fogger was the only one that was used.

22    Q.    And I'm going to ask.  I know you used the

23  fogger, but do you know why COII may not use the

24  fogger -- or his OC spray?

25    A.    COII Pacheco was standing next to me.

```
1        Q.    Okay.

2        A.    I reached for the fogger with my right

3   hand, and he gave it to me.

4        Q.    Okay.

5        A.    We only have one fogger, and that's the

6   one I used.

7        Q.    Understood.  Is there -- and I just want

8   to make sure.  There's one fogger in the control

9   room?

10       A.    At that time that day there was only one.

11       Q.    Okay.  All right.  So the sentence says,

12  "I ran to the gate to let staff in."  Which gate did

13  you run towards?

14       A.    I ran to the gate next to building, the

15  number twenty-nine.

16       Q.    Okay.  The one that we initially just

17  marked G?

18       A.    Correct.

19       Q.    Were there inmates in front of or near the

20  gate?

21       A.    There were inmates all over.

22       Q.    Okay.  Says that you ran to the gate to

23  let staff in.  Were there staff waiting at the gate?

24       A.    I saw Sergeant Thompson and somebody else

25  heading towards the gate.
```

```
1       Q.   Where -- they were coming from complex,
2   like the supervisor room?
3       A.   I don't know where they were coming from.
4       Q.   Okay.
5       A.   I didn't have a chance to look and see
6   where they were coming from.
7       Q.   Okay.  But you said that you saw them?
8       A.   They were close enough for me to see them
9   getting towards that gate.
10      Q.   Okay.  Can you maybe in front of that gate
11  put the approximation of where you believe Sergeant
12  Thompson was at the time that you opened the gate?
13             MS. LOMBINO:  Objection.
14      A.   I didn't open the gate.
15             MS. LOMBINO:  Objection.  It hasn't
16  been established --
17             MR. GRIFFITHS:  Well, earlier she's
18  testified she unsecured gate one.
19      A.   But I didn't open it.  There's a
20  difference between opening and unsecuring the gate.
21      Q.   Okay.  So maybe you can explain the
22  difference to me real quick, and I can --
23      A.   The difference is there's a lock hanging.
24      Q.   Okay.
25      A.   I unsecured the lock.  I did not open the
```

1    gate.

2         Q.    Okay.  All right, thank you.  Now, on that

3    map would you be able to indicate where you saw --

4    you believe that you saw Sergeant Thompson?

5         A.    At what time?

6         Q.    Well, when you --

7         A.    When I got to the gate?

8         Q.    "I ran to the gate to let staff in."  So

9    staying right in that time frame, "I ran to the gate

10   to let staff in," and then I asked, did you see

11   staff there, and you said Sergeant Thompson was

12   approaching, and then --

13        A.    But are we talking as I'm running to the

14   gate, or are we talking when I got and I stood in

15   front of the gate and unsecured the lock?  Which

16   section are you talking about --

17        Q.    Well --

18        A.    -- because as I'm running to the gate, I

19   could see him from far away.  But when -- as I get

20   to the gate, he's standing right in front of me, and

21   the only thing that's dividing us between us is the

22   gate.

23        Q.    Okay.

24        A.    So I need some clarification.  What is it

25   that you want me to answer, which part?

1      Q.    Okay.  So the gate that at the time that
2  you're at the gate unsecuring the gate.
3      A.    He was right in front of me.
4      Q.    Okay.  And were there other officers with
5  him?
6      A.    I believe there was one more with him.
7      Q.    At that time were there inmates
8  surrounding you?
9      A.    There were inmates everywhere.
10     Q.    And at this point they were being violent
11 towards each other?
12     A.    As I was running to the gate, there were
13 two -- there were three inmates assaulting one
14 inmate.  I still had a little bit of fogger left,
15 and I sprayed him, and I kept running towards the
16 gate.
17     Q.    Okay.  Did you see any weapons being used
18 by the inmates?
19     A.    I saw one inmate.  He had two broom
20 sticks.  They were pointed.  They were pointed
21 like -- like if you were going to stick them into
22 the ground.  And there were other inmates, I don't
23 recall what they were using, if they were just using
24 their hands or if they were using other things to
25 hurt each other.

1      Q.    Sure.  Did you see any other weapons, like

2   a baseball bat?

3      A.    Not at that time, not while I was on that

4   yard.

5      Q.    Did you see any shivs or any other weapons

6   at all?

7      A.    No.

8      Q.    Did you see any inmates using socks that

9   had rocks in them?

10      A.    No.  I wasn't paying attention to every

11   little thing they were doing or what they had in

12   their hands.

13      Q.    Okay.  So, all right.  Go back.  It says,

14   "I ran to the gate to let staff in."  So you get to

15   gate G, that we marked gate G, and you unsecured

16   the --

17      A.    I unsecured the lock.

18      Q.    You unsecured the lock.  And then what did

19   you do after that?

20      A.    I remember Sergeant Thompson wanting to

21   get in.  The gate opened, and as the gate opened, I

22   walked through the gate, and then like about -- I

23   don't know how many inmates rushed behind me.  They

24   were black inmates.  They rushed behind me.

25      Q.    Okay.

1      A.    Then I turned around, and Sergeant

2  Thompson started pushing the gate in, and I helped

3  him push the gate in.  I remember him telling me to

4  leave, and I told him, "I'm not going to leave you."

5           And we were holding the gate back.  That

6  way the rest of the whites and the rest of the

7  Hispanic inmates would not get out because the

8  inmates that got out were black.

9      Q.    Okay.  So you didn't open the gate.  You

10  simply unsecured the lock?

11      A.    Correct.

12      Q.    And then Sergeant Thompson opened the

13  gate?

14      A.    I can't say he did or he didn't.  I don't

15  recall that detail.

16      Q.    Okay.  And I'm sorry.  I forgot the

17  answer.  I think I asked this before, but were there

18  any other officers -- at the time that you unsecured

19  the lock, were there any other officers with

20  Sergeant Thompson.

21      A.    I believe there was one more.  I told you

22  there was one person --

23      Q.    Yeah, I'm sorry.  I forgot.  I'm getting

24  into the story.

25      A.    No, you're fine.

1        Q.    So you turn around.   The gate unlocks --
2    the gate gets opened, not by you.
3        A.    Correct.
4        Q.    And then the inmates, the black inmates,
5    push their way through the gate.
6        A.    Correct.
7        Q.    And then Sergeant Thompson says to you,
8    "Get out of here."   And you're like, "I'm not
9    leaving you"?
10       A.    Between him and I, we closed the gate.   We
11   kept it -- we pushed it so other inmates would not
12   get out.
13       Q.    How did you secure the gate again?
14             MS. LOMBINO:   Objection.   It's
15   speculation.   It hasn't been established.
16             MR. GRIFFITHS:   That's why I'm asking
17   it.
18       Q.    You said that you and Sergeant Thompson
19   pushed against the gate to stop other inmates from
20   coming out.
21       A.    Correct, but I never stated how we secured
22   it.
23       Q.    I'm asking -- that was the question I was
24   asking.   So did the gate get secured?
25       A.    The gate got secured.

1        Q.    How did it get secured?

2        A.    With my handcuffs.

3        Q.    Okay.  Thank you.  Do you know any of the

4    inmates that went out of the gate when it was

5    opened?

6        A.    All I know, they were all black.

7        Q.    You didn't know any of their names?

8        A.    No.

9        Q.    And since that time, have you learned

10   their names?

11       A.    No.

12       Q.    Do you have any other recollection as to

13   their mental health scores?

14       A.    If I didn't know their names, I didn't

15   know their mental health scores either.

16       Q.    Thank you.  And did you know any of their

17   criminal history or past?

18       A.    No.  I was an officer back then.  I didn't

19   have the information available to me.

20       Q.    The next part, the second part of the

21   sentence says, "Some inmates started to climb over

22   the fence by programs."  Is that in the same general

23   vicinity as gate -- the gate marked as G?

24       A.    Not the gate where I was at.  It was on

25   the other side of the building.

1        Q.    Okay.

2        A.    The education building curves.  It's

3    like -- it's like a square.  So as you keep going

4    towards the basketball area, you could turn to the

5    left, and then there was that gate that some of the

6    inmates climbed over.  I know there was one that

7    climbed over.

8        Q.    So -- and I just want to -- I think I

9    understand what you're saying, but I just want to be

10    clear.  The fence that you're describing inmates

11    climbing over or attempting to climb over is between

12    building twenty-nine and the basketball area?

13        A.    Yes.

14        Q.    In that vicinity?

15        A.    It's on the -- I wish I could described it

16    so you could write it down, but there's a fence that

17    went all the way from the edge of that building

18    to -- that would go all the way to A run, but it was

19    a little section right here, a little fence where an

20    inmate climbed over.

21        Q.    Because I think to me it's important,

22    could you put, like, just a little dotted line where

23    you think that fence is?

24        A.    (Complying.)

25        Q.    And then that fence --

1          MS. LOMBINO:  Can you wait, counsel?
2    I want to see it and then share it with Ms. Illsley.
3          MS. ILLSLEY:  I apologize.  For the
4    record, this dotted line that's on Exhibit 1, did
5    you testify that you saw an inmate climb over this?
6          THE WITNESS:  I didn't see an inmate
7    climb over it.  I heard an inmate had climbed over
8    it, and it was one of the inmates that I assisted
9    that broke his two ankles.
10          MS. ILLSLEY:  Okay, thank you.
11     Q.    So the statement, "Some inmates started to
12    climb over the fence by programs," you didn't
13    witness them climbing over the fence, but you heard
14    that they climbed over the fence?
15     A.    I knew that one of them had climbed over
16    the fence because that's the one that some officers
17    and I put inside the programs building to secure
18    him.
19     Q.    Did he tell you that he climbed the fence,
20    or did you find him on the other side of the fence?
21    How did you know that --
22     A.    We found him on the other side of the
23    fence.
24     Q.    With his ankles that were possibly broken?
25     A.    He stated that his ankles were hurting.

Minerette Jasso - November 29, 2018                    50

1        Q.    Understood.

2        A.    I'm not medical so I wasn't able to

3   determine whether they were broken or not.

4        Q.    Sure.  The fence that we're talking about,

5   does it have barbed wire on it?

6        A.    At that time it didn't.  Now it does.

7        Q.    Okay.  The fence that you've described and

8   you've noted here, are there any other fences behind

9   it or beyond it that would prevent the inmates from

10  getting into Santa Rita, the -- into another area

11  that's not yard three?

12       A.    That's the only fence on that area that

13  would prevent them from going from yard three to the

14  other section of the Santa Rita unit.

15       Q.    Okay.  Like yard two, this inmate --

16       A.    They're not connected.  Yard three and

17  yard two are not connected.

18       Q.    Okay.  So if that inmate had jumped that

19  fence and hadn't hurt his ankles, would he have been

20  able to run into the central rec yard?

21       A.    No, because there's -- at that time it was

22  a big area that was fenced, a big recreational yard

23  that was fenced.

24       Q.    And he would not have been able to access

25  the softball field?

1      A.   He would have been able to go to the
2  baseball field.  There is a baseball field.
3      Q.   Yes.  And the baseball field is between
4  yard three and yard four on this map?
5      A.   It's not between them.
6      Q.   Well, it's --
7      A.   It's in front of them.
8      Q.   That's a better description, thank you.
9  But you're saying the inmate, if he had jumped that
10 fence and not hurt his ankles, might have been able
11 to run to the baseball field?
12     A.   He might have been able to run wherever he
13 wanted to run.  He could have run towards DA1, the
14 dining area, towards -- it's --
15     Q.   There was no fence to stop him?
16     A.   Not to stop him from that large area, but
17 there are other fences that wouldn't let him off the
18 unit.
19     Q.   Off of Santa Rita unit?
20     A.   Off of Santa Rita unit.
21     Q.   And he would not have been able to get
22 into yard two unless he went through a gate that was
23 opened?
24     A.   Correct.
25     Q.   Okay.  And the same with yard four, he

```
 1    wouldn't have been able to access yard four?
 2         A.    Obviously, he hurt his ankles; he couldn't
 3    move.  So he couldn't go anywhere.
 4         Q.    Sure.  He was kind of stuck there.
 5    Gotcha.  The next sentence if you would, please?
 6         A.    Can you remind me?
 7         Q.    "All the inmates"?
 8         A.    Still page one?
 9         Q.    Still page one.
10         A.    "All the inmates rushed the gate."
11         Q.    Okay.  So this is where you were
12    describing that after Sergeant Thompson or another
13    officer opened the gate -- and, by the way, I didn't
14    ask --
15                   MS. LOMBINO:  Objection.  She said
16    she didn't know how the gate got opened.  It hasn't
17    been established.  You're mischaracterizing her
18    testimony.
19                   MR. GRIFFITHS:  Fair enough.  Thank
20    you.
21         Q.    Did Sergeant Thompson -- you testified
22    that you don't know who opened the gate, correct?
23         A.    Correct.
24         Q.    It could have been Sergeant Thompson?
25    Yes?
```

1      A.   I'm not going to say it could have been
2   him because I don't know who did it.
3      Q.   Could have been another officer who was
4   with him?
5      A.   I'm not going to say if it was another
6   officer, because I don't know if he did it or he
7   didn't.
8      Q.   I understand.  I'm asking, could it have
9   been?
10     A.   There were only two people there.  It
11  could have been one of them.
12     Q.   Could it have been an inmate that was
13  surrounding you?
14     A.   No, it could not have been an inmate.
15     Q.   How would you know that if you don't know
16  who else did it?
17     A.   Because I was standing in front of the
18  gate.  In order to open that gate -- for an inmate
19  to open the gate, he would have had to push me out
20  of the way.
21     Q.   Okay, understood.  So thank you very much.
22  I appreciate it.  So the gate got opened by either
23  you, Sergeant Thompson, or another officer?
24     A.   It was not me.
25     Q.   I understand.

```
1        A.    I unlocked -- I unsecured the lock.

2        Q.    You -- yes.

3        A.    I did not open the gate.

4        Q.    Yes, I totally understand --

5        A.    If I would --

6        Q.    -- that.

7        A.    -- have opened the gate, I would have tell

8   you, I opened the gate.  I did not open that gate.

9        Q.    Correct.  You unsecured the lock.  I see

10  the distinction.  But in terms of who opened the

11  gate, it wasn't you, and there were only two other

12  people on the outside of the gate, correct?

13       A.    Correct.

14       Q.    And there were a bunch of inmates on the

15  inside of the gate, correct?

16       A.    Correct.

17       Q.    But they didn't open it because they would

18  have had to go through you, correct?

19       A.    Correct.

20       Q.    Awesome, thank you.  I appreciate that.

21  Which gate did you open?  Is it G or G2?

22             MS. LOMBINO:  Objection.  She just --

23       Q.    I'm sorry.  Which -- which gate did you --

24       A.    Are you trying --

25       Q.    -- unsecure the lock?
```

1       A.    -- to get me confused?

2       Q.    No.

3       A.    You already know what gate.  I already

4   answered what gate.

5       Q.    Well, please remind me.

6       A.    The one that's to the building -- the

7   education building.  The one that says G.  It does

8   not say G1.  It says G.

9       Q.    Okay.

10                  THE WITNESS:  Can we take a break?

11                  MS. LOMBINO:  Yes.

12

13            (Recess from 11:02 a.m. to 11:10 a.m.)

14

15       Q.    If we can go back on the record,

16   Lieutenant Jasso, I forget which sentence we were

17   on, but I think it was the, "All the inmates rushed

18   the gate," sentence.  So after the gate is opened,

19   then you've described all the inmates rushed the

20   gate and a moment ago that you described that only

21   black inmates got through the gate.  Can you maybe

22   offer some clarification as to --

23       A.    All the inmates rushed the gate, but the

24   first ones that were -- that were rushing towards

25   the gate were the black inmates.

1      Q.    Okay.  And in your opinion were they

2  rushing to the gate to get away from other inmates

3  that were going to beat them up?

4      A.    Yes.

5      Q.    The black inmates that rushed through the

6  gate, had you seen them fighting with weapons or

7  fighting other inmates?

8      A.    Like my next sentence says, "Everything

9  happened very fast."

10      Q.    Okay.

11      A.    I didn't stop to see who was fighting who

12  or what was doing what.

13      Q.    Okay.  The next sentence, "Everything

14  happened so fast," this kind of goes back to maybe

15  what you had said before.  Spatially you weren't

16  watching your time -- you weren't watching your

17  watch, but approximately how long do you think that

18  it took from the time the basketball court, where

19  you fogged the inmates at the basketball court area,

20  to the time the inmates were rushing the gate?

21      A.    I wouldn't be able to give you a specific

22  time.  I'm not going to tell you it was three

23  minutes, five minutes because I don't know how long

24  it took.

25      Q.    And the next -- the final sentence on this

1    page, could you read that?

2         A.    "I tried to hold the gate so no more

3    inmates would get out.  I used my handcuffs to try

4    to secure the gate."

5         Q.    Here you're describing your effort to stop

6    any other inmates that are white or Mexican from

7    getting through the gate?

8                   MS. LOMBINO:   Objection.  She

9    didn't -- it's speculation.  It's not in the record.

10   She didn't say what race the inmates were.

11                  MR. GRIFFITHS:   You can answer.

12                  MS. ILLSLEY:   I apologize, but for

13   the record, can we make it clear that she's -- we're

14   now on the continuation page on Bates Garcia 001108?

15                  MR. GRIFFITHS:   Yes, thank you.

16        Q.    You tried to hold the gate so no more

17   inmates would get out.  Which inmates were you

18   trying to prevent from getting out?

19        A.    Whites and Hispanics, Mexican, Mexican

20   nationals.

21        Q.    Okay.  Were any black inmates trying to

22   get out as well?

23        A.    I didn't see any black inmates.

24        Q.    Okay.

25        A.    They were on the other side of the fence,

1  I mean, with me.

2      Q.   Approximately how many black inmates got

3  out through the open gate?

4      A.   I don't know.  I didn't count them.

5      Q.   You indicated that you used your handcuffs

6  to try to secure the gate.  I think that's a pretty

7  creative solution.  Is that one that you're taught

8  at the academy?

9      A.   No.

10     Q.   Ultimately, were you successful in using

11 your handcuffs to secure the gate?

12     A.   Yes.

13     Q.   Okay.  And that was your effort and

14 Sergeant Thompson's efforts to close the gate and

15 then secure it with your handcuffs?

16     A.   Our effort was to make sure that no other

17 inmates will get out and hurt the black inmates that

18 got out.  We were protecting the black inmates that

19 got out.

20     Q.   You secured the gate in an effort to

21 protect the black inmates that got out?

22     A.   Correct.

23     Q.   After the black inmates got out, did you

24 stop and talk with those inmates?

25     A.   I didn't have time to stop and talk to

1    those inmates.  There was another inmate that was

2    injured.

3         Q.    Where was that inmate at?

4         A.    In front of number twenty-nine on your

5    map.

6         Q.    Okay.

7         A.    On the dirt road.

8         Q.    Is that the one with the broken ankles or

9    the injured ankles?

10        A.    That's the one that was -- had blood all

11   over his face.  I can't tell you what his injuries

12   were because I'm not medical.  All I know, he was

13   about to pass out.

14        Q.    So you're at -- when you testified right

15   now, the effort was to secure the gate so that no

16   other inmates, white or Mexican or Mexican

17   nationals, would get out and hurt the black inmates?

18        A.    Correct.

19        Q.    And you testified that you know at least

20   one other inmate was injured.  And did you go tend

21   to that inmate?  Specifically, is he, like, included

22   in any of the rest of this paragraph?  Because we'll

23   come to him.

24        A.    He's included in the paragraph.

25        Q.    Okay.  What happened with the black

1    inmates that got through the open gate?

2        A.    I don't know.  I don't know what happened.

3    There were another group of inmates that got out of

4    yard two.

5        Q.    Okay.

6        A.    Half of that yard was out because they

7    were going to take them to DA1, to dining area one,

8    for chow when everything happened.

9        Q.    Okay.  And I see you marking on the map.

10   Where is dining area one?

11       A.    It doesn't have a number, but I will

12   circle it.  It's really close to number

13   twenty-seven, but it's not number twenty-seven,

14   because it's the dirt road, unless number

15   twenty-seven is supposed to be for that building.

16            MS. LOMBINO:  Give us a minute,

17   please.

18       Q.    And I just want to clarify.  I'm not

19   trying to ask another question.  That's dining area

20   one, you said?

21       A.    Correct.

22       Q.    Okay.

23            MS. LOMBINO:  Give us a minute,

24   please.

25            MR. GRIFFITHS:  Sure.

Minerette Jasso - November 29, 2018                    61

1        Q.    And so that I can be clear about what
2    you're describing, from yard number two there were
3    inmates that were out from yard two because they
4    were going to dining area number one, to DA1?
5        A.    They were supposed to be securing yard
6    two, but everything happened so fast at that time,
7    it was chow time.
8        Q.    Okay.
9        A.    It was a time when we used to take them to
10   eat.
11       Q.    Okay.
12       A.    And yard one and two, they go to eat to
13   DA1, dining area one.   Yard three and yard four go
14   to DA2.
15       Q.    And just so I'm clear, you marked DA2 on
16   the map, and that's approximately building number
17   thirty on that map?
18       A.    I don't have it in front of me right now.
19       Q.    Okay.
20              MR. GRIFFITHS:  Can I see the map,
21   too?
22              MS. LOMBINO:  Yes.
23              MR. GRIFFITHS:  Thank you.
24       Q.    So if I understand, yard two -- yards one
25   and two would have been turned out for dining, for

1    meals at dining area one and were being returned

2    from dining area one?

3          A.   I don't know where those inmates came

4    from.  All I know, it was a large group of inmates.

5          Q.   Okay.  But you believe that they came from

6    yard two?  They're inmates that were yard two

7    inmates?

8          A.   I know they came from yard two because

9    yard one doesn't go out the gate to go to eat.  The

10   only ones that go out the gate to go to eat are from

11   yard two.

12         Q.   That makes sense.  Thank you.  So you

13   unsecured the lock at the gate, and then the gate

14   was opened by somebody, and the black inmates ran

15   out, and then you and Sergeant Thompson made an

16   effort to secure the gate and were successful by

17   using your handcuffs to secure the gate?

18         A.   Yes.  We used the handcuffs to secure the

19   gate.

20         Q.   And you did so to prevent further injury

21   to the black inmates that got out through the gate?

22         A.   Yes.

23         Q.   Okay.  At the time that that happened, did

24   you know that there were inmates in movement from

25   yard two, either going to dining or for any other

1    purpose?  Did you know that there were inmates that

2    were in the central yard?

3         A.    They were coming towards us.  That's when

4    I pulled one of the inmates -- some of my coworkers

5    and I pulled an inmate into the education building,

6    the one that was injured, to protect him and make

7    sure he didn't get hurt more.

8         Q.    This is what you were talking about

9    before?

10         A.    Correct.

11         Q.    Okay.  But as far as your awareness or

12    knowledge that there were inmates from other yards

13    that were in the central area, at that time did you

14    know that there were other inmates from yard two or

15    yard one or yard four in the central yard?

16         A.    There was no one from yard four out.  That

17    yard was locked down.

18         Q.    Okay.

19         A.    Yard one was locked down.

20         Q.    Okay.

21         A.    Like I stated before, it was a group of

22    inmates coming from the direction of yard two

23    towards us.

24         Q.    Did you know that they were out there when

25    you opened the gate -- or I'm sorry -- when the gate

1    got opened?

2        A.    I didn't see them because I wasn't

3    focusing on them.

4        Q.    Okay.

5        A.    I saw the inmate that was injured, and I

6    went towards the inmate because one of my coworkers

7    was with that inmate.

8        Q.    Okay.

9        A.    Then I noticed the crowd rushing towards

10   us.

11       Q.    Understood.

12       A.    And that is when we grabbed the inmate and

13   took him into the education building, to make sure

14   he did not get any injured anymore.

15       Q.    Okay.

16       A.    We were protecting that inmate.

17       Q.    Sure.  Can I just ask you a question,

18   generally, about, like, the radios at the unit?

19   When you called an ICS, you said -- when I asked you

20   about the ICS, you said you call on the radio.  You

21   tell them details, like, your name, where you are,

22   and the situation as it developed, and you request

23   assistance.  Is that correct?

24       A.    Yes.

25       Q.    When you call an ICS over the radio, is

1    the radio traffic limited to just yard three, or,

2    more specifically, do other officers in the yard --

3         A.    Every yard could hear you if you are

4    paying attention to your radio and you have the

5    radio turned on to the right channel.

6         Q.    Okay.  And is that the standard procedure,

7    to have your radio on and turned to the channel that

8    you would be able to hear all of the yards?

9         A.    That is the responsibility of the

10   officers, to have the radio on the correct channel.

11        Q.    Okay.  And as far as I know, because you

12   had called an ICS and people responded to the ICS

13   over the radio, you had the radio turned on to the

14   right channel, correct?

15        A.    Yes, it was on the right channel.

16        Q.    Okay.  When -- in yard three in the

17   practices of yard three on that day, if you were to

18   turn out inmates to chow to go to dining area number

19   two, would you broadcast that on the radio?

20        A.    Yes.

21        Q.    Okay.  So there would be an announcement

22   from either you or COII Pacheco, 'cause you're the

23   yard officers, that you're taking the inmates from

24   yard two to the dining area two?

25        A.    Correct.

1        Q.    And that would be the same for yard two

2    inmates being sent up to chow at dining area number

3    one?

4        A.    Correct.

5        Q.    But your -- I just wanted to make sure no

6    inmates from yard two and yard three would be --

7    like, you do chow at different times for yard two

8    and yard three, right?

9        A.    Not at different times, within the --

10   within the same hour.

11       Q.    Okay.

12       A.    They just go in different directions.

13       Q.    But there's no commingling between yard

14   two inmates that are going to dining and yard three

15   inmates going to dining because they go different

16   directions?

17       A.    They go in different directions.

18       Q.    Okay.  But they don't commingle, right?

19       A.    They're not supposed to commingle.

20       Q.    Would you tell them not to commingle if

21   they were commingling?

22       A.    You just give them a ticket for being out

23   of place.

24       Q.    All right.

25       A.    If you need to.

1      Q.   All right.   In the time frame -- I know

2   you testified something to this before, and I just

3   want to go back to it, so please forgive me for

4   re-asking something I think you did answer.

5           But you were you already turning out --

6   you were returning inmates from chow at the time

7   that this began to occur, the disturbance began to

8   occur, correct?

9      A.   Correct.

10      Q.   And that aligns with yard two bringing

11   their inmates back in from chow as well?   It's the

12   same time frame, right?

13      A.   Not -- not the exact time.

14      Q.   Okay.   You said it's not the exact time.

15   If --

16      A.   It all depends on what time count cleared.

17   It all depends if the unit count clear or the

18   institutional count clear, which is all the complex

19   count clear.   If the count does not clear, inmates

20   do not turn out.

21      Q.   Okay.

22      A.   Sometimes it takes twenty minutes to clear

23   count; sometimes it takes a half an hour; sometimes

24   it's forty-five minutes.   If it's not clear within

25   an hour, then we have to do emergency count.

1    Q.    Okay.  So September 20, 2012 --

2    A.    It was a regular count.

3    Q.    Great.  So I just need -- I want to be

4    clear.  Yard two and yard three inmates could be at

5    chow at the same time?  They'd be turned out to chow

6    at the same time?

7    A.    They can be, but we would try not to have

8    them turn out at the same time.

9    Q.    Okay.  And why would you not try that?

10   A.    For the same reason, for safety reasons so

11   they wouldn't intermingle or start something between

12   the groups.

13   Q.    Okay.  After you -- after the lock was

14   unsecured and the gate was opened and the black

15   inmates ran out, did Sergeant Thompson go into yard

16   three?

17   A.    No one went back in yard three --

18   Q.    So --

19   A.    -- at that time.

20   Q.    Thank you.  So Sergeant Thompson, another

21   officer, and you were on the outside of yard three

22   after the gate was secured with your handcuffs?

23   A.    Correct.

24   Q.    Okay.  We're on the third page, and

25   it's -- the first sentence says, "I saw my

1    coworker."  Can you read that for me?

2         A.    "I saw my coworker, COII Pacheco, safe

3    with COII Puri in the control room."

4         Q.    Okay.  So COII Pacheco did not accompany

5    you to the gate, correct?

6         A.    No.

7         Q.    Instead, from this description, it seems

8    that COII Pacheco made his way back to the control

9    room?

10        A.    Yes.

11        Q.    Have you talked to COII Pacheco about what

12   happened when you went to the gate?

13        A.    Did I ever talk to him about it?

14        Q.    Yes.

15        A.    People talk about whatever happened, what

16   they saw --

17        Q.    Okay.

18        A.    -- but didn't really sat there and have

19   coffee and drank about it and talked about it in

20   details, no.

21        Q.    Okay, fair enough.  The next sentence, if

22   you would, please?

23        A.    "I was outside the fence of yard three."

24        Q.    And then you can continue on to the next

25   sentence.

1        A.    "Inmates that were inside yard three

2    started going into the cells, destroying property or

3    anything that they could get their hands on."

4        Q.    Okay.  And is that something that you

5    actually witnessed?

6        A.    I took a -- yes, I did.

7        Q.    Okay.  Did you see inmates -- well, let me

8    strike that.  I'll come back to that.  Now that you

9    were outside the fence of yard three, were you

10   surrounded by inmates at that time?

11       A.    Not at that time when I was outside the

12   fence.  That's when I saw COII Peralta next to an

13   injured inmate.

14       Q.    Okay.

15       A.    As I was turning around to my left, he

16   caught my attention.  But as I was turning around is

17   when I saw the inmates throwing TVs from the second

18   floor, the second tier of their cells --

19       Q.    Okay.

20       A.    -- and their objects.

21       Q.    So you had a few moments to look and to

22   see --

23       A.    Probably less than a minute.

24       Q.    Okay.

25       A.    I was too busy looking at my co-worker --

1      Q.    Okay.

2      A.    -- and the group of inmates that were

3  coming towards us.

4      Q.    Okay.  The inmates that were coming from

5  the direction of yard two?

6      A.    Correct.

7      Q.    What do you recall about those inmates

8  coming from yard two?

9      A.    They were rushing towards us.

10     Q.    Running towards you?

11     A.    Rushing towards us.  It could be running;

12  it could be walking fast.  It could be -- you know,

13  just rushing towards us.

14     Q.    Were they fighting amongst themselves?

15     A.    No.

16     Q.    The inmates that were coming from the

17  direction of yard two, were they of one race or was

18  it a mixed race group?

19     A.    Mixed race group.

20     Q.    Twenty-five inmates, thirty inmates?

21     A.    I didn't take the time to count them.  I

22  was looking at the inmate that was injured.

23     Q.    So you don't have an estimate as to the

24  number of inmates that were approaching?

25     A.    No.

1       Q.    How about the next sentence, I do want to

2  get to this, starting at "COII Peralta."

3       A.    "COII Peralta was next to an injured

4  inmate by the recreations shack, and there was

5  another inmate" -- "and there was another inmate

6  there injured."

7       Q.    Okay.  So COII Peralta was sitting with or

8  was tending to two inmates who may have been

9  injured; is that correct?

10      A.    Correct.

11      Q.    All right.  And how did COII Peralta get

12 your attention?

13      A.    He didn't get my attention.  I saw him

14 with the inmate full of blood.  That would get

15 anybody's attention, if you see an individual full

16 of blood.

17      Q.    Sure.  And so your reaction was to go over

18 and assist COII Peralta?

19      A.    My reaction was go and assist the inmate.

20      Q.    Okay.  When you went over to the inmates

21 and COII Peralta, what did you do?

22      A.    What my next sentence says.  "Some of my

23 coworkers, Inmate Brown and I moved the inmates into

24 the programs building."

25      Q.    Okay.  So you just immediately started

```
1   assisting those inmates inside the programs
2   building?
3         A.   We put them in the programs building.
4         Q.   Okay.
5         A.   That was the closest place that was a
6   secure area.
7         Q.   Okay.  I like it.  It's awesome.  And I
8   just want to be -- make sure I understand how this
9   all goes together.  Is the entrance to the programs
10  building, gate three, G3, that you marked on the
11  map?
12        A.   Yes.
13        Q.   So you had a key for that?
14        A.   Somebody had a key.
15        Q.   Okay.
16        A.   I did not open that.  One of my coworkers
17  opened the gate.
18        Q.   But you did or did not have a key?
19        A.   I don't recall if my key set had that key
20  for it.
21        Q.   Okay.
22        A.   All I know, there are two -- it was a
23  little gated area and a door, and we pulled the
24  inmates in there.
25        Q.   Okay.  Was Sergeant Thompson with you?  I
```

1   know that he's not listed here, but do you recall

2   him being with you?

3         A.   He was not with me at the time when we

4   were pulling the inmates in --

5         Q.   Okay.

6         A.   -- that area.

7         Q.   And you used the term, "some of my

8   coworkers."  Is that --

9         A.    I didn't remember how many were there.  I

10  think there were two or three that assisted.

11        Q.   Okay.  And that's why I'm asking about

12  Sergeant Thompson here 'cause it says, "some of my

13  coworkers," and you initially listed COII Peralta.

14  And I just want to make sure I know where he is

15  because I get to speak to him soon too.

16        A.   COII Peralta?

17        Q.   No, with Sergeant Thompson.

18        A.   He wasn't --

19        Q.   Sergeant --

20        A.   -- there.

21        Q.   When you wrote, "some of my coworkers,"

22  could it have been that other corrections officer

23  that was with Thompson on the outside of the gate?

24        A.    I believe it was Peralta.

25        Q.   It was just --

Minerette Jasso - November 29, 2018                    75

1        A.    It was Peralta and the kitchen officer,

2   but I don't recall his name, but the kitchen officer

3   was from DA1.  He was not from DA2, I know for a

4   fact.

5        Q.    How do you know that?  That's interesting

6   you know.  I just want to know, how do you know

7   that?

8        A.    Because he always worked DA1.  He never

9   worked DA2.

10       Q.    So this officer, do you know his name?  I

11  don't want to call him kitchen officer.  Do you know

12  his last name?

13       A.    I think it was Segura.

14       Q.    Okay.

15       A.    I'm not sure.

16       Q.    So -- and is it a COII that works in the

17  kitchens as well, COII Segura?

18       A.    Correct.

19       Q.    So he made it quite a ways down to be able

20  to assist you with these inmates as well, right?

21       A.    I would say half the yard.

22       Q.    Do you know of any reason that he would be

23  down that far?

24       A.    I didn't ask him.

25       Q.    Okay.  In a normal course of business,

1    would COII Segura or any kitchen officer have to get

2    down to this area between yards two and three?

3         A.    If the kitchen is secure --

4         Q.    Okay.

5         A.    -- and we need assistance, it's their

6    responsibility to respond.

7         Q.    Okay.  And these are corrections officers?

8    They're not -- they're corrections officers, right?

9         A.    Correct.

10        Q.    They're not third-party contractors

11   working --

12        A.    No.

13        Q.    -- the kitchen?  Okay.  It says, "some of

14   your coworkers", "Inmate Brown and I moved the

15   inmates."  And you've identified inmate Brown's

16   number.  Do you know inmate Brown?  And I'm just

17   asking from --

18        A.    I didn't --

19        Q.    -- working in the yards or something.

20        A.    I didn't know him.

21        Q.    Okay.

22        A.    If it's close to 180 something inmates per

23   yard, multiply it by four.  How many inmates are in

24   the whole yard -- in the whole unit, not the yard?

25   There's at least 180 something inmates per yard.

1      Q.     Okay.  And I'm sure inmate Brown --

2      A.     I knew his name because I asked him his

3   name.

4      Q.     Okay.

5      A.     I wanted to know the name of the inmates

6   that were with me.

7      Q.     Okay.  Was inmate Brown respectful to you?

8      A.     Yes, he was.

9      Q.     Awesome.  Did inmate Brown have any --

10  demonstrate any medical training with those other

11  injured inmates?

12     A.     It wasn't his job to aid any medical

13  treatment.  Inmates are not allowed to give other

14  inmates medical treatment even if they used to be

15  doctors or nurses or in the medical field before

16  they became inmates.  They are not allowed to do

17  that, and we're not allowed to let them do that.

18     Q.     So you didn't allow him to do anything to

19  help with those inmates except move them?

20     A.     He just made sure that we did what we were

21  supposed to do.

22     Q.     You said we made sure that we did what we

23  were supposed to do, or he made sure?  I'm sorry.  I

24  didn't hear that.

25     A.     The inmate made sure that we treated the

1    other inmates correctly.

2         Q.    Okay.

3         A.    He did not pick up an inmate, but he

4    assisted by opening the doors, holding the door so

5    we could bring the inmate in.

6         Q.    Okay.

7         A.    He assisted by making sure the other

8    inmates follow my instructions.

9         Q.    The next sentence, you describe, "Inmate

10   Mach or Mash was injured and bleeding from his mouth

11   and looked like he was going to pass out."

12        A.    Yes.

13        Q.    Did you offer inmate Mash any medical

14   care?

15        A.    My -- my main concern at that time was to

16   get his DOC number so I could identify who he was.

17        Q.    Okay.

18        A.    I kept asking him for his DOC number.  My

19   job at that time was to make sure he did not pass

20   out.  I needed his information.  I needed his DOC

21   number in order to be able to give that information

22   to medical so they will be able to get his escape

23   flyer so he would be treated and transported off the

24   unit, if needed.  And the way the inmate looked, he

25   needed to go out of the unit and get medical

1     attention somewhere else.

2          Q.   As just a follow-up, do you know, did

3     inmate Mash end up being transported off the unit?

4          A.   I'm sure he did, but I can't confirm it

5     and say he left off the unit.  At that time his

6     injuries were really bad.  I didn't give him any

7     medical attention.  The only thing I did was give

8     him paper towels, make sure that he put his own

9     pressure in the areas of his face, if he could.  But

10    my concern and my objective was for him not to pass

11    out.

12         Q.   Okay.  The next inmate, inmate Boak, who

13    was also injured, had a cut on his forehead and his

14    nose appeared broken.  What type of care did you

15    offer to inmate Boak?

16         A.   I went into the refrigerator, and there

17    was some ice, and I gave him some ice.

18         Q.   Was he able to speak with you?

19         A.   He was able to speak with me, and I could

20    say his nose appeared broken because it wasn't

21    straight.

22         Q.   Was he bleeding profusely?

23         A.   He was bleeding, and he stated he was in a

24    lot of pain from that area.

25         Q.   Yeah.  I've had forehead cuts.  Man, they

```
1   don't stop.  The next inmate, inmate Hughes, was
2   also hurt.  It appeared like both of his ankles were
3   broken.  And this was the fellow that you believe
4   was trying to hop the fence, the fence that's behind
5   the programs building?
6         A.   He stated that he climbed over the fence.
7         Q.   Did he state why he climbed over the
8   fence?
9         A.   He didn't state why.  He just said he
10  stated he climbed over the fence.
11        Q.   Okay.  Did he express how his ankles got
12  injured, why he believed they were broken?
13        A.   He just said he climbed over the fence and
14  jumped off and heard a noise in his ankles.  But I
15  asked him if he could stand up, and he said he
16  couldn't.
17        Q.   Okay.
18        A.   That's why we had to drag him into the
19  building.
20        Q.   What type of medical care did you provide
21  to him?
22        A.   I didn't provide any medical care to him.
23        Q.   Okay.  The next sentence, "Once inside
24  programs, I called main control to let them know
25  where I was with the injured inmates."
```

1      A.    "Where I was and how many inmates were
2   injured."
3      Q.    Oh, sorry.  I skipped a line there.  You
4   called main control using your radio?
5      A.    I was in a programs building.  I called
6   using the phone.
7      Q.    Okay.  And you reported your location and
8   how many inmates were injured?
9      A.    Correct.
10      Q.    The next sentence I want to get into a
11   little difference of the medical, part two.  "I also
12   called medical to give them the names and numbers of
13   the injured inmates."  Do you recall that
14   conversation when you called medical?
15      A.    Yes, I called medical.
16      Q.    Do you remember who you spoke with?
17      A.    I spoke with the medical officer.
18      Q.    Okay.  But you don't recall the medical
19   officer's name?
20      A.    I wouldn't be able to spell it either,
21   Petrick or Patrick.
22      Q.    Okay.  COII Petrick?
23      A.    Patrick or Petrick, I always mispronounce
24   his name.
25      Q.    Sure.  Do you recall your conversation

1    with COII Petrick?

2         A.    I just told him I'm in the education

3    building.   I have these four inmates, inmate

4    so-and-so, gave his number; inmate so-and-so, gave

5    his number, inmate so-and-so, gave his number.

6         Q.    Do you recall what he said after you

7    provided that information?

8         A.    I told him we need medical and we need

9    medical soon, fast.

10        Q.    Okay.   And what was his response, if any?

11        A.    He didn't respond.   He just said we'll try

12   to get help to you as soon as we can.

13        Q.    Okay.   Inmate Brown was also in the

14   programs building, but he was not injured, which you

15   established before, and, if anything, he was just

16   being helpful to you and to COII Peralta.

17        A.    Peralta was not in that building.   It was

18   just me.

19        Q.    Did COII Segura stay with you?

20        A.    No one stayed with me.   It was just me.

21        Q.    Okay.   The next sentence actually does

22   have a time stamp, so we should talk about it.   "At

23   1810 hours four medical officers were on site."   So

24   that puts it at 6:10 p.m., four medical staff were

25   on site.   When you say medical staff were on site,

1    does that mean that they were in with you in the

2    recreation room?

3         A.    Yes.

4         Q.    Okay.  And where they began to tend to the

5    injured inmates?

6         A.    Yes.

7         Q.    It says at 1810 hours, and that's a

8    specific time frame reference.  At this point did

9    you have the opportunity to look at your watch?

10        A.    I did look at my watch.

11        Q.    Okay.

12        A.    And when medical staff walked in, one of

13   them wanted to take care of me, and I told him not

14   to worry about me, to take care of the inmates

15   first.

16        Q.    Yeah.  It took assistant deputy warden to

17   get you to take care of your arm, right?

18        A.    Correct.

19                  MS. LOMBINO:  Need a break?

20                  THE WITNESS:  No, I'm good.  Thank

21   you.

22        Q.    I thought it was very -- in your report

23   you didn't mention the arm until the very end, where

24   you injured your arm, I think.  So how did you

25   injure your arm?  What happened?

1        A.    I do not recall how I injured my arm.

2        Q.    Do you recall about when it occurred in

3   the short --

4        A.    I did not know that I had injured my arm

5   until the deputy warden -- until I returned to yard

6   three, and I saw ADW Days.

7        Q.    Did you go to complex medical to have it

8   looked at or they take you to the hospital?

9        A.    She walked me to the medical unit at our

10  unit.

11       Q.    And from there, did you go to the hospital

12  or --

13       A.    From there -- from there I went back to

14  the yard.

15       Q.    Okay.

16       A.    After going back to the yard, I got

17  interviewed by CIU.  Then I wrote my report; then I

18  went to the hospital.

19       Q.    Okay.  Was there a objective injury to

20  your arm?  What was the diagnosis for your arm

21  injury?

22       A.    The hospital didn't even treat my arm.

23  Only treatment I received was from medical at the

24  unit.

25       Q.    And that was the medical care provided at

1   the time by Wexford Health Services -- or Health

2   Sources?

3          A.   I don't know who it was.

4          Q.   Okay.  One question I did have, you just

5   answered, was you spoke to CIU.  Did you speak to

6   any other investigating agencies?

7          A.   No.

8          Q.   Did you give any recorded statement to

9   anybody, like where they would have recorded it or

10  videoed you?

11         A.   I'm not sure if CIU did record it.  I

12  can't tell you yes or no.

13         Q.   Okay.

14         A.   I know I was interviewed by them.

15         Q.   Okay.  And were you interviewed on that

16  day, on September 20th?

17         A.   Yes.

18         Q.   Okay.  We had a brief conversation about

19  the inmates that would turn out for meals between

20  yards three and yard two.  Are there other occasions

21  where inmates are not -- where inmates are walking

22  around in the central rec area?

23         A.   What do you mean, the central rec area?

24         Q.   Well, thank you.  I'm talking about, like,

25  the big, I guess, recreation area in front of yards

1    one, two, three, and four has -- it's the baseball

2    field.

3         A.    If you see this, this is a dirt road.

4         Q.    Okay.

5         A.    It goes all the way around.

6         Q.    Okay.

7         A.    It's a dirt road where inmates walk, staff

8    walks.

9         Q.    Okay.

10        A.    The center piece that you're talking

11   about, there's no way the inmates could walk through

12   there because it was -- I don't know if it still is

13   now, but at that time it was a recreational area

14   that was fenced.

15        Q.    Okay.

16        A.    You could not get in there unless an

17   officer unlocked the lock, opened the gate for you

18   to get inside.

19        Q.    Where's the -- the baseball field is in

20   front of -- you testified to this; I'm just

21   repeating it now at this point.  The baseball field

22   is in front of yards three and four?

23        A.    Correct.

24        Q.    Okay.  Is there a fence around the

25   baseball field at the time?

1          A.    Not a -- not a gated fence or a fence as
2    high -- as tall as someone's height.
3          Q.    Okay.
4          A.    It was a small fence.
5          Q.    For, like, marking home runs or something,
6    the baseball field?
7          A.    Well, you have the regular home base fence
8    behind it.
9          Q.    Uh-huh.
10         A.    And then you have the dugouts.
11         Q.    Okay.  And those are fenced as well, is
12   what you're saying?
13         A.    Correct.
14         Q.    And then there's a small fence in the
15   outfield?
16         A.    Yes.
17         Q.    But you don't have to have a key --
18         A.    No.
19         Q.    -- to get into that baseball field?  You
20   can just kind of walk around that little fence to
21   get into it?
22         A.    Yes.
23         Q.    Okay.  So to go back to my question, I'm
24   just kind of generically calling it the rec area,
25   the baseball field, the fenced recreation.  And by

1    the way, while we're at it, what is that other third

2    area that's numbered ninety-four, what is that?

3         A.    Ninety-four?

4         Q.    Yeah.  It's the weird-shaped one right

5    there.  What's in that area?

6         A.    I think that was still part of the big

7    large reaction field.

8         Q.    Okay.  So you think that was fenced as

9    well?

10        A.    Yes.

11        Q.    Okay.  So I think collectively I'll just

12   call it the recreation area, the baseball field and

13   that -- that section.  Are there times in your

14   experience at that -- back in 2012 where inmates

15   that are not being turned out to meals would walk

16   through that central area?

17        A.    Again, they wouldn't walk through that

18   central area.

19        Q.    Okay.  Do you --

20        A.    They would use the dirt road to walk

21   around that area.

22        Q.    Well, let me just ask then, there's small,

23   little looks like walkways through the middle of

24   those three field areas.  Are those part of the dirt

25   walkways that inmates would use?

1      A.    There's only one walkway, this -- the one

2   next to --

3      Q.    Okay.

4      A.    -- the baseball field.  Everything else

5   was a big recreation area.

6      Q.    Okay.  But you said there was --

7      A.    A fenced recreation area.  If you go

8   around the fenced recreation area, that's a dirt

9   road.

10     Q.    Okay.  Do inmates use the dirt road?

11     A.    Yes.

12     Q.    Do they walk around unattended, with

13  corrections officers?

14     A.    They walk when they go to the -- another

15  education building that's close to the sergeant's

16  office.  They walk when they were called to the --

17  to the yard office, which is the sergeant's office

18  or accountability --

19     Q.    Okay.

20     A.    -- or when they went to religious

21  services, to visitation.

22     Q.    And medical, as well?

23     A.    And medical, as well.

24     Q.    So there's an occasion for other inmates

25  to be out in that area, either on the road or in

1    those walkways?

2         A.    Correct.

3         Q.    Okay.  And you knew that before, 'cause

4    you worked there for several years before the

5    disruption?

6         A.    Before the disturbance, yes.

7         Q.    Disturbance.  And when you unsecured the

8    lock from the gate, was it the intent to let the

9    black inmates out then?

10                    MS. LOMBINO:   Asked and answered.

11        A.    No.

12        Q.    Since the events on September 20th, 2012,

13   have you been in any other race disturbances like

14   that?

15        A.    No.

16        Q.    Okay.  At the time that the -- that you

17   unsecured the lock to the gate, the intent -- if it

18   wasn't to let the black inmates out, it was to let

19   Sergeant Thompson and another correction officer

20   into the yard?

21        A.    That was the intent at first.

22        Q.    Okay.  Would Sergeant Thompson have been

23   able to access G3, to come in through the

24   recreations room -- or the programs room?

25        A.    I don't know if his key set had the key to

1    go through there.

2         Q.    Do you know if he would have been able to

3    access G2?

4         A.    That one, I don't think so.

5         Q.    Okay.

6         A.    His key set doesn't have those big keys to

7    open those gates.

8         Q.    Okay.  Did you indicate -- I'm kind of --

9    I don't know if I remember this -- gate three, does

10   it require keys or can that be opened through the

11   control room?

12        A.    Gate three is the one by the programs

13   building.

14        Q.    Right.

15        A.    That cannot be opened by the control room.

16        Q.    Which outside -- which gate into yard

17   three would be controlled -- would be accessible or

18   openable by the control room?

19        A.    The one that I labeled G2.

20        Q.    Okay.  So if you were unable to unsecure

21   the lock for whatever reason, Sergeant Thompson or

22   other responders would have been able to go to G2

23   and have the control room operator to open the gate?

24        A.    If it was safe to open the gate.

25        Q.    Sure.  Having been in the Department of

1    Corrections for the length of time that you have,

2    are there a set of rules that address or

3    departmental orders that address how to handle

4    disturbances with large groups of inmates?

5         A.   There's a lot of departmental orders that

6    address inmates' behavior.

7         Q.   Do any of them address race disturbances?

8         A.   There's a lot of department orders that

9    address inmates' behavior.

10        Q.   Okay.  Are there any departmental orders

11   that indicate it's okay to open the gate during --

12   from one area where inmates are in a disturbance to

13   an area where they're not a safe or a secured area?

14        A.   There's nothing that specifies about a

15   gate.

16        Q.   Or any access point?

17        A.   I'm trying to think, 'cause there are too

18   many department orders.

19        Q.   I tend to agree with you on that, but I'm

20   just wondering if you know of any regarding -- that

21   would control whether it's appropriate or

22   inappropriate to open a gate or any access point.

23        A.   There's nothing in the department orders

24   that talks or specifically written about any gates.

25        Q.   And access points?  I'm using that term

1  very generic because I know there's gates and then

2  there's going to be sally ports, and there's going

3  to be any number of entry points into a yard.  And I

4  realize what you're saying about the gates, but is

5  there anything about any other entry points?

6                MS. LOMBINO:  Objection, form.

7                MR. GRIFFITHS:  You can answer.

8       A.    Repeat the question one more time.

9       Q.    Is there any departmental order that

10  covers or outlines what should be done to not open

11  or open an entry point during a disturbance, an

12  inmate disturbance?

13      A.    There's nothing in the department orders

14  that specifies anything about gates or entries.

15      Q.    Any other entry points?

16                MS. LOMBINO:  Objection, form.

17      Q.    And the other thing is, if you don't know

18  and you say, "I don't know if there's a departmental

19  order," that's fine.  I can take that as an answer.

20  I want to know what you know about the departmental

21  orders --

22      A.    There's nothing that specifies specific

23  gates.

24                MR. GRIFFITHS:  Maybe I can take five

25  minutes?  I'd like to maybe take a look at my notes

1    and see if I can whittle things down a little bit.

2

3                (Recess from 12:01 p.m. to 12:14 p.m.)

4

5           Q.   I have a few more questions.  We'll go

6    back on the record.  Back on the record, how well do

7    you know Sergeant Thompson?

8           A.   How what?

9           Q.   How well do you know Sergeant Thompson?

10          A.   We worked together at another unit before

11   he became the supervisor.

12          Q.   So you worked with him as a COII?

13          A.   Correct, before he promoted.

14          Q.   And then so how long would you say that

15   you worked with him?

16          A.   I wouldn't be able to count the years.  At

17   least maybe two years as officers and couple of

18   months as a supervisor.

19          Q.   Okay.  And initially I asked how well do

20   you know him.  I know you said that you worked with

21   him --

22          A.   Hm-hmm.

23          Q.   -- but how well do you think you know him?

24          A.   What do you mean?

25          Q.   Well, is he married?

1    A.    Yes.

2    Q.    Does he have kids?

3    A.    Yes.

4    Q.    I'm not going to ask what they are, but do

5    you know his kids' names?

6    A.    No, not off the top of my head.

7    Q.    Okay.  I'm just trying to figure out maybe

8    how well you know him, trying to define that a

9    little bit.  Did you work the same shifts as

10   Sergeant Thompson or different shifts?

11   A.    When we worked together in Winchester, we

12   worked the same shift.

13   Q.    And on September 20th, 2012, he was a

14   sergeant?

15   A.    Correct.

16   Q.    Is he sergeant at the Santa Rita unit or

17   just over yard three?  How does that work?

18   A.    He's a sergeant for the whole unit.

19   Q.    Okay, fair enough.  How long, if you know,

20   has he been a sergeant?

21   A.    I don't know.  I didn't count the months

22   or the days or the years he was a sergeant.  All I

23   know, he was by himself that day.

24   Q.    Okay.  Was he a relatively new sergeant?

25   Having worked with him on a shift as both COIIs and

Minerette Jasso - November 29, 2018                96

1    then knowing that he got promoted, do you know if it

2    was very long before --

3        A.   I don't recall.  I didn't keep track of

4    his DOC career.

5        Q.   Do you have any professional disagreements

6    with Sergeant Thompson?

7        A.   No.

8        Q.   So if he asked you to do something, you

9    would do it?

10       A.   I trust him with my life, if that's what

11   you want to know.

12       Q.   Kind of getting around to that.

13       A.   If I didn't agree with something, I would

14   tell him --

15       Q.   Okay.

16       A.   -- even though he was my supervisor, but

17   that's just the person that I am.

18       Q.   Sure.  Whose idea was it for him to come

19   to the gate?

20           MS. LOMBINO:  Objection, calls for

21   speculation.

22           THE WITNESS:  Do I answer?

23           MS. LOMBINO:  If you can.

24       A.   Whose idea?  I don't read his mind.

25       Q.   Did he tell you to come to the gate?

1      A.   Even if you don't work in the department

2  and you look -- and you use logical sense, you know

3  that one of the gates needs to be popped open,

4  right, from the control room.  The other gate, you

5  have to have a key to unsecure it and get through

6  it, right?

7      Q.   Right.

8      A.   So which gate would you use?  If

9  everything was going off around you, which gate

10  would you use?

11      Q.   Are you asking me?

12      A.   Yes.

13      Q.   Gate three, but that's just me.

14      A.   Gate three go through the programs

15  building?

16      Q.   Sure, and I have an answer for that.  But

17  I'm asking you questions.

18      A.   Hm-hmm.

19      Q.   So did Sergeant Thompson ask you to meet

20  him at the gate?

21      A.   He didn't ask me what particular gate to

22  meet him at.

23      Q.   All right.  So when you saw him

24  approaching from a distance, you just met him at the

25  closest gate?

1      A.   I met him at the closest gate that I could

2  get through, that I could -- they could get through,

3  if they needed to come in the yard.

4      Q.   Okay.  Was it his idea to open the gate?

5      A.   Yes.

6      Q.   Did he tell you to open the gate?

7      A.   He said to open the gate.

8      Q.   And you did not do that?

9      A.   I unlocked the gate.

10     Q.   I understand you unsecured the gate, to

11  use your terms.

12     A.   Correct.

13     Q.   But he told you to open the gate, correct?

14     A.   But I knew what he meant.  He didn't mean

15  to open the gate, have it wide open.

16     Q.   Okay.

17     A.   He meant to unsecure the gate.

18     Q.   So he used an imprecise term.  We've been

19  very precise; I've been corrected several times on

20  this, but I just want to make sure I understand.

21  When he says -- tells you to open the gate and

22  you're saying, I interpreted that as, oh, he meant

23  to unsecure the gate, why would he have you unsecure

24  the gate?

25     A.   I don't know.  That's a question you might

1    have to ask him.

2         Q.    It will come up, but I'm asking you

3    because there are three people right there, plus a

4    bunch of rioting inmates or disturbing inmates.  So

5    I guess I'm asking you, did he tell you to open the

6    gate, open the gate?

7         A.    He did say open the gate.  I'm not going

8    to lie, especially I'm under oath.

9         Q.    Thank you.

10        A.    He told me open the gate.

11        Q.    Okay.  And --

12        A.    I unsecured the gate --

13        Q.    And then --

14        A.    -- the lock.

15        Q.    -- did you -- and then after you unsecured

16   the gate, did you continue watching the lock?

17        A.    No.  I'm not the lock's babysitter.  No, I

18   was not watching the lock.

19        Q.    Okay.  Did you watch Sergeant Thompson?

20        A.    Did I watch what he was doing?

21        Q.    Yes.

22        A.    No.

23        Q.    Did you turn around to leave, to watch the

24   inmates?  What did you do after you unsecured the

25   gate?

1     A.     Everything happened so fast.  I can't tell
2  you, oh, I stood there for a minute and looked at
3  what the inmates were doing.  Oh, I was too busy
4  making sure that I didn't get assaulted or get
5  runned over.  Oh, I was looking at my partner that
6  was dealing with the inmate with the blood.  I can't
7  tell you what happened in that second or that
8  minute.
9     Q.     But you are saying that you didn't watch
10  Sergeant Thompson?
11     A.     I didn't watch what he was doing.
12     Q.     Okay.  I think in one of the reports that
13  I was looking at I saw the name COII Runge.
14     A.     Runge.
15     Q.     Runge, okay.  Thank you.  Was COII Runge
16  with Thompson?  Does that refresh your memory as
17  to --
18     A.     I know he was around there, but I wasn't
19  looking at what he was doing, either.
20     Q.     Okay.  I'm just asking if you recall it
21  being COII Runge.
22     A.     Yes.  He was around there, but I don't --
23  I don't recall seeing what he was doing.
24     Q.     Okay.  But he was the other officer that
25  was with Thompson?

1    A.   I don't know if he was the other officer

2    that was with Thompson or Peralta was the other

3    officer with Thompson.

4        Q.   Okay.  But your testimony about Peralta is

5    after you went through the open gate and you secured

6    the gate with your handcuffs, closing the inmates

7    in, you looked to your left and you saw Peralta with

8    injured inmates?

9        A.   Yes.

10       Q.   So just -- I know we can't establish time

11   'cause you weren't looking at your watch, but how

12   long -- I mean, was there time for -- if it was

13   Peralta with Thompson, would that have been enough

14   time for him to go and begin giving aid to the

15   inmates that are injured, that one inmate that was

16   injured?

17       A.   I can't answer that question.

18       Q.   Okay.

19       A.   I don't know.

20       Q.   When you secured the gate with Thompson,

21   was the other officer with you?

22       A.   It was just Thompson and I.

23       Q.   So the other officer, whoever it was, went

24   someplace else?  He didn't go inside yard three?

25       A.   No.  No officers went inside yard three.

1    Q.   Okay.  Did you agree with the decision to
2    unsecure the gate?
3    A.   Are you asking me if I would change
4    anything of that day of what I did?  The answer is
5    no.
6    Q.   Okay.  Well, that wasn't the question, but
7    did you agree with the decision, the order to
8    unsecure the gate?
9    A.   Yes.
10   Q.   You --
11   A.   I did agree.
12   Q.   Okay.  You would agree then also that it
13   was proper for the gate to be opened?
14   A.   It's proper for the gate to be unsecured
15   so people could go in or get out.
16   Q.   Okay.  When you unsecured the gate, you
17   knew that it could be opened then at that point,
18   right?
19   A.   It would have to go through me in order to
20   open it.
21   Q.   But you knew that it could be done, and
22   that's not necessarily true.  I mean, somebody
23   behind you opened it, behind the fence, right?  So
24   you knew that by unsecuring the gate, that the gate
25   could be opened, unsecuring the --

1        A.    Unsecuring the lock.

2        Q.    I'm sorry, unsecuring the lock -- we'll be

3   precise -- that the gate could be opened?

4        A.    Any gate that has an unsecured lock could

5   be opened.

6        Q.    Right.  And you know that there'd be a

7   risk that the inmates who were rioting would be able

8   to go out?

9        A.    There was a risk that I could go out in a

10  gurney if I didn't step outside that gate.

11       Q.    Yes.

12       A.    There was a risk that the black inmates

13  could have gone out in a gurney if they didn't walk

14  out of that gate.  There's a lot of risks.  You're

15  never going to understand unless you were there

16  yourself.

17       Q.    And there's a risk that there would be

18  maybe inmates that were outside in the yard, the

19  common area, on the roadway or the walkways, coming

20  back from meals on yard two, or walking back from

21  complex medical, those inmates could also be injured

22  if inmates from yard three got out, the rioting

23  inmates?

24            MS. LOMBINO:  Objection, form,

25  speculation.

1      Q.    You can answer.

2      A.    I don't know.  I don't know what the

3    inmates would do once they got out.

4      Q.    That wasn't the question.  The question

5    was if you knew that there would be a risk that

6    they're --

7      A.    They're in prison.  There's always a risk.

8    It doesn't matter if there's disturbances going on

9    or not.  There's always a risk that inmates will get

10   injured.  There's always a risk that staff will get

11   assaulted.  There's always a risk, no matter what.

12     Q.    But that risk of inmates leaving yard

13   three to assault inmates or staff or to get in

14   fights or cause trouble would be minimal or nil if

15   the lock was secured?

16               MS. LOMBINO:  Objection, form,

17   speculation.

18               MR. GRIFFITHS:  That's not

19   speculative.  That's a pretty direct thing, but she

20   can answer.

21     A.    Like I stated before, there's always a

22   risk that staff or inmates could get assaulted on a

23   daily basis.

24     Q.    But that risk is high end if you unsecure

25   a lock?

```
 1        A.    There's always a risk --

 2        Q.    Yes or no?

 3        A.    -- that officers could get hurt on a daily

 4    basis.

 5        Q.    Yes, but that --

 6        A.    And inmates could get hurt on a daily

 7    basis.

 8        Q.    Risk is heightened if there's an unsecured

 9    lock, correct?

10        A.    I can't answer for the inmates' behavior

11    and their actions.  I don't know what they could do.

12    They could choose not to hurt anybody even if that

13    lock is open.

14        Q.    Just on a --

15        A.    They could choose to hurt someone if that

16    gate is open.  I cannot control their behavior.

17        Q.    Yes, you can, right, if you did not

18    unsecure a lock?

19        A.    Can you control a person's behavior?  The

20    answer is no.

21        Q.    Well, but --

22              MS. LOMBINO:  Objection.  Counsel,

23    you're arguing with the witness, and I'm going to

24    direct her not to answer.

25              MR. GRIFFITHS:  Ultimately, I think
```

1    what we're -- she's not answering the questions, so

2    I have the right to be able to ask the question.  I

3    keep asking really the same question.

4                    MS. LOMBINO:  Well, then it's asked

5    and answered.  I'm going to ask you to move on.

6                    MR. GRIFFITHS:  Okay.

7                    MS. BARNES:  Excuse me.  This is

8    DeeAnn on the phone.  I don't know if anything

9    changed, but I've had a somewhat garbled --

10                   MS. LOMBINO:  You're coming across

11   garbled now.  You know, you're coming across kind of

12   garbled now.  We haven't changed anything on our end

13   here.

14                   MR. DUNN:  Yeah, this is Brian.  It

15   sounds like DeeAnn because I can hear the deposition

16   fine.

17                   MS. LOMBINO:  And you're coming

18   across very clearly, too.  DeeAnn, do you want us

19   to -- maybe we should disconnect and try to connect

20   with both of you again?  Or, I guess, Brad, you stay

21   on the line.  DeeAnn, do you want to hang up and

22   we'll conference you back in again, see if that

23   corrects the problem?  Hello?  DeeAnn?  Brad, are

24   you still with us?

25                   MR. DUNN:  I am here, yeah.  Why

1    don't you just go ahead and disconnect?

2

3              (A discussion off the record took place.)

4

5        Q.    So I want to take a step back, and so I'll

6    apologize for getting tense 'cause I kind of get

7    that way, and I'm sorry if I made you feel

8    uncomfortable.  I do have some tough questions to

9    ask, so I don't want it to be where it's

10   confrontation and I hear the same answer, but -- and

11   I understand that you work with these folks, and you

12   work in a very tough environment.

13             Was the point of unsecuring the gate and

14   maybe unsecuring the lock and then opening the gate,

15   was it to get officers in or was it for you to be

16   able to get out?

17       A.    The first objective was to get officers

18   in.

19       Q.    Okay.  And did that change, though?

20       A.    With the actions of everybody around, yes,

21   it did.

22       Q.    Okay, fair enough.  I think with a bunch

23   of -- I know we don't use the term, but rioting

24   inmates, I might understand that.  But you're saying

25   you don't know if Sergeant Thompson opened the gate?

1          A.    I don't know if it was him or the officer
2     that was with him.
3          Q.    Was not you, we know.  And it was not any
4     other inmates, who would have had to go around you,
5     right?
6          A.    Not around.
7          Q.    Or through you?
8          A.    Correct.
9          Q.    Are you aware if anybody died that day?
10         A.    No.
11         Q.    You are not aware or --
12         A.    No, I know that nobody died that day.
13    That's something that we would have been informed
14    of.
15         Q.    Okay.  Maybe what I'd do is just read to
16    you from this report, and I just have questions, see
17    if it refreshes your memory.  This is Sergeant
18    Thompson.  This is Bates labeled document, ADC
19    Garcia 1074, and it's Sergeant Thompson's report
20    from that day.
21                MR. GRIFFITHS:  I guess we should
22    just put it in as an exhibit.
23
24         (Exhibit 3 was marked for identification.)
25         Q.    Exhibit 3 has been handed to you.  I'll

1    have you take a look at it, but what I'll tell you

2    beforehand is this is Sergeant Thompson's report

3    about the incident.  And part of it is like a copy

4    and paste.  It looks like the top part has been

5    copied down into the bottom part.

6              You have a chance to take a look at it?

7    The only part that I think I would ask about would

8    be, it's the paragraph it's about three-quarters of

9    the way down.  It starts, "At 1713," and these are,

10   of course, Sergeant Thompson's words, and this is

11   only meant to see if, you know, his -- his take on

12   events is something that would cause you to remember

13   if COII Runge was the other officer that was with

14   him.

15             He's listed COII Jasso, Runge, and Pacheco

16   as the four -- and him as the four people that were

17   there at yard three.  Does that refresh your memory

18   at all?

19        A.    Runge was not inside yard three.

20        Q.    Okay.

21        A.    It was just Pacheco and I.

22        Q.    Okay.  But is it possible COII Runge was

23   with him on the outside of the gate at yard three?

24        A.    It's possible, but I can't say yes or no.

25        Q.    Okay.  In COII Runge's report, he

1   mentioned that -- he writes, "I had noticed it was
2   the whites and Mexican inmates fighting the blacks.
3   The white inmates saw the gate was open and started
4   to the run out.  COII Jasso and Sergeant Thompson
5   were holding the gate.  One black inmate yelled
6   'Rush the gate.'
7          "I immediately gave a direct order to get
8   back, and the inmates did not comply.  I then
9   deployed more chemical agents to contain the inmates
10  in the yard.  The black inmates managed to force the
11  gate open and continued to chase the white and
12  Mexican inmates to the front of the rec shack."
13         So I was going to ask, when you and
14  Sergeant Thompson were trying to secure the gate,
15  did you at some point almost have it secured and the
16  black inmates pushed through, or did the black
17  inmates get out the gate and then you pushed to
18  secure it?
19      A.    Everything happened fast, but what I
20  recalled --
21      Q.    Hm-hmm.
22      A.    -- the black inmates got out, and we
23  pushed the gate so no one else would get out.
24      Q.    Okay.  And to your recollection did -- and
25  you secured the gate with your handcuffs, which we

1   have established.  But did the gate get opened again

2   after that?

3        A.   No.

4        Q.   Okay.  He also wrote, COII Runge also

5   wrote, "Inmates were assaulting inmates.  Inmates

6   were using weapons on inmates, mops, brooms,

7   crutches, canes, rocks, TVs, boots.  I observed COII

8   Jasso running for the gate and COII Pacheco getting

9   swarmed by inmates."

10            Is that consistent with the inmates

11   fighting and using weapons and hurting one another?

12       A.   I can't say yes because I wasn't paying

13   attention to what they were using.  I already told

14   you.

15       Q.   Okay.

16       A.   All I know, that they were hurting each

17   other.

18       Q.   I know you testified earlier like a broom

19   handle or mop handle --

20       A.   That was the one thing --

21       Q.   Okay.

22       A.   -- one inmate that I saw.

23       Q.   You didn't see any crutches getting used

24   as weapons?

25       A.   It's not funny, and, no, I didn't.

1      Q.   Did you see any socks with rocks?

2      A.   No, not myself.  No, I didn't.

3           MR. GRIFFITHS:  I don't think I have

4  any more.  Thank you.

5           MS. LOMBINO:  I need another little

6  break.  I'm sorry.

7           MR. GRIFFITHS:  Sure.

8

9           (Recess from 12:40 p.m. to 12:45 p.m.)

10

11          MS. LOMBINO:  Do you have any

12 questions?

13          MS. ILLSLEY:  I don't have any

14 questions from Corizon.

15          MS. LOMBINO:  Brad, any questions?

16          MR. DUNN:  No, I have no questions.

17          MS. LOMBINO:  And, DeeAnn, any

18 questions?

19          MS. BARNES:  No.

20          MS. LOMBINO:  Officer Jasso, I just

21 have a few.

22

23                   EXAMINATION

24 BY MS. LOMBINO:

25     Q.   Mr. Griffiths was asking you about ADC

1  policies that relate to responding to a disturbance.

2  Does ADC have any employees who are specifically

3  trained to respond to disturbances like those on

4  September 20th, 2012?

5        A.   We have what we call TSU, which is

6  tactical support unit.

7        Q.   And does the tactical support unit have

8  any specialized training?

9        A.   I know they do, but I can't really specify

10  what kind of training they receive because I'm not

11  part of the support -- the support unit.  But I know

12  they are the support unit that we called when

13  there's disturbances.

14        Q.   So you yourself were not a member of the

15  tactical support unit in 2012?

16        A.   No.

17        Q.   Have you ever been a member of the

18  tactical support unit?

19        A.   No.

20        Q.   Now, you said you sustained an injury to

21  your left arm --

22        A.   Yes.

23        Q.   -- during the incident.  And -- but you

24  don't recall how that happened?

25        A.   No.

1      Q.    Do you have any permanent injury as a

2   result of what happened on September 20th, 2012?

3      A.    I still have the scar.

4      Q.    May we see the scar?

5      A.    It's almost gone.  It's been six years.

6      Q.    It's this C-shape; it's about six inches,

7   would you say?

8      A.    Yes.

9      Q.    But you have no recollection how that

10  happened --

11     A.    No.

12     Q.    And you testified, I think, that you went

13  to off premises after giving your report to have the

14  scar attended to; is that correct?

15     A.    I was taken to Banner University south

16  campus hospital, the one off the highway.

17     Q.    All right.  And then you returned to --

18  you returned to the yard that same evening, after

19  being seen by --

20     A.    After seen by medical, we went back

21  because the sergeant and the officer that were part

22  of CIRT, which is the critical incident response

23  team, they're more there for support.  We went back

24  to the yard to pick up their belongings.  Then after

25  that, I went home.

1      Q.   Do you know if anybody who was on the

2    yard on -- well, the whole -- when I say the yard, I

3    mean the Santa Rita unit.  Do you know if anyone who

4    worked for ADC on that date, September 20th, 2012,

5    was a member of the tactical support unit?

6      A.   Sergeant Thompson.  Sergeant Thompson is a

7    member -- at that time was a member of the tactical

8    support unit.

9      Q.   Did you receive any recognition from ADC

10   for your actions on September 20th, 2012?

11     A.   Yes.  I received a lifesaving award.

12     Q.   And have you received any other awards

13   from ADC during your tenure as an employee there?

14     A.   My twelve years, which would be twelve

15   years.  Yes, I received, as officers, officer of the

16   month, officer of the quarterly; as a supervisor,

17   supervisor of the month, supervisor of the

18   quarterly, supervisor of the year.  I received a

19   letter from the governor at that time.

20     Q.   And what was the letter related to?

21     A.   The disturbance and the actions in the

22   disturbance that I took.

23     Q.   Have you ever been disciplined as an

24   employee at the Arizona Department of Corrections?

25     A.   No.

1              MS. LOMBINO:  I have nothing further.

2              MR. GRIFFITHS:  I do have a couple of

3    follow-ups, at least one follow-up question.

4

5                       EXAMINATION

6    BY MR. GRIFFITHS:

7         Q.   So you just testified that you don't have

8    any specialized training, like tactical support unit

9    training?

10        A.   Right.

11        Q.   That's correct, okay.  But it's reasonably

12   foreseeable that a COII working in Santa Rita unit

13   yard three would be considered a first responder for

14   an inmate disturbance and would need to know what

15   are the appropriate policies or the appropriate

16   actions to take in terms of opening gates and/or

17   points of entry?

18             MS. LOMBINO:  Objection, form,

19   compound question.

20        A.   We are trained in CPR.

21        Q.   Okay.

22        A.   We're trained in removing inmates from a

23   bunk, if they're on an upper bunk.  We're trained

24   in -- some of us, not all of us, are trained in

25   motivational interviewing, which is the way you

1  interact and speak with inmates to diffuse

2  situations.  At that time I did not have that

3  training, but now I do.  There's a lot of other

4  different types of training that we have when it

5  comes to interacting with inmates.

6       Q.    But as far as the tactical support unit

7  and training, first of all, you're not a member of

8  tactical support unit, right?

9       A.    I'm not a member of the tactical support

10  unit.

11      Q.    Have you received that training?

12      A.    You are not -- you do not receive that

13  training unless you go through the interview

14  process and you are selected to be part of the

15  tactical support unit.  Then you receive the

16  training that they get.

17      Q.    Understood.  Okay.

18            MR. GRIFFITHS:  I don't have any

19  other further questions.

20            MS. LOMBINO:  We'll read and sign.

21      (Deposition concluded at 12:53 p.m.)

22

23

24  _____
    JASSO MINERETTE

25

Minerette Jasso - November 29, 2018

```
1   STATE OF ARIZONA  )

2   COUNTY OF PIMA     )

3        BE IT KNOWN the foregoing deposition was taken

4   by me pursuant to stipulation of counsel; that I was

5   then and there a certified court reporter of the

6   State of Arizona, and by virtue thereof authorized

7   to administer an oath; that the witness before

8   testifying was duly sworn by me to testify to the

9   whole truth; pursuant to request, notification was

10  provided that the deposition is available for review

11  and signature; that the questions propounded by

12  counsel and the answers of the witness thereto were

13  taken down by me in shorthand and thereafter

14  transcribed into typewriting under my direction;

15  that the foregoing pages are a full, true, and

16  accurate transcript of all proceedings and testimony

17  had and adduced upon the taking of said deposition,

18  all to the best of my skill and ability.

19       I FURTHER CERTIFY that I am in no way related

20  to nor employed by any parties hereto nor am I in

21  any way interested in the outcome hereof.

22       DATED at Tucson, Arizona, this 5th day of

23  December, 2018.

24                        _____
                          Nancy P. Richmond
25                        Certified Court Reporter #50864
```

Garcia vs. Ryan
2:13-cv-1591-DJH(DMF)

Minerette Jasso
November 29, 2018

## A

**able (31)** 5:18;13:19;
17:16;18:19;20:5;
24:21;32:2;42:3;
50:2,20,24;51:1,10,
12,21;52:1;56:21;
65:8;75:19;78:21,22;
79:18,19;81:20;
90:23;91:2,22;94:16;
103:7;106:2;107:16
**above (1)** 25:4
**academy (6)** 22:3;
30:4,5,6,10;58:8
**access (8)** 17:16;
50:24;52:1;90:23;
91:3;92:16,22,25
**accessible (1)** 91:17
**accompany (1)** 69:4
**According (1)** 17:1
**accountability (2)**
21:7;89:18
**accounted (1)** 11:10
**across (4)** 24:4;
106:10,11,18
**actions (5)** 105:11;
107:20;115:10,21;
116:16
**actually (6)** 8:16;
17:7;24:5;34:25;
70:5;82:21
**ADC (6)** 108:18;
112:25;113:2;115:4,
9,13
**address (5)** 92:2,3,6,
7,9
**administration (1)**
17:13
**administrator (1)** 9:9
**ADW (1)** 84:6
**afraid (1)** 37:1
**again (5)** 46:13;
88:17;106:20,22;
111:1
**against (2)** 38:20;
46:19
**agencies (1)** 85:6
**agents (12)** 34:17,20;
35:23,24;36:6;37:4,5,
6,17;39:16,18;110:9
**ago (8)** 7:16,18;23:4;
26:21;29:19;30:7;
34:4;55:20
**agree (7)** 24:16;
92:19;96:13;102:1,7,
11,12
**ahead (1)** 107:1
**aid (2)** 77:12;101:14
**aligns (1)** 67:10
**allow (1)** 77:18
**allowed (4)** 11:18;
77:13,16,17

**almost (2)** 110:15;
114:5
**always (11)** 5:11;
35:9,12;75:8;81:23;
104:7,9,10,11,21;
105:1
**amended (1)** 10:3
**amongst (1)** 71:14
**and/or (1)** 116:16
**angry (2)** 30:20;31:3
**ankles (11)** 49:9,24,
25;50:19;51:10;52:2;
59:8,9;80:2,11,14
**announcement (1)**
65:21
**answered (4)** 55:4;
85:5;90:10;106:5
**anymore (1)** 64:14
**apologize (3)** 49:3;
57:12;107:6
**appeared (3)** 79:14,
20;80:2
**appears (1)** 16:2
**appreciate (4)** 28:9,
14;53:22;54:20
**approaching (3)**
42:12;71:24;97:24
**appropriate (3)** 92:21;
116:15,15
**approximate (1)** 25:5
**approximately (5)**
17:3;19:18;56:17;
58:2;61:16
**approximation (1)**
41:11
**area (52)** 13:20;
14:19,21;15:10;
19:17;27:24;36:3,15;
38:4;48:4,12;50:10,
12,22;51:14,16;
56:19;60:7,10,19;
61:4,13;62:1,2;
63:13;65:18,24;66:2;
73:6,23;74:6;76:2;
79:24;85:22,23,25;
86:13;87:24;88:2,5,
12,16,18,21;89:5,7,8,
25;92:12,13,13;
103:19
**areas (6)** 10:10;
13:25;14:7;27:17;
79:9;88:24
**arguing (1)** 105:23
**Arizona (8)** 5:22;7:11,
15,20;8:21,23;9:2;
115:24
**arm (10)** 83:17,23,24,
25;84:1,4,20,20,22;
113:21
**around (22)** 11:25;
20:9,20;45:1;46:1;
70:15,16;85:22;86:5,
24;87:20;88:21;89:8,

12;96:12;97:9;99:23;
100:18,22;107:20;
108:4,6
**assault (4)** 37:2,2,3;
104:13
**assaulted (3)** 100:4;
104:11,22
**assaulting (2)** 43:13;
111:5
**assist (3)** 72:18,19;
75:20
**assistance (2)** 64:23;
76:5
**assistant (1)** 83:16
**assisted (4)** 49:8;
74:10;78:4,7
**assisting (1)** 73:1
**attempting (1)** 48:11
**attended (2)** 8:3;
114:14
**attention (9)** 44:10;
65:4;70:16;72:12,13,
15;79:1,7;111:13
**attorney (2)** 5:9;23:10
**attorneys (1)** 23:13
**available (1)** 47:19
**award (1)** 115:11
**awards (1)** 115:12
**aware (2)** 108:9,11
**awareness (1)** 63:11
**away (3)** 38:24;
42:19;56:2
**Awesome (4)** 6:18;
54:20;73:7;77:9

## B

**babysitter (1)** 99:17
**bachelor's (1)** 8:8
**back (33)** 7:21;18:5,
6,7,8,12;19:5;27:10;
32:22;34:3;44:13;
45:5;47:18;55:15;
56:14;67:3,11;68:17;
69:8;70:8;84:13,16;
87:23;88:14;94:6,6;
103:20,20;106:22;
107:5;110:8;114:20,
23
**bad (1)** 79:6
**Banner (1)** 114:15
**barbed (1)** 50:5
**BARNES (4)** 15:9,13;
106:7;112:19
**base (1)** 87:7
**baseball (15)** 15:7;
44:2;51:2,2,3,11;
86:1,19,21,25;87:6,
19,25;88:12;89:4
**Based (1)** 21:20
**basis (3)** 104:23;
105:4,7
**basketball (13)** 14:21;

15:8,11;19:13,16;
27:24;36:3,15;38:4;
48:4,12;56:18,19

**bat (1)** 44:2
**Bates (2)** 57:14;
108:18
**beat (1)** 56:3
**became (2)** 77:16;
94:11
**beforehand (1)** 109:2
**began (5)** 21:25;
38:19;67:7,7;83:4
**begin (3)** 8:23;28:22;
101:14
**beginning (1)** 25:3
**behavior (7)** 30:14,
18;92:6,9;105:10,16,
19
**Behind (11)** 36:5,12;
38:17,18;44:23,24;
50:8;80:4;87:8;
102:23,23
**belongings (1)**
114:24
**belt (1)** 37:9
**belts (1)** 39:20
**besides (4)** 16:15;
23:9,13;39:16
**best (1)** 6:14
**better (1)** 51:8
**beyond (1)** 50:9
**big (6)** 50:22,22;
85:25;88:6;89:9;91:6
**bit (5)** 14:18;38:1;
43:14;94:1;95:9
**black (34)** 26:18;
27:15;28:21;36:5,9,
12;38:18;44:24;45:8;
46:4;47:6;55:21,25;
56:5;57:21,23;58:2,
17,18,21,23;59:17,
25;62:14,21;68:14;
90:9,18;103:12;
110:5,10,16,16,22
**blacks (6)** 29:11;
31:12;34:4;36:18,22;
110:2
**blanks (1)** 25:2
**bleeding (3)** 78:10;
79:22,23
**blood (4)** 59:10;
72:14,16;100:6
**Boak (2)** 79:12,15
**boots (1)** 111:7
**both (4)** 28:5;37:3;
80:2;95:25;106:20
**bottom (1)** 109:5
**Brad (3)** 106:20,23;
112:15
**break (6)** 7:1,2,4;
55:10;83:19;112:6
**Brian (1)** 106:14
**brief (1)** 85:18

**bring (1)** 78:5
**bringing (1)** 67:10
**broadcast (1)** 65:19
**broke (3)** 11:21;
14:20;49:9
**broken (7)** 49:24;
50:3;59:8;79:14,20;
80:3,12
**broom (2)** 43:19;
111:18
**brooms (1)** 111:6
**brought (1)** 10:11
**Brown (7)** 72:23;
76:14,16;77:1,7,9;
82:13
**Brown's (1)** 76:15
**building (45)** 13:17,
21,25;16:2,3,22,23,
24;17:2,14,21,24;
18:2,8,12;21:3,3;
33:5,6,10;40:14;
47:25;48:2,12,17;
49:17;55:6,7;60:15;
61:16;63:5;64:13;
72:24;73:2,3,10;80:5,
19;81:5;82:3,14,17;
89:15;91:13;97:15
**buildings (1)** 14:7
**bunch (3)** 54:14;99:4;
107:22
**bunk (2)** 116:23,23
**Bushman (1)** 23:11
**business (2)** 17:12;
75:25
**busy (2)** 70:25;100:3

## C

**California (7)** 8:1,3,4,
21,22;9:5,6
**call (6)** 33:18;64:20,
25;75:11;88:12;
113:5
**called (14)** 20:15,17;
29:11,17;64:19;
65:12;80:24;81:4,5,
12,14,15;89:16;
113:12
**calling (1)** 87:24
**calls (2)** 32:9;96:20
**came (3)** 62:3,5,8
**cameras (3)** 32:1,1,5
**campus (1)** 114:16
**Can (59)** 7:7;10:8,9,
14,25;12:18,20,20;
14:18,22;15:9,14;
16:4,14,17;17:4;
18:9;26:15;27:13;
31:24;32:11,12,13,
19,23;33:5,7,7;34:11;
35:8;41:10,21,22;
49:1;52:6;55:10,15,
21;57:11,13;61:1,20;

Garcia vs. Ryan
2:13-cv-1591-DJH(DMF)

Minerette Jasso
November 29, 2018

64:17;68:7;69:1,24;
82:12;87:20;91:10;
93:7,19,24;94:1;
96:23;104:1,20;
105:17,19;106:15
**canes (1)** 111:7
**care (8)** 78:14;79:14;
80:20,22;83:13,14,
17;84:25
**career (1)** 96:4
**carry (2)** 37:8;39:19
**carrying (1)** 35:24
**Carson (1)** 8:4
**case (5)** 5:10;10:2;
13:1;24:5;37:19
**cases (1)** 34:25
**caught (2)** 36:25;
70:16
**cause (12)** 13:16;
21:16;26:13;32:16;
65:22;74:12;90:3;
92:17;101:11;
104:14;107:6;109:12
**cell (2)** 20:18,19
**cells (1)** 70:2,18
**center (1)** 86:10
**central (9)** 17:16;
50:20;63:2,13,15;
85:22,23;88:16,18
**Certified (1)** 5:2
**chance (4)** 8:19;
33:24;41:5;109:6
**change (2)** 102:3;
107:19
**changed (2)** 106:9,12
**channel (5)** 65:5,7,10,
14,15
**charge (1)** 3:11
**Charlie (2)** 33:16,17
**charter (1)** 24:10
**chase (1)** 110:11
**check (1)** 11:8
**checks (1)** 20:10
**Chemical (12)** 34:17,
19;35:23,24;36:6;
37:4,5,5,17;39:15,18;
110:9
**choose (2)** 105:12,15
**chow (14)** 11:9,24;
12:3;26:17;27:4;
60:8;61:7;65:18;
66:2,7;67:6,11;68:5,5
**circle (1)** 60:12
**CIRT (1)** 114:22
**CIU (4)** 9:22;84:17;
85:5,11
**clarification (2)** 42:24;
55:22
**clarify (1)** 60:18
**cleaner (1)** 6:22
**clear (11)** 48:10;
57:13;61:1,15;67:17,
18,19,19,22,24;68:4

**cleared (1)** 67:16
**clearly (1)** 106:18
**climb (6)** 37:23;
47:21;48:11;49:5,7,
12
**climbed (11)** 48:6,7,
20;49:7,14,15,19;
80:6,7,10,13
**climbing (2)** 48:11;
49:13
**close (6)** 21:7;41:8;
58:14;60:12;76:22;
89:15
**closed (1)** 46:10
**closer (1)** 21:8
**closest (4)** 27:9;73:5;
97:25;98:1
**closing (1)** 101:6
**coffee (1)** 69:19
**COII (63)** 11:16,17;
12:12;19:14,16,23;
25:5,8,11;26:10,21,
22,25;29:15;32:7,14;
33:8;34:13,18;35:2,
14;36:1;37:2,18;
39:13,17,23,25;
65:22;69:2,3,4,8,11;
70:12;72:2,3,7,11,18,
21;74:13,16;75:16,
17;76:1;81:22;82:1,
16,19;94:12;100:13,
15,21;109:13,15,22,
25;110:4;111:4,7,8;
116:12
**COIIs (1)** 95:25
**collectively (1)** 88:11
**college (2)** 8:2,13
**coming (14)** 41:1,3,6;
46:20;63:3,22;71:3,4,
8,16;103:19;106:10,
11,17
**comma (2)** 34:15,17
**command (1)** 34:22
**commingle (3)** 66:18,
19,20
**commingling (2)**
66:13,21
**common (1)** 103:19
**communications (1)**
8:11
**comparing (1)** 14:10
**complaining (1)** 10:5
**complaint (4)** 9:25;
10:1,3,4
**complete (3)** 7:22,24;
8:19
**completely (2)** 24:11;
39:10
**complex (9)** 11:5;
12:8;13:12;14:16;
17:13;41:1;67:18;
84:7;103:21
**comply (2)** 6:13;

110:8
**Complying (5)** 15:4,
16;16:5,18;48:24
**compound (1)** 116:19
**Compton (3)** 9:5,5,6
**concern (3)** 26:13;
78:15;79:10
**Conduct (3)** 11:8;
12:5,7
**conference (1)**
106:22
**confirm (1)** 79:4
**confrontation (1)**
107:10
**confused (1)** 55:1
**connect (1)** 106:19
**connected (2)** 50:16,
17
**consider (1)** 17:8
**considered (1)**
116:13
**consistent (1)** 111:10
**contain (1)** 110:9
**contents (1)** 9:16
**continually (1)** 22:5
**continuation (1)** 57:14
**continue (3)** 25:7;
69:24;99:16
**continued (1)** 110:11
**contractors (1)** 76:10
**control (46)** 11:17,18,
19;18:23,24,25;20:1,
2;25:9,17;26:23,25;
27:4;29:10,13;31:7,
13,17,19,20,21,21,23,
23;32:18,23;33:11;
34:5,9;36:2;37:12,
14;38:3;40:8;69:3,8;
80:24;81:4;91:11,15,
18,23;92:21;97:4;
105:16,19
**controlled (1)** 91:17
**conversation (6)**
29:14,21;35:10;
81:14,25;85:18
**conversations (1)**
9:16
**Cool (1)** 6:11
**copied (1)** 109:5
**copy (3)** 9:25;10:12;
109:3
**Corizon (1)** 112:14
**corner (5)** 33:4,6,9,
14,20
**corrected (1)** 98:19
**correction (2)** 19:10;
90:19
**Corrections (12)** 7:12,
15,21;8:24;22:1,6;
74:22;76:7,8;89:13;
92:1;115:24
**correctly (1)** 78:1
**corrects (1)** 106:23

**counsel (7)** 6:5;9:17;
12:22;23:10;32:25;
49:1;105:22
**counselor (2)** 23:11,
14
**count (20)** 11:10,23;
12:2,7,7,10,12;22:22;
58:4;67:16,17,18,19,
19,23,25;68:2;71:21;
94:16;95:21
**counts (2)** 12:6,8
**couple (2)** 94:17;
116:2
**course (5)** 5:24;
33:23;75:25;109:10
**courses (1)** 8:13
**court (6)** 15:7,8,11;
19:14;56:18,19
**covers (1)** 93:10
**coworker (2)** 69:1,2
**co-worker (1)** 70:25
**coworkers (8)** 63:4;
64:6;72:23;73:16;
74:8,13,21;76:14
**CPR (1)** 116:20
**creative (1)** 58:7
**criminal (1)** 47:17
**critical (1)** 114:22
**crowd (1)** 64:9
**crutches (2)** 111:7,23
**C-shape (1)** 114:6
**curious (1)** 10:24
**currently (1)** 7:11
**curves (1)** 48:2
**cut (1)** 79:13
**cuts (1)** 79:25

**D**

**D1 (3)** 17:8,11,11
**DA1 (7)** 19:12;51:13;
60:7;61:4,13;75:3,8
**DA2 (5)** 19:12;61:14,
15;75:3,9
**daily (3)** 104:23;
105:3,6
**dangerous (1)** 36:21
**date (3)** 7:17;25:4;
115:4
**David (2)** 5:10,22
**day (24)** 5:19;9:12;
10:6;11:3,14,17,20;
12:9;21:22;23:15,16,
21;24:18;27:12;
28:23;37:6;40:10;
65:17;85:16;95:23;
102:4;108:9,12,20
**Days (2)** 84:6;95:22
**deal (1)** 22:24
**dealing (1)** 100:6
**December (2)** 7:19;
22:1
**decision (2)** 102:1,7

**DeeAnn (6)** 106:8,15,
18,21,23;112:17
**defendants (1)** 5:23
**define (1)** 95:8
**degree (5)** 8:7,7,8,17,
18
**Delta (1)** 33:18
**demonstrate (1)**
77:10
**Department (13)** 7:12,
15,21;8:24;22:1,5;
91:25;92:8,18,23;
93:13;97:1;115:24
**departmental (6)**
92:3,5,10;93:9,18,20
**depending (1)** 19:12
**depends (2)** 67:16,17
**deployed (1)** 110:9
**deposition (11)** 5:12,
14,17,24;9:15,17,20;
21:18;23:9,10;
106:15
**depositions (1)** 6:11
**deputy (2)** 83:16;84:5
**describe (3)** 32:23;
33:3;78:9
**described (6)** 26:11;
36:8;48:15;50:7;
55:19,20
**describing (9)** 14:3;
22:16,18;28:15;
32:25;48:10;52:12;
57:5;61:2
**description (4)** 23:3;
34:3;51:8;69:7
**destroying (1)** 70:2
**detail (1)** 45:15
**details (5)** 10:7;
23:19,23;64:21;
69:20
**determine (1)** 50:3
**developed (1)** 64:22
**diagnosis (1)** 84:20
**died (2)** 108:9,12
**difference (4)** 41:20,
22,23;81:11
**different (15)** 13:25;
14:7,7;15:22;20:9;
27:17;30:6;32:2;
39:18;66:7,9,12,15,
17;95:10
**differently (1)** 14:1
**difficult (1)** 14:18
**dining (15)** 51:14;
60:7,10,19;61:4,13,
25;62:1,2,25;65:18,
24;66:2,14,15
**direct (3)** 104:19;
105:24;110:7
**directing (1)** 6:8
**direction (6)** 26:19;
27:16;28:21;63:22;
71:5,17

Case 2:13-cv-01591-DJH-DMF   Document 298-5   Filed 05/17/19   Page 122 of 134

Garcia vs. Ryan
2:13-cv-1591-DJH(DMF)

Minerette Jasso
November 29, 2018

**directions (3)** 66:12, 16,17
**dirt (9)** 13:20;59:7; 60:14;86:3,7;88:20, 24;89:8,10
**disagreements (2)** 26:5;96:5
**disciplined (1)** 115:23
**disconnect (2)** 106:19;107:1
**discussion (1)** 107:3
**disruption (1)** 90:5
**distance (1)** 97:24
**distinction (1)** 54:10
**distract (1)** 38:24
**District (2)** 9:1,6
**disturbance (17)** 11:21;14:20;23:1; 28:23;29:2;36:17; 37:16;67:7;90:6,7; 92:12;93:11,12; 113:1;115:21,22; 116:14
**disturbances (10)** 26:2,3,4;30:12; 90:13;92:4,7;104:8; 113:3,13
**disturbing (1)** 99:4
**divided (1)** 24:11
**dividing (1)** 42:21
**DOC (4)** 78:16,18,20; 96:4
**doctors (1)** 77:15
**document (4)** 21:17, 20;24:17;108:18
**dog (1)** 33:17
**Dominguez (1)** 8:4
**done (4)** 11:23; 34:24;93:10;102:21
**door (4)** 17:4;18:25; 73:23;78:4
**doors (5)** 17:7,10,17, 20;78:4
**doorways (1)** 16:19
**dot (1)** 33:13
**dotted (2)** 48:22;49:4
**down (12)** 11:10; 26:5;39:9;48:16; 63:17,19;75:19,23; 76:2;94:1;109:5,9
**Dr (1)** 23:11
**drag (1)** 80:18
**drank (1)** 69:19
**drugs (1)** 30:22
**due (2)** 25:5;26:16
**dugouts (1)** 87:10
**duly (1)** 5:2
**DUNN (3)** 106:14,25; 112:16
**during (5)** 12:3; 92:11;93:11;113:23; 115:13
**duties (2)** 11:7;12:4

**E**

**earlier (2)** 41:17; 111:18
**eat (5)** 26:7;61:10,12; 62:9,10
**edge (1)** 48:17
**education (11)** 8:17; 16:2,3;17:21;21:3; 48:2;55:7;63:5; 64:13;82:2;89:15
**effort (6)** 57:5;58:13, 16,20;59:15;62:16
**efforts (1)** 58:14
**either (8)** 19:2;47:15; 53:22;62:25;65:22; 81:20;89:25;100:19
**else (7)** 23:24;40:24; 53:16;79:1;89:4; 101:24;110:23
**emergency (1)** 67:25
**employed (1)** 22:5
**employee (2)** 115:13, 24
**employees (1)** 113:2
**end (6)** 29:12;33:16; 79:3;83:23;104:24; 106:12
**enough (9)** 23:3; 24:20;29:5;41:8; 52:19;69:21;95:19; 101:13;107:22
**entail (1)** 11:7
**enter (2)** 16:12;17:9
**entire (1)** 31:24
**entrance (1)** 73:9
**entries (1)** 93:14
**entry (9)** 16:12;17:4, 11,19;93:3,5,11,15; 116:17
**entryways (1)** 16:20
**environment (1)** 107:12
**escape (1)** 78:22
**especially (1)** 99:8
**establish (1)** 101:10
**established (5)** 41:16; 46:15;52:17;82:15; 111:1
**estimate (2)** 38:12; 71:23
**even (5)** 77:14;84:22; 96:16;97:1;105:12
**evening (1)** 114:18
**event (1)** 23:25
**events (7)** 9:11; 10:14;22:8;23:15,16; 90:12;109:12
**everybody (1)** 107:20
**everywhere (1)** 43:9
**exact (1)** 67:13,14
**exactly (3)** 6:20;

11:22;27:12
**EXAMINATION (3)** 5:6;112:23;116:5
**except (2)** 32:6;77:19
**Excuse (1)** 106:7
**Exhibit (10)** 10:18,20, 23;21:12,14;32:22; 49:4;108:22,24,25
**experience (1)** 88:14
**explain (1)** 41:21
**express (1)** 80:11
**expressions (1)** 31:2

**F**

**face (2)** 59:11;79:9
**facial (1)** 31:2
**fact (2)** 26:17;75:4
**Fair (7)** 23:3;24:20; 29:5;52:19;69:21; 95:19;107:22
**far (5)** 6:18;42:19; 63:11;65:11;75:23
**fast (10)** 26:19;27:15; 28:21;56:9,14;61:6; 71:12;82:9;100:1; 110:19
**feel (3)** 36:21,24; 107:7
**feeling (2)** 37:15,18
**fellow (1)** 80:3
**fence (39)** 37:23; 38:5;47:22;48:10,16, 19,23,25;49:12,13, 14,16,19,20,23;50:4, 7,12,19;51:10,15; 57:25;69:23;70:9,12; 80:4,4,6,8,10,13; 86:24;87:1,1,4,7,14, 20;102:23
**fenced (8)** 50:22,23; 86:14;87:11,25;88:8; 89:7,8
**fences (2)** 50:8;51:17
**few (7)** 10:24;15:19; 22:11;29:18;70:21; 94:5;112:21
**field (17)** 50:25;51:2, 2,3,11;77:15;86:2,19, 21,25;87:6,19,25; 88:7,12,24;89:4
**fight (2)** 22:13;36:25
**fighting (14)** 34:14, 19;35:16,16,20;36:7; 38:25;39:3;56:6,7, 11;71:14;110:2; 111:11
**fights (12)** 22:9,12,14, 15,16,18,20;23:4,5,6; 26:4;104:14
**figure (1)** 95:7
**fill (1)** 25:1
**final (1)** 56:25

**find (2)** 39:12;49:20
**fine (3)** 45:25;93:19; 106:16
**finished (1)** 27:3
**first (11)** 5:2,11;7:9; 33:17;35:25;55:24; 68:25;83:15;90:21; 107:17;116:13
**Five (3)** 23:18;56:23; 93:24
**floor (1)** 70:18
**flyer (1)** 78:23
**focus (1)** 9:10
**focusing (1)** 64:3
**fogged (1)** 56:19
**fogger (17)** 37:7,19; 38:19,23;39:2,3,13,13, 14,16,17,21,23,24; 40:2,5,8;43:14
**folks (1)** 107:11
**follow (1)** 78:8
**follows (1)** 5:4
**follow-up (4)** 25:24; 30:10;79:2;116:3
**follow-ups (1)** 116:3
**force (1)** 110:10
**forehead (1)** 79:13,25
**foreseeable (1)** 116:12
**forget (1)** 55:16
**forgive (1)** 67:3
**forgot (2)** 45:16,23
**form (5)** 93:6,16; 103:24;104:16; 116:18
**formal (1)** 12:10
**forty-five (1)** 67:24
**found (1)** 49:22
**four (22)** 12:15,21; 13:2,10;19:8,11; 22:13;27:9;51:4,25; 52:1;61:13;63:15,16; 76:23;82:3,23,24; 86:1,22;109:16,16
**four-on-one (1)** 23:5
**four-year (1)** 8:7
**frame (4)** 42:9;67:1, 12;83:8
**front (25)** 12:17; 13:23;21:5,8;31:12, 13;34:5,6;36:4,11; 38:17,18;40:19; 41:10;42:15,20;43:3; 51:7;53:17;59:4; 61:18;85:25;86:20, 22;110:12
**full (3)** 7:8;72:14,15
**funny (1)** 111:25
**further (2)** 62:20; 116:1
**furthest (1)** 27:23

**G**

**G1 (4)** 18:10,15,16; 55:8
**G2 (11)** 16:14,17; 18:9,10,16;27:7,8; 54:21;91:3,19,22
**G3 (6)** 16:14;17:5; 18:10,17;73:10; 90:23
**garbled (3)** 106:9,11, 12
**Garcia (4)** 5:10,22; 57:14;108:19
**gate (196)** 15:20,21, 22,23,24;16:10,15; 17:6;18:3,4,6,6,7,25; 26:16;27:1,6,6,9; 37:22;40:12,12,14, 20,22,23,25;41:9,10, 12,14,18,20;42:1,7,8, 9,14,15,18,20,22; 43:1,2,2,12,16;44:14, 15,15,21,21,22;45:2, 3,5,9,13;46:1,2,5,10, 13,19,24,25;47:4,23, 23,24;48:5;51:22; 52:10,13,16,22; 53:18,18,19,22;54:3, 7,8,8,11,12,15,21,23; 55:3,4,18,18,20,21, 23,25;56:2,6,20;57:2, 4,7,16;58:3,6,11,14, 20;59:15;60:1;62:9, 10,13,13,16,17,19,21; 63:25,25;68:14,22; 69:5,12;73:10,17; 74:23;86:17;90:8,17; 91:9,12,16,23,24; 92:11,15,22;96:19, 25;97:4,8,9,13,14,20, 21,25;98:1,4,6,7,9,10, 13,15,17,21,23,24; 99:6,6,7,10,12,16,25; 101:5,6,20;102:2,8, 13,14,16,24,24; 103:3,4,10,14; 105:16;107:13,14,25; 109:23;110:3,5,11, 14,17,23,25;111:1,8
**gate' (1)** 110:6
**gated (2)** 73:23;87:1
**gates (11)** 16:13,16; 18:19;91:7;92:24; 93:1,4,14,23;97:3; 116:16
**gate's (3)** 19:4,5,6
**gave (6)** 40:3;79:17; 82:4,4,5;110:7
**general (1)** 47:22
**generally (1)** 64:18
**generic (1)** 93:1

Garcia vs. Ryan
2:13-cv-1591-DJH(DMF)

Minerette Jasso
November 29, 2018

**generically (1)** 87:24
**gets (1)** 46:2
**giving (2)** 101:14;
114:13
**glass (1)** 17:10
**goes (3)** 56:14;73:9;
86:5
**Good (6)** 5:8;25:21,
22,25;33:10;83:20
**Gotcha (1)** 52:5
**governor (1)** 115:19
**grabbed (1)** 64:12
**graduate (1)** 8:5
**graduated (1)** 8:12
**Great (2)** 27:25;68:3
**GRIFFITHS (30)** 5:7,
9;10:17;13:1,6;
21:11;28:11,13;33:2,
23;34:1;41:17;46:16;
52:19;57:11,15;
60:25;61:20,23;93:7,
24;104:18;105:25;
106:6;108:21;112:3,
7,25;116:2,6
**ground (1)** 43:22
**group (10)** 20:15;
25:19;29:25;30:3;
60:3;62:4;63:21;
71:2,18,19
**grouping (13)** 25:6;
26:12;29:10;30:15,
25;31:12,13,14;32:8,
15;34:4,5,7
**groupings (1)** 30:11
**groups (4)** 26:9;
36:14;68:12;92:4:4
**guess (4)** 85:25;99:5;
106:20;108:21
**gurney (2)** 103:10,13

## H

**half (5)** 32:16,19;
60:6;67:23;75:21
**hand (1)** 40:3
**handcuffs (10)** 47:2;
57:3;58:5,11,15;
62:17,18;68:22;
101:6;110:25
**handed (1)** 108:25
**handle (3)** 92:3;
111:19,19
**hands (3)** 43:24;
44:12;70:3
**hang (1)** 106:21
**hanging (1)** 41:23
**happen (2)** 26:8;29:4
**happened (21)** 5:19;
9:11;10:6;24:18;
27:12;56:9,14;59:25;
60:2,8;61:6;62:23;
69:12,15;83:25;
100:1,7;110:19;

113:24;114:2,10
**happens (1)** 6:6
**happy (2)** 7:2;14:22
**hard (3)** 13:13,24;
30:7
**head (1)** 95:6
**heading (1)** 40:25
**health (4)** 47:13,15;
85:1,1
**hear (6)** 35:8;65:3,8;
77:24;106:15;107:10
**heard (3)** 49:7,13;
80:14
**hearing (1)** 35:9
**height (1)** 87:2
**heightened (1)** 105:8
**Hello (1)** 106:23
**help (4)** 10:8,9;77:19;
82:12
**helped (1)** 45:2
**helpful (1)** 82:16
**high (6)** 7:22,24,25;
9:9;87:2;104:24
**highlighted (1)** 15:5
**highlighter (2)** 14:24,
25
**highway (1)** 114:16
**Hills (1)** 8:4
**himself (1)** 95:23
**Hispanic (1)** 45:7
**Hispanics (1)** 57:19
**history (1)** 47:17
**Hm-hmm (3)** 94:22;
97:18;110:21
**hold (3)** 15:15;57:2,
16
**holding (3)** 45:5;78:4;
110:5
**home (3)** 87:5,7;
114:25
**hop (1)** 80:4
**hopefully (1)** 38:25
**horrible (1)** 6:12
**hospital (5)** 84:8,11,
18,22;114:16
**hour (3)** 66:10;67:23,
25
**hours (2)** 82:23;83:7
**Hughes (1)** 80:1
**hundred (1)** 19:21
**hurt (15)** 30:22,23;
38:10;43:25;50:19;
51:10;52:2;58:17;
59:17;63:7;80:2;
105:3,6,12,15
**hurting (5)** 39:10,11;
49:25;111:11,16

## I

**ice (2)** 79:17,17
**ICS (14)** 25:5;34:13,
18,21;35:1,3,15,17,

25;64:19,20,25;
65:12,12
**idea (4)** 31:9;96:18,
24;98:4
**identification (4)**
10:20;14:8;21:14;
108:24
**identified (5)** 16:10;
17:14;19:13;20:25;
76:15
**identify (6)** 10:10;
12:18,20;14:18;15:2;
78:16
**ILLSLEY (1)** 14:13;
15:14,17;33:25;49:2,
3,10;57:12;112:13
**immediately (3)** 8:23;
72:25;110:7
**important (1)** 48:21
**imprecise (1)** 98:18
**inappropriate (1)**
92:22
**inches (1)** 114:6
**incident (5)** 9:23;
34:22;109:3;113:23;
114:22
**included (2)** 59:21,24
**indicate (3)** 42:3;
91:8;92:11
**indicated (6)** 15:19,
20;20:14;21:25;
26:21;58:5
**individual (1)** 72:15
**influence (1)** 30:21
**information (7)** 5:19;
30:8;35:4;47:19;
78:20,21;82:7
**informed (1)** 108:13
**initially (3)** 40:16;
74:13;94:19
**initiate (2)** 35:1,3
**initiated (7)** 25:5;
34:13,18;35:15,17,
21,25
**injure (1)** 83:25
**injured (29)** 59:2,9,
20;63:6;64:5,14;
70:13;71:22;72:3,6,
9;77:11;78:10;79:13;
80:12,25;81:2,8,13;
82:14;83:5,24;84:1,
4;101:8,15,16;
103:21;104:10
**injuries (2)** 59:11;
79:6
**injury (5)** 62:20;
84:19,21;113:20;
114:1
**inmate (63)** 22:9,12;
30:18,25,25;43:14,
19;48:20;49:5,6,7;
50:15,18;51:9;53:12,
14,18;59:1,3,20,21;

63:5;64:5,6,7,12,16;
70:13;71:22;72:4,5,5,
14,19,23;76:14,15,
16;77:1,7,9,25;78:3,
5,9,13,24;79:3,12,12,
15;80:1,1;82:3,4,5,
13;93:12;100:6;
101:15;110:5;
111:22;116:14
**inmates (204)** 11:8;
16:12;19:19,23;
20:10,15;23:21;
25:18;26:12,17,19;
27:3,15;28:21;29:1,
10;30:2;32:8,15;
34:14,19;35:7,15;
36:4,5,6,9,10,11,12;
37:23;38:10,16,17,
18;39:3,6,9;40:19,21;
43:7,9,13,18,22;44:8,
23,24;45:7,8;46:4,4,
11,19;47:4,21;48:6,
10;49:8,11;50:9;
52:7,10;54:14;55:17,
19,21,23,25;56:2,5,7,
19,20;57:3,6,10,17,
17,21,23;58:2,17,17,
18,21,23,24;59:1,16,
17;60:1,3;61:3;62:3,
4,6,7,14,21,24;63:1,4,
12,14,22;65:18,23;
66:2,6,14,15;67:6,11,
19;68:4,15;70:1,7,10,
17;71:2,4,7,16,20,20,
24;72:8,20,23;73:1,
24;74:4;75:20;76:15,
22,23,25;77:5,11,13,
14,16,19;78:1,8,13;
80:25;81:1,8,13;
82:3;83:5,14;85:19,
21,21;86:7,11;88:14,
25;89:10,24;90:9,18;
92:4,12;99:4,4,24;
100:3;101:6,8,15;
103:7,12,18,21,22,
23;104:3,9,12,13,22;
105:6;107:24;108:4;
110:2,3,8,9,10,12,16,
17,22;111:5,5,5,6,9,
10;116:22
**inmates' (3)** 92:6,9;
105:10
**inmate's (1)** 30:13
**inside (9)** 49:17;
54:15;70:1;73:1;
80:23;86:18;101:24,
25;109:19
**Instead (1)** 69:7
**institutional (1)** 67:18
**instructions (1)** 78:8
**insulins (1)** 11:12
**intent (3)** 90:8,17,21
**interchangeably (1)**

12:25
**interesting (1)** 75:5
**intermingle (1)** 68:11
**interpreted (1)** 98:22
**interviewed (3)** 84:17;
85:14,15
**interviewing (1)**
116:25
**into (27)** 6:21;9:14;
17:20,25;18:20;27:4;
29:13;43:21;45:24;
50:10,10,20;51:22;
63:5;64:13;68:15;
70:2;72:23;79:16;
80:18;81:10;87:19,
21;90:20;91:16;93:3;
109:5
**investigating (1)** 85:6
**involved (2)** 22:24;
24:12

## J

**JASSO (16)** 5:1,8;
7:10;21:16;25:5,11;
28:14;34:13,18;35:3,
15;55:16;109:15;
110:4;111:8;112:20
**J-A-S-S-O (1)** 7:10
**job (3)** 24:15;77:12;
78:19
**jumped (3)** 50:18;
51:9;80:14

## K

**keep (3)** 48:3;96:3;
106:3
**kept (3)** 43:15;46:11;
78:18
**key (15)** 16:22;18:21,
23;19:2,3;73:13,14,
18,19,19;87:17;
90:25,25;91:6;97:5
**keys (2)** 91:6,10
**kids (1)** 95:2
**kids' (1)** 95:5
**kind (12)** 10:14;
24:22;34:24;52:4;
56:14;87:20,24;91:8;
96:12;106:11;107:6;
113:10
**kitchen (7)** 19:11;
75:1,2,11;76:1,3,13
**kitchens (1)** 75:17
**knew (8)** 49:15;77:2;
90:3;98:14;102:17,
21,24;104:5
**knowing (1)** 96:1
**knowledge (1)** 63:12

## L

**Garcia vs. Ryan**
2:13-cv-1591-DJH(DMF)

**Minerette Jasso**
November 29, 2018

**label (2)** 16:4;17:4
**labeled (4)** 16:24;
27:6;91:19;108:18
**Labor (1)** 8:10
**large (4)** 51:16;62:4;
88:7;92:4
**last (2)** 7:10;75:12
**later (1)** 23:18
**lawsuit (2)** 5:21;10:4
**lawyer (1)** 9:8
**learn (2)** 24:6;25:2
**learned (1)** 47:9
**least (4)** 59:19;76:25;
94:17;116:3
**leave (4)** 38:3;45:4,4;
99:23
**leaving (2)** 46:9;
104:12
**left (7)** 37:14;43:14;
48:5;70:15;79:5;
101:7;113:21
**length (2)** 39:3;92:1
**less (1)** 70:23
**letter (4)** 16:4,11;
115:19,20
**letting (1)** 39:5
**level (1)** 24:13
**lie (1)** 99:8
**Lieutenant (5)** 5:8;
21:16;25:11;28:14;
55:16
**lieutenant's (1)** 21:6
**life (1)** 96:10
**lifesaving (1)** 115:11
**limited (1)** 65:1
**line (7)** 24:22,22;
33:17;48:22;49:4;
81:3;106:21
**listed (3)** 74:1,13;
109:15
**listening (1)** 35:12
**little (15)** 12:11;
14:18;37:25;43:14;
44:11;48:19,19,22;
73:23;81:11;87:20;
88:23;94:1;95:9;
112:5
**living (1)** 21:21
**located (1)** 15:24
**location (2)** 10:25;
81:7
**locations (1)** 28:15
**lock (31)** 15:22,23;
26:5;41:23,25;42:15;
44:17,18;45:10,19;
54:1,9,25;62:13;
68:13;86:17;90:8,17;
91:21;99:14,16,18;
103:1,2,4;104:15,25;
105:9,13,18;107:14
**locked (1)** 11:10;
63:17,19
**lock's (1)** 99:17

**logical (1)** 97:2
**LOMBINO (41)**
12:22;13:4,7;28:8,
10,12,19;32:9,25;
33:21;41:13,15;
46:14;49:1;52:15;
54:22;55:11;57:8;
60:16,23;61:22;
83:19;90:10;93:6,16;
96:20,23;103:24;
104:16;105:22;
106:4,10,17;112:5,
11,15,17,20,24;
116:1,18
**long (8)** 9:3;16:6;
56:17,23;94:14;
95:19;96:2;101:12
**long-term (1)** 8:25
**look (15)** 18:18;28:8;
30:13,19;33:7;38:6,
11;41:5;70:21;83:9,
10;93:25;97:2;109:1,
6
**looked (6)** 31:3;
78:11,24;84:8;100:2;
101:7
**looking (8)** 38:8,8;
70:25;71:22;100:5,
13,19;101:11
**looks (3)** 17:1;88:23;
109:4
**losing (1)** 37:25
**lot (9)** 26:18;27:15;
28:20;30:5;31:2;
79:24;92:5,8;103:14

---

**M**

**Mach (1)** 78:10
**mail (1)** 11:11
**main (3)** 78:15;80:24;
81:4
**makes (2)** 6:1;62:12
**making (2)** 78:7;
100:4
**Man (1)** 79:25
**managed (1)** 110:10
**manual (1)** 19:3
**many (10)** 19:18;
22:12,20;44:23;58:2;
74:9;76:23;81:1,8;
92:18
**map (28)** 10:9,10,12,
13,22;12:17;13:9,11;
14:22;15:24;16:11,
25;17:1;18:7,18;
19:13;20:23;27:19;
32:22;33:5;42:3;
51:4;59:5;60:9;
61:16,17,20;73:11
**mark (9)** 10:24;14:22;
16:14,17;18:9;21:11;
28:12;32:23;33:3:5

**marked (12)** 10:18,
20,23;16:10;18:13;
21:14;40:17;44:15;
47:23;61:15;73:10;
108:24
**marking (2)** 60:9;87:5
**married (1)** 94:25
**Mash (3)** 78:10,13;
79:3
**master's (3)** 8:17,17,
20
**math (1)** 7:18
**matter (2)** 104:8,11
**may (9)** 6:19,20;
13:18;14:17;28:8;
32:6;39:23;72:8;
114:4
**maybe (22)** 10:9,24;
11:25;16:8;19:20;
20:21;21:5;24:24;
25:6;33:4;41:10,21;
55:21;56:14;93:24,
25;94:17;95:7;
103:18;106:19;
107:14;108:15
**meals (4)** 62:1;85:19;
88:15;103:20
**mean (10)** 22:15;
33:1;58:1;83:1;
85:23;94:24;98:14;
101:12;102:22;115:3
**meant (4)** 98:14,17,
22;109:11
**medical (34)** 13:12;
21:7;50:2;59:12;
77:10,12,14,15;
78:13,22,25;79:7;
80:20,22;81:11,12,
14,15,17,18;82:8,9,
23,24,25;83:12;84:7,
9,23,25;89:22,23;
103:21;114:20
**meds (1)** 11:12
**meet (2)** 97:19,22
**member (6)** 17:12;
113:14,17;115:5,7,7
**memory (4)** 21:21;
100:16;108:17;
109:17
**mental (2)** 47:13,15
**mention (1)** 83:23
**mentioned (2)** 21:17;
110:1
**met (2)** 97:24;98:1
**Mexican (7)** 57:6,19,
19;59:16,16;110:2,12
**Mexicans (2)** 31:14;
34:6
**middle (3)** 36:25;
38:21;88:23
**might (10)** 13:23,23;
25:1;28:22;30:21,22;
51:10,12;98:25;

107:24
**mind (3)** 10:13,16;
96:24
**mine (1)** 12:19
**MINERETTE (2)** 5:1;
7:9
**M-I-N-E-R-E-T-T-E (1)**
7:10
**minimal (1)** 104:14
**minor (1)** 8:10
**minute (8)** 28:10;
33:21;38:13;60:16,
23;70:23;100:2,8
**minutes (5)** 56:23,23;
67:22,24;93:25
**mischaracterizing (1)**
52:17
**mispronounce (1)**
81:23
**missing (1)** 24:25
**mixed (2)** 71:18,19
**moment (6)** 10:23;
14:20;23:4;26:21;
34:4;55:20
**moments (3)** 15:19;
29:18;70:21
**month (2)** 115:16,17
**months (2)** 94:18;
95:21
**mop (1)** 111:19
**mops (1)** 111:6
**more (14)** 6:2;7:2;
32:16;43:6;45:21;
57:2,16;63:7;65:2;
93:8;94:5;110:9;
112:4;114:23
**morning (1)** 5:8
**most (1)** 32:20
**motivational (1)**
116:25
**mouth (1)** 78:10
**move (3)** 52:3;77:19;
106:5
**moved (4)** 8:21,22;
72:23;76:14
**movement (1)** 62:24
**movements (1)** 31:1
**moving (5)** 26:19;
27:15,17;28:21;29:1
**much (5)** 27:13;28:9,
17;38:2;53:21
**multi-cultural (1)** 8:17
**multiple (2)** 13:16;
26:8
**multiply (1)** 76:23
**myself (1)** 112:2

---

**N**

**name (14)** 5:8;7:8,9,
10;64:21;75:2,10,12;
77:2,3,5;81:19,24;
100:13

**names (5)** 47:7,10,
14;81:12;95:5
**nationals (2)** 57:20;
59:17
**near (2)** 13:14;40:19
**necessarily (2)** 26:4;
102:22
**need (12)** 7:1;18:3;
35:6;42:24;66:25;
68:3;76:5;82:8,8;
83:19;112:5;116:14
**needed (6)** 19:12;
78:20,20,24,25;98:3
**needs (1)** 97:3
**new (1)** 95:24
**news (2)** 35:11,12
**next (32)** 6:11;15:25;
16:3;25:7;26:15;
29:4,5;31:11;34:11;
35:22;37:20,21;
39:25;40:14;47:20;
52:5;56:8,13,25;
69:21,24;70:12;72:1,
3,22;78:9;79:12;
80:1,23;81:10;82:21;
89:2
**nil (1)** 104:14
**ninety-four (2)** 88:2,3
**nobody (1)** 108:12
**noise (1)** 80:14
**normal (1)** 75:25
**nose (2)** 79:14,20
**note (1)** 24:10
**noted (1)** 50:8
**notes (1)** 93:25
**noticed (5)** 26:18;
27:15;28:20;64:9;
110:1
**number (32)** 13:8,18,
22;15:25;16:1,24;
17:14;20:23;21:8;
32:22;33:1,3;40:15;
59:4;60:11,12,13,14;
61:2,4,16;65:18;
66:2;71:24;76:16;
78:16,18,21;82:4,5,5;
93:3
**numbered (1)** 88:2
**numbers (2)** 13:13;
81:12
**nurses (1)** 77:15

---

**O**

**oath (1)** 99:8
**object (1)** 6:5
**objection (17)** 6:5,7;
32:9,12;41:13,15;
46:14;52:15;54:22;
57:8;93:6,16;96:20;
103:24;104:16;
105:22;116:18
**objective (3)** 79:10;

Garcia vs. Ryan
2:13-cv-1591-DJH(DMF)

Minerette Jasso
November 29, 2018

84:19;107:17
**objects (1)** 70:20
**observed (4)** 31:16,
18;34:8;111:7
**obviously (2)** 5:21;
52:2
**OC (3)** 39:19,20,24
**occasion (1)** 89:24
**occasions (1)** 85:20
**occur (2)** 67:7,8
**occurred (1)** 84:2
**off (12)** 51:17,19,20;
78:23;79:3,5;80:14;
95:6;97:9;107:3;
114:13,16
**offer (3)** 55:22;78:13;
79:15
**office (7)** 20:7,22;
21:7;34:23;89:16,17,
17
**officer (34)** 11:4,6,13,
16,17,18;12:5;18:24;
47:18;52:13;53:3,6,
23;68:21;74:22;75:1,
2,10,11;76:1;81:17;
86:17;90:19;100:24;
101:1,3,21,23;108:1;
109:13;112:20;
114:21;115:15,16
**officers (19)** 20:3;
35:10;43:4;45:18,19;
49:16;65:2,10,23;
76:7,8;82:23;89:13;
94:17;101:25;105:3;
107:15,17;115:15
**officer's (1)** 81:19
**Once (2)** 80:23;104:3
**one (84)** 6:23;16:16,
17;18:4;19:9,10;
22:13,13,14;25:18;
27:19,23;32:11;
34:24;36:9;38:10;
39:14,21;40:5,6,8,10,
16;41:18;43:6,13,19;
45:21,22;48:6;49:8,
15,16;52:8,9;53:11;
55:6,7;58:7;59:8,10,
20;60:7,10,20;61:4,
12,13,24;62:1,2,9;
63:4,6,15,16,19;64:6;
66:3;68:17;71:17;
73:16;82:20;83:12;
85:4;86:1;88:4;89:1,
1;91:4,12,19;92:12;
93:8;97:3;100:12;
101:15;110:5,23;
111:11,20,22;114:16;
116:3
**one-on-one (2)**
22:13;23:5
**ones (3)** 27:22;55:24;
62:10
**only (19)** 7:3;11:13;

16:16;19:7;39:14,21;
40:5,10;42:21;50:12;
53:10;54:11;55:20;
62:10;79:7;84:23;
89:1;109:7,11
**open (39)** 11:24;
41:14,19,25;45:9;
53:18,19;54:3,8,17,
21;58:3;60:1;73:16;
91:7,23,24;92:11,22;
93:10,11;97:3;98:4,6,
7,13,15,15,21;99:5,6,
7,10;101:5;102:20;
105:13,16;110:3,11
**openable (1)** 91:18
**opened (32)** 15:21;
41:12;44:21,21;
45:12;46:2;47:5;
51:23;52:13,16,22;
53:22;54:7,8,10;
55:18;62:14;63:25;
64:1;68:14;73:17;
86:17;91:10,15;
102:13,17,23,25;
103:3,5;107:25;
111:1
**opening (4)** 41:20;
78:4;107:14;116:16
**operative (1)** 10:3
**operator (1)** 91:23
**opinion (1)** 56:1
**opportunity (2)** 5:18;
83:9
**opposed (1)** 14:10
**order (9)** 18:1,2;
53:18;78:21;93:9,19;
102:7,19;110:7
**orders (8)** 92:3,5,8,
10,18,23;93:13,21
**out (73)** 6:22;11:9,12,
18,21;14:20;25:18;
26:17;27:3;31:19,20;
34:8;35:12;36:1;
39:12;45:7,8;46:8,12,
20;47:4;53:19;57:3,
17,18,22;58:3,17,18,
19,21,23;59:13,17;
60:3,6;61:3,25;62:9,
10,15,21;63:16,24;
65:18;66:22;67:5,20;
68:5,8,15;78:11,20,
25;79:11;85:19;
88:15;89:25;90:9,18;
95:7;102:15;103:8,9,
13,14,22;104:3,7,
107:16;110:4,17,22,
23
**outfield (1)** 87:15
**outlines (1)** 93:10
**outside (11)** 17:25;
54:12;68:21;69:23;
70:9,11;74:23;91:16;
103:10,18;109:23

**over (29)** 6:23;19:20;
32:19;37:23;40:21;
47:21;48:6,7,11,11,
20;49:5,7,7,12,13,14,
15;59:11;64:25;
65:13;72:17,20;80:6,
7,10,13;95:17;100:5
**own (1)** 79:8

---

**P**

**Pacheco (18)** 11:16;
12:12;19:15,16,23;
36:1;37:2;39:13,17,
25;65:22;69:2,4,8,11;
109:15,21;111:8
**page (6)** 25:3;52:8,9;
57:1,14;68:24
**pain (1)** 79:24
**panel (1)** 19:1
**paper (1)** 79:8
**paperwork (1)** 20:8
**paragraph (3)** 59:22,
24;109:8
**parents (1)** 23:18
**part (17)** 13:20;
24:15;30:15;35:22;
37:20;42:25;47:20,
20;81:11;88:6,24;
109:3,4,5,7;113:11;
114:21
**particular (1)** 97:21
**partner (4)** 11:16;
37:2;38:9;100:5
**parts (1)** 32:2
**pass (4)** 59:13;78:11,
19;79:10
**past (1)** 47:17
**paste (1)** 109:4
**Patrick (2)** 81:21,23
**paying (3)** 44:10;
65:4;111:12
**Pedro (2)** 7:25,25
**pen (4)** 12:19,20;
14:17,23
**people (7)** 53:10;
54:12;65:12;69:15;
99:3;102:15;109:16
**per (2)** 76:22,25
**Peralta (17)** 70:12;
72:2,3,7,11,18,21;
74:13,16,24;75:1;
82:16,17;101:2,4,7,
13
**period (2)** 34:15,20
**permanent (1)** 114:1
**person (2)** 45:22;
96:17
**personal (2)** 9:21;
24:9
**personally (1)** 34:8
**person's (1)** 105:19
**Petrick (4)** 81:21,22,

23;82:1
**phone (4)** 20:17,18;
81:6;106:8
**phones (1)** 20:19
**pick (2)** 78:3;114:24
**picked (1)** 37:11
**pictures (1)** 31:21
**piece (1)** 86:10
**place (6)** 10:15;
33:11;38:2;66:23;
73:5;107:3
**places (2)** 10:24;15:2
**plaintiff (2)** 5:10;24:5
**please (6)** 6:21;7:8;
15:15;37:21;52:5;
55:5;60:17,24;67:3;
69:22
**plus (1)** 99:3
**pm (5)** 82:24;94:3,3;
112:9,9
**point (16)** 17:4,11,19;
31:24;32:18;33:8;
36:16;43:10;83:8;
86:21;92:16,22;
93:11;102:17;
107:13;110:15
**pointed (3)** 25:18;
43:20,20
**points (7)** 10:13;
16:11;92:25;93:3,5,
15;116:17
**policies (2)** 113:1;
116:15
**popped (1)** 97:3
**ports (1)** 93:2
**possible (2)** 109:22,
24
**possibly (1)** 49:24
**post (4)** 11:3,6,7;
20:12
**posted (1)** 11:4
**postgraduate (1)** 8:15
**practices (1)** 65:17
**precise (2)** 98:19;
103:3
**prefer (1)** 24:19
**premises (1)** 114:13
**preparation (1)** 23:8
**prepare (2)** 9:17,19
**pressure (1)** 79:9
**pretty (2)** 58:6;104:19
**prevent (4)** 50:9,13;
57:18;62:20
**Prior (6)** 7:20;9:4,8;
21:18;22:8,23
**prison (6)** 20:19,21;
25:21,23,25;104:7
**probably (5)** 6:5;10:8;
15:1;23:12;70:23
**problem (1)** 106:23
**problems (2)** 26:1,2
**procedure (1)** 65:6
**professional (1)** 96:5

23;82:1
**profusely (1)** 79:22
**programs (20)** 13:20;
16:21,23;17:20;21:3;
37:24;47:22;49:12,
17;72:24;73:1,3,9;
80:5,24;81:5;82:14;
90:24;91:12;97:14
**promise (1)** 6:23
**promoted (2)** 94:13;
96:1
**proper (2)** 102:13,14
**property (1)** 70:2
**protect (2)** 58:21;63:6
**protecting (2)** 58:18;
64:16
**provide (4)** 10:9;
12:19;80:20,22
**provided (1)** 10:22;
82:7;84:25
**psychology (1)** 8:10
**pulled (3)** 63:4,5;
73:23
**pulling (1)** 74:4
**Puri (15)** 11:17;
19:24,25;25:8,12;
26:10,21,22,25;
29:15;32:7,14;33:8;
37:18;69:3
**purpose (1)** 63:1
**purposes (2)** 14:8;
23:19
**push (3)** 45:3;46:5;
53:19
**pushed (5)** 46:11,19;
110:16,17,23
**pushing (1)** 45:2
**put (11)** 11:1;14:6;
17:6;24:13;32:12;
41:11;48:22;49:17;
73:3;79:8;108:22
**puts (1)** 82:24
**putting (3)** 10:13;
17:8;33:13

---

**Q**

**quarterly (2)** 115:16,
18
**quick (1)** 41:22
**quite (1)** 75:19

---

**R**

**race (12)** 22:25;
25:19;26:2,12;28:22;
36:17;57:10;71:17,
18,19;90:13;92:7
**racial (2)** 30:11,11
**racially (2)** 24:11;
25:19
**radio (15)** 25:8;
26:23;35:2,10;64:20,
25;65:1,4,5,7,10,13,

Garcia vs. Ryan
2:13-cv-1591-DJH(DMF)

Minerette Jasso
November 29, 2018

13,19;81:4
**radios** (1) 64:18
**ramada** (2) 31:15;
34:7
**ran** (9) 37:22;40:12,
14,22;42:8,9;44:14;
62:14;68:15
**rather** (1) 24:20
**reached** (1) 40:2
**reaction** (3) 72:17,19;
88:7
**read** (11) 9:22,25;
10:11;26:15;29:5;
34:11;37:20;57:1;
69:1;96:24;108:15
**reading** (1) 27:10
**reads** (1) 26:22
**real** (1) 41:22
**realize** (2) 14:17;93:4
**really** (7) 6:13,24;
60:12;69:18;79:6;
106:3;113:9
**re-asking** (1) 67:4
**reason** (6) 10:7;37:3;
38:23;68:10;75:22;
91:21
**reasonably** (1)
116:11
**reasons** (1) 68:10
**rec** (5) 50:20;85:22,
23;87:24;110:12
**recall** (24) 14:9;
19:18;20:21;25:11;
28:25;30:7;31:5;
32:20;43:23;45:15;
71:7;73:19;74:1;
75:2;81:13,18,25;
82:6;84:1,2;96:3;
100:20,23;113:24
**recalled** (1) 110:20
**receive** (3) 11:11;
113:10;115:9
**received** (5) 84:23;
115:11,12,15,18
**Recess** (3) 55:13;
94:3;112:9
**recognition** (1) 115:9
**recognize** (3) 23:21;
30:11,24
**recollection** (5) 36:16;
38:2;47:12;110:24;
114:9
**record** (10) 6:22;7:8;
49:4;55:15;57:9,13;
85:11;94:6,6;107:3
**recorded** (2) 85:8,9
**recreation** (7) 83:2;
85:25;87:25;88:12;
89:5,7,8
**recreational** (2)
50:22;86:13
**recreations** (2) 72:4;
90:24

**reference** (1) 83:8
**referenced** (1) 29:18
**refresh** (2) 100:16;
109:17
**refreshes** (1) 108:17
**refrigerator** (1) 79:16
**regarding** (2) 5:19;
92:20
**regular** (2) 68:2;87:7
**relate** (1) 113:1
**related** (1) 115:20
**relatively** (1) 95:24
**relay** (1) 35:4
**religious** (1) 89:20
**relocated** (1) 14:6
**remember** (15) 9:12;
11:20;21:22;25:15;
27:11,13,13;29:21;
36:20;44:20;45:3;
74:9;81:16;91:9;
109:12
**remembering** (1)
27:11
**remind** (2) 52:6;55:5
**removing** (1) 116:22
**repeat** (3) 15:9;
32:13;93:8
**repeating** (1) 86:21
**rephrase** (1) 6:4
**report** (19) 9:21,22;
10:11;15:18;20:13,
14;23:23;24:21,24,
24,25;26:22;83:22;
84:17;108:16,19;
109:2,25;114:13
**reported** (1) 81:7
**Reporter** (1) 5:3
**reports** (1) 100:12
**represent** (1) 5:10
**representing** (1) 24:4
**request** (1) 64:22
**require** (1) 91:10
**required** (1) 37:16
**reread** (1) 9:21
**respectful** (1) 77:7
**respond** (4) 35:6;
76:6;82:11;113:3
**responded** (1) 65:12
**responder** (1) 116:13
**responders** (1) 91:22
**responding** (1) 113:1
**response** (2) 82:10;
114:22
**responsibility** (2)
65:9;76:6
**responsible** (1) 19:22
**rest** (3) 45:6,6;59:22
**result** (1) 114:2
**returned** (2) 62:1;
84:5;114:17,18
**returning** (1) 67:6
**review** (2) 15:19;
21:20

**reviewed** (1) 21:18
**right** (57) 7:7;15:25;
16:2;18:13;25:9,12,
13,21,22;26:11,20,
24;27:23;28:7;30:1;
31:11;34:11;35:22;
36:25;39:12;40:2,11;
42:2,9,20;43:3;
44:13;48:19;59:14;
61:18;65:5,14,15;
66:8,18,24;67:1,12;
72:11;75:20;76:8;
83:17;88:4;91:14;
97:4,6,7,23;99:3;
102:18,23;103:6;
105:17;106:2;108:5;
114:17;116:10
**riot** (2) 22:25;23:2
**rioting** (4) 99:4;103:7,
22;107:23
**risk** (14) 103:7,9,12,
17;104:5,7,9,10,11,
12,22,24;105:1,8
**risks** (1) 103:14
**Rita** (15) 10:12;11:5;
12:21;16:7,9;19:7;
31:22;35:3;50:10,14;
51:19,20;95:16;
115:3;116:12
**road** (8) 59:7;60:14;
86:3,7;88:20;89:9,10,
25
**roadway** (1) 103:19
**rocks** (3) 44:9;111:7;
112:1
**room** (44) 11:17,19;
17:14;18:23,24,25;
20:1,2;25:9,17;26:23,
25;27:4;29:10,14;
31:7,13,17,19,20,21,
23,23;32:19,23;
33:11;34:5,9;36:2;
37:12,15;38:3;40:9;
41:2;69:3,9;83:2;
90:24,24;91:11,15,
18,23;97:4
**rooms** (1) 31:22
**rude** (1) 38:7
**rule** (1) 6:11
**rules** (1) 92:2
**run** (38) 12:16,16,16,
16;25:10;26:11,18,
19,24;27:14,16,20,
20,20,20,23,24;28:3,
4,6,21;29:1,9;31:14;
33:17,18,18;34:6;
36:2;38:4;40:13;
48:18;50:20;51:11,
12,13,13;110:4
**Runge** (10) 100:13,
14,15,15,21;109:13,
15,19,22;111:4
**Runge's** (1) 109:25

**runned** (1) 100:5
**running** (8) 27:16;
42:13,18;43:12,15;
71:10,11;111:8
**runs** (5) 12:14,15,15;
33:19;87:5
**Rush** (1) 110:6
**rushed** (8) 38:20;
44:23,24;52:10;
55:17,19,23;56:5
**rushing** (7) 55:24;
56:2,20;64:9;71:9,11,
13

---

**S**

**safe** (5) 38:9,10;69:2;
91:24;92:13
**safety** (1) 68:10
**sally** (1) 93:2
**same** (19) 6:24;14:3,
6;23:12;24:13;47:22;
51:25;66:1,10;67:12;
68:5,6,8,10;95:9,12;
106:3;107:10;114:18
**San** (2) 7:25,25
**Santa** (15) 10:12;
11:5;12:21;16:7,9;
19:7;31:22;35:3;
50:10,14;51:19,20;
95:16;115:3;116:12
**sat** (1) 69:18
**saw** (20) 29:9;40:24;
41:7;42:3,4;43:19;
49:5;64:5;68:25;
69:2,16;70:12,17;
72:13;84:6;97:23;
100:13;101:7;110:3;
111:22
**saying** (7) 48:9;51:9;
87:12;93:4;98:22;
100:9;107:24
**scar** (3) 114:3,4,14
**school** (6) 7:22,24,25;
9:1,6;24:11
**schools** (1) 9:9
**scores** (2) 47:13,15
**Scott** (1) 5:9
**screaming** (1) 31:4
**second** (7) 26:20;
34:16;39:2;47:20;
70:17,18;100:7
**section** (6) 25:3;
33:16;42:16;48:19;
50:14;88:13
**sections** (1) 13:16
**secure** (14) 46:13;
49:17;57:4;58:6,11,
15;59:15;62:16,17,
18;73:6;76:3;110:14,
18
**secured** (13) 18:24;
46:21,24,25;47:1;

58:20;68:22;92:13;
101:5,20;104:15;
110:15,25
**securing** (1) 61:5
**security** (2) 11:8;32:1
**seeing** (1) 100:23
**seem** (3) 25:9;26:11,
24
**seems** (2) 33:10;69:7
**Segura** (4) 75:13,17;
76:1;82:19
**sense** (4) 6:1;38:1;
62:12;97:2
**sent** (1) 66:2
**sentence** (26) 25:7;
26:15;29:6,7,12;
31:11;34:12;35:23;
37:21;40:11;47:21;
52:5;55:16,18;56:8,
13,25;68:25;69:21,
25;72:1,22;78:9;
80:23;81:10;82:21
**separated** (1) 14:1
**September** (15) 5:20;
9:11;13:3;14:19;
21:22;22:8,23;68:1;
85:16;90:12;95:13;
113:4;114:2;115:4,
10
**Sergeant** (53) 20:4,
15;29:11,17,22;
40:24;41:11;42:4,11;
44:20;45:1,12,20;
46:7,18;52:12,21,24;
53:23;58:14;62:15;
68:15,20;73:25;
74:12,17,19;90:19,
22;91:21;94:7,9;
95:10,14,16,18,20,22,
24;96:6;97:19;99:19;
100:10;107:25;
108:17,19;109:2,10;
110:4,14;114:21;
115:6,6
**sergeant's** (3) 21:6;
89:15,17
**Services** (2) 85:1;
89:21
**set** (6) 20:12;39:18;
73:19;90:25;91:6;
92:2
**several** (3) 15:1;90:4;
98:19
**shack** (2) 72:4;
110:12
**share** (3) 33:22;49:2
**shift** (2) 95:12,25
**shifts** (2) 95:9,10
**shivs** (1) 44:5
**short** (1) 84:3
**show** (1) 15:15
**shrug** (1) 6:16
**side** (6) 36:9,10;

Garcia vs. Ryan
2:13-cv-1591-DJH(DMF)

Minerette Jasso
November 29, 2018

47:25;49:20,22;
57:25
**sides (1)** 28:5
**Sierra (2)** 9:1,1
**signs (1)** 30:25
**simply (1)** 45:10
**site (3)** 82:23,25,25
**sitting (2)** 24:4;72:7
**situation (3)** 21:22;
24:8;64:22
**situations (1)** 24:12
**six (3)** 9:7;114:5,6
**skipped (1)** 81:3
**slowing (1)** 39:9
**small (3)** 87:4,14;
88:22
**so-and-so (3)** 82:4,4,
5
**socks (2)** 44:8;112:1
**softball (1)** 50:25
**solution (1)** 58:7
**somebody (6)** 17:9;
34:25;40:24;62:14;
73:14;102:22
**someone (3)** 17:12;
30:22;105:15
**someone's (1)** 87:2
**someplace (2)** 20:20;
101:24
**Sometimes (3)** 67:22,
23,23
**somewhat (1)** 106:9
**somewhere (2)** 17:3;
79:1
**soon (4)** 36:7;74:15;
82:9,12
**sorry (11)** 14:13;
15:14;45:16,23;
54:23;63:25;77:23;
81:3;103:2;107:7;
112:6
**sounds (1)** 106:15
**Sources (1)** 85:2
**south (1)** 114:15
**space (1)** 34:16
**spatially (2)** 11:1;
56:15
**speak (5)** 23:9;74:15;
79:18,19;85:5
**speaking (3)** 6:23;
13:5;16:15
**specialized (2)** 113:8;
116:8
**specific (4)** 30:8;
56:21;83:8;93:22
**specifically (7)** 5:20;
6:8;25:16;59:21;
65:2;92:24;113:2
**specifies (3)** 92:14;
93:14,22
**specify (1)** 113:9
**speculation (6)** 32:10;
46:15;57:9;96:21;

103:25;104:17
**speculative (1)**
104:19
**spell (1)** 81:20
**spoke (3)** 81:16,17;
85:5
**spoken (1)** 23:14
**spray (2)** 39:19,24
**sprayed (1)** 43:15
**sprayer (1)** 39:20
**square (1)** 48:3
**staff (18)** 16:12;
17:12;20:10;37:22;
40:12,23,23;42:8,10,
11;44:14;82:24,25;
83:12;86:7;104:10,
13,22
**staff-only (2)** 31:15;
34:7
**stamp (1)** 82:22
**stand (1)** 80:15
**standard (1)** 65:6
**standing (5)** 26:16;
27:1;39:25;42:20;
53:17
**start (10)** 5:11;6:21;
7:14;10:25,25;24:17,
21;26:1,8;68:11
**started (17)** 20:14;
26:17;27:14;34:14,
19;35:15,16;36:2,7,
24;37:23;45:2;47:21;
49:11;70:2;72:25;
110:3
**starting (4)** 25:19;
29:24;30:2;72:2
**starts (1)** 109:9
**State (6)** 5:22;7:7;
8:3;35:5;80:7,9
**stated (11)** 12:4;25:8,
12;26:22;46:21;
49:25;63:21;79:23;
80:6,10;104:21
**statement (2)** 49:11;
85:8
**stay (2)** 82:19;106:20
**stayed (2)** 27:5;82:20
**staying (1)** 42:9
**step (2)** 103:10;107:5
**stick (1)** 43:21
**sticks (1)** 43:20
**still (9)** 6:7;18:3;
43:14;52:8,9;86:12;
88:6;106:24;114:3
**stood (2)** 42:14;100:2
**stop (13)** 26:20;
34:16;38:25;39:2,11;
46:19;51:15,16;
56:11;57:5;58:24,25;
80:1
**stopped (1)** 36:3
**story (1)** 45:24
**straight (1)** 79:21

**strike (1)** 70:8
**stuck (1)** 52:4
**studies (1)** 8:10
**subject (1)** 5:21
**substitute (1)** 8:25
**success (1)** 39:1
**successful (5)** 39:4,5,
9;58:10;62:16
**suggested (1)** 37:19
**Summary (1)** 25:4
**supervisor (9)** 20:9;
41:2;94:11,18;96:16;
115:16,17,17,18
**support (11)** 113:6,7,
11,11,12,15,18;
114:23;115:5,8;
116:8
**supposed (6)** 38:6;
60:15;61:5;66:19;
77:21,23
**sure (43)** 5:25;11:9,9,
10,11,11;23:22;
32:14;33:19;34:2;
38:9;39:12;40:8;
44:1;50:4;52:4;
58:16;60:25;63:7;
64:13,17;66:5;72:17;
73:8;74:14;75:15;
77:1,20,22,23,25;
78:7,19;79:4,8;
81:25;85:11;91:25;
96:18;97:16;98:20;
100:4;112:7
**surrounded (3)** 36:4,
9;70:10
**surrounding (2)** 43:8;
53:13
**surroundings (1)** 38:8
**sustained (1)** 113:20
**swarmed (1)** 111:9
**switched (1)** 12:24
**sworn (1)** 5:2
**system (1)** 34:22

---

### T

**table (2)** 7:4;24:4
**tactical (7)** 113:6,7,
15,18;115:5,7;116:8
**talk (5)** 58:24,25;
69:13,15;82:22
**talked (3)** 39:16;
69:11,19
**talking (8)** 12:23;
42:13,14,16;50:4;
63:8;85:24;86:10
**talks (1)** 92:24
**tall (1)** 87:2
**taught (5)** 24:10;30:4,
13,19;58:7
**teach (1)** 30:5
**teacher (3)** 8:25;9:5,9
**teaching (2)** 24:10;

30:15
**team (1)** 114:23
**telling (1)** 45:3
**tells (1)** 98:21
**tend (3)** 59:20;83:4;
92:19
**tending (1)** 72:8
**tense (2)** 24:12;107:6
**tenure (1)** 115:13
**term (4)** 74:7;92:25;
98:18;107:23
**terms (4)** 30:2;54:10;
98:11;116:16
**testified (10)** 5:4;
41:18;52:21;59:14,
19;67:2;86:20;
111:18;114:12;116:7
**testify (1)** 49:5
**testimony (2)** 52:18;
101:4
**there'd (1)** 103:6
**thinking (1)** 29:1
**third (3)** 10:3;68:24;
88:1
**third-party (1)** 76:10
**thirty (2)** 61:17;71:20
**thirty-three (3)** 13:22,
23;17:15
**Thompson (49)** 20:4,
16;29:11,18,22;
40:24;41:12;42:4,11;
44:20;45:2,12,20;
46:7,18;52:12,21,24;
53:23;62:15;68:15,
20;73:25;74:12,17,
23;90:19,22;91:21;
94:7,9;95:10;96:6;
97:19;99:19;100:10,
16,25;101:2,3,13,20,
22;107:25;108:18;
110:4,14;115:6,6
**Thompson's (4)**
58:14;108:19;109:2,
10
**though (2)** 96:16;
107:19
**thought (1)** 83:22
**three (66)** 9:4;11:5;
12:5,21;13:2,5,6,8;
14:21;15:12;16:8,12,
20;17:13,17,24;
18:19,20;19:8,11;
20:3;21:1;25:6;
43:13;50:11,13,16;
51:4;56:22;61:13;
65:1,16,17;66:6,8,14;
68:4,16,17,21;69:23;
70:1,9;73:10;74:10;
76:2;84:6;85:20;
86:1,22;88:24;91:9,
12,17;95:17;97:13,
14;99:3;101:24,25;
103:22;104:13;

109:17,19,23;116:13
**three-quarters (1)**
109:8
**throw (1)** 6:5
**throwing (1)** 70:17
**ticket (1)** 66:22
**tier (1)** 70:18
**tiers (1)** 28:3
**times (7)** 5:25;6:4;
32:12;66:7,9;88:13;
98:19
**today (4)** 6:14,19;
9:10;14:4
**today's (4)** 5:24;9:17;
21:18;23:8
**together (4)** 11:1;
73:9;94:10;95:11
**told (10)** 16:16;26:10;
29:23;32:7;45:4,21;
82:2,8;83:13;98:13;
99:10;111:13
**took (8)** 10:14;56:18,
24;64:13;70:6;83:16;
107:3;115:22
**tool (1)** 37:9
**top (2)** 95:6;109:4
**total (1)** 12:15
**totally (1)** 54:4
**tough (2)** 107:8,12
**towards (21)** 21:8;
36:2;38:4;40:13,25;
41:9;43:11,15;48:4;
51:13,14;55:24;63:3,
23;64:6,9;71:3,9,10,
11,13
**towels (1)** 79:8
**town (1)** 9:10
**track (1)** 96:3
**traffic (1)** 65:1
**trained (5)** 30:3;
113:3;116:20,22,23,
24
**training (7)** 23:19;
30:10;77:10;113:8,
10;116:8,9
**transported (2)** 78:23;
79:3
**trauma (2)** 23:11,14
**traumatic (3)** 23:25;
24:7,14
**treat (1)** 84:22
**treated (2)** 77:25;
78:23
**treatment (3)** 77:13,
14;84:23
**tried (2)** 57:2,16
**trouble (1)** 104:14
**true (1)** 102:22
**trust (1)** 96:10
**truth (3)** 5:3,3,4
**try (12)** 6:4,14,17,24;
13:3;30:22;57:3;
58:6;68:7,9;82:11;

Case 2:13-cv-01591-DJH-DMF   Document 298-5   Filed 05/17/19   Page 128 of 134

Garcia vs. Ryan
2:13-cv-1591-DJH(DMF)

Minerette Jasso
November 29, 2018

106:19
**trying (13)** 6:20;25:2;
38:7;39:6;54:24;
57:18,21;60:19;80:4;
92:17;95:7,8;110:14
**TSU (1)** 113:5
**Tucson (3)** 11:5;12:8;
14:15
**turn (9)** 11:9,12;46:1;
48:4;65:18;67:20;
68:8;85:19;99:23
**turned (8)** 26:17;
45:1;61:25;65:5,7,
13;68:5;88:15
**turning (3)** 67:5;
70:15,16
**TV (1)** 35:10
**TVs (2)** 70:17;111:7
**Twelve (5)** 7:16,18;
30:6;115:14,14
**twenty (1)** 67:22
**twenty-five (3)** 13:8;
21:1;71:20
**twenty-nine (13)**
15:25;16:1,25;18:3;
20:23,24;21:2;33:5,6,
10;40:15;48:12;59:4
**twenty-one (2)** 13:14;
21:9
**twenty-seven (3)**
60:13,13,15
**twenty-six (1)** 13:11
**twenty-two (1)** 13:18
**two (55)** 12:14,15;
16:13,16;17:10;18:4;
19:10,10;22:15;28:1,
1;36:14;43:13,19;
49:9;50:15,17;51:22;
53:10;54:11;60:4;
61:2,3,6,12,24,25;
62:6,6,8,11,25;63:14,
22;65:19,24,24;66:1,
6,7,14;67:10;68:4;
71:5,8,17;72:8;
73:22;74:10;76:2;
81:11;85:20;86:1;
94:17;103:20
**Two-year (1)** 8:7
**type (3)** 35:6;79:14;
80:20
**types (4)** 22:16,18;
23:4;30:18

**U**

**Ultimately (2)** 58:10;
105:25
**unable (1)** 91:20
**unattended (1)** 89:12
**uncomfortable (1)**
107:8
**under (2)** 30:21;99:8
**Understood (5)**

21:10;40:7;50:1;
53:21;64:11
**unfamiliar (1)** 12:11
**Unified (1)** 9:6
**unit (51)** 10:12;11:5;
12:8,21,21,25;13:5;
14:5,12;16:7,9,12,20;
17:13,17;18:20;19:7,
7,8,9,9;21:5,8;50:14;
51:18,19,20;64:18;
67:17;76:24;78:24,
25;79:3,5;84:9,10,24;
94:10;95:16,18;
113:6,7,11,12,15,18;
115:3,5,8;116:8,12
**units (1)** 12:24
**University (2)** 8:3;
114:15
**unless (7)** 6:8;14:6;
18:5;51:22;60:14;
86:16;103:15
**unlocked (3)** 54:1;
86:17;98:9
**unlocks (1)** 46:1
**unsecure (10)** 54:25;
91:20;97:5;98:17,23,
23;102:2,8;104:24;
105:18
**unsecured (25)**
15:22,23;18:24;
41:18,25;42:15;
44:15,17,18;45:10,
18;54:1,9;62:13;
68:14;90:7,17;98:10;
99:12,15,24;102:14,
16;103:4;105:8
**unsecuring (8)** 41:20;
43:2;102:24,25;
103:1,2;107:13,14
**up (13)** 11:24;15:15;
23:5;27:23;37:11;
56:3;66:2;78:3;79:3;
80:15;99:2;106:21;
114:24
**upper (1)** 116:23
**upset (4)** 30:21;31:3,
8,9
**use (20)** 12:20;13:2,
3;14:9,23,24;23:1;
24:21;37:7,16;39:13,
23;88:20,25;89:10;
97:2,8,10;98:11;
107:23
**used (20)** 32:1;34:18,
20;35:23;36:6;38:23;
39:17,20,21,22;40:6;
43:17;57:3;58:5;
61:9;62:18;74:7;
77:14;98:18;111:23
**using (18)** 12:24;
14:17;17:11;37:3,6;
38:19;43:23,23,24;
44:8;58:10;62:17;

81:4,6;92:25;111:6,
11,13

**V**

**vantage (3)** 31:24;
32:18;33:8
**versus (1)** 5:22
**via (3)** 35:9,10,10
**vicinity (2)** 47:23;
48:14
**videoed (1)** 85:10
**violent (1)** 43:10
**visitation (3)** 13:24;
17:14;89:21
**Vista (2)** 9:1,1

**W**

**wait (1)** 49:1
**waiting (1)** 40:23
**walk (13)** 17:15;20:9;
38:3;86:7,11;87:20;
88:15,17,20;89:12,
14,16;103:13
**walked (5)** 34:8;36:1;
44:22;83:12;84:9
**walking (10)** 26:18;
27:14;29:8,9;31:18,
20;36:2;71:12;85:21;
103:20
**walks (1)** 86:8
**walkway (1)** 89:1
**walkways (4)** 88:23,
25;90:1;103:19
**warden (2)** 83:16;
84:5
**watch (12)** 32:2;38:6,
11;56:17;83:9,10;
99:19,20,23;100:9,
11;101:11
**watching (5)** 35:11;
56:16,16;99:16,18
**way (16)** 10:5;21:5;
45:6;46:5;48:17,18;
52:13;53:20;69:8;
78:24;86:5,11;88:1;
107:7;109:9;116:25
**ways (1)** 75:19
**weapons (7)** 43:17;
44:1,5;56:6;111:6,11,
24
**weird-shaped (1)**
88:4
**welcome (2)** 6:3;
28:18
**weren't (3)** 56:15,16;
101:11
**Wexford (1)** 85:1
**what's (4)** 24:24;
29:24;35:5;88:5
**whatsoever (1)** 7:2
**Where's (1)** 86:19

**wherever (2)** 17:3;
51:12
**Whetstone (2)** 14:12,
15
**white (8)** 36:5,10,11;
38:18;57:6;59:16;
110:3,11
**whites (7)** 31:13;
34:5;36:17,22;45:6;
57:19;110:2
**whittle (1)** 94:1
**whole (5)** 5:3;76:24,
24;95:18;115:2
**Whose (2)** 96:18,24
**wide (1)** 98:15
**Winchester (1)** 95:11
**wire (1)** 50:5
**wish (1)** 48:15
**within (3)** 66:9,10;
67:24
**WITNESS (9)** 14:15;
15:11,16;49:6,13;
55:10;83:20;96:22;
105:23
**witnessed (1)** 70:5
**wondering (1)** 92:20
**word (1)** 23:2
**words (2)** 24:18;
109:10
**work (1)** 7:11;14:12;
16:6;19:7,8;23:19;
95:9,17;97:1;107:11,
12
**worked (16)** 19:6,9,9,
10,11;75:8,9;90:4;
94:10,12,15,20;
95:11,12,25;115:4
**working (13)** 7:14,20;
8:16,23;14:11;19:4,5,
6,14;21:25;76:11,19;
116:12
**works (1)** 75:16
**worry (1)** 83:14
**write (1)** 48:16
**writes (1)** 110:1
**written (1)** 92:24
**wrote (7)** 15:18;
28:20;35:14;74:21;
84:17;111:4,5

**Y**

**yard (135)** 11:4,4,6,
13,15,16,24;12:5,5,
15,25;13:2,2,6,8,10;
14:21;15:12;17:15,
16,24,25;19:10,10,
11,11;19:20;7:8,22;
21:1,6;25:6;27:9,18;
28:16;29:23;31:24;
32:3,17,19,21;44:4;
50:11,13,15,16,17,20,
22;51:4,4,22,25;52:1;

60:4,6;61:2,3,5,12,
13,13,24;62:6,6,8,9,
11,25;63:2,14,15,15,
15,16,17,19,22;65:1,
2,3,16,17,23,24;66:1,
6,6,7,8,13,14;67:10;
68:4,4,15,17,21;
69:23;70:1,9;71:5,8,
17;75:21;76:23,24,
24,25;84:5,14,16;
85:20;89:17;90:20;
91:16;93:3;95:17;
98:3;101:24,25;
103:18,20,22;104:12;
109:17,19,23;110:10;
114:18,24;115:2,2;
116:13
**yards (9)** 12:23;
61:24;63:12;65:8;
76:2,19;85:20,25;
86:22
**year (2)** 7:17;115:18
**years (14)** 7:16,18;
9:4,7;16:8;23:18;
30:7;90:4;94:16,17;
95:22;114:5;115:14,
15
**yelled (1)** 110:5
**yelling (1)** 31:4
**yellow (1)** 14:25

**0**

**001108 (1)** 57:14

**1**

**1 (5)** 10:18,20,23;
32:22;49:4
**1074 (1)** 108:19
**11:02 (1)** 55:13
**11:10 (1)** 55:13
**12:01 (1)** 94:3
**12:14 (1)** 94:3
**12:40 (1)** 112:9
**12:45 (1)** 112:9
**1713 (1)** 109:9
**180 (3)** 19:20;76:22,
25
**1810 (2)** 82:23;83:7

**2**

**2 (2)** 21:12,14
**20 (2)** 11:3;68:1
**2006 (3)** 7:19,19;22:2
**2012 (18)** 5:20;9:12;
11:3;14:3,9,19;
21:23;22:9,23;68:1;
88:14;90:12;95:13;
113:4,15;114:2;
115:4,10
**20th (13)** 5:20;9:11;

Garcia vs. Ryan
2:13-cv-1591-DJH(DMF)

| |
|---|
| 14:19;21:23;22:8,23;<br>85:16;90:12;95:13;<br>113:4;114:2;115:4,<br>10 |
| **3** |
| **3 (2)** 108:24,25 |
| **4** |
| **4:00 (3)** 11:24;12:7,8 |
| **5** |
| **5:00 (1)** 11:23<br>**5:30 (1)** 11:25 |
| **6** |
| **6:10 (1)** 82:24 |

PRODUCED BY AN AUTODESK EDUCATIONAL PRODUCT



**ARIZONA DEPARTMENT OF CORRECTIONS**

**Information Report**

Report Number  12-C02- 3568 D
Report Date  09-20-2012
Page  1 of 3

| To Fay | Title DW | Unit Santa Rita |
|---|---|---|
| From Jasso | Title COII | Unit Santa Rita |
| Subject | | |

**Staff Involved**

| Employee Name (Last, First M I) Puri | Title COII | Badge Number 9778 |
|---|---|---|
| Employee Name (Last, First M I) Pacheco | Title COII | Badge Number |

**Intel**

| Intelligence Category 1 | | Intelligence Category 2 | |
|---|---|---|---|
| Source Type | Source's Last Name | | Source's ADC Number |

**Inmates Involved**

| Inmate Name (Last, First M I.) | ADC Number | Unit | HU/BED | Involved As: |
|---|---|---|---|---|
| Inmate Name (Last, First M.I) | ADC Number | Unit | HU/BED | Involved As: |

| Time 1655 | Date 9-20-2012 | Location Yard 3 |
|---|---|---|

**Summary**

On the above date and approximate time, I, COII Jasso initiated ICS due to grouping on yard 3. COII Puri stated on the radio from the control room that something didn't seem right in A run. I was standing by the gate due to the fact that inmates had turned out to chow, I started walking to A run when I noticed a lot of black inmates moving fast from A run directions. As I was walking to A run, I saw the inmates grouping, I went in the control room and called Sgt Thompson. The blacks were grouping in front of the control room, the whites were grouping in front of B run and some of the Mexicans were grouping by the staff only ramada. At that time, I COII Jasso initiated ICS and all the inmates stated fighting. Chemical agents were used. I ran to the gate to let staff in, some inmates started to climb over the fence by programs. All the inmates rush the gate. Everything happen very fast. I tried to hold the gate so no more inmates would get out, used my hand cuffs

| Employee's Signature *M Jasso* | Title COII #5990 |
|---|---|

**Action Taken**

Comments/Action Taken   Information included in Packet concerning 9/20/12 Disturbance

| Employee's Signature | Title |
|---|---|
| | CO IV |

**Distribution** (Check all that apply)

☐ _____
☐ _____
☐ _____

Entered into Database
By _____
Date _____

1 of 2

ICS 2
8/8/08

CONFIDENTIAL INFORMATION

ADC/GARCIA 001106

EX: 2  DATE 11/29/18
WITNESS: Jasso
NANCY P. RICHMOND, RPR

Information Report Supplemental Cet

Report Number  3 12 C02 3568
Report Date  09-20-2012
Page  2 of X  B to 3

| To | | Date |
|---|---|---|
| Comments/Action Taken | | |
| Employee's Signature | | Job Title |

| To | | Date |
|---|---|---|
| Comments/Action Taken | | |
| Employee's Signature | | Job Title |

| To | | Date |
|---|---|---|
| Comments/Action Taken | | |
| Employee's Signature | | Job Title |

| To | | Date |
|---|---|---|
| Comments/Action Taken | | |
| Employee's Signature | | Job Title |

Distribution (Same as first page)

105-2
9/8/09

CONFIDENTIAL INFORMATION

ADC/GARCIA 001107

**ARIZONA DEPARTMENT OF CORRECTIONS**

Continuation Sheet

To be used as a continuation for all reports. Indicate sections being continued.

| Date | Report Number |
|------|---------------|
| 09/20/2012 | 12 CO7 3568 D |

to try to secure the gate, I saw my co-worker COII Pacheco, safe with COII Purl in the Control room. I was outside the fence of Yard 3. Inmates that were inside yard three started going into cells and destroying property or anything they could get their hands on. COII Peralta was next to an injury inmate by the recreation shack, and there was another inmates there injured. Some of my co-workers, Inmate Brown #147770 and I moved the inmates into the programs building. Inmate Mach or Mash #150002 was really injured bleeding from his mouth it looked like he was going to pass out. Inmate Boak #147511 was also injured, he had a cut on his forehead and his nose appeared broken. Inmate Hughes #184654 was also hurt it appeared like both of his ankles were broken. Once inside programs, I called main control to let them know were I was and how many inmates were injured. I also called medical to give them the names and numbers of the injured inmates. Inmate Brown #147770 was also in the programs building he was not injured. At 1810 hrs, four medical staff were on site. All three inmates were treated by medical and removed from the programs building. Inmate Brown was escorted back to his yard by COII Escarcega. I returned to yard 3 and I saw ADW Days, she walked me to medical for my injured on my left arm. End of report. Report completed at 2125 hrs on Sept. 20, 2012.

| Employee Name (Last, First MI) | Employee Signature and Badge Number | Date |
|---|---|---|
| Tn550, M COII | M Jn050 #5990 | 9/30/12 |

Page 3 of 3

CONFIDENTIAL INFORMATION        ADC/GARCIA 001108

ARIZONA DEPARTMENT OF CORR~~CTIONS

Use of Force/Incident Command Report  Continuation Sheet

| Report Date | Control Number |
|---|---|
| 09/20/2012 | 12-C02-3568 |

Describe incide~~nt in detail (who, what, when, where, why and how). Include a corre~~ physical description, type of weapon used, location of incident, current investigation, number of individuals involved and any unit actions, e.g., suspects, shakedowns, etc. Use additional sheets as necessary. PLEASE PRINT LEGIBLY.

: approximatley 1708 on 9-20-2012, COII Jasso #     contacted myself Sgt Thompson 1189 via telephone, and stated the inmates on yard 3 were grouping. I Sgt thompson. I #1189 stated I would be enroute.

At 1709 I Sgt thompson. I #1189 Called for COII Runge # 6730 and COII Vogel #2426  and  COII Martinez to meet me at yard 3.

At 1711 COII Jasso #     activated ics for several inmates fighting

At 1711 I Sgt Thompson. I and Capt Childree arrived on scene, by this time approximatley 100 inmates began fighting at that point i called control for dart teams to be activated. All .

At 1712  The fight had broken out of yard 3 and was in between  the main rec field and yard 3 fence.

At 1713 I Had COII Jasso and COII Runge and COII Pacheco involved in trying to contain it, but COII Pacheco and COII Jasso were surrounded, at which point myself and COII Runge began Spraying chemical agents into the crowd, COII Pacheco locked himself in the control room and I grabbed COII Jasso out of the crowd and the 3 of us tryed securing the gate on yard 3. The inmates seemed to calm down  when Inmate  Peoples started on the blacks again, I Verbally directed inmate Peoples to stand down when he lunged at myself so i placed him to the ground with the least amount of force necesary. once the inmates backed off i had my staff conduct a outer perimeter to try and secure the group.

At approximately 1708 on 9-20-2012, COII Jason #     contacted myself Sgt Thompson .1189 via telephone, and stated the inmates on yard 3 were grouping.  I Sgt Thompson. I #1189 stated I would be enroute.

At 1709 I Sgt Thompson. I #1189 Called for COII Runge # 6730 and COII Vogel #2426  and  COII Martinez to meet me at yard 3.

At 1711 COII Jasso #     activated ics for several inmates fighting

At 1711 I Sgt Thompson. I and Capt Childree arrived on scene, by this time approximatley 100 inmates began fighting at that point i called control for dart teams to be activated. All .

: 712  The fight had broken out of yard 3 and was in between  the main rec field and yard 3 fence.

At 1713 I Had COII Jasso and COII Runge and COII Pacheco involved in trying to contain it, but COII Pacheco and COII Jasso were surrounded, at which point myself and COII Runge began Spraying chemical agents into the crowd, COII Pacheco locked himself in the control room and I grabbed COII Jasso out of the crowd and the 3 of us tryed securing the gate on yard 3. The inmates seemed to calm down  when Inmate  Peoples started on the blacks again, I Verbally directed inmate Peoples to stand down when he lunged at myself so i placed him to the ground with the least amount of force necesary. once the inmates backed off i had my staff conduct a outer perimeter to try and secure the group.

At 1715 COII luker was asking for back up, seeing that there was no immidiate threat to my staff in that area, i ran to COII Luker #     at yard 4. COII Luker was standing over inmate garcia who was unconsuios and choking on his blood  with his face caved in, I immediatly called medical to respond but they were unable to. I Sgt Thompson I #1189 threw inmate garcia on my shoulder in a firemans carry and ran the inmate to medical.

At 1720 I Linked back up with my staff at Yard 4 which had started to go off, My Staff on that yard secured themselfs into there control room, and myself and COII Runge secured the gate on yard 4 so no more overflow would get on the yard.

| Reviewer Comments |
|---|
|  |

| Reporting Officer's Name | Witness Name |
|---|---|
| thompson i SGT |  |
| Reporting Officer's Signature | Witness Signature |
| Reviewed By: Shift Commander | Chief of Security Officer |
| ..iinistrator/Deputy Warden | Warden |
| Division Director, Offender Operations |  |

Distribution · Original · Master Record File
        Copy · Institutional File

Page ____ of ____

804-2A
3/7/11



EX: 3  DATE 11/29/18
WITNESS: J6550
NANCY P. RICHMOND, RPR