# EXHIBIT D

Ian Thompson - November 29, 2018                    1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


DAVID M. GARCIA,                    )
                                    )
          Plaintiff,                )
                                    )
vs.                                 )  No. 2:13-cv-1591-DJH(DMF)
                                    )
CHARLES L. RYAN, et al.,            )
                                    )
          Defendants.               )
_____ )


DEPOSITION OF IAN THOMPSON

Tucson, Arizona

November 29, 2018

1:49 p.m.


By:  Nancy P. Richmond, CSR, RPR
     Certified Court Reporter
     Certificate No. 50864

1        DEPOSITION OF IAN THOMPSON, commenced at

2   1:49 p.m. on November 29th, 2018, at the offices of

3   the Arizona Attorney General, 416 West Congress

4   Street, Tucson, Arizona, before Nancy P. Richmond,

5   Certified Court Reporter in and for the County of

6   Pima, State of Arizona.

7

8                       * * * * *

9

10  APPEARANCES:

11      For the Plaintiff:
            MILLS & WOODS LAW, PLLC
12          BY:     SCOTT GRIFFITHS, Esq.
                    5055 North 12th Street
13                  Suite 101
                    Phoenix, AZ  85014
14                  (480) 999-4556
                    docket@millsandwoods.com
15

16
        For the Defendants, Jasso, Pacheco, Thompson,
17      Ryan, Thomas, Moody, Runge, Puri, Luker,
        Kokemor, and McCutcheon:
18          MARK BRNOVICH, STATE ATTORNEY GENERAL
            BY:     MICHELLE LOMBINO, Esq.
19                  205 North Central Avenue
                    Phoenix, AZ
20                  (602) 542-7670
                    michelle.lombino@azag.gov
21

22

23

24

25

```
1        For the Defendant, Corizon Health, Inc.:
              QUINTAIROS, PRIETO, WOOD & BOYER, P.A.
2             BY:     ALYSSA R. ILLSLEY, Esq.
                      2390 East Camelback Road
3                     Suite 440
                      Phoenix, AZ, 85016
4                     (602) 954-5605
                      alyssa.illsley@qpwblaw.com
5

6        For the Defendant, Thomas Rawa, M.D.:
              LEWIS BRISBOIS BISGAARD & SMITH LLP
7             BY:     DeeAnn Barnes, Esq.
                      (Telephonically)
8                     2929 North Central Avenue
                      Suite 1700
9                     Phoenix, AZ, 85012
                      (602) 385-7873
10                    deeann.barnes@lewisbrisbois.com

11

12       For the Defendant, Wexford Health Sources,
         Inc.:
13            HINSHAW & CULBERTSON LLP
              BY:     BRAD L. DUNN, Esq.
14                    (Telephonically)
                      2375 East Camelback Road
15                    Suite 750
                      Phoenix, Az  85016
16                    (602) 337-5531
                      bdunn@hinshawlaw.com
17

18

19       Also Present:

20            Chris Dowsey, Paralegal

21

22

23

24

25
```

```
 1                    I N D E X

 2   Examinations                      Page

 3   MINERETTE JASSO

 4   By Mr. Griffiths                    5

 5   By Ms. Illsley                     73

 6   By Ms. Lombino                     75

 7   By Mr. Griffiths                   87

 8

 9                  E X H I B I T S

10

11   No.         Description             Page

12

13   Exhibit 4   Thompson letter of suspension    63

14   Exhibit 5   Thompson performance review      69

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    IAN THOMPSON,
 2    having been first duly sworn by the Certified
 3    Reporter to tell the truth, the whole truth, and
 4    nothing but the truth, testified as follows:
 5
 6                    EXAMINATION
 7    BY MR. GRIFFITHS:
 8         Q.   Good afternoon.  My name is Scott, and how
 9    should I call you today?  Mr. Thompson is how I've
10    been referring to you in my documents.  Is that
11    okay?
12         A.   That's fine.
13         Q.   Okay, cool.  Or Sergeant Thompson, but
14    you're not with the DOC anymore.
15         A.   No.
16         Q.   So I'll just call you Mr. Thompson, if
17    that's all right.
18         A.   Yes.
19         Q.   I represent David Garcia in this case, and
20    he's the plaintiff, and you're a defendant.  And so
21    I should ask, have you ever had your deposition
22    taken before?
23         A.   No.
24         Q.   You never have, okay.
25         A.   No.
```

1      Q.   All right.  I'll explain kind of the

2   rules, and I'm sure you got a little trainer from

3   your attorney as well.  This is my opportunity to be

4   able to ask questions, get information and learn

5   kind of the events that happened on September 20th,

6   2012, so that we can just move forward with the

7   case, okay?  So I'll generally go through records

8   and ask questions about them, ask you to be able to

9   participate.  If you -- if I ask a question and you

10  don't understand what I'm asking, please stop me and

11  say, "I don't understand."

12     A.   Okay.

13     Q.   "I don't know" is an answer, but I'll

14  probably peck a little bit more on those, right?

15  But if you answer a question, I'll -- I'll go with

16  the assumption that you understood it if you

17  answered it.

18     A.   Yeah.

19     Q.   And so that's kind of the first rule of

20  depositions.  The second rule is, you know, yes or

21  no answers, no uh-huh's or shaking of the head

22  because we want to have a clean record for the court

23  reporter.  I will do my very best not to talk over

24  you, but it always happens, right?  And so if -- you

25  know, if I'm asking questions, please let me get it

1    out even though you know what I'm going to ask,

2    probably, and then I will let you finish your answer

3    as best I can.  And I'll catch myself; I'm quite

4    sure of this.

5           Throughout the day, you know, your

6    attorney may jump in with an objection.  This is her

7    opportunity to put an objection on the record.

8    Unless she expressly tells you not to answer that

9    question, then you can go ahead and answer the

10   question after she gets her objection on the record.

11       A.   Got it.

12       Q.   Okay?  And then we'll deal with it at some

13   later point.  Finally, I don't expect this to be a

14   very long deposition, but I always say that.  So if

15   you'd like to take a break, you know, stretch your

16   legs, you need to make a call, something like that,

17   just let us know and we're good.  The only thing

18   I'll ask is if we have an open question, that you

19   just answer it first.

20       A.   Okay.

21       Q.   All right.  So the rules are cool?

22       A.   Yes, sir.

23       Q.   All right.  Cool.  So we're here about the

24   events that occurred on September 20th, 2012.  Do

25   you know the events that I'm talking about?

1       A.   Yes, I do.

2       Q.   In preparation for today's deposition,

3   what did you do to prepare?  And I don't need to

4   know about the types of conversation you might have

5   had with your attorney, but what have you done to

6   prepare?

7       A.   Honestly, just looked over the report --

8       Q.   Okay.

9       A.   -- and my report.

10      Q.   You looked at your report?

11      A.   Yeah.

12      Q.   Did you look at the CIU report?

13      A.   Not that I know of.

14      Q.   All right.  Maybe, can we use Exhibit

15  Number 3 -- I'm sorry -- Exhibit Number 2 -- was

16  that his?  Or I'm sorry, Exhibit Number 3.  So I'm

17  going to show you Exhibit Number 3 from our -- is

18  that the report that you used to refresh your

19  memory?

20      A.   Yes, sir.

21      Q.   Okay.  And is that the only document that

22  you used?

23      A.   There was another one.

24      Q.   Okay.

25      A.   I don't know -- I can't remember what it

1  was called, but it basically is a chronological

2  order of events.

3         Q.    Okay.  Fair enough.  I'm going to --

4  primarily, I'm going to ask you questions starting

5  with what's on there.  We'll get to it eventually,

6  and I have a couple of other exhibits that we'll go

7  through as well.  Start with some basic information

8  about you.  Did you graduate high school?

9         A.    I did.

10         Q.    Where did you go to high school?

11         A.    Tucson High and then a little bit in Palo

12  Verde.

13         Q.    Palo Verde High?

14         A.    Yes.  And I joined the Army from Palo

15  Verde.

16         Q.    And then you joined the military?

17         A.    I did.

18         Q.    What branch of the military?

19         A.    Army.

20         Q.    Was there a particular part of the Army?

21  Like, what division of the Army?

22         A.    It was part of the eighty-second.  I was a

23  paratrooper.

24         Q.    How long were you in the military?

25         A.    I have twenty years now.

1       Q.    Wow.

2       A.    I still am.

3       Q.    You're still in the military?

4       A.    I am.

5       Q.    All right.  I think I saw something --

6    some reference to that in the record, but it's been

7    a few years since that.  So you're still in the

8    military?

9       A.    I am, sir.

10      Q.    All right, cool.  When did you start

11   working for the Arizona Department of Corrections?

12      A.    The first time was 2002.  I did a year,

13   and then I went to college, and then I came back to

14   Corrections, I want to say 2009.

15      Q.    Okay.  And when you went to college, where

16   did you go to college?

17      A.    Pima Community College.

18      Q.    Okay.  Did you finish there?

19      A.    No.

20      Q.    Okay.  And you didn't do any other college

21   or universities?

22      A.    No, just Pima.

23      Q.    What were you studying?

24      A.    Back then it was liberal arts, and then

25   turned to criminal justice once I got into

1    Corrections.

2         Q.   Then you resumed your employment with ADC

3    in 2009?

4         A.   I did around that area.  I'm trying to

5    remember.

6         Q.   Okay.  Between 2002 and 2009, I know you

7    attended college at Pima Community College.  Did you

8    also work?

9         A.   I did.  I was in the Army still.

10        Q.   Okay.

11        A.   So I did full time Army with National

12   Guard and reserves for the border mission, on

13   orders.

14        Q.   So you're in the military now, but you're

15   not full time?

16        A.   No.

17        Q.   I don't know how this works.

18        A.   Right now I'm a reservist.

19        Q.   Okay.

20        A.   So seems like it's full time just 'cause

21   of my position, but --

22        Q.   Okay.  And I see by your shirt looks like

23   Anytime Fitness, as well?

24        A.   I am.

25        Q.   Okay.

1      A.    I'm a training director.

2      Q.    All right.  When did you stop working for

3  the Arizona Department of Corrections?

4      A.    I want to say August of -- been out a

5  year.  It's been about a year I've been out, so.

6      Q.    Okay.  2017?

7      A.    Yes, sir.

8      Q.    On September 20th of 2012, you were a

9  sergeant with the Arizona Department of Corrections?

10      A.    I was, sir.

11      Q.    And before I get to the report, I know you

12  looked at the report and another document to

13  prepare, but what happened that day?

14      A.    I remember I did briefing, kicked

15  everybody out to shift.  They were feeding chow.  I

16  got a call from Officer Jasso in the sergeant's

17  office.  She had called me that there had been

18  grouping on yard three, I think it was.

19      Q.    Okay.

20      A.    I told her okay, I'd be right there.  So I

21  stepped out of the office.  As soon as I stepped out

22  of the office, that's when everything happened; the

23  riot kicked off.

24      Q.    Okay.

25      A.    She had activated ICS on the radio, and I

1    had took off running to yard three.

2        Q.    Okay.  And do you remember what happened

3    after you ran to yard three?

4        A.    When I got to yard three, Jasso was in the

5    middle of the yard.  Obviously, the riot's going

6    off.  So I gathered what stuff I had out.  There was

7    a yard officer, and then there was Officer Jasso,

8    got her out of the yard at that point.

9        Q.    Okay.

10       A.    We tried securing the gate.  It was myself

11   and Jasso.  So we physically held the gate.

12       Q.    Yeah.

13       A.    At that point we were standing on the

14   gate.  I remember inmates chanting, and they said,

15   "We'll just stab them," and they pushed through the

16   gate.  I think at that point I told Jasso to get off

17   the gate.  She got off the gate, and the gate

18   flooded open.

19            I know we tried to secure it some other

20   way.  I think Jasso tried to use handcuffs, but I

21   don't recall that.

22       Q.    Okay.

23       A.    From there it just burst out into between

24   yard three and the rec field at that point.  And

25   then it seemed to calm down for a second, where

1   African American inmates -- that's who everybody was

2   after -- basically were asking for direction of what

3   I wanted them to do.  And then it erupted again with

4   the white boys in there started assaulting them

5   again, physically assaulting them, hitting them.

6          Q.   She'll need you to speak up just because

7   we've got to --

8          A.   Yeah.  From there, I remember it died off.

9   The black inmates ended up by the main control area,

10  where they had staged.  They kind of listened to

11  what I told them to do --

12         Q.   Okay.

13         A.   -- because at the time they had actually

14  had them all calmed down.  So they -- they took off

15  to the -- it's like a little holding area, where it

16  was away from everything.

17         Q.   Okay.

18         A.   But then the other yard started going off.

19  At that point I responded to yard four.  I don't

20  know what happened to Jasso after that, so -- 'cause

21  she went to go do her thing.  And then I took off to

22  yard four to deal with that situation.

23              That's when Luker had called over the

24  radio for -- is it Garcia, for the inmate that

25  was --

Ian Thompson - November 29, 2018                    15

```
 1        Q.    David Garcia.
 2        A.    Yeah, that was the inmate that was down by
 3   the chow hall.  He was calling for help, but nobody
 4   could respond.  Medical can't come on the yard
 5   because the yard was still under a riot.  So from
 6   yard four is when I responded to the Garcia
 7   incident.
 8        Q.    Okay.  All right.  Did you open the
 9   gate --
10        A.    No.
11        Q.    -- to yard three?
12        A.    No.
13        Q.    Who opened the gate in yard three?
14        A.    I have no idea.  It was open when I got
15   there.
16        Q.    It was unsecured.  We established -- we
17   understand it was unsecured by -- by I guess at the
18   time COII Jasso?
19        A.    I wouldn't know that, because it was open
20   before I even got there, so.
21        Q.    Okay.  Who was with you when you came --
22   well, first of all, where were you when you got the
23   phone call from Lieutenant -- I'm going to call her
24   Lieutenant Jasso.  I know she wasn't --
25        A.    I was in the sergeant's office.
```

1      Q.    Okay.

2      A.    That's over to by main control, right by

3  medical.

4      Q.    Okay.  So I have a map there, and I think

5  it's marked as Exhibit Number 1.  If you could

6  maybe -- I know we have some other markings on

7  there.  Can you just point out where you were?

8      A.    It would -- if this is the hallway, I

9  would think the medical is right here.  The yard

10  office would be right about here.

11      Q.    So put a little circle there, if you

12  would, and maybe write next to it "yard office"?

13      A.    Yeah.  It's where we do our briefings and

14  stuff like that.

15      Q.    Okay.

16              MS. LOMBINO:  Do you want to have him

17  initial it?

18      Q.    Yeah.  Put your initials.  I'm not trying

19  to make a real ugly -- I don't think I'm going to

20  ask too many more questions about this map.

21              MS. LOMBINO:  May we all see that?

22              MR. GRIFFITHS:  We're going to pass

23  it around so everybody can see where you were.

24              THE WITNESS:  Okay.

25              MS. ILLSLEY:  I'm sorry.  Did Jasso

1   write in different colors?

2                   MS. LOMBINO:  She did, yeah.  She did

3   use black, yeah.

4                   MS. ILLSLEY:  Maybe we can use

5   different colors.  Do you think you could write in

6   blue?

7                   THE WITNESS:  I can.

8        Q.   Okay.  So when you received the call, you

9   were -- when you received the telephone call, you

10  were in the yard office?

11       A.   I was.

12       Q.   Okay.  And then you told her you would --

13  you told Lieutenant Jasso you'd be en route?

14       A.   Hm-hmm.  Yes, sir.

15       Q.   Okay.  And then what's the route that you

16  took?

17       A.   So as soon as I stepped out of the office,

18  there's a hallway --

19       Q.   Yeah.

20       A.   -- in this area.  As soon as I stepped out

21  of the office, you -- it's weird.  You could feel

22  the yard, like, move.  And I just see a cloud, like

23  a group of orange in the middle of the yard just

24  going at it.  So I just took off running.

25       Q.   And you ran around on the road?

1       A.    On the dirt road --

2       Q.    Yeah.

3       A.    -- 'cause this is secure.

4       Q.    Even that walkway in the middle?

5       A.    It's locked at all times.  This is a rec

6   field, so it has a fence around it.  So it's locked.

7       Q.    In 2012 is that true for like the softball

8   field area?

9       A.    It is.  It had a metal fence around.

10       Q.    Okay.  So you used the roadway?

11       A.    Yeah.  This is like a dirt track that goes

12   around.  So I ran around the dirt track to get to

13   them.

14       Q.    Okay.  We had Lieutenant Jasso in here a

15   little while ago, this morning, and so she marked --

16   and I'm just going to point it out on the map

17   here -- but approximate locations of gates.  There's

18   gate -- the gate that she says is opened, that's

19   kind of center of --

20       A.    That's -- that's the single gate.

21       Q.    Okay.

22       A.    This is a double gate where you can get

23   vehicles in if you needed to.

24       Q.    Okay, cool.

25             MS. LOMBINO:  And he said which?

1   Please say by number on there.

2                   MR. GRIFFITHS:  Yeah.  So he's saying

3   that the single gate is the G1 or G gate.  G2 is the

4   double wide, so you can get a vehicle in.  And she

5   also marked G3 that is an entry point into the

6   recreation room.

7        A.    This is, like, a back area.

8        Q.    Okay.  So are there any other entry points

9   to yard three?

10       A.    Not that I recall.

11       Q.    Nothing back behind the housing units to

12   get in the back doors?

13       A.    There's -- there's always ways of getting

14   in the back, but you would have to get like a

15   complex key set, or there's a special key set to get

16   back.  They call this no man's land.

17                   MS. LOMBINO:  And you're indicating,

18   when you say no man's land?

19       A.    It's the back side of the housing units,

20   and it's called no man's land because there's only

21   one fence from stopping the inmates from getting out

22   to the general public.

23       Q.    Do you guys -- because I've been to a

24   couple prisons, is that the area where you guys

25   rake?

1     A.    No.   The raking part is actually in

2   between the fence lines.

3     Q.    Ah, okay.

4     A.    'Cause you have two fences, and you would

5   rake back there.   But no man's land is behind the

6   building, so that means only staff and an escorted,

7   like, maintenance worker should be back there.

8   Nobody else should be back there.

9     Q.    I see.

10           MS. ILLSLEY:   So, for the record,

11   sorry, that would be considered on the bottom of the

12   page where it says in all capital letters, for

13   example, "Santa Rita"?   You see that on the map?

14           THE WITNESS:   Yeah, that would be

15   there, but it would be this whole -- so, do you see

16   all buildings right there?   That's all no man's

17   land.

18           MS. ILLSLEY:   Got it.   Okay, thank

19   you.

20     Q.    So your testimony today is that you came

21   out of your office, and you could see or kind of

22   feel that there was something in the air?

23     A.    It wasn't feel there's something in the

24   air.   Like, when you have that many inmates going at

25   it, it's the ground is moving.   You can feel it

1   almost.  It's like a physical.

2           And at that point then Jasso started on

3   the radio yelling, inmates fighting, inmates

4   fighting, ICS.  I don't recall exactly what she

5   said, but I remember she got on the radio and was

6   calling the ICS.  So I took off running the most

7   direct route to get to her.

8       Q.   Which is around that dirt road --

9       A.   It is, 'cause there's a fence --

10      Q.   -- in front of yard four, going to three.

11  And then she testified -- well, she says that she

12  met you at gate -- at what is labeled G?

13      A.   This one right here.

14      Q.   At that gate, that single gate?

15      A.   That's where we got her out from.

16      Q.   Okay.

17      A.   I remember that.

18      Q.   Okay.  So was the intent to get her out of

19  the yard?

20      A.   It is.  She was the only staff member at

21  that time in the middle of everybody --

22      Q.   Okay.

23      A.   -- and that's my main concern as a

24  supervisor is my staff's safety first.  It's -- they

25  prioritize it.  Safety of the public, then safety of

1    staff, then safety of the inmates.

2         Q.    Okay.  So when you got there, was the

3    gate -- the lock unsecured?

4         A.    Yeah.  The gate was open.

5         Q.    The gate was open --

6         A.    It was.

7         Q.    -- by the time you got there?

8         A.    It was.

9         Q.    Had black inmates already run out of the

10   gate?

11        A.    No.

12        Q.    Okay.

13        A.    So that happened -- we had secured the

14   gate, myself and Jasso.  I remember us sitting on

15   the gate, actually physically holding the gate, and

16   them trying to push through.  I know she -- she said

17   she tried to secure it with cuffs.  I don't recall

18   that because --

19        Q.    Okay.

20        A.    -- I'm too busy trying to hold the gate.

21        Q.    Let's take a step back because you're

22   telling me a little bit of new information.  I just

23   want to make sure I get it straight, what you're

24   saying versus what Lieutenant Jasso testified to.

25              When you got there, the gate was opened?

```
 1        A.    It was.
 2        Q.    The lock was already unsecured.  Where was
 3   Lieutenant Jasso?  Was she in the yard or out of the
 4   yard?
 5        A.    She was in the yard.
 6        Q.    What direction was she looking?
 7        A.    I cannot recall that.  That's --
 8        Q.    Okay.
 9        A.    -- how many years ago?
10        Q.    Of course, right.  Who was -- and I'm
11   sorry.  I think I started to ask this question
12   before; then we got into the map thing.  Was anybody
13   with you?
14        A.    With me?
15        Q.    Yes.
16        A.    There was one other yard officer.
17        Q.    Who was it?
18        A.    I -- I don't recall.  It would be the yard
19   set.  I know I called for Officer Runge.
20        Q.    When you say yard set, is it yard set for
21   yard three or yard set for the whole unit?
22        A.    For the whole unit.
23        Q.    Okay.
24        A.    So at that point, at that time on the yard
25   I think I had one yard set on the yard.
```

1       Q.    Okay.

2       A.    So if anything happens, the yard sets,

3    they can bounce from all four yards.

4       Q.    Okay.

5       A.    So the ICS hadn't even started yet.  So I

6    had already called Officer Runge to come meet me.

7       Q.    Okay.  You said the ICS hadn't already

8    started by the time you got there?

9       A.    No.  When I left sergeant's office, as

10   soon as I opened the --

11      Q.    Okay.

12      A.    -- I had called Runge prior to that --

13      Q.    Okay.

14      A.    -- to just meet me at the yard.

15      Q.    Sorry.  I know we're going fast.  This is

16   getting interesting to me, and I apologize to you.

17   Okay.  We have to slow it down a little bit,

18   Mr. Thompson.

19      A.    Okay.  So, basically, if I'm going to be

20   dealing with a group of inmates --

21      Q.    Yes.

22      A.    -- I'm not going to deal with them by

23   myself.  So I would call a yard set over to come

24   assist me with it.  For one, you have proof that

25   somebody -- whatever happens, somebody's there; and,

1    two, I have backup 'cause on these yards, you

2    figure -- I want to say there's, like, ten, forty --

3    each one of these is a set of cells.  Two inmates

4    per, there's two tiers.  You're looking at close to

5    a hundred something inmates on one yard.  And if it

6    is a gathering or what she had called on the

7    telephone, I'm dealing with that by myself, I'm

8    going to call people.  It's not --

9         Q.   Okay.  So let me stop you, 'cause I -- try

10   to bring down to -- so when you left out of your

11   office, did you contact Runge or your yard set

12   officer?

13        A.   Whoever the yard set was, was who I would

14   have contacted, and I believe it was Officer Runge.

15        Q.   So whoever went with you -- 'cause we

16   don't hundred percent know it's Runge -- someone was

17   with you, is it possible that that officer opened

18   the gate?

19        A.   He had -- well, no, 'cause he hadn't

20   gotten there before me --

21        Q.   Okay.

22        A.   -- from what I recall.  I don't recall on

23   that.  Like, I don't know if he was already on

24   scene.  I just remember afterwards, when me and

25   Jasso got off this gate, Runge was in the middle

Ian Thompson - November 29, 2018                    26

1   with me and Jasso when we had the blacks and the

2   whites separated in this little cart along the dirt

3   path right there.

4        Q.   Okay.

5        A.   That's when I recall the third officer.

6   Before then, I don't recall.

7        Q.   Okay.  So you arrived at the gate, and it

8   was open?

9        A.   It was.

10        Q.   And you testified a moment ago that

11   Lieutenant Jasso was inside --

12        A.   Yes, sir.

13        Q.   -- the yard?  Did you tell her to come

14   out?  Like, how did she get out of the gate?

15        A.   I'm pretty sure I went in, and -- and we

16   got out.

17        Q.   Okay.

18        A.   But, I mean, I'm sure I told her

19   something.  I don't know if I was professional when

20   I told her to get out, or, I mean, I don't recall

21   what my words were, but, yeah, I'm getting Jasso

22   out.

23        Q.   I want to stop there for one other side

24   question.  When you left your office, did you have

25   chemical agents with you?

1      A.   I did.  I had a fogger.

2      Q.   So you brought a fogger to the fight?

3      A.   I did.  I always carry a fogger.  Like,

4  that's just -- so, from my experience, 'cause I've

5  been a tactical member my whole DOC career --

6      Q.   Okay.

7      A.   -- so I've always carried a fogger.

8      Q.   Did you fog the inmates that were around

9  Jasso?

10      A.   I did.  I exerted the whole fogger in that

11  whole area.

12      Q.   Did you get Jasso with the fogger, too?

13      A.   Probably not.  I don't -- I'm pretty good

14  at spraying individuals.  But, I mean, we all suck

15  gas.  It's not --

16      Q.   Kay.  Were there -- how many officers were

17  inside yard three on that day?

18      A.   On that day?  Assigned there would be two,

19  two or three.  As during the actual when it kicked

20  off, I only saw Jasso.

21      Q.   Okay.  Let's just talk about what a

22  regular day was, like how that day was supposed to

23  go, right?  There would be two or three people in --

24      A.   You would have three people per yard.  So

25  somebody in the control bubble that would pop doors,

1    and then you'd have two in the yard.

2        Q.   Okay.  So that would be Jasso, and in this

3    case I think we said Pacheco, maybe.

4        A.   I don't recall that, but --

5        Q.   Okay.

6        A.   -- there would be another officer out

7    there with her.

8        Q.   And then officer -- according to the

9    earlier deposition and then the records that I've

10   seen, Officer Puri?

11       A.   He was one of the officers.

12       Q.   He was in the bubble?

13       A.   Okay.

14       Q.   Okay.

15       A.   That would make sense because somebody

16   pops the doors, like.

17       Q.   Okay.  Let's talk about that for just a

18   second.  We were just talking about the three gates,

19   right, or three entry points to yard three?

20       A.   There is.

21       Q.   Okay.  So the gate that you went to, the

22   single gate, that's a gate that you can only access

23   if you have a key --

24       A.   Padlock.

25       Q.   -- a padlock key?

Ian Thompson - November 29, 2018                    29

1        A.    It is.

2        Q.    So the control room person has no ability

3   to open that gate?

4        A.    No.   There's no ability to open any of

5   these gates.   They're all padlocked.

6        Q.    So gate two also is padlocked?

7        A.    It is.   This is the vehicle gate, so it's

8   definitely padlocked.

9        Q.    What about -- what about gate three?

10        A.    Gate three has to be padlocked as well,

11   'cause it's on the back side of the building.

12        Q.    All right.   For entry into gate one, gate

13   two, and gate three, is it the same key?

14        A.    I can't recall on that.

15        Q.    Okay.   Would Lieutenant Jasso's key open

16   gate one -- would there be one key for gate one,

17   two, and three?

18        A.    Again, I don't recall.   I know she would

19   have a key for gate one, more than likely have a key

20   for gate two, 'cause that is an emergency gate for

21   vehicles coming in, for ambulances and stuff.   So

22   more than likely she would have a key to access

23   those.

24        Q.    How about, did you have a key for those?

25        A.    I would.

1      Q.   Okay.  To your recollection or do you

2   know, could it be the same key?

3      A.   I don't think so, because this is --

4   again, this is an emergency gate, so if everybody

5   had access to that, that's two big giant gates

6   opening up.  You would flood the yard.

7      Q.   Makes sense.  Okay.  Thank you.  After you

8   got to the gate and Lieutenant Jasso is inside, you

9   testified a moment ago that you may have gone in,

10   said something to her, and then came out.  Did you

11   physically grab her and pull her out?

12      A.   I don't recall, and maybe Jasso remembers

13   that part.  I don't.  It was -- honestly, it was

14   just a big blur.  Like, I don't even recall times

15   back then.  It could have been an hour; it could

16   have been -- ten minutes feels like an hour when

17   you're dealing with a disturbance like that.

18      Q.   Okay.  So she steps back out of yard three

19   with you, and then we go to -- you go to close the

20   gate?

21      A.   We do --

22      Q.   Okay.

23      A.   -- and it's -- and that's the point that

24   we didn't find a lock to secure it.  There was no

25   way of securing it.  So we physically -- I remember

1    us physically holding the gate with our body.

2    Like --

3         Q.   Okay.

4         A.   -- Jasso, I think, tried to cuff it, to

5    handcuff it, but I don't -- I don't recall if that

6    worked or not.  I'm not -- I'm not sure.  All I

7    remember is in this hallway, me and her sitting on

8    it, trying to hold the gate, basically with our

9    backs against the gate.  And I remember inmates

10   saying, "Just fucking stab them," which, I mean, if

11   it's the African American inmates trying to get out

12   because their lives are in danger -- it's everybody

13   against them -- I don't blame them for saying

14   something like that.  I remember telling Jasso,

15   "Just go."

16             As soon as she got off the gate, the gate

17   flooded open.  And at that point, the African

18   American inmates ended up over here on the fence

19   line by the rec field.

20        Q.   Okay.  So your -- just for the record,

21   you're indicating in front of yard three on the --

22   on the road --

23        A.   On the dirt road in front of this, like,

24   gated area.

25        Q.   Okay.

1      A.   And they -- at that point once they got

2   out, they actually stopped for a second, stopped

3   doing -- like, acting crazy, and they were, like,

4   "What do you want from us, Sergeant Thompson?"

5           The original plan was to lock them into

6   the actual rec room because it's a secure area.

7   It's controlled.  Then the white boys started

8   fighting again right there in the middle, right

9   while we were dealing with that.

10     Q.   Let's stop right there for a second.

11  You're telling the good story.  I want to make sure

12  I get it all the way down.  When you were at the

13  gate and you and Lieutenant Jasso were pressing up

14  against the fence, you said you could -- why

15  couldn't you use the lock that was previously --

16     A.   It wasn't there.  There was no lock there.

17     Q.   What happened to it?

18     A.   I have no idea.  Like, that's -- at the

19  time I'm not worried about the lock, where the lock

20  is.  I'm worried about what's about to happen to us

21  and what's going on in the yard.  It's not --

22     Q.   Fair enough.  And forgive me.  I'm going

23  to ask the question, so I'll keep asking them --

24     A.   Got it.

25     Q.   -- but it's so cool that you have that

Ian Thompson - November 29, 2018                    33

1    answer.  So are the padlocks at gate -- at yard

2    three at that gate, are they a free padlock, or are

3    they chained?  Are the padlocks chained pad --

4         A.   No.  It's a loop system --

5         Q.   Okay.

6         A.   -- that goes through the door.  It's a

7    free padlock.

8         Q.   Okay.  But it's not -- but there's no

9    chain --

10        A.   No.

11        Q.   -- that holds the padlock to that gate --

12        A.   No.

13        Q.   -- in that area?

14        A.   There would be, more than likely -- and,

15   again, I've been in DOC ten years, so yards and

16   riots and that kind of blend with me.  But typically

17   on like the emergency gates at the lawns and stuff

18   like that, there would be a chain on something like

19   that.

20        Q.   Okay.

21        A.   The single gate like that would just have

22   a padlock on, actually.

23        Q.   Okay.  Do you know, did Lieutenant Jasso

24   turn in her keys that day?

25        A.   At the end of the day, yeah.

1      Q.    You do know that she did?

2      A.    Yes.  They would -- you would have to.

3   Like, the yard -- the yard cannot clear.  If we're

4   missing keys, obviously, we can't secure the yard.

5      Q.    Okay.

6      A.    So at the end of shift, yard keys get

7   turned in, radios get turned in.  So even though

8   it's a disturbance, keys and everything would have

9   to be accounted for.

10     Q.    The other officer, the yard set officer

11  for -- that you called for the Santa Rita unit --

12     A.    Okay.

13     Q.    -- when he came, would he have had a key

14  to --

15     A.    He would have had a key.

16     Q.    He would?

17     A.    He would have.

18     Q.    So you and Lieutenant Jasso leaned against

19  the gate, and then I think you said the inmates

20  pushed through?

21     A.    They did.  It was when -- because they

22  were making the comments, they had yelled, "Just

23  stab them," and at the point, on the yard you could

24  see they had broken brooms and stuff like that.  So

25  I just told Jasso, "Just go," 'cause there's no

1    point both of us -- to me, there was no point in

2    both of us getting...

3         Q.   Okay.  Stop you right there.  When the

4    inmates said, "Just stab them," they're talking

5    about stabbing you --

6         A.   Yes.

7         Q.   -- with a broom or --

8         A.   Whatever they had.  I wasn't, "Hey, wait a

9    minute.  What do you guys have to stab me with?"

10        Q.   Right.  Okay.  But I want to make sure

11   that that's the stabbing comment.  Great.

12        A.   Yes.

13        Q.   Okay.

14        A.   And then at that point -- 'cause it's a

15   chain link fence.  So you can push through -- it

16   didn't even have to be a sharp object.  You can push

17   through with a broom, a mop, whatever, and it's

18   still going to cause some damage.  So I just told

19   Jasso to go.

20             When she released her weight on the gate,

21   I couldn't hold it no more.  There was all those

22   inmates trying to get out, so the gate flooded open.

23        Q.   Okay.  And that's dangerous?

24        A.   It's very dangerous.

25        Q.   Why is it dangerous?

1     A.   Why is it dangerous?   For us.   I mean,

2   it's two of us against a hundred something inmates,

3   like.

4     Q.   Okay.   So the risk that you could get hurt

5   or staff members could get hurt --

6     A.   Exactly.

7     Q.   -- or other inmates that are outside?

8     A.   Possibly.   You have to outweigh the odds,

9   though.   And the odds at that point was, this yard

10  was rioting.   Yard three was rioting.   So no other

11  yards at that point were rioting.   So you kind of

12  have to outweigh the odds on that.   Okay.

13        I have forty black inmates in here that

14  their lives are at risk now because it's everyone

15  against the black inmates.   It always is.   In

16  Arizona Corrections, when the yard riots, they are

17  the minority.   So when you have forty lives at stake

18  right there, 'cause they're still humans, I made the

19  decision to open that gate with them.

20    Q.   Okay.   So you made a decision to open the

21  gate?

22    A.   Yeah, 'cause I wanted Jasso out.

23    Q.   Okay.   So did you open the gate or tell

24  her to do it?

25    A.   The gate was open already --

1      Q.    How did it --

2      A.    -- but either way -- either way, I would

3    have opened the gate.

4      Q.    Okay.

5      A.    I would have.  There's no -- I wouldn't

6    change that at all, because in my mindset, I'm

7    getting Jasso out because she's in the middle of

8    everything.  After that, it was the smallest gate so

9    it's the smallest funnel.  So logic would say the

10   gate, the size of that door, if I'm filing -- forty

11   people aren't going to get through that gate all at

12   once.  So you can somewhat control it.

13          And at the time when I had arrived, they

14   were all in the middle.  Nobody was at that gate

15   until the blacks started running, 'cause obviously

16   everybody was after the blacks.  And they were --

17   people were trying to climb over the double gates.

18   They were trying to climb over the barbed wire.

19   They were trying to get out whichever way they

20   could.  People were all over the building.

21          That's how Jasso ended up with the three

22   inmates over here, because inmates were trying to

23   climb over and breaking their legs and stuff.

24     Q.    So all the keys got turned in.  I'll go

25   back to the keys for a minute.  All the keys got

```
1    turned in.  So that's how you know you could clear
2    the yard?
3         A.   They would have had to have been.
4         Q.   Okay.
5         A.   Now, at that time I wouldn't have been the
6    one there, because, number one, I was part of the
7    incident, and I was also on the SWAT team at the
8    time.  So I was a responder.  So I went home for an
9    hour and came back to deal with this, so.
10        Q.   Okay.  What about equipment that people
11   carry with them, handcuffs?
12        A.   They would carry handcuffs.  They would
13   carry pepper spray.  That's the actual only required
14   equipment they need on the duty belt.
15        Q.   How many pairs of handcuffs?  Is it --
16        A.   Typically a regular line officer would
17   carry one pair of handcuffs.
18        Q.   Okay.
19        A.   More experienced officers would probably
20   have two, and definitely if you're on the tactical
21   team, you carry two.
22        Q.   Okay.  So when did -- okay.  So you had
23   Lieutenant Jasso step aside so she wouldn't get
24   stabbed through the gate --
25        A.   Yes, sir.
```

1      Q.    -- through the fence, and then the inmates

2    that were coming out of yard three pushed the gate

3    open?

4      A.    They did.

5      Q.    Okay.  How many inmates escaped,

6    approximately?

7      A.    There was approximately -- I would say

8    there had to have been thirty or -- thirty black

9    inmates.  I'm not sure, sir.  To be honest --

10      Q.    Okay.

11      A.    -- with you, it was a long time ago,

12    and --

13      Q.    But these were all the black inmates that

14    pushed --

15      A.    These were --

16      Q.    -- through?

17      A.    These were all the black inmates trying to

18    get out first, and then the whites and the Mexicans

19    chasing them.

20      Q.    So when did you and Lieutenant Jasso begin

21    to use her handcuffs to close the gate, to secure

22    the gate?

23      A.    I -- I don't recall.  Like, I -- again, I

24    don't recall that.  I know that she -- she's forever

25    stated that she used handcuffs on the gate.  I never

1  saw that.  I don't -- if she did, it didn't work,

2  so, honestly, I couldn't tell you on that.

3        Q.    Okay.

4        A.    I never gave her a directive to use

5  handcuffs.  So if that's something she did, she did

6  that on her own.

7        Q.    But that would be -- scratch that.  So,

8  Mr. Thompson, right now you're saying that the

9  handcuffs were not used to secure the gate?

10        A.    I don't know if they were or not.  She

11  might have attempted.  But, obviously, it didn't

12  work because the inmates flooded out.

13        Q.    So when did you come to leave the gate at

14  yard three?

15        A.    Leave the gate at yard three --

16        Q.    Yes.

17        A.    -- is when the inmates pushed out, and --

18        Q.    Okay.

19        A.    -- I was still in front of the yard.

20        Q.    Okay.

21        A.    'Cause this is when the second incident

22  happened, where they all got --

23        Q.    When you left --

24        A.    -- into it, like, into a fight in the

25  middle of that dirt area right there.

1      Q.    So the inmates that pushed through got --

2   continued their fighting on the dirt track?

3      A.    So once they pushed through, again, they

4   had gathered behind myself and Jasso.  And at that

5   point I remember the black inmate that -- whoever

6   runs the yard, 'cause each yard has somebody that

7   runs their race.  Whoever it was, was, like, he had

8   asked, "What do you want us to do,

9   Sergeant Thompson," and I had told him, "We'll

10  secure you in the rec field."

11          Right when I stated that, inmate Peoples,

12  he was one of the soldiers for the Aryan brothers,

13  at that point, he just started going at one of the

14  black inmates again.  And at that point I thought he

15  would grab Jasso, and everything erupted again right

16  in the middle of that area.

17          From that point the black inmates took off

18  and headed towards main control --

19     Q.    Okay.

20     A.    -- which is over in this area, and they

21  ended up corralling right about here.

22     Q.    Okay.  So when did you -- when you left,

23  was the gate to yard three open or closed?

24     A.    I -- I wouldn't know.  I'm assuming it was

25  still open when I left.

1      Q.   Okay.   And Lieutenant Jasso, what happened

2    with her?

3      A.   I -- I don't recall that.   Somehow she

4    ended up back in this building with three inmates.

5    But at that point we split up.   I don't -- 'cause I

6    went to deal with yard four starting to go off.

7      Q.   Okay.

8      A.   And then it seemed like there was a calm.

9    That's -- that's how I was able to head to yard four

10   and that.   The black inmates took off to go, like,

11   corral themselves in an area.   This had pretty much

12   died down, from what I remember.   And I was able to

13   get to yard four.

14        Yard four, there wasn't -- there was a

15   little bits of rioting going on in yard four, but

16   nothing -- yard three was the main thing that was

17   going on.   And at the same time you had yard one,

18   little incidents at yard one, little incidents at

19   yard two.

20        By this time we would have some resources

21   on the yard.   Like, I remember Captain Childree was

22   on the yard.   The deputy warden, the warden had

23   already started getting on the yard.   So we had DART

24   team was already responding, and DART team was the

25   ones that was able to, like, isolate what was going

1    on here.

2           It's all happening at the same time, you

3    have to remember.  I don't know if it's an hour or

4    if it's thirty minutes 'cause when you're dealing

5    with conflict like that, ten minute feels like an

6    hour.  So when I had got to yard four, this is when

7    Luker was calling on the radio in regards to inmate

8    Garcia, and Luker was calling medical.  He was

9    calling responders.  He was calling for all kinds of

10   stuff.

11          Q.   And if I understood you correctly, if the

12   inmates are leaving yard three, the black inmates

13   are leaving the -- leaving yard three, and they're

14   going to go reconvene in front of the administrative

15   building --

16          A.   Yes, sir.

17          Q.   -- they would take the same path that you

18   seemed to take, by taking that dirt path around in

19   front of yard four?

20          A.   I -- I really don't recall how they got

21   there.

22          Q.   Okay.

23          A.   Like, I'm pretty sure they just got there

24   by any means that they could because, again, it's

25   everybody against the blacks.  But it seemed like

1    this whole area here had lulled down, like it was --

2         Q.    Okay.  But your earlier testimony was that

3    the baseball field is chained off, and inmates

4    wouldn't be able to cut across it?

5         A.    From what I remember.

6         Q.    Okay.  And the central yard is chained off

7    or fenced off, and they couldn't cut through that?

8         A.    I'm not sure if this is a large fence or

9    I -- honestly, I don't recall this area.  It's been,

10   I don't know how many -- obviously, since 2012 since

11   I've been there, and I can't remember if this is,

12   like, a half fence for, like, a softball field or if

13   it's the full one.

14        Q.    Okay.

15        A.    I know the main one is a full fence.  This

16   might be a half fence.

17        Q.    Okay.  COII Luker was at yard four?

18        A.    COII Luker was our DA officer.  He was a

19   chow hall officer.

20        Q.    Chow hall, okay.

21        A.    So he would have been in the chow hall.

22        Q.    Okay.

23        A.    And when I met him where Garcia was is the

24   actual, like, the lamp pole right outside the chow

25   hall.

1      Q.    Okay.  What did you see when you got there

2  and saw Garcia?

3      A.    Garcia was out.  Like, he was shaking,

4  covered in blood, soaked in blood.

5      Q.    Okay.  Did you have a conversation with

6  Luker about his medical status?

7      A.    Garcia or --

8      Q.    With Luker about Garcia's medical status.

9      A.    No.

10     Q.    Okay.

11     A.    I mean, I don't even know if Luker would

12  be privy to whatever Garcia is going through.  I

13  mean, he knows he needs help.

14     Q.    Yeah.

15     A.    He's calling for it.

16     Q.    Well, that's what I'm referring to.

17     A.    Oh, okay.

18     Q.    I'm sorry.  So you -- so Luker is flagging

19  you down?

20     A.    Luker was calling on the radio.

21     Q.    Okay.

22     A.    And at this time this was all pretty much

23  lulled down, died down.  There was, like, sporadic

24  individuals.  When I ran, there was a couple of

25  black inmates over here that I don't know if they

1   were assaulting him.  I don't know, but Luker was

2   already calling for the Garcia incident.

3        Q.   Okay.  When you arrived with Luker, he was

4   with -- he was already with Garcia?

5        A.   He was by that area.  I don't know if he

6   was standing over him.  I don't recall that --

7        Q.   Okay.

8        A.   -- but he might not have been able to

9   'cause it happened right here.  The chow hall fence

10  is right here.  It's open, and Luker -- if he was a

11  kitchen officer, he would have been probably right

12  about this area.

13       Q.   Okay.

14       A.   I know he did meet up -- we did meet up

15  together, definitely.

16       Q.   You met with Luker?

17       A.   I did --

18       Q.   Okay.

19       A.   -- 'cause he helped me get Garcia up.

20       Q.   Okay.  And we'll talk about that.  Did you

21  make any radio calls to medical?

22       A.   I did.

23       Q.   What was the result?

24       A.   They couldn't come on the yard.  They

25  wouldn't come on the yard because the yard was still

1  rioting.

2       Q.   What did you do with inmate Garcia?

3       A.   I had Luker help me get him up, and I

4  fireman carried him over to medical.

5       Q.   Okay.  But at this point -- and I just

6  want to make sure that I'm clear -- things were

7  dying down.  In your opinion they were dying down?

8       A.   They were in this area, but yard one and

9  two started going off.

10      Q.   Okay.

11      A.   So it was kind of like a fire.  You know,

12 one flame, one flame, and then another flame starts

13 sparking.

14      Q.   Where did you take Garcia to?

15      A.   To medical, right over here.

16      Q.   Did you take him all the way to medical?

17      A.   I don't recall.  I remember I ran until I

18 had medical staff come meet me.

19      Q.   Yeah.  Well, COII Petrick, are you

20 familiar with him?

21      A.   Yes, sir.

22      Q.   He has a report, and his report says he

23 met you, like, halfway.

24      A.   Petrick has a report?  He passed away.

25      Q.   Yeah.  Well, there's --I mean, from

1   2012 --

2        A.    Okay.

3        Q.    -- the day of this incident he wrote a

4   report that he met you, like, halfway with a --

5        A.    Gurney.

6        Q.    -- wheelchair?

7        A.    Yeah.

8        Q.    Does that make you remember any of that?

9        A.    Yeah.  That would be in this area, right

10  here.

11       Q.    Okay.  So Petrick -- Petrick was able to

12  get out to come --

13       A.    Petrick might have been a medical officer.

14  I don't know.  At the time he might have been

15  medical, with medical staff, 'cause we always kept

16  an officer with medical.

17       Q.    Okay.  So he was a corrections officer?

18       A.    He was.

19       Q.    And he was able to get out to the yard?

20       A.    He might have.

21       Q.    Okay.

22       A.    Well, yeah, he was able to, but I don't

23  know what his position was that day, but I'm pretty

24  sure he was support, which means he might have been

25  the medical officer.

1      Q.    Are you aware what happened to David

2  Garcia as a result of that assault?

3      A.    Afterwards?

4      Q.    Yeah.

5      A.    I mean, I'm pretty sure it was pretty bad.

6  It looked pretty bad when I came up on him, so

7  nothing good.

8      Q.    Did you know David Garcia before?

9      A.    No.

10      Q.    And you haven't seen him since?

11      A.    No.  I had responded one time with TSU, I

12  think, to Rincon, and I remember he was hollering

13  stuff through the door.  And he was, like, hey,

14  you're the sergeant with Escarcega.  I don't know.

15  He was just saying thank you, stuff like that, at

16  that point.  And that was, I want to say housing

17  unit eight in Rincon.

18      Q.    Okay.

19      A.    I think that was the last time I saw him.

20  But he was -- if you're in housing unit eight, it's

21  because you're getting transferred somewhere, and he

22  seemed fine then.

23      Q.    Approximately how long after the --

24      A.    That would have been a couple months

25  after.  I don't recall exact dates, but I do

1   remember seeing him over there in the transit unit,

2   and we were over there doing searches and stuff, so.

3        Q.   Did you recognize him?

4        A.   No, not until he actually, like,

5   identified himself.

6        Q.   Okay.  You're a member of TSU?

7        A.   I was.

8        Q.   What is T -- or was T --

9        A.   It's our tactical support, all the way

10  until I left.

11       Q.   Okay.  I'm just going to call it TSU, if

12  that's okay.

13       A.   Yes, sir.

14       Q.   In the TSU, do they train you to do

15  fireman carries?

16       A.   No.

17       Q.   Did they train you to do fireman carry as

18  part of the corrections academy?

19       A.   No.

20       Q.   Okay.  Is that part of any protocol or

21  standard -- let me just finish so we can get a clean

22  record -- protocol or standards through the

23  corrections trainings?

24       A.   No, it's not, but it is with the

25  military --

1       Q.    Okay.
2       A.    -- and since I had military experience,
3    then --
4       Q.    Okay.  Through the TSU are there protocols
5    for when you should or shouldn't open gates on these
6    yards that might be having a disturbance?
7       A.    No.
8       Q.    There are no policies for that?
9       A.    There is no policy.  We have tactical
10   priorities, which you use as a guideline, so.
11      Q.    Okay.  What are those tactical priorities?
12      A.    The first is safety of the public, safety
13   of staff.  It's safety and welfare of the public,
14   staff, and inmates.  And the second one would be
15   isolate, stabilize, and contain the incident.  Third
16   one is remove endangered personnel and treat the
17   injured.  And then the fourth one would be limit
18   damages to property and restore the unit to normal
19   operation.
20      Q.    Those are your tactical priorities?
21      A.    They are, and as a tactical member,
22   they're ingrained in us.
23      Q.    Your testimony was that when you got to
24   the gate at yard three, it was opened, right?
25      A.    It was unsecured, sir.

Ian Thompson - November 29, 2018                    52

1        Q.    Well, the lock was unsecured --

2        A.    Yes.

3        Q.    -- and the gate was opened?

4        A.    I believe so.  I -- when I say open, I

5    mean there's no secure on it -- security on it, so.

6        Q.    Okay.  And --

7        A.    I -- honestly, I don't recall if it was

8    closed or opened at that point.  I know it was

9    unsecured.

10       Q.    Okay.  Is there any reason that you can

11   think of that Lieutenant Jasso did not exit yard

12   three if it was unsecured?

13       A.    Because she was in the middle of

14   everything going on.  Like, if I'm in the middle of

15   inmates fighting, I don't know if you panic or you

16   kind of limited on where you can go.  She was lucky

17   at that time they were fighting each other and not

18   going after staff, so.

19       Q.    Right.  But they were fighting -- they

20   were fighting each other?

21       A.    They were, sir.

22       Q.    And you saw that?

23       A.    I did.

24       Q.    Did you see the inmates using weapons?

25       A.    I did.

1      Q.    Okay.  What did you see?

2      A.    Well, when you say weapons, it's not

3   typical street weapons, but, you know, you got TVs

4   being thrown.  You got mops out there.  You got --

5   they use everything.

6      Q.    Did you see a baseball bat?

7      A.    I'm not sure on that.  I don't recall.

8      Q.    But you saw broom handles or mop handles

9   being used?

10      A.    Yes, sir, and that would make sense

11   because they have porters that clean up and stuff,

12   so that stuff is readily available.

13      Q.    Saw TVs being thrown?

14      A.    Yeah, I remember TVs.  I got a TV thrown

15   at me, so I remember.

16      Q.    Why aren't you with the DOC anymore?

17      A.    Because I wanted to open my own gym.

18      Q.    So it was you choosing to leave, and it

19   wasn't the ADOC saying goodbye?

20      A.    No.  I had a pretty good -- I love DOC,

21   and I would have stayed longer.  I just -- I had an

22   opportunity to move on, do bigger, better things.

23      Q.    Okay.  We'll look at this exhibit, I think

24   we said Exhibit Number 3, which is your report.

25      A.    Okay.

Ian Thompson - November 29, 2018                    54

1          Q.    And part of the report -- as I've read
2    this several times, part looks like it's just copied
3    and then pasted down below, right?  Like, the first
4    three or four paragraphs, maybe five paragraphs,
5    look like they have been added down below.
6          A.    I think it's the same.  It looks like it's
7    the same sentence.
8          Q.    Well, maybe I'll just call your attention
9    to a paragraph, it's about three-quarters of the way
10   down the report, starts with, it says, "At 1713."
11   And can you just read -- like, we'll go sentence by
12   sentence, and I'll ask you questions about that.
13         A.    "At 1713, I had COII Jasso, COII Runge,
14   and COII Pacheco involved in trying to contain it,
15   but COII Pacheco and COII Jasso were surrounded, at
16   which point myself and COII Runge began spraying
17   chemical agents into the crowd.  COII Pacheco locked
18   himself into the control room, and I grabbed
19   COII Jasso out of the crowd, and three of us tried
20   securing the gate on yard three.
21         Q.    Hold it.  Let's stop right there.  So in
22   your report you wrote that you grabbed COII Jasso
23   out of the crowd.  Does that refresh your memory as
24   to how she got out?
25         A.    Kind of.  I mean, it would make sense that

1    I went in and got her.  Like, I -- honestly, I don't

2    recall, like, specifics.  It's what, how many years

3    ago?

4         Q.   Okay.  Yeah, I know it's been a number of

5    years, and that's why I'm just trying to go sentence

6    by sentence.  I did the same with her, too.

7         A.   So Officer Runge, if he had responded, he

8    would have been the yard set.

9         Q.   Okay.

10        A.   So that would make sense for him to be

11   there.

12        Q.   Okay.  Yeah.  That's what -- I'm kind of

13   going with Runge and talking about him.  And so I

14   don't want to beleaguer the point, but I do want to

15   be very clear 'cause, I mean, I'm kind of at the

16   point of I don't know what the full answer to this.

17   So you have a different testimony than Lieutenant

18   Jasso in terms of the gate.

19             So you said maybe the gate was open when

20   you got there, and then you've -- you've now said,

21   well, that really means to me that the gate was just

22   unsecured; the -- the lock was gone.  And so I think

23   I'm interested in the lock part, for sure, and I

24   believe it was unsecured when you got there, 'cause

25   Lieutenant Jasso was very adamant about that.

1           But do you have any specific recollection

2    about who opened that gate --

3           A.   No.

4           Q.   -- who actually opened the gate itself?

5           A.   I don't recall that, sir --

6           Q.   Okay.

7           A.   -- honestly.

8           Q.   All right.  But you do know that you -- at

9    some point the gate was opened because you --

10          A.   I ended up --

11          Q.   -- you grabbed Jasso, and you pulled her

12   through?

13          A.   Yes, sir.

14          Q.   And that was right before the group of

15   inmates ran out?

16          A.   It was.

17          Q.   Okay.  You grabbed COII Jasso out of the

18   crowd, and the three of us tried securing the gate

19   on yard three.  And I'm assuming that means you,

20   Jasso, and Runge?

21          A.   Yes, sir.  And that would -- honestly,

22   that would make sense because Runge is the floater.

23          Q.   Okay.  Your testimony is that it was --

24   your efforts to do that were unsuccessful?

25          A.   They were because we were up against the

1  gate, and I do remember telling Jasso, "Just go,"
2  and at that point the gate flooded open.
3          Q.    And inmates poured out?
4          A.    Yes, sir.
5          Q.    Inmates of all races?
6          A.    The blacks first.
7          Q.    But other folks came out, too?
8          A.    Yes, sir.
9          Q.    Okay.  And when they poured out, they had
10  been fighting on the inside of yard three?
11          A.    They did.  It was all over yard three.  It
12  was not one specific area.  You figure that many
13  inmates, they were just everywhere.  It was like an
14  ant hill.
15          Q.    But when they got out of yard three, it
16  seemed to quiet down for a moment?
17          A.    Between the blacks.  The blacks -- it did
18  because you figure it's a doorway.  That way, you
19  can't get a hundred something inmates through a door
20  all at one time.  So it was like a funnel that came
21  out.
22          Q.    Okay.
23          A.    I don't know what for a minute.  It seemed
24  like the three of us were like a wall, and they
25  just -- in between them.  And there was -- at first

1   it was talking, and then it re-erupted again.  It

2   might have been the chemical agents.

3        Q.   There's the next sentence, "The inmates

4   seemed to calm down when" -- or "it seemed to calm

5   down when inmate Peoples started on the blacks

6   again.  I verbally directed inmate Peoples to stand

7   down when he lunged at myself.  So I placed him to

8   the ground with the least amount of force

9   necessary."

10            I'm going to stop right there.  I love

11   that sentence.  So what was -- do you recall doing

12   that?

13        A.   I do recall doing that.

14        Q.   What was -- what happened there?

15        A.   So that was when the blacks were talking,

16   and they were asking me, "Hey, where do you want us

17   to go?"  Inmate Peoples was -- at that point was,

18   like -- again, like, he was one of the soldiers, I

19   guess, for the Aryan brothers, and he was riling up

20   the races, and he had gotten into one of the black

21   guy's face that was asking for directions.

22            And I told him to stand down.  And I think

23   Jasso was to the right of me.  Somebody was to the

24   right of me; I just don't recall who it was.  And I

25   thought they grabbed the officer, so that's when I

1  ended up taking him down.

2       Q.   All right.  You testified that you left

3  the yard for a while, like, after --

4       A.   I left yard three.

5       Q.   Okay.

6       A.    I didn't leave the whole yard.

7       Q.   You stayed at Santa Rita?  You didn't come

8  home for an hour and them come back?

9       A.    That was later.  That was once the yard

10 was already contained.  They had DART on the yard.

11 The ambulances were already coming.  I had already

12 been investigated by CIU.  They came in and took my

13 statement, all that stuff.  I had already been

14 there -- I don't recall what time I left.  It was

15 early in the morning.  I remember I went home, got

16 an hour of sleep, and then I got back in my gear and

17 went back in because my team was there.

18       Q.   Sure, okay.  I just wanted to get clarity

19 on that.  This is -- I'll just read it to you, see

20 if it refreshes your memory.  This is from

21 COII Mitchell Petrick.  So he said that he was

22 posted in medical at the time of the disturbance.

23 And then several lines down, "I was then advised by

24 Sergeant Thompson he was escorting a medical

25 priority inmate Garcia, number 106743, to medical.

1    With medical staff secure, I left medical with a

2    wheelchair and picked up inmate Garcia by Santa Rita

3    baseball field.  I then escorted Garcia via

4    wheelchair to medical so I could assess his

5    injuries."

6         A.    That would be right about here.  This is

7    the baseball field you're talking about.

8         Q.    So he met you outside of the yard

9    someplace?

10        A.    This is the hallway right here.

11        Q.    Okay.

12        A.    The baseball field starts.  Remember how

13   you said, like, if I could come across and that, but

14   it's secured.  There's a fence.  You have to run

15   around.  So that's where he met me.

16              MS. LOMBINO:  So, counsel, he's been

17   talking about pointing to things on the map, and

18   you're not getting any of it down for the record, so

19   the record is not going to be clear.

20        A.    Do you want me to put Petrick right there?

21        Q.    No, no.  Let's not do that.

22              MR. GRIFFITHS:  I think what he's --

23   I don't even know how to describe the hallway that

24   he's saying there's a hallway, and at the end of the

25   hallway where medical is, where it meets with the

1  baseball field.

2      A.    So this is like a straightaway.  When you

3  come on the yard, you have the main control right

4  here where staff comes in.  To your right you have

5  medical unit.  Then you have the sergeant's office.

6          This is a hallway, 'cause right here you

7  have, like, visitation and stuff like that.  It was

8  like a music room, little area for kids and stuff,

9  like that right there.  So this is like a -- a

10  cemented hallway.  That's what I called it, a

11  hallway.

12          MS. ILLSLEY:  I apologize.  For the

13  record, trying to describe it --

14          MR. GRIFFITHS:  Yeah.

15          MS. ILLSLEY:  -- if you are at the

16  top of Exhibit 3, if you have "Produced by an

17  Autodesk Educational Product," that is at the top --

18          MS. LOMBINO:  Exhibit 1.

19          MS. ILLSLEY:  Yes, Exhibit 1, I

20  apologize.

21          MR. GRIFFITHS:  Exhibit 1, it's

22  crazy.

23          MS. ILLSLEY:  If you look at that

24  sentence, "Produced by an Autodesk Educational

25  Product," there's a -- to the left of the P, there

 1    is, it looks like a little column.  Is that the
 2    cement hallway that you're talking about?
 3                   MR. GRIFFITHS:  Right here.  She's
 4    talking about that, and that's --
 5                   THE WITNESS:  So that area right
 6    there --
 7                   MS. ILLSLEY:  Is that what you were
 8    referring to in your prior testimony just now,
 9    though, or is that different?
10                   THE WITNESS:  No, this -- I think
11    that is the road.
12                   MS. ILLSLEY:  Okay.
13                   THE WITNESS:  Yeah.  This is the
14    road.  This is the road into the unit.
15                   MS. ILLSLEY:  Yeah.  I apologize,
16    'cause from down here, I think going to
17    Ms. Lombino's point is --
18                   THE WITNESS:  Okay.
19                   MS. ILLSLEY:  -- I can't see what
20    you're referring to.  So when you say things like
21    "this" --
22                   MS. LOMBINO:  So can you --
23                   MS. ILLSLEY:  Yeah.
24                   MS. LOMBINO:  -- perhaps you can
25    refer to it by number.  There are numbers on the

1    map, and --

2                   THE WITNESS:  So right where G11 --

3                   MS. ILLSLEY:  Okay.

4                   THE WITNESS:  -- the second one is --

5                   MS. ILLSLEY:  Okay.

6                   THE WITNESS:  -- and the dot, that

7    whole area right there is like a cement hallway.

8                   MS. ILLSLEY:  So, okay.  Between G11

9    and I would say the number twenty-one on the map, is

10   that correct?

11                  THE WITNESS:  G11 to fifty-four,

12   right there.

13                  MS. ILLSLEY:  Okay.  Thank you.

14                  MR. GRIFFITHS:  We're on Exhibit

15   Number 4 now.  Go ahead and mark Exhibit Number 4.

16

17        (Exhibit 4 was marked for identification.)

18

19        Q.   This is Exhibit Number 4.  So --

20        A.   Got it.

21        Q.   So how long were you working on the Santa

22   Rita unit?  How long did you work at the Santa Rita

23   unit?

24        A.   When that incident happened?

25        Q.   Well, I mean, just from -- I guess, from

Ian Thompson - November 29, 2018                64

1   your history, starting in 2009, did you -- when you

2   returned to the ADC, did you go to the Santa Rita

3   unit?

4          A.   No.  I started out at Winchester.

5          Q.   Okay.

6          A.    I was at Winchester for, I want to say two

7   or three years, 'cause we had the rotation.  I went

8   to Cimarron.  I was there for a couple months, and

9   then I went to Santa Rita as a sergeant once I

10  promoted.

11         Q.   Okay.  And then after you worked at Santa

12  Rita and then you made it to the Morey unit, was

13  that the next transfer that you had?

14         A.   I did.  My wife had accepted a job in

15  Phoenix, so I moved out to Buckeye area.

16         Q.   Yeah, I know that unit.

17         A.   Yeah, it was a fun unit.

18         Q.   So I have -- I mean, this is from your

19  personnel file.  You're familiar with this document?

20         A.   I am.  I can explain it to you.  This

21  is -- I had been on military orders --

22         Q.   Okay.

23         A.   -- for a while, and apparently they had

24  sent email out.  I don't check my work email on the

25  military because I'm not getting paid by DOC to do

1   that.  They had sent an email out.  It was weird.

2          Morey at that time -- Morey unit was a

3   level four yard, but they started integrating PCs

4   in, I guess, half of the building, 'cause we were

5   overpopulated.

6      Q.   When you say PCs, what are PCs?

7      A.   They're protective custody inmates.  So

8   they started integrating them, and I hadn't briefed

9   it in briefing 'cause I didn't know.  I hadn't been

10  around.  They had been doing this for, like, the

11  last week or so.

12         When I got back to the yard -- and I think

13  that's why I probably only got a letter of

14  reprimand, is because I didn't understand.  I never

15  got the information to put it out to the officers

16  that, hey, we have PC inmates.

17         So what had happened was the two officers

18  had let the porter, who was a GP inmate -- he was a

19  GP inmate, into that side of the building.  So you

20  figure you got one housing unit, and you know how

21  Morey unit is.  These are -- these are gangbangers.

22  They're murderers.  These are --

23         So GP, they're used to porters going from

24  side to side to clean actual day areas.  So they had

25  let a porter in on the PC side because they weren't

1    aware because I never briefed it.  Obviously, it's

2    called vicarious liability.  I was a supervisor of

3    the day, so I'm responsible for what those officers

4    did.

5         Q.   But you didn't brief the officers?

6         A.   I didn't in briefing --

7         Q.   Okay.

8         A.   -- for that particular housing.

9         Q.   So not quite vicarious liability, when,

10   you know, like, you didn't do it and they didn't

11   know to do it.

12        A.   Exactly.

13        Q.   Right.  Was the porter injured?

14        A.   No.

15        Q.   But he could have been?

16        A.   The porter could have been, but, I mean,

17   it was protective custody inmates against a general

18   population inmate.  The general population inmate

19   would, of course, hurt that individual, like -- and

20   the individual that actually had done this was

21   getting out.  And he was part of one of the security

22   threat groups, I guess, that that's their bylaws is

23   to handle stuff if they get a chance.

24             And he got the opportunity to do it, so he

25   handled his stuff, handled his -- his business, I

```
 1   guess.  So the officers actually -- when I say
 2   vicarious liability is the officers, they already
 3   knew because they had been briefed by other
 4   sergeants, and I was the new sergeant coming in
 5   straight off of military, didn't know what -- how
 6   the yard had changed.
 7           And, basically, that's why they popped the
 8   door.  So that's why they got in trouble is because
 9   they knew.  Because you have to override.  Even in
10   Morey unit, it's lockdown.  So even if I had of
11   briefed them at all, you still, as the controlling
12   officer, you have to manually override the lock.
13           So what they did on those pods, if had
14   general population inmates and protective custody
15   inmates, they put a lock on the system.  So you
16   would have to manually go in.  You can't just hit a
17   button and open the door.  You have to override the
18   button, 'cause it's already locked, so.
19       Q.   Okay.  But -- well, all right.  So,
20   ultimately, this is a discipline form for you --
21       A.   It is.
22       Q.   -- because you didn't -- you weren't up on
23   the policy --
24       A.   Exactly.
25       Q.   -- and you didn't make sure that your --
```

1       A.    Staff was --

2       Q.    -- staff was doing what needs to be done?

3       A.    Yeah.   And that always happens with the

4    supervisor.   We're responsible for what our staff

5    does or doesn't do.

6                   MS. ILLSLEY:   I apologize.   Can you

7    slow down?   The court reporter is having a really

8    hard time.

9                   THE WITNESS:   I'm sorry.

10                  MR. GRIFFITHS:   I knew I would do it,

11   and I'm sorry.

12      A.    And this is the only, like -- what do they

13   call it -- punitive action I've ever had in DOC.

14      Q.    So just because of that, some inmates were

15   injured?

16      A.    Yes, I believe one inmate.

17      Q.    Do you know how seriously injured?

18      A.    It was just a fight, so he wasn't

19   seriously injured.

20                  MS. LOMBINO:   I'd like to take a

21   break.

22                  MR. GRIFFITHS:   Okay.

23

24          (Recess from 2:57 p.m. to 3:04 p.m.)

25

1        Q.   We can go back on the record.  So this

2    will be Exhibit Number 5.

3

4            (Exhibit 5 was marked for identification.)

5

6        Q.   Mr. Thompson, have you had a chance to

7    take a look at what's been marked as Exhibit Number

8    5?

9        A.   Oh, yeah.  We have access to these, like,

10   during our tenure in the department.

11       Q.   Okay.

12       A.   These are, like, our reviews.

13       Q.   Sure.  You're familiar with this document?

14       A.   I am.

15       Q.   I was just going to call your attention

16   and ask questions regarding starting with the last

17   sentence on this page and then carrying on.

18            MR. GRIFFITHS:  For the folks on the

19   phone, I'm sorry, I jumped ahead --

20            MS. LOMBINO:  Did you say this page?

21   Which is what page, counsel?

22            MR. GRIFFITHS:  For the folks on the

23   phone --

24            MS. LOMBINO:  I'm sorry.

25            MR. GRIFFITHS:  -- ADC -- pages ADC

```
 1   Garcia 012865, 866 and 867.
 2        Q.   And what -- Mr. Thompson, what is this
 3   document?
 4        A.   This is a performance review.
 5        Q.   Okay.  You said you've seen this before?
 6        A.   I have.
 7        Q.   Okay.  The last sentence on the first page
 8   on page 12865 says, "Sergeant Thompson is a
 9   dichotomy.  He is excellent at his job, strives to
10   be the best at all he does, but also requires a high
11   level of scrutiny due to his high speed nature and
12   his desire to do better than all others around him.
13   This also causes him to be a bit unpredictable at
14   times."  Do you agree with that?
15        A.   To somewhat.  Basically, what it -- at the
16   time they had brought me to the academy to bring a
17   lot more paramilitary into it, and DOC standard at
18   that point was a lot -- wasn't so high in their
19   expectations.  So out of my cadets, I would push my
20   cadets a lot harder than most sergeants would.
21   There were certain things I would do.
22             And, for instance, because I've been
23   involved in riots, I would introduce my cadets to
24   chemical agents because they're going to be around
25   chemical agents.  They're going to have to work in
```

1   stuff like that.  Other sergeants weren't doing it

2   at the time.

3             So you got to remember when something is

4   new and you have an old regime there, it's kind

5   of -- eventually what happened was I ended up re- --

6   I want to say bringing in stuff to the academy that

7   all the new sergeants are doing, like the military

8   protocols and stuff like that.  The old sergeants

9   weren't savvy to that.  They didn't want the

10  paramilitary there.

11            Physically, I demanded more of my cadets,

12  and that's what it was.  And, typically, I would do

13  it, and then he would make comments.  I would do it

14  and ask for forgiveness later.

15       Q.   He would say that about you?

16       A.   He did.

17       Q.   That you would do it and ask for --

18       A.   Yeah.

19       Q.   -- forgiveness later?

20       A.   Instead of vice-versa, where I would ask,

21  well, can I do this?

22       Q.   Yeah.  That's the next comment on the next

23  section.  "Once again, Sergeant Thompson's desire to

24  be the best, absolute best at everything, he

25  sometimes pushes the envelope without seeking

1   permission first."  And that's what you're

2   describing?

3        A.   It is.  And, like, the academy supervisor

4   at the time, they called him the commander.  He said

5   this is what I love about you, but it's also my

6   headache.  Like --

7        Q.   Okay.

8        A.   -- you have to understand my background.

9   I've been in specialty teams, like, for the last

10  twenty years in my military career and DOC career.

11  So regular line officers don't get as much training

12  as we do.  So I try to give them as much as I can

13  because I know what they're getting themselves into.

14       Q.   On the top of the third page, 12867,

15  manager comment, "Sergeant Thompson displays a high

16  level of integrity, although his enthusiasm

17  sometimes overrides his better judgment."

18       A.   So that was one thing they made the

19  comment.  I'm brutally honest.  Even if I messed up,

20  I would own up to it and tell them.  I would

21  sometimes tell them what I've done myself before

22  they could even get to it.  So that's -- so I'm

23  pretty sure that's what that's talking about.

24       Q.   Okay.

25       A.   And then the particular case was I ran the

1   cadets down the road.  There's a road right by the

2   academy.  So we did a -- like, a class run, where we

3   run them in formation.  And then we do that in the

4   military, and we were doing cadence.

5             Well, the neighborhood up there is a

6   retiree neighborhood.  So they got mad at the sound,

7   like, all the noise, the cadets were cheering and

8   stuff like that, that they called the academy, and

9   the academy wasn't used to that, so.

10      Q.   Where is the academy at?

11      A.   It's on Trails End Road, right up the road

12  on Grant.

13      Q.   Here in Tucson?

14      A.   It is.

15             MR. GRIFFITHS:  I don't have any

16  other questions.

17

18                     EXAMINATION

19  BY MS. ILLSLEY:

20      Q.   My one question, earlier -- we do this in

21  law; we use legal jargon, and we expect people to

22  know it when they don't.  When you said a "yard set

23  officer," can you explain what that is for the

24  record so we have a better understanding?

25      A.   Basically, they control movement on the

1  yard.

2       Q.   Okay.

3       A.   So they're not assigned to a particular --

4  they're assigned to -- so Santa Rita is kind of

5  weird, 'cause it's split up in four different yards,

6  and we call Santa Rita itself a yard.  So Santa

7  Rita, if we call that a unit, the yard officer would

8  be in charge of movement on the unit --

9       Q.   Okay.

10      A.   -- instead of on the unit -- instead of on

11 the yard, individual yards.

12      Q.   Okay.  And that's a yard set officer?

13      A.   It is.

14      Q.   And just, I guess, could you call it a

15 floater officer?

16      A.   Yes.

17      Q.   Okay.

18      A.   Exactly.

19           MS. ILLSLEY:  Perfect.  That was it.

20 Thank you.  That was it.

21           MS. LOMBINO:  Brad?

22           MR. DUNN:  I have no questions.

23 Thanks.

24           MS. LOMBINO:  DeeAnn?

25           MS. BARNES:  Nothing for me.

1                    EXAMINATION

2    BY MS. LOMBINO:

3        Q.    Mr. Thompson, you said you've been in the

4    military twenty years?

5        A.    I have, ma'am.

6        Q.    And you talked about your paramilitary

7    training today.  Can you describe for us the

8    training that you got in the military?

9        A.    So I've been a paratrooper, an

10   infantryman, for I want to say ten years in my

11   career.  I did some specialty schools.  I went

12   through the Ranger indoctrine program.

13       Q.    Through the?

14       A.    Ranger indoctrine program.  I jumped out

15   of airplanes.  I'm trying to think what else.  Right

16   now I'm a first sergeant of a petroleum unit, so I

17   have three companies with about 900 soldiers that

18   I'm responsible for.  Trying to think what else.

19            With DOC, obviously, I was tactical

20   support unit for the last -- out of ten years, I was

21   TSU for nine.  I was their sniper.  I was the state

22   sniper.  I taught sniper school.  I taught the

23   tactical officers academy.  Trying to think what

24   else.  I competed for DOC in sniper events.

25       Q.    Did you have any training in the military

1    in lifesaving measures?

2         A.    I do, about eighteen years.  They

3    initiated -- before we used to have basic life

4    support.  Then they -- in 2000, they introduced

5    combat lifesaver, and now it's called care under

6    fire.  Basically, we go over everything from giving

7    IVs to how to carry wounded soldiers, how to treat

8    bullet wounds, sucking chest wounds.  Most stuff I

9    can do like a paramedic, besides give narcotics and

10   surgery, obviously.

11        Q.    And you said you had this training over

12   the course of eighteen years?

13        A.    Eighteen years.  Annually, we have to

14   recertify annually on it.  It's normally done around

15   July, during our annual training.  My most recent

16   was last March, during the Best Warrior competition.

17        Q.    Prior to the events of September 20th,

18   2012, when was your last military training in

19   lifesaving techniques?

20        A.    That would have been July, during our

21   annual training.

22        Q.    July of what year?

23        A.    Of that year.

24        Q.    Of 2012?

25        A.    Yes, ma'am, 'cause annual training is

1    typically when we do most of our -- we call them

2    warrior tasks, and that's where we have to get

3    blessed off and stuff like that.  We have to get

4    either trained -- yeah, that's all.

5         Q.   By blessed, you're saying B-L-E-S-S-E-D?

6         A.   Like you get evaluated.

7         Q.   Evaluated?

8         A.   Yeah.

9         Q.   In other words, they say, you pass?

10        A.   Yeah.  You have to pass in order to --

11   especially with combat lifesaver, to retain your

12   combat lifesaver.  Every individual soldier does get

13   basic care, which also does include carrying

14   techniques and stuff like that.

15        Q.   What are the carrying techniques that you

16   were taught?

17        A.   You have the fireman's carry, individual

18   hold, the fireman's carry, individual hold.  That's

19   for individual, an individual person hold.  We

20   practice buddy carries.  We practice all sorts -- I

21   don't know.  Everything you can think of we practice

22   on that, as far as if the body is alive, if the body

23   is, like, unconscious, different ways, if we're

24   under fire, if we're not under fire.

25        Q.   Can you describe for us what a fireman's

```
 1   carry is?
 2        A.   So what a fireman's carry is you would
 3   basically place your arm through the individual's
 4   inner thigh area, come around behind the outer
 5   thigh.  You would grab your opposite arm, and you
 6   would hike him up on your shoulder.  And you can do
 7   this on one arm, because an individual that's
 8   probably about -- say a hundred pound individual can
 9   carry a 180 pound, 200 pound person easily just by
10   using the technique.  And it keeps us able to react
11   to respond, 'cause we have one hand open for our
12   weapon.
13        Q.   Were you taught that there were certain
14   situations when you should not use a fireman's
15   carry?
16        A.   If there is a neck injury present that
17   would cause paralysis.
18        Q.   So if there was a neck injury that would
19   cause paralysis, you would not do a fireman's carry;
20   is that correct?
21        A.   Yes, ma'am.
22        Q.   And were you trained in how to identify
23   signs of a neck injury that would cause paralysis?
24        A.   Yes.  For one, it would be paralysis; the
25   arms and legs would not be moving.  There'd be
```

1   swelling in the actual neck and rear of the head

2   area.

3        Q.   Did you have occasion to employ a

4   fireman's carry during your career with the

5   military?

6        A.   I have.  Well, through training we have to

7   get certified on it.  And then overseas I had a

8   gunner, Ryan Lopez, he's a soldier now.  But our

9   vehicle had flipped overseas.  So, basically, we

10  were involved in a firefight.  Our job over there

11  was on patrol, and we got --

12       Q.   Could you tell us where you were, please?

13       A.   It was Ghazni, Afghanistan, G-H-A-Z-N-I.

14  It's Afghanistan.  We had received small armor fire,

15  and my driver basically overcorrected and ended up

16  hitting a wadi in the Humvee.

17       Q.   Hitting a --

18       A.   Wadi.  Basically, it's like a mound of

19  dirt that goes into water.  So he hit the wadi, and

20  the vehicle flipped.

21            So the gunner, we had to bring the gunner

22  inside.  The gunner was unconscious, and basically I

23  pulled him out of the vehicle because he's my

24  gunner.  There's three of us in the Humvee, And I

25  carried him behind, like, support, like a building.

1    And he's -- he's doing fine now.  He's still in the

2    military.  He's still doing his thing.

3          Q.   Did he have any injuries that you noticed

4    before --

5          A.   He had --

6          Q.   -- you picked him up in the fireman's

7    carry?

8          A.   Yeah.  Obviously, he was knocked

9    unconscious from the actual Humvee flipping over,

10   hit his head.  He was still, like, able to, like,

11   maneuver a little bit, and I could -- I could talk

12   to him.  But he couldn't move with all the gear and

13   stuff and the Humvee being over with his legs and

14   head in it, he couldn't move.

15          And I remember when I pulled him out, we

16   put him on the side of the Humvee, and then we just

17   run him behind one of the -- it's like a dirt

18   building that's right there.

19          He did get diagnosed with traumatic brain

20   injury.  I know he gets disability from the V.A.,

21   but he's still in the National Guard.  So he's doing

22   fine.

23          Q.   Now, I'm sorry.  Did you tell us, were you

24   the sergeant --

25          A.   I was --

Ian Thompson - November 29, 2018                    81

1        Q.    -- at this time --

2        A.    I was their squad leader.

3        Q.    -- in the military?  What year was this,

4   sir?

5        A.    I want to say 2008, 2009 time.

6        Q.    Now, returning to the events of September

7   20th, 2012, there seemed to be a little bit of

8   confusion.  You were talking about a gate being --

9   an unsecured gate versus an open gate, and you

10  testified initially that when you got to yard three,

11  the gate was open, and I believe at some point you

12  said that when you got to yard three, the gate was

13  unsecured but you didn't know if the gate was

14  actually opened or not.  So could you clarify for us

15  what you meant?  When you were saying that the gate

16  was open, what did that mean to you?

17       A.    To me, when I'm saying open, it means it's

18  unsecured.

19       Q.    And by unsecured, sir, what does --

20       A.    It means --

21       Q.    -- that mean?

22       A.    -- not locked with, like -- with a

23  physical lock, not locked.

24       Q.    Let's slow down.  So during -- prior to

25  that time when you clarified for the record, each

1   time when you said that you got to yard gate -- or

2   excuse me, you got to yard three and the gate was

3   open, what did you mean?

4        A.   I mean it was unsecured.  Like, it wasn't

5   open as in open like a door is wide open.  I meant

6   it's unsecured.  We were able to get in.

7        Q.   You mean it was the unlocked?

8        A.   Yes, ma'am.

9        Q.   But you don't know who unlocked the gate?

10       A.   I do not, and from what I remember is it

11   was chow time, which would make sense for it to be

12   inlocked, because the inmates would be going to chow

13   and going back.  So at that time it wasn't common --

14   like, uncommon for the door to be unlocked or a gate

15   to be unlocked.

16       Q.   So, again, on September 20th, 2012, when

17   you first came upon inmate David Garcia, could you

18   describe for us his condition, his physical

19   condition?

20       A.   He was laid down.  His face was pretty

21   much smashed in.

22       Q.   Was he on his back?

23       A.   From what I remember, yeah.  He was

24   covered, soaked in blood.  I went up, and I did the

25   usual tap to make sure he was conscious.  He was

1  mumbling, so he was conscious.  He was breathing

2  still, but he had lost so much blood.  Like, there

3  was a ton of blood.  I remember it was, like, soaked

4  on the ground.  It was soaked over him.

5           I called for medical, too, to try to get

6  them to come out.  They wouldn't.  And I think

7  that's probably when I called Petrick.

8       Q.   So when you say medical, as opposed to

9  Officer Petrick, what --

10      A.   So --

11      Q.   -- what's the distinction that you're

12  making?

13      A.   So medical is civilian nurses or the

14  medical staff, whichever was employed back then.  I

15  don't remember if it was Corizon or -- whatever they

16  are, they're civilians.  They're not officers.

17  They're not training to be officers.  They're not --

18  so it is, and I think it's part of their procedures,

19  and I know it's part of, like -- I know TPD and all

20  that, nobody will come on the yard if there's a riot

21  disturbance because, again, tactical priorities from

22  the department, we won't put the public in harm's

23  way.

24           That being said, they're nurses.  They are

25  public.  They're not officers.  They're not sworn.

1      Q.    They're not corrections officers?

2      A.    They're not corrections officers.   Now,

3  Officer Petrick was a correctional officer, so he

4  could respond.   He took it upon himself to respond,

5  so.

6      Q.    But when you earlier referred to Officer

7  Petrick as a medical officer --

8      A.    I meant he was assigned to the --

9      Q.    -- assigned --

10      A.    -- medical unit.

11      Q.    So you meant that he was an officer

12  assigned to the medical unit.   Is that --

13      A.    Yes, ma'am.

14      Q.    -- correct?   To your knowledge Officer

15  Petrick was not a nurse.   Was he --

16      A.    No, not at all.

17      Q.    To your knowledge Officer Petrick had no

18  medical training?

19      A.    No.

20      Q.    Is that correct?

21      A.    That's correct.   He was a line officer.

22      Q.    So returning to you're there with David

23  Garcia, and Officer Luker is with you.   Can you

24  remember what happened next after you initially

25  evaluated --

1        A.    I remember --

2        Q.    -- David Garcia?

3        A.     -- they refused to come on the yard,

4    which, I mean, I understand.  And I remember I had

5    Luker help pick him up from behind.  We picked him

6    up from under his armpits and then I scooted him up

7    over my shoulder, came through, grabbed him like so.

8    I remember I had my radio in my hand, and we took

9    off.

10        Q.    So what you're describing when you said

11   "like so," did you employ the fireman's carry that

12   you learned in the military?

13        A.    I did, ma'am.

14        Q.    And is this the same fireman's carry for

15   which you had just been recertified two months

16   prior?

17        A.    It was, ma'am.

18        Q.    And this is the same fireman's carry which

19   you employed on your injured comrade in Afghanistan?

20        A.    It was, ma'am.

21        Q.    And why didn't you just leave David Garcia

22   there until medical could come to him?

23        A.    Because he's a human being.  I would

24   expect somebody to do that for me.  There was -- if

25   we had left him there, he had lost so much blood, he

1    would have died.  I'm a hundred percent sure of

2    that.

3         Q.   In fact, you received a lifesaving award

4    for your carrying David Garcia off the field that

5    day; isn't that correct?

6         A.   I did.

7         Q.   And Governor Janet Brewer also recognized

8    you that day, did she not?

9         A.   She did.

10        Q.   And you received other awards from the

11   Department of Corrections, haven't you?

12        A.   I have.

13        Q.   Could you please tell us about those?

14        A.   I got -- I have a second lifesaver award,

15   and that was at the academy over a cadet.  A cadet

16   was choking.  I performed the Heimlich maneuver and

17   got him breathing again.

18        Q.   And you did that without asking anybody's

19   permission to rescue that cadet, didn't you,

20   Mr. Thompson?

21        A.   I did.  It was funny because the

22   lieutenant -- and we're at chow, so all of us are in

23   there.  And I'm the one that reacted on it.

24        Q.   So you were a junior officer, and yet you

25   reacted while your lieutenant more or less stood by

1    while that cadet was choking?

2        A.   Yes, ma'am.

3        Q.   And do you think that your military

4    training aided you in that?

5        A.   It did.  And I had been -- so this isn't

6    the only riot I've been through, disturbance.  Like,

7    I've been through several disturbance.  It was the

8    first one as a regular line sergeant.  Prior to

9    that, I had been through several riots as a tactical

10   operator.  After that, I had -- before I got to the

11   academy, I'd been through several riots.  It's just

12   based off of experience.

13       Q.   So prior to September 20th, 2012, you had

14   responded to a number of other disturbances while

15   serving as a tactical officer?

16       A.   I had, ma'am.  I had several in Tucson,

17   couple out in Eyman in Florence area.

18                 MS. LOMBINO:  Let me just confer with

19   my colleague.  I'm all set.

20                 MR. GRIFFITHS:  Just a follow-up then

21   real quick.

22

23                     EXAMINATION

24   BY MR. GRIFFITHS:

25       Q.   So you're proficient in everything you're

1    testifying to.  You're proficient in the fireman's

2    carry and stuff.  So on the day --

3         A.    I am.

4         Q.    -- that you ran into David Garcia in front

5    of yard four, you described that you did a -- you

6    slapped him or checked him on his face to make sure

7    he was conscious?

8         A.    We didn't slap him.

9         Q.    What did you do?

10        A.    We -- basically, you can do a sternum rub.

11   You can hit the legs, 'cause you don't know if a

12   individual has a weapon or not.  So, clearly, he was

13   not a threat.  Like, he was -- his face was pretty

14   much caved, like, on one side.  So I was just

15   checking for consciousness.  And he was mumbling.

16   He was --

17        Q.    Okay.

18        A.    He couldn't talk.  He couldn't, like,

19   visually -- not visually, but verbally tell me, but

20   he was mumbling.  He was breathing still, which is a

21   good sign.  You could see the gurgling with the

22   blood, but there was a ton of blood.

23        Q.    So did you check him for paralysis?

24        A.    For paralysis, his arms and legs were

25   flailing.  He wasn't paralyzed.

1      Q.   Did you check him for any other brain

2   swelling or --

3      A.   There was no swelling, and the way we do

4   that it's an actual check, and you just run your

5   fingers down the back, down the back side of the

6   body and all that stuff.  All the blood was on the

7   front of side of his head.

8      Q.   For brain swelling --

9      A.   I don't know about the brain swelling, but

10  his head wasn't swollen at that point.

11     Q.   Okay.  You said that you could not use

12  fireman carry if there's a neck injury present that

13  would cause paralysis?

14     A.   Yes, sir.

15     Q.   And how would you know that from the

16  position that David Garcia was --

17     A.   Because he wasn't paralyzed.  His arms and

18  legs were moving fine.  Like, he was still -- he

19  wasn't able to talk or anything, but his body was

20  still able to move.

21     Q.   So let me just ask you, just parse it off

22  just a little bit here.

23     A.   Gotcha.

24     Q.   So he wasn't paralyzed when you saw him?

25     A.   Yes, sir.

Ian Thompson - November 29, 2018                    90

1      Q.   But did you know that he had a neck injury

2  or potential neck injury that could cause paralysis?

3      A.   When I did the original check on the body,

4  no, he didn't have a neck injury.

5           MR. GRIFFITHS:   I don't have any

6  further questions.

7           MS. LOMBINO:   We'll read and sign.

8      (Deposition concluded at 3:31 p.m.)

9

10

11

12

13  _____  1.17.19

14            IAN THOMPSON

15

16

17

18

19

20

21

22

23

24

25

Scanned by CamScanner

Ian Thompson - November 29, 2018

1  STATE OF ARIZONA )

2  COUNTY OF PIMA    )

3       BE IT KNOWN the foregoing deposition was taken

4  by me pursuant to stipulation of counsel; that I was

5  then and there a certified court reporter of the

6  State of Arizona, and by virtue thereof authorized

7  to administer an oath; that the witness before

8  testifying was duly sworn by me to testify to the

9  whole truth; pursuant to request, notification was

10  provided that the deposition is available for review

11  and signature; that the questions propounded by

12  counsel and the answers of the witness thereto were

13  taken down by me in shorthand and thereafter

14  transcribed into typewriting under my direction;

15  that the foregoing pages are a full, true, and

16  accurate transcript of all proceedings and testimony

17  had and adduced upon the taking of said deposition,

18  all to the best of my skill and ability.

19       I FURTHER CERTIFY that I am in no way related

20  to nor employed by any parties hereto nor am I in

21  any way interested in the outcome hereof.

22       DATED at Tucson, Arizona, this 5th day of

23  December, 2018.

24  _____
    Nancy P. Richmond

25  Certified Court Reporter #50864

Garcia vs. Ryan
2:13-cv-1591-DJH(DMF)

Ian Thompson
November 29, 2018

## A

ability (2) 29:2,4
able (15) 6:4,8;42:9,
12,25;44:4;46:8;
48:11,19,22;78:10;
80:10;82:6;89:19,20
absolute (1) 71:24
academy (11) 50:18;
70:16;71:6;72:3;
73:2,8,9,10;75:23;
86:15;87:11
accepted (1) 64:14
access (4) 28:22;
29:22;30:5;69:9
according (1) 28:8
accounted (1) 34:9
across (2) 44:4;60:13
acting (1) 32:3
action (1) 68:13
activated (1) 12:25
actual (8) 27:19;32:6;
38:13;44:24;65:24;
79:1;80:9;89:4
actually (10) 14:13;
20:1;22:15;32:2;
33:22;50:4;56:4;
66:20;67:1;81:14
adamant (1) 55:25
ADC (4) 11:2;64:2;
69:25,25
added (1) 54:5
administrative (1)
43:14
ADOC (1) 53:19
advised (1) 59:23
Afghanistan (3)
79:13,14;85:19
African (3) 14:1;
31:11,17
afternoon (1) 5:8
afterwards (2) 25:24;
49:3
again (18) 14:3,5;
29:18;30:4;32:8;
33:15;39:23;41:3,14,
15;43:24;58:1,6,18;
71:23;82:16;83:21;
86:17
against (9) 31:9,13;
32:14;34:18;36:2,15;
43:25;56:25;66:17
agents (5) 26:25;
54:17;58:2;70:24,25
ago (6) 18:15;23:9;
26:10;30:9;39:11;
55:3
agree (1) 70:14
Ah (1) 20:3
ahead (3) 7:9;63:15;
69:19
aided (1) 87:4

air (2) 20:22,24
airplanes (1) 75:15
alive (1) 77:22
almost (1) 21:1
along (1) 26:2
although (1) 72:16
always (8) 6:24;7:14;
19:13;27:3,7;36:15;
48:15;68:3
ambulances (2)
29:21;59:11
American (3) 14:1;
31:11,18
amount (1) 58:8
annual (3) 76:15,21,
25
Annually (2) 76:13,14
answered (1) 6:17
ant (1) 57:14
anymore (2) 5:14;
53:16
apologize (5) 24:16;
61:12,20;62:15;68:6
apparently (1) 64:23
approximate (1)
18:17
approximately (3)
39:6,7;49:23
area (29) 11:4;14:9,
15;17:20;18:8;19:7,
24;27:11;31:24;32:6;
33:13;40:25;41:16,
20;42:11;44:1,9;
46:5,12;47:8;48:9;
57:12;61:8;62:5;
63:7;64:15;78:4;
79:2;87:17
areas (1) 65:24
Arizona (4) 10:11;
12:3,9;36:16
arm (3) 78:3,5,7
armor (1) 79:14
armpits (1) 85:6
arms (3) 78:25;88:24;
89:17
Army (6) 9:14,19,20,
21;11:9,11
around (16) 11:4;
16:23;17:25;18:6,9,
12,12;21:8;27:8;
43:18;60:15;65:10;
70:12,24;76:14;78:4
arrived (3) 26:7;
37:13;46:3
arts (1) 10:24
Aryan (2) 41:12;
58:19
aside (1) 38:23
assault (1) 49:2
assaulting (3) 14:4,5;
46:1
assess (1) 60:4
Assigned (6) 27:18;

74:3,4;84:8,9,12
assist (1) 24:24
assuming (2) 41:24;
56:19
assumption (1) 6:16
attempted (1) 40:11
attended (1) 11:7
attention (2) 54:8;
69:15
attorney (3) 6:3;7:6;
8:5
August (1) 12:4
Autodesk (2) 61:17,
24
available (1) 53:12
award (2) 86:3,14
awards (1) 86:10
aware (2) 49:1;66:1
away (2) 14:16;47:24

## B

back (28) 10:13,24;
19:7,11,12,14,16,19;
20:5,7,8;22:21;
29:11;30:15,18;
37:25;38:9;42:4;
59:8,16,17;65:12;
69:1;82:13,22;83:14;
89:5,5
background (1) 72:8
backs (1) 31:9
backup (1) 25:1
bad (2) 49:5,6
barbed (1) 37:18
BARNES (1) 74:25
baseball (6) 44:3;
53:6;60:3,7,12;61:1
based (1) 87:12
basic (3) 9:7;76:3;
77:13
basically (14) 9:1;
14:2;24:19;31:8;
67:7;70:15;73:25;
76:6;78:3;79:9,15,18,
22;88:10
bat (1) 53:6
began (1) 54:16
begin (1) 39:20
behind (7) 19:11;
20:5;41:4;78:4;
79:25;80:17;85:5
beleaguer (1) 55:14
below (2) 54:3,5
belt (1) 38:14
besides (1) 76:9
best (6) 6:23;7:3;
70:10;71:24,24;
70:12;72:17;73:24
big (2) 30:5,14
bigger (1) 53:22

bit (8) 6:14;9:11;
22:22;24:17;70:13;
80:11;81:7;89:22
bits (1) 42:15
black (15) 14:9;17:3;
22:9;36:13,15;39:8,
13,17;41:5,14,17;
42:10;43:12;45:25;
58:20
blacks (9) 26:1;37:15,
16;43:25;57:6,17,17;
58:5,15
blame (1) 31:13
blend (1) 33:16
blessed (2) 77:3,5
B-L-E-S-S-E-D (1)
77:5
blood (9) 45:4,4;
82:24;83:2,3;85:25;
88:22,22;89:6
blue (1) 17:6
blur (1) 30:14
body (6) 31:1;77:22,
22;89:6,19
border (1) 11:12
both (2) 35:1,2
bottom (1) 20:11
bounce (1) 24:3
boys (2) 14:4;32:7
Brad (1) 74:21
brain (4) 80:19;89:1,
8,9
branch (1) 9:18
break (2) 7:15;68:21
breaking (1) 37:23
breathing (3) 83:1;
86:17;88:20
Brewer (1) 86:7
brief (1) 66:5
briefed (4) 65:8;66:1;
67:3,11
briefing (3) 12:14;
65:9;66:6
briefings (1) 16:13
bring (3) 25:10;
70:16;79:21
bringing (1) 71:6
broken (1) 34:24
broom (3) 35:7,17;
53:8
brooms (1) 34:24
brothers (2) 41:12;
58:19
brought (2) 27:2;
70:16
brutally (1) 72:19
bubble (2) 27:25;
28:12
Buckeye (1) 64:15
buddy (1) 77:20
building (9) 20:6;
29:11;37:20;42:4;
43:15;65:4,19;79:25;

80:18
buildings (1) 20:16
bullet (1) 76:8
burst (1) 13:23
business (1) 66:25
busy (1) 22:20
button (2) 67:17,18
bylaws (1) 66:22

## C

cadence (1) 73:4
cadet (4) 86:15,15,
19;87:1
cadets (6) 70:19,20,
23;71:11;73:1,7
call (19) 5:9;16:7;16;
12:16;15:23,23;17:8,
9;19:16;24:23;25:8;
50:11;54:8;68:13;
69:15;74:6,7,14;77:1
called (16) 9:1;12:17;
14:23;19:20;23:19;
24:6,12;25:6;34:11;
61:10;66:2;72:4;
73:8;76:5;83:5,7
calling (9) 15:3;21:6;
43:7,8,9,9;45:15,20;
46:2
calls (1) 46:21
calm (4) 13:25;42:8;
58:4,4
calmed (1) 14:14
came (12) 10:13;
15:21;20:20;30:10;
34:13;38:9;49:6;
57:7;20:59:12;82:17;
85:7
can (37) 6:6;7:3,9;
8:14;16:7,23;17:4,7;
18:22;19:4;20:25;
24:3;28:22;35:15,16;
37:12;50:21;52:10,
16;54:11;62:22,24;
64:20;68:6;69:1;
71:21;72:12;73:23;
75:7;76:9;77:21;25;
78:6,8;84:23;88:10,
11
capital (1) 20:12
Captain (1) 42:21
care (2) 76:5;77:13
career (5) 27:5;72:10,
10;75:11;79:4
carried (3) 27:7;47:4;
79:25
carries (2) 50:15;
77:20
carry (22) 27:3;38:11,
12,13,17,21;50:17;
76:7;77:17;18;78:1,2,
9,15,19;79:4;80:7;
85:11,14,18;88:2;

Garcia vs. Ryan
2:13-cv-1591-DJH(DMF)

Ian Thompson
November 29, 2018

89:12

**carrying (4)** 69:17;
77:13,15;86:4
**cart (1)** 26:2
**case (4)** 5:19;6:7;
28:3;72:25
**catch (1)** 7:3
**cause (41)** 11:20;
14:20;18:3;20:4;
21:9;25:1,9,15,19;
27:4;29:11,20;34:25;
35:14,18;36:18,22;
37:15;40:21;41:6;
42:5;43:4;46:9,19;
48:15;55:15,24;61:6;
62:16;64:7;65:4,9;
67:18;74:5;76:25;
78:11,17,19,23;
88:11;89:13
**causes (1)** 70:13
**caved (1)** 88:14
**cells (1)** 25:3
**cement (2)** 62:2;63:7
**cemented (1)** 61:10
**center (1)** 18:19
**central (1)** 44:6
**certain (2)** 70:21;
78:13
**Certified (2)** 5:2;79:7
**chain (1)** 33:9,18;
35:15
**chained (4)** 33:3,3;
44:3,6
**chance (2)** 66:23;
69:6
**change (1)** 37:6
**changed (1)** 67:6
**chanting (1)** 13:14
**charge (1)** 74:8
**chasing (1)** 39:19
**check (4)** 64:24;
88:23;89:1,4
**checked (1)** 88:6
**checking (1)** 88:15
**cheering (1)** 73:7
**chemical (5)** 26:25;
54:17;58:2;70:24,25
**chest (1)** 76:8
**Childree (1)** 42:21
**choking (2)** 86:16;
87:1
**choosing (1)** 53:18
**chow (10)** 12:15;
15:3;44:19,20,21,24;
46:9;82:11,12;86:22
**chronological (1)** 9:1
**Cimarron (1)** 64:8
**circle (1)** 16:11
**CIU (2)** 8:12;59:12
**civilian (1)** 83:13
**civilians (1)** 83:16
**clarified (1)** 81:25
**clarify (1)** 81:14

**clarity (1)** 59:18
**class (1)** 73:2
**clean (4)** 6:22;50:21;
53:11;65:24
**clear (5)** 34:3;38:1;
47:6;55:15;60:19
**clearly (1)** 88:12
**climb (3)** 37:17,18,23
**close (3)** 25:4;30:19;
39:21
**closed (2)** 41:23;52:8
**cloud (1)** 17:22
**COII (15)** 15:18;
44:17,18;47:19;
54:13,13,14,15,15,16,
17,19,22;56:17;59:21
**colleague (1)** 87:19
**college (7)** 10:13,15,
16,17,20;11:7,7
**colors (2)** 17:1,5
**column (1)** 62:1
**combat (3)** 76:5;
77:11,12
**coming (4)** 29:21;
39:2;59:11;67:4
**commander (1)** 72:4
**comment (4)** 35:11;
71:22;72:15,19
**comments (3)** 34:22;
71:13
**common (1)** 82:13
**Community (2)** 10:17;
11:7
**companies (1)** 75:17
**competed (1)** 75:24
**competition (1)** 76:16
**complex (1)** 19:15
**comrade (1)** 85:19
**concern (1)** 21:23
**condition (2)** 82:18,19
**confer (1)** 87:18
**conflict (1)** 43:5
**confusion (1)** 81:8
**conscious (3)** 82:25;
83:1;88:7
**consciousness (1)**
88:15
**considered (1)** 20:11
**contact (1)** 25:11
**contacted (1)** 25:14
**contain (2)** 51:15;
54:14
**contained (1)** 59:10
**continued (1)** 41:2
**control (9)** 14:9;16:2;
27:25;29:2;37:12;
41:18;54:18;61:3;
73:25
**controlled (1)** 32:7
**controlling (1)** 67:11
**conversation (2)** 8:4;
45:5
**cool (6)** 5:13;7:21,23;

10:10;18:24;32:25
**copied (1)** 54:2
**Corizon (1)** 83:15
**corral (1)** 42:11
**corralling (1)** 41:21
**correctional (1)** 84:3
**Corrections (12)**
10:11,14;11:1;12:3,
9;36:16;48:17;50:18,
23;84:1,2;86:11
**correctly (1)** 43:11
**counsel (2)** 60:16;
69:21
**couple (6)** 9:6;19:24;
45:24;49:24;64:8;
87:17
**course (3)** 23:10;
66:19;76:12
**court (2)** 6:22;68:7
**covered (2)** 45:4;
82:24
**crazy (2)** 32:3;61:22
**criminal (1)** 10:25
**crowd (4)** 54:17,19,
23;56:18
**cuff (1)** 31:4
**cuffs (1)** 22:17
**custody (3)** 65:7;
66:17;67:14
**cut (2)** 44:4,7

**D**

**DA (1)** 44:18
**damage (1)** 35:18
**damages (1)** 51:18
**danger (1)** 31:12
**dangerous (4)** 35:23,
24,25;36:1
**DART (3)** 42:23,24;
59:10
**dates (1)** 49:25
**David (11)** 5:19;15:1;
49:1,8;82:17;84:22;
85:2,21;86:4;88:4;
89:16
**day (15)** 7:5;12:13;
27:17,18,22,22;
33:24,25;48:3,23;
65:24;66:3;86:5,8;
88:2
**deal (5)** 7:12;14:22;
24:22;38:9;42:6
**dealing (5)** 24:20;
25:7;30:17;32:9;43:4
**decision (2)** 36:19,20
**DeeAnn (1)** 74:24
**defendant (1)** 5:20
**definitely (3)** 29:8;
38:20;46:15
**demanded (1)** 71:11
**Department (6)**
10:11;12:3,9;69:10;

83:22;86:11
**deposition (5)** 5:21;
7:14;8:2;28:9
**depositions (1)** 6:20
**deputy (1)** 42:22
**describe (5)** 60:23;
61:13;75:7;77:25;
82:18
**described (1)** 88:5
**describing (2)** 72:2;
85:10
**desire (2)** 70:12;
71:23
**diagnosed (1)** 80:19
**dichotomy (1)** 70:9
**died (4)** 14:8;42:12;
45:23;86:1
**different (6)** 17:1,5;
55:17;62:9;74:5;
77:23
**direct (1)** 21:7
**directed (1)** 58:6
**direction (2)** 14:2;
23:6
**directions (1)** 58:21
**directive (1)** 40:4
**director (1)** 12:1
**dirt (11)** 18:1,11,12;
21:8;26:2;31:23;
40:25;41:2;43:18;
79:19;80:17
**disability (1)** 80:20
**discipline (1)** 67:20
**displays (1)** 72:15
**distinction (1)** 83:11
**disturbance (7)**
30:17;34:8;51:6;
59:22;83:21;87:6,7
**disturbances (1)**
87:14
**division (1)** 9:21
**DOC (11)** 5:14;27:5;
33:15;53:16,20;
64:25;68:13;70:17;
72:10;75:19,24
**document (5)** 8:21;
12:12;64:19;69:13;
70:3
**documents (1)** 5:10
**done (5)** 8:5;66:20;
68:2;72:21;76:14
**door (8)** 33:6;37:10;
49:13;57:19;67:8,17;
82:5,14
**doors (3)** 19:12;
27:25;28:16
**doorway (1)** 57:18
**dot (1)** 63:6
**double (3)** 18:22;
19:4;37:17
**down (31)** 13:25;
14:14;15:2;24:17;
25:10;32:12;42:12;

44:1;45:19,23,23;
47:7,7;54:3,5,10;
57:16;58:4,5,7,22;
59:1,23;60:18;62:16;
68:7;73:1;81:24;
82:20;89:5,5
**driver (1)** 79:15
**due (1)** 70:11
**duly (1)** 5:2
**DUNN (1)** 74:22
**during (7)** 27:19;
69:10;75:16,20;
79:4;81:24
**duty (1)** 38:14
**dying (2)** 47:7,7

**E**

**earlier (4)** 28:9;44:2;
73:20;84:6
**early (1)** 59:15
**easily (1)** 78:9
**Educational (2)**
61:17,24
**efforts (1)** 56:24
**eight (2)** 49:17,20
**eighteen (3)** 76:2,12,
13
**eighty-second (1)**
9:22
**either (3)** 37:2,2;77:4
**else (4)** 20:8;75:15,
18,24
**email (3)** 64:24,24;
65:1
**emergency (3)** 29:20;
30:4;33:17
**employ (1)** 79:3;
85:11
**employed (2)** 83:14;
85:19
**employment (1)** 11:2
**en (1)** 17:13
**end (4)** 33:25;34:6;
60:24;73:11
**endangered (1)** 51:16
**ended (9)** 14:9;
31:18;37:21;41:21;
42:4;56:10;59:1;
71:5;79:15
**enough (2)** 9:3;32:22
**enthusiasm (1)** 72:16
**entry (4)** 19:5,8;
28:19;29:12
**envelope (1)** 71:25
**equipment (2)** 38:10,
14
**erupted (2)** 14:3;
41:15
**escaped (1)** 39:5
**Escarcega (1)** 49:14
**escorted (2)** 20:6;
60:3

Garcia vs. Ryan
2:13-cv-1591-DJH(DMF)

Ian Thompson
November 29, 2018

escorting (1) 59:24
especially (1) 77:11
established (1) 15:16
evaluated (3) 77:6,7;
  84:25
even (13) 7:1;15:20;
  18:4;24:5;30:14;
  34:7;35:16;45:11;
  60:23;67:9,10;72:19,
  22
events (7) 6:5;7:24,
  25;9:2;75:24;76:17;
  81:6
eventually (2) 9:5;
  71:5
everybody (8) 12:15;
  14:1;16:23;21:21;
  30:4;31:12;37:16;
  43:25
everyone (1) 36:14
everywhere (1) 57:13
exact (1) 49:25
exactly (5) 21:4;36:6;
  66:12;67:24;74:18
EXAMINATION (4)
  5:6;73:18;75:1;
  87:23
example (1) 20:13
excellent (1) 70:9
excuse (1) 82:2
exerted (1) 27:10
Exhibit (18) 8:14,15,
  16,17;16:5;53:23,24;
  61:16,18,19,21;
  63:14,15,17,19;69:2,
  4,7
exhibits (1) 9:6
exit (1) 52:11
expect (3) 7:13;
  73:21;85:24
expectations (1)
  70:19
experience (3) 27:4;
  51:2;87:12
experienced (1)
  38:19
explain (3) 6:1;64:20;
  73:23
expressly (1) 7:8
Eyman (1) 87:17

**F**

face (4) 58:21;82:20;
  88:6,13
fact (1) 86:3
Fair (2) 9:3;32:22
familiar (3) 47:20;
  64:19;69:13
far (1) 77:22
fast (1) 24:15
feeding (1) 12:15
feel (4) 17:21;20:22,

23,25
feels (2) 30:16;43:5
fence (15) 18:6,9;
  19:21;20:2;21:9;
  31:18;32:14;35:15;
  39:1;44:8,12,15,16;
  46:9;60:14
fenced (1) 44:7
fences (1) 20:4
few (1) 10:7
field (12) 13:24;18:6,
  8;31:19;41:10;44:3,
  12;60:3,7,12;61:1;
  86:4
fifty-four (1) 63:11
fight (3) 27:2;40:24;
  68:18
fighting (9) 21:3,4;
  32:8;41:2;52:15,17,
  19,20;57:10
figure (4) 25:2;57:12,
  18;65:20
file (1) 64:19
filing (1) 37:10
Finally (1) 7:13
find (1) 30:24
fine (5) 5:12;49:22;
  80:1,22;89:18
fingers (1) 89:5
finish (3) 7:2;10:18;
  50:21
fire (5) 47:11;76:6;
  77:24,24;79:14
firefight (1) 79:10
fireman (4) 47:4;
  50:15,17;89:12
fireman's (12) 77:17,
  18,25;78:2,14,19;
  79:4;80:6;85:11,14,
  18;88:1
first (16) 5:2;6:19;
  7:19;10:12;15:22;
  21:24;39:18;51:12;
  54:3;57:6,25;70:7;
  72:1;75:16;82:17;
  87:8
Fitness (1) 11:23
five (1) 54:4
flagging (1) 45:14
flailing (1) 88:25
flame (3) 47:12,12,12
flipped (2) 79:9,20
flipping (1) 80:9
floater (2) 56:22;
  74:15
flood (1) 30:6
flooded (5) 13:18;
  31:17;35:22;40:12;
  57:2
Florence (1) 87:17
fog (1) 27:8
fogger (6) 27:1,2,3,7,
  10,12

folks (3) 57:7;69:18,
  22
follows (1) 5:4
follow-up (1) 87:20
force (1) 58:8
forever (1) 39:24
forgive (1) 32:22
forgiveness (2) 71:14,
  19
form (1) 67:20
formation (1) 73:3
forty (4) 25:2;36:13,
  17;37:10
forward (1) 6:6
four (17) 14:19,22;
  15:6;21:10;24:3;
  42:6,9,13,14,15;43:6,
  19;44:17;54:4;65:3;
  74:5;88:5
fourth (1) 51:17
free (2) 33:2,7
front (8) 21:10;31:21,
  23;40:19;43:14,19;
  88:4;89:7
fucking (1) 31:10
full (6) 11:11,15,20;
  44:13,15;55:16
fun (1) 64:17
funnel (2) 37:9;57:20
funny (1) 86:21

**G**

G1 (1) 19:3
G11 (3) 63:2,8,11
G2 (1) 19:3
G3 (1) 19:5
gangbangers (1)
  65:21
Garcia (28) 5:19;
  14:24;15:1,6;43:8;
  44:23;45:2,3,7,12;
  46:2,4,19;47:2,14;
  49:2,8;59:25;60:2,3;
  70:1;82:17;84:23;
  85:2,21;86:4;88:4;
  89:16
Garcia's (1) 45:8
gas (1) 27:15
gate (104) 13:10,11,
  14,16,17,17,17;15:9,
  13;18:18,18,20,22;
  19:3,3;21:12,14,14;
  22:3,4,5,10,14,15,15,
  20,25;25:18,25;26:7,
  14;28:21,22,22;29:3,
  6,7,9,10,12,12,13,16,
  16,19,20,20;30:4,8,
  20;31:1,8,9,16,16;
  32:13;33:1,2,11,21;
  34:19;35:20,22;
  36:19,21,23,25;37:3,
  8,10,11,14;38:24;

39:2,21,22,25;40:9,
  13,15;41:23;51:24;
  52:3;54:20;55:18,19,
  21;56:2,4,9,18;57:1,
  2;81:8,9,9,11,12,13,
  15;82:1,2,9,14
gated (1) 31:24
gates (7) 18:17;
  28:18;29:5;30:5;
  33:17;37:17;51:5
gathered (2) 13:6;
  41:4
gathering (1) 25:6
gave (1) 40:4
gear (2) 59:16;80:12
general (4) 19:22;
  66:17,18;67:14
generally (1) 6:7
gets (2) 7:10;80:20
Ghazni (1) 79:13
G-H-A-Z-N-I (1) 79:13
giant (1) 30:5
giving (1) 76:6
goes (3) 18:11;33:6;
  79:19
Good (7) 5:8;7:17;
  27:13;32:11;49:7;
  53:20;88:21
goodbye (1) 53:19
Gotcha (1) 89:23
Governor (1) 86:7
GP (3) 65:18,19,23
grab (3) 30:11;41:15;
  78:5
grabbed (6) 54:18,22;
  56:11,17;58:25;85:7
graduate (1) 9:8
Grant (3) 73:12
Great (1) 35:11
GRIFFITHS (16) 5:7;
  16:22;19:2;60:22;
  61:14,21;62:3;63:14;
  68:10,22;69:18,22,
  25;73:15;87:20,24
ground (3) 20:25;
  58:8;83:4
group (3) 17:23;
  24:20;56:14
grouping (1) 12:18
groups (1) 66:22
Guard (2) 11:12;
  80:21
guess (7) 15:17;
  58:19;63:25;65:4;
  66:22;67:1;74:14
guideline (1) 51:10
gunner (5) 79:8,21,
  21,22,24
gurgling (1) 88:21
Gurney (1) 48:5
guys (3) 19:23,24;
  35:9
guy's (1) 58:21

gym (1) 53:17

**H**

half (3) 44:12,16;65:4
halfway (2) 47:23;
  48:4
hall (6) 15:3;44:19,
  20,21,25;46:9
hallway (12) 16:8;
  17:18;31:7;60:10,23,
  24,25;61:6,10,11;
  62:2;63:7
hand (2) 78:11;85:8
handcuff (1) 31:5
handcuffs (9) 13:20;
  38:11,12,15,17;
  39:21,25;40:5,9
handle (1) 66:23
handled (2) 66:25,25
handles (2) 53:8,8
happen (1) 32:20
happened (6) 6:5;
  12:13,22;13:2;14:20;
  22:13;32:17;40:22;
  42:1;46:9;49:1;
  58:14;63:24;65:17;
  71:5;84:24
happening (1) 43:2
happens (6) 6:24;
  24:2;25;68:3
hard (1) 68:8
harder (1) 70:20
harm's (1) 83:22
head (7) 6:21;42:9;
  79:1;80:10,14;89:7,
  10
headache (1) 72:6
headed (1) 41:18
Heimlich (1) 86:16
held (1) 13:11
help (4) 15:3;45:13;
  47:3;85:5
helped (1) 46:19
Hey (4) 35:8;49:13;
  58:16;65:16
high (8) 9:8,10,11,13;
  70:10,11,18;72:15
hike (1) 78:6
hill (1) 57:14
himself (3) 50:5;
  54:18;84:4
history (1) 64:1
hit (4) 67:16;79:19;
  80:10;88:11
hitting (3) 14:5;79:16,
  17
Hm-hmm (1) 17:14
hold (7) 22:20;31:8;
  35:21;54:21;77:18,
  18,19
holding (3) 14:15;
  22:15;31:1

Case 2:13-cv-01591-DJH-DMF   Document 298-7   Filed 05/17/19   Page 96 of 105

Garcia vs. Ryan
2:13-cv-1591-DJH(DMF)

Ian Thompson
November 29, 2018

**holds (1)** 33:11
**hollering (1)** 49:12
**home (3)** 38:8;59:8, 15
**honest (2)** 39:9;72:19
**Honestly (8)** 8:7; 30:13;40:2;44:9; 52:7;55:1;56:7,21
**hour (7)** 30:15,16; 38:9;43:3,6;59:8,16
**housing (6)** 19:11,19; 49:16,20;65:20;66:8
**human (1)** 85:23
**humans (1)** 36:18
**Humvee (5)** 79:16,24; 80:9,13,16
**hundred (6)** 25:5,16; 36:2;57:19;78:8;86:1
**hurt (3)** 36:4,5;66:19

## I

**IAN (1)** 5:1
**ICS (5)** 12:25;21:4,6; 24:5,7
**idea (2)** 15:14;32:18
**identification (2)** 63:17;69:4
**identified (1)** 50:5
**identify (1)** 78:22
**ILLSLEY (20)** 16:25; 17:4;20:10,18;61:12, 15,19,23;62:7,12,15, 19,23;63:3,5,8,13; 68:6;73:19;74:19
**incident (7)** 15:7; 38:7;40:21;46:2; 48:3;51:15;63:24
**incidents (2)** 42:18,18
**include (1)** 77:13
**indicating (2)** 19:17; 31:21
**individual (11)** 66:19, 20;74:11;77:12,17, 18,19,19;78:7,8; 88:12
**individuals (2)** 27:14; 45:24
**individual's (1)** 78:3
**indoctrine (2)** 75:12, 14
**infantryman (1)** 75:10
**information (4)** 6:4; 9:7;22:22;65:15
**ingrained (1)** 51:22
**initial (1)** 16:17
**initially (2)** 81:10; 84:24
**initials (1)** 16:18
**initiated (1)** 76:3
**injured (2)** 51:17; 66:13;68:15,17,19; 85:19

**injuries (2)** 60:5;80:3
**injury (5)** 78:16,18, 23;80:20;89:12
**inlocked (1)** 82:12
**inmate (17)** 14:24; 15:2;41:5,11;43:7; 47:2;58:5,6,17; 59:25;60:2;65:18,19; 66:18,18;68:16; 82:17
**inmates (57)** 13:14; 14:1,9;19:21;20:24; 21:3,3;22:1,9;24:20; 25:3,5;27:8;31:9,11, 18;34:19;35:4,22; 36:2,7,13,15;37:22, 22;39:1,5,9,13,17; 40:12,17;41:1,14,17; 42:4,10;43:12,12; 44:3;45:25;51:14; 52:15,24;56:15;57:3, 5,13,19;58:3;65:7,16; 66:17;67:14,15; 68:14;82:12
**inner (1)** 78:4
**inside (5)** 26:11; 27:17;30:8;57:10; 79:22
**instance (1)** 70:22
**Instead (1)** 71:20; 74:10,10
**integrating (2)** 65:3,8
**integrity (1)** 72:16
**intent (1)** 21:18
**interested (1)** 55:23
**interesting (1)** 24:16
**into (17)** 10:25;13:23; 19:5;23:12;29:12; 32:5;40:24,24;54:17, 18;58:20;62:14; 65:19;70:17;72:13; 79:19;88:4
**introduce (1)** 70:23
**introduced (1)** 76:4
**investigated (1)** 59:12
**involved (3)** 54:14; 70:23;79:10
**isolate (2)** 42:25; 51:15
**IVs (1)** 76:7

## J

**Janet (1)** 86:7
**jargon (1)** 73:21
**Jasso (53)** 12:16; 13:4,7,11,16,20; 14:20;15:18,24; 16:25;17:13;18:14; 21:2;22:14,24;23:3; 25:25;26:1,11,21; 27:9,12,20;28:2;30:8, 12;31:4,14;32:13;

33:23;34:18,25; 35:19;36:22;37:7,21; 38:23;39:20;41:4,15; 42:1;52:11;54:13,15, 19,22;55:18,25; 56:11,17,20;57:1; 58:23
**Jasso's (1)** 29:15
**job (3)** 64:14;70:9; 79:10
**joined (2)** 9:14,16
**judgment (1)** 72:17
**July (3)** 76:15,20,22
**jump (1)** 7:6
**jumped (2)** 69:19; 75:14
**junior (1)** 86:24
**justice (1)** 10:25

## K

**Kay (1)** 27:16
**keep (1)** 32:23
**keeps (1)** 78:10
**kept (1)** 48:15
**key (14)** 19:15,15; 28:23,25;29:13,15, 16,19,19,22,24;30:2; 34:13,15
**keys (7)** 33:24;34:4,6, 8;37:24,25,25
**kicked (3)** 12:14,23; 27:19
**kids (1)** 61:8
**kind (15)** 6:1,5,19; 14:10;18:19;20:21; 33:16;36:11;47:11; 52:16;54:25;55:12, 15;71:4;74:4
**kinds (1)** 43:9
**kitchen (1)** 46:11
**knew (3)** 67:3,9; 68:10
**knocked (1)** 80:8
**knowledge (2)** 84:14, 17
**knows (1)** 45:13

## L

**labeled (1)** 21:12
**laid (1)** 82:20
**lamp (1)** 44:24
**land (5)** 19:16,18,20; 20:5,17
**large (1)** 44:8
**last (8)** 49:19;65:11; 69:16;70:7;72:9; 75:20;76:16,18
**later (4)** 7:13;59:9; 71:14,19
**law (1)** 73:21
**lawns (1)** 33:17

**leader (1)** 81:2
**leaned (1)** 34:18
**learn (1)** 6:4
**learned (1)** 85:12
**least (1)** 58:8
**leave (5)** 40:13,15; 53:18;59:6;85:21
**leaving (3)** 43:12,13, 13
**left (13)** 24:9;25:10; 26:24;40:23;41:22, 25;50:10;59:2,4,14; 60:1;61:25;85:25
**legal (1)** 73:21
**legs (7)** 7:16;37:23; 78:25;80:13;88:11, 24;89:18
**less (1)** 86:25
**letter (1)** 65:13
**letters (1)** 20:12
**level (3)** 65:3;70:11; 72:16
**liability (3)** 66:2,9; 67:2
**liberal (1)** 10:24
**Lieutenant (20)** 15:23,24;17:13; 18:14;22:24;23:3; 26:11;29:15;30:8; 32:13;33:23;34:18; 38:23;39:20;42:1; 52:11;55:17,25; 86:22,25
**life (1)** 76:3
**lifesaver (4)** 76:5; 77:11,12;86:14
**lifesaving (3)** 76:1,19; 86:3
**likely (3)** 29:19,22; 33:14
**limit (1)** 51:17
**limited (1)** 52:16
**line (5)** 31:19;38:16; 72:11;84:21;87:8
**lines (2)** 20:2;59:23
**link (1)** 35:15
**listened (1)** 14:10
**little (17)** 6:2,14;9:11; 14:15;16:11;18:15; 22:22;24:17;26:2; 42:15,18,18;61:8; 62:1;80:11;81:7; 89:22
**lives (3)** 31:12;36:14, 17
**locations (1)** 18:17
**lock (14)** 22:3;23:2; 30:24;32:5,15,16,19, 19;52:1;55:22,23; 67:12,15;81:23
**lockdown (1)** 67:10
**locked (6)** 18:5,6; 54:17;67:18;81:22,

23
**logic (1)** 37:9
**LOMBINO (16)** 16:16, 21;17:2;18:25;19:17; 60:16;61:18;62:22, 24;68:20;69:20,24; 74:21,24;75:2;87:18
**Lombino's (1)** 62:17
**long (6)** 7:14;9:24; 39:11;49:23;63:21, 22
**longer (1)** 53:21
**look (5)** 8:12;53:23; 54:5;61:23;69:7
**looked (4)** 8:7,10; 12:12;49:6
**looking (2)** 23:6;25:4
**looks (4)** 11:22;54:2, 6;62:1
**loop (1)** 33:4
**Lopez (1)** 79:8
**lost (2)** 83:2;85:25
**lot (3)** 70:17,18,20
**love (3)** 53:20;58:10; 72:5
**lucky (1)** 52:16
**Luker (17)** 14:23; 43:7,8;44:17,18;45:6, 8,11,18,20;46:1,3,10, 16;47:3;84:23;85:5
**lulled (2)** 44:1;45:23
**lunged (1)** 58:7

## M

**ma'am (10)** 75:5; 76:25;78:21;82:8; 84:13;85:13,17,20; 87:2,16
**mad (1)** 73:6
**main (7)** 14:9;16:2; 21:23;41:18;42:16; 44:15;61:3
**maintenance (1)** 20:7
**Makes (1)** 30:7
**making (2)** 34:22; 83:12
**manager (1)** 72:15
**maneuver (2)** 80:11; 86:16
**man's (5)** 19:16,18, 20;20:5,16
**manually (2)** 67:12,16
**many (9)** 16:20; 20:24;23:9;27:16; 38:15;39:5;44:10; 55:2;57:12
**map (8)** 16:4,20; 18:16;20:13;23:12; 60:17;63:1,9
**March (1)** 76:16
**mark (1)** 63:15
**marked (6)** 16:5;

Garcia vs. Ryan
2:13-cv-1591-DJH(DMF)

Ian Thompson
November 29, 2018

18:15;19:5;63:17;
69:4,7
**markings (1)** 16:6
**may (3)** 7:6;16:21;
30:9
**Maybe (9)** 8:14;16:6,
12;17:4;28:3;30:12;
54:4,8;55:19
**mean (21)** 26:18,20;
27:14;31:10;36:1;
45:11,13;47:25;49:5;
52:5;54:25;55:15;
63:25;64:18;66:16;
81:16,21;82:3,4,7;
85:4
**means (7)** 20:6;
43:24;48:24;55:21;
56:19;81:17,20
**meant (4)** 81:15;82:5;
84:8,11
**measures (1)** 76:1
**Medical (33)** 15:4;
16:3,9;43:8;45:6,8;
46:21;47:4,15,16,18;
48:13,15,15,16,25;
59:22,24,25;60:1,1,4,
25;61:5;83:5,8,13,14;
84:7,10,12,18;85:22
**meet (5)** 24:6,14;
46:14,14;47:18
**meets (1)** 60:25
**member (4)** 21:20;
27:5;50:6;51:21
**members (1)** 36:5
**memory (3)** 8:19;
54:23;59:20
**messed (1)** 72:19
**met (7)** 21:12;44:23;
46:16;47:23;48:4;
60:8,15
**metal (1)** 18:9
**Mexicans (1)** 39:18
**middle (12)** 13:5;
17:23;18:4;21:21;
25:25;32:8;37:7,14;
40:25;41:16;52:13,
14
**might (10)** 8:4;40:11;
44:16;46:8;48:13,14,
20,24;51:6;58:2
**military (23)** 9:16,18,
24;10:3,8;11:14;
50:25;51:2;64:21,25;
67:5;71:7;72:10;
73:4;75:4,8,25;
76:18;79:5;80:2;
81:3;85:12;87:3
**mindset (1)** 37:6
**minority (1)** 36:17
**minute (4)** 35:9;
37:25;43:5;57:23
**minutes (2)** 30:16;
43:4

**missing (1)** 34:4
**mission (1)** 11:12
**Mitchell (1)** 59:21
**moment (3)** 26:10;
30:9;57:16
**months (3)** 49:24;
64:8;85:15
**mop (2)** 35:17;53:8
**mops (1)** 53:4
**more (10)** 6:14;
16:20;29:19,22;
33:14;35:21;38:19;
70:17;71:11;86:25
**Morey (5)** 64:12;65:2,
2,21;67:10
**morning (2)** 18:15;
59:15
**most (5)** 21:6;70:20;
76:8,15;77:1
**mound (1)** 79:18
**move (6)** 6:6;17:22;
53:22;80:12,14;
89:20
**moved (1)** 64:15
**movement (2)** 73:25;
74:8
**moving (3)** 20:25;
78:25;89:18
**much (8)** 42:11;
45:22;72:11,12;
82:21;83:2;85:25;
88:14
**mumbling (3)** 83:1;
88:15,20
**murderers (1)** 65:22
**music (1)** 61:8
**myself (9)** 7:3;13:10;
22:14;24:23;25:7;
41:4;54:16;58:7;
72:21

**N**

**name (1)** 5:8
**narcotics (1)** 76:9
**National (2)** 11:11;
80:21
**nature (1)** 70:11
**necessary (1)** 58:9
**neck (5)** 78:16,18,23;
79:1;89:12
**need (4)** 7:16;8:3;
14:6;38:14
**needed (1)** 18:23
**needs (2)** 45:13;68:2
**neighborhood (2)**
73:5,6
**new (4)** 22:22;67:4;
71:4,7
**next (6)** 16:12;58:3;
64:13;71:22,22;
84:24
**nine (1)** 75:21

**nobody (4)** 15:3;20:8;
37:14;83:20
**noise (1)** 73:7
**normal (1)** 51:18
**normally (1)** 76:14
**noticed (1)** 80:3
**Number (18)** 8:15,15,
16,17;16:5;19:1;
38:6;53:24;55:4;
59:25;62:25;63:9,15,
15,19;69:2,7;87:14
**numbers (1)** 62:25
**nurse (1)** 84:15
**nurses (2)** 83:13,24

**O**

**object (1)** 35:16
**objection (3)** 7:6,7,10
**Obviously (9)** 13:5;
34:4;37:15;40:11;
44:10;66:1;75:19;
76:10;80:8
**occasion (1)** 79:3
**occurred (1)** 7:24
**odds (3)** 36:8,9,12
**off (27)** 12:23;13:1,6,
16,17;14:8,14,18,21;
17:24;21:6;25:25;
27:20;31:16;41:17;
42:6,10;44:3,6,7;
47:9;67:5;77:3;85:9;
86:4;87:12;89:21
**office (14)** 12:17,21,
22;15:25;16:10,12;
17:10,17,21;20:21;
24:9;25:11;26:24;
61:5
**Officer (42)** 12:16;
13:7,7;23:16,19;
24:6;25:12,14,17;
26:5;28:6,8,10;34:10,
10;38:16;44:18,19;
46:11;48:13,16,17,
25;55:7;58:25;67:12;
73:23;74:7,12,15;
83:9;84:3,3,6,7,11,
14,17,21,23;86:24;
87:15
**officers (16)** 27:16;
28:11;38:19;65:15,
17;66:3,5;67:1,2;
72:11;75:23;83:16,
17,25;84:1,2
**old (2)** 71:4,8
**once (7)** 10:25;32:1;
37:12;41:3;59:9;
64:9;71:23
**one (48)** 8:23;19:21;
21:13;23:16,25;
24:24;25:3,5;26:23;
28:11;29:12,16,16,
16,19;38:6,6,17;

41:12,13;42:17,18;
44:13,15;47:8,12,12;
49:11;51:14,16,17;
57:12,20;58:18,20;
63:4;65:20;66:21;
68:16;72:18;73:20;
78:7,11,24;80:17;
86:23;87:8;88:14
**ones (1)** 42:25
**only (11)** 7:17;8:21;
19:20;20:6;21:20;
27:20;28:22;38:13;
65:13;68:12;87:6
**open (36)** 7:18;
13:18;15:8,14,19;
22:4,5;26:8;29:3,4,
15;31:17;35:22;
36:19,20,23,25;39:3;
41:23,25;46:10;51:5;
52:4;53:17;55:19;
57:2;67:17;78:11;
81:9,11,16,17;82:3,5,
5,5
**opened (13)** 15:13;
18:18;22:25;24:10;
25:17;37:3;51:24;
52:3,8;56:2,4,9;81:14
**opening (1)** 30:6
**operation (1)** 51:19
**operator (1)** 87:10
**opinion (1)** 47:7
**opportunity (4)** 6:3;
7:7;53:22;66:24
**opposed (1)** 83:8
**opposite (1)** 78:5
**orange (1)** 17:23
**order (2)** 9:2;77:10
**orders (2)** 11:13;
64:21
**original (1)** 32:5
**others (1)** 70:12
**out (66)** 7:1;12:4,5,
15,21,21;13:6,8,23;
16:7;17:17,20;18:16;
19:21;20:21;21:15,
18;22:9;23:3;25:10;
26:14,14,16,20,22;
28:6;30:10,11,18;
31:11;32:2;35:22;
36:22;37:7,19;39:2,
18;40:12,17;45:3;
48:12,19;53:4;54:19,
23,24;56:15,17;57:3,
7,9,15,21;64:4,4,15,24;
65:1,15;66:21;70:19;
75:14,20;79:23;
80:15;83:6;87:17
**outer (1)** 78:4
**outside (3)** 36:7;
44:24;60:8
**outweigh (2)** 36:8,12
**over (27)** 6:23;8:7;
14:23;16:2;24:23;

31:18;37:17,18,20,
22,23;41:20;45:25;
46:6;47:4,15;50:1,2;
57:11;76:6,11;79:10;
80:9,13;83:4;85:7;
86:15
**overcorrected (1)**
79:15
**overpopulated (1)**
65:5
**override (3)** 67:9,12,
17
**overrides (1)** 72:17
**overseas (2)** 79:7,9
**own (3)** 40:6;53:17;
72:20

**P**

**Pacheco (2)** 28:3;
54:14,15,17
**pad (1)** 33:3
**Padlock (5)** 28:24,25;
33:2,7,11,22
**padlocked (4)** 29:5,6,
8,10
**padlocks (2)** 33:1,3
**page (7)** 20:12;69:17,
20,21;70:7,8;72:14
**pages (1)** 69:25
**paid (1)** 64:25
**pair (1)** 38:17
**pairs (1)** 38:15
**Palo (3)** 9:11,13,14
**panic (1)** 52:15
**paragraph (1)** 54:9
**paragraphs (2)** 54:4,4
**paralysis (7)** 78:17,
19,23,24;88:23,24;
89:13
**paralyzed (3)** 88:25;
89:17,24
**paramedic (1)** 76:9
**paramilitary (3)**
70:17;71:10;75:6
**paratrooper (2)** 9:23;
75:9
**parse (1)** 89:21
**part (13)** 9:20,22;
20:1;30:13;38:6;
50:18,20;54:1,2;
55:23;66:21;83:18,
19
**participate (1)** 6:9
**particular (4)** 9:20;
66:8;72:25;74:3
**pass (3)** 16:22;77:9,
10
**passed (1)** 47:24
**pasted (1)** 54:3
**path (3)** 26:3;43:17,
18
**patrol (1)** 79:11

Garcia vs. Ryan
2:13-cv-1591-DJH(DMF)

Ian Thompson
November 29, 2018

PC (2) 65:16,25
PCs (3) 65:3,6,6
peck (1) 6:14
people (8) 25:8;
27:23,24;37:11,17,
20;38:10;73:21
Peoples (4) 41:11;
58:5,6,17
pepper (1) 38:13
per (2) 25:4;27:24
percent (2) 25:16;
86:1
Perfect (1) 74:19
performance (1) 70:4
performed (1) 86:16
perhaps (1) 62:24
permission (2) 72:1;
86:19
person (3) 29:2;
77:19;78:9
personnel (2) 51:16;
64:19
Petrick (13) 47:19,24;
48:11,11,13;59:21;
60:20;83:7,9;84:3,7,
15,17
petroleum (1) 75:16
Phoenix (1) 64:15
phone (3) 15:23;
69:19,23
physical (3) 21:1;
81:23;82:18
physically (7) 13:11;
14:5;22:15;30:11,25;
31:1;71:11
pick (1) 85:5
picked (3) 60:2;80:6;
85:5
Pima (3) 10:17,22;
11:7
place (1) 78:3
placed (1) 58:7
plaintiff (1) 5:20
plan (1) 32:5
please (5) 6:10,25;
19:1;79:12;86:13
pm (2) 68:24,24
pods (1) 67:13
point (38) 7:13;13:8,
13,16,24;14:19;16:7;
18:16;19:5;21:2;
23:24;30:23;31:17;
32:1;34:23;35:1,1,
14;36:9,11;41:5,13,
14,17;42:5;47:5;
49:16;52:8;54:16;
55:14,16;56:9;57:2;
58:17;62:17;70:18;
81:11;89:10
pointing (1) 60:17
points (2) 19:8;28:19
pole (1) 44:24
policies (1) 51:8

policy (2) 51:9;67:23
pop (1) 27:25
popped (1) 67:7
pops (1) 28:16
population (3) 66:18,
18;67:14
porter (4) 65:18,25;
66:13,16
porters (2) 53:11;
65:23
position (3) 11:21;
48:23;89:16
possible (1) 25:17
Possibly (1) 36:8
posted (1) 59:22
pound (3) 78:8,9,9
poured (2) 57:3,9
practice (3) 77:20,20,
21
preparation (1) 8:2
prepare (3) 8:3,6;
12:13
present (2) 78:16;
89:12
pressing (1) 32:13
pretty (13) 26:15;
27:13;42:11;43:23;
45:22;48:23;49:5,5,
6;53:20;72:23;82:20;
88:13
previously (1) 32:15
primarily (1) 9:4
prior (7) 24:12;62:8;
76:17;81:24;85:16;
87:8,13
priorities (4) 51:10,11,
20;83:21
prioritize (1) 21:25
priority (1) 59:25
prisons (1) 19:4
privy (1) 45:12
probably (8) 6:14;7:2;
27:13;38:19;46:11;
65:13;78:8;83:7
procedures (1) 83:18
Produced (2) 61:16,
24
Product (2) 61:17,25
professional (1) 26:19
proficient (2) 87:25;
88:1
program (2) 75:12,14
promoted (1) 64:10
proof (1) 24:24
property (1) 51:18
protective (1) 65:7;
66:17;67:14
protocol (2) 50:20,22
protocols (2) 51:4;
71:8
public (6) 19:22;
21:25;51:12,13;
83:22,25

pull (1) 30:11
pulled (3) 56:11;
79:23;80:15
punitive (1) 68:13
Puri (1) 28:10
push (4) 22:16;35:15,
16;70:19
pushed (7) 13:15;
34:20;39:2,14;40:17;
41:1,3
pushes (1) 71:25
put (8) 7:7;16:11,18;
60:20;65:15;67:15;
80:16;83:22

Q

quick (1) 87:21
quiet (1) 57:16
quite (2) 7:3;66:9

R

race (1) 41:7
races (2) 57:5;58:20
radio (8) 12:25;
14:24;21:3,5;43:7;
45:20;46:21;85:8
radios (1) 34:7
rake (2) 19:25;20:5
raking (1) 20:1
ran (8) 13:3;17:25;
18:12;45:24;47:17;
56:15;72:25;88:4
Ranger (2) 75:12,14
re- (1) 71:5
react (1) 78:10
reacted (2) 86:23,25
read (3) 54:1,11;
59:19
readily (1) 53:12
real (2) 16:19;87:21
really (3) 43:20;
55:21;68:7
rear (1) 79:1
reason (1) 52:10
rec (5) 13:24;18:5;
31:19;32:6;41:10
recall (33) 13:21;
19:10;21:4;22:17;
23:7,18;25:22,22;
26:5,6,20;28:4;29:14,
18;30:12,14;31:5;
39:23,24;42:3;43:20;
44:9;46:6;47:17;
49:25;52:7;53:7;
55:2;56:5;58:11,13,
24;59:14
received (5) 17:8,9;
79:14;86:3,10
recent (1) 76:15
recertified (1) 85:15
recertify (1) 76:14

Recess (1) 68:24
recognize (1) 50:3
recognized (1) 86:7
recollection (2) 30:1;
56:1
reconvene (1) 43:14
record (13) 6:22;7:7,
10;10:6;20:10;31:20;
50:22;60:18,19;
61:13;69:1;73:24;
81:25
records (2) 6:7;28:9
recreation (1) 19:6
re-erupted (1) 58:1
refer (1) 62:25
reference (1) 10:6
referred (1) 84:6
referring (4) 5:10;
45:16;62:8,20
refresh (2) 8:18;54:23
refreshes (1) 59:20
refused (1) 85:3
regarding (1) 69:16
regards (1) 43:7
regime (1) 71:4
regular (4) 27:22;
38:16;72:11;87:8
released (1) 35:20
remember (39) 8:25;
11:5;12:14;13:2,14;
14:8;21:5,17;22:14;
25:24;30:25;31:7,9,
14;41:5;42:12,21;
43:3;44:5,11;47:11;
48:8;49:12;50:1;
53:14,15;57:1;59:15;
60:12;71:3;80:15;
82:10,23;83:3,15;
84:24;85:1,4,8
remembers (1) 30:12
remove (1) 51:16
report (15) 8:7,9,10,
12,18;12:11,12;
47:22,22,24;48:4;
53:24;54:1,10,22
Reporter (3) 5:3;6:23;
68:7
represent (1) 5:19
reprimand (1) 65:14
required (1) 38:13
requires (1) 70:10
rescue (1) 86:19
reserves (1) 11:12
reservist (1) 11:18
resources (1) 42:20
respond (5) 15:4;
78:11;84:4,4
responded (5) 14:19;
15:6;49:11;55:7;
87:14
responder (1) 38:8
responders (1) 43:9
responding (1) 42:24

responsible (3) 66:3;
68:4;75:18
restore (1) 51:18
result (2) 46:23;49:2
resumed (1) 11:2
retain (1) 77:11
retiree (1) 73:6
returned (1) 64:2
returning (2) 81:6;
84:22
review (1) 70:4
reviews (1) 69:12
right (68) 5:17;6:1,14,
24;7:21,23;8:14;
10:5,10;11:18;12:2,
20;15:8;16:2,9,10;
20:16;21:13;23:10;
26:3;27:23;28:19;
29:12;32:8,8,10;35:3,
10;36:18;40:8,25;
41:11,15,21;44:24;
46:9,10,11;47:15;
48:9;51:24;52:19;
54:3,21;56:8,14;
58:10,23,24;59:7;
60:6,10,20;61:3,4,6,
9;62:3,5;63:2,7,12;
66:13;67:19;73:1,11;
75:15;80:18
riling (1) 58:9
Rincon (2) 49:12,17
riot (4) 12:23;15:5;
83:20;87:6
rioting (5) 36:10,10,
11;42:15;47:1
riots (5) 33:16;36:16;
70:23;87:9,11
riot's (1) 13:5
risk (2) 36:4,14
Rita (12) 20:13;
34:11;59:7;60:2;
63:22,22;64:2,9,12;
74:4,6,7
road (12) 17:25;18:1;
21:8;31:22,23;62:11,
14,14;73:1,1,11,11
roadway (1) 18:10
room (5) 19:6;29:2;
32:6;54:18;61:8
rotation (1) 64:7
route (3) 17:13,15;
21:7
rub (1) 88:10
rule (2) 6:19,20
rules (2) 6:2;7:21
run (6) 22:9;60:14;
73:2,3;80:17;89:4
Runge (13) 23:19;
24:6,12;25:11,14,16,
25;54:13,16;55:7,13;
56:20,22
running (4) 13:1;
17:24;21:6;37:15

Garcia vs. Ryan
2:13-cv-1591-DJH(DMF)

Ian Thompson
November 29, 2018

**runs (2)** 41:6,7
**Ryan (1)** 79:8

**S**

**safety (7)** 21:24,25,
25;22:1;51:12,12,13
**same (10)** 29:13;
30:2;42:17;43:2,17;
54:6,7;55:6;85:14,18
**Santa (12)** 20:13;
34:11;59:7;60:2;
63:21,22;64:2,9,11;
74:4,6,6
**savvy (1)** 71:9
**saw (9)** 10:5;27:20;
40:1;45:2;49:19;
52:22;53:8,13;89:24
**saying (11)** 19:2;
22:24;31:10,13;40:8;
49:15;53:19;60:24;
77:5;81:15,17
**scene (1)** 25:24
**school (3)** 9:8,10;
75:22
**schools (1)** 75:11
**scooted (1)** 85:6
**Scott (1)** 5:8
**scratch (1)** 40:7
**scrutiny (1)** 70:11
**searches (1)** 50:2
**second (9)** 6:20;
13:25;28:18;32:2,10;
40:21;51:14;63:4;
86:14
**section (1)** 71:23
**secure (11)** 13:19;
18:3;22:17;30:24;
32:6;34:4;39:21;
40:9;41:10;52:5;60:1
**secured (2)** 22:13;
60:14
**securing (4)** 13:10;
30:25;54:20;56:18
**security (2)** 52:5;
66:21
**seeing (1)** 50:1
**seeking (1)** 71:25
**seemed (10)** 13:25;
42:8;43:18,25;49:22;
57:16,23;58:4,4;81:7
**seems (1)** 11:20
**sense (7)** 28:15;30:7;
53:10;54:25;55:10;
56:22;82:11
**sent (2)** 64:24;65:1
**sentence (10)** 54:7,
11,12;55:5,6;58:3,11;
61:24;69:17;70:7
**separated (1)** 26:2
**September (7)** 6:5;
7:24;12:8;76:17;
81:6;82:16;87:13

**Sergeant (14)** 5:13;
12:9;32:4;41:9;
49:14;59:24;64:9;
67:4;70:8;71:23;
72:15;75:16;80:24;
87:8
**sergeants (5)** 67:4;
70:20;71:1,7,8
**sergeant's (4)** 12:16;
15:25;24:9;61:5
**seriously (2)** 68:17,19
**serving (1)** 87:15
**set (16)** 19:15,15;
23:19,20,20,21,25;
24:23;25:3,11,13;
34:10;55:8;73:22;
74:12;87:19
**sets (1)** 24:2
**several (6)** 54:2;
59:23;87:7,9,11,16
**shaking (2)** 6:21;45:3
**sharp (1)** 35:16
**shift (2)** 12:15;34:6
**shirt (1)** 11:22
**shoulder (2)** 78:6;
85:7
**show (1)** 8:17
**side (11)** 19:19;
26:23;29:11;65:19,
24,24,25;80:16;
88:14;89:5,7
**sign (1)** 88:21
**signs (1)** 78:23
**single (5)** 18:20;19:3;
21:14;28:22;33:21
**sitting (2)** 22:14;31:7
**situation (1)** 14:22
**situations (1)** 78:14
**size (1)** 37:10
**slap (1)** 88:8
**slapped (1)** 88:6
**sleep (1)** 59:16
**slow (3)** 24:17;68:7;
81:24
**small (1)** 79:14
**smallest (2)** 37:8,9
**smashed (1)** 82:21
**sniper (4)** 75:21,22,
22,24
**soaked (4)** 45:4;
82:24;83:3,4
**softball (2)** 18:7;
44:12
**soldier (2)** 77:12;79:8
**soldiers (4)** 41:12;
58:18;75:17;76:7
**somebody (6)** 24:25;
27:25;28:15;41:6;
58:23;85:24
**somebody's (1)** 24:25
**Somehow (1)** 42:3
**someone (1)** 25:16
**someplace (1)** 60:9

**sometimes (3)** 71:25;
72:17,21
**somewhat (2)** 37:12;
70:15
**somewhere (1)** 49:21
**soon (5)** 12:21;17:17,
20;24:10;31:16
**sorry (12)** 8:15,16;
16:25;20:11;23:11;
24:15;45:18;68:9,11;
69:19,24;80:23
**sorts (1)** 77:20
**sound (1)** 73:6
**sparking (1)** 47:13
**speak (1)** 14:6
**special (1)** 19:15
**specialty (2)** 72:9;
75:11
**specific (2)** 56:1;
57:12
**specifics (1)** 55:2
**speed (1)** 70:11
**split (2)** 42:5;74:5
**sporadic (1)** 45:23
**spray (1)** 38:13
**spraying (2)** 27:14;
54:16
**squad (1)** 81:2
**stab (5)** 13:15;31:10;
34:23;35:4,9
**stabbed (1)** 38:24
**stabbing (2)** 35:5,11
**stabilize (1)** 51:15
**staff (15)** 20:6;21:20;
22:1;36:5;47:18;
48:15;51:13,14;
52:18;60:1;61:4;
68:1,2,4;83:14
**staff's (1)** 21:24
**staged (1)** 14:10
**stake (1)** 36:17
**stand (2)** 58:6,22
**standard (2)** 50:21;
70:17
**standards (1)** 50:22
**standing (2)** 13:13;
46:6
**Start (2)** 9:7;10:10
**started (15)** 14:4,18;
21:2;23:11;24:5,8;
32:7;37:15;41:13;
42:23;47:9;58:5;
64:4;65:3,8
**starting (4)** 9:4;42:6;
64:1;69:16
**starts (3)** 47:12;
54:10;60:12
**state (1)** 75:21
**stated (2)** 39:25;
41:11
**statement (1)** 59:13
**status (2)** 45:6,8
**stayed (2)** 53:21;59:7

**step (2)** 22:21;38:23
**stepped (4)** 12:21,21;
17:17,20
**steps (1)** 30:18
**sternum (1)** 88:10
**still (19)** 10:2,3,7;
11:9;15:5;35:18;
36:18;40:19;41:25;
46:25;67:11;80:1,2,
10,21;83:2;88:20;
89:18,20
**stood (1)** 86:25
**stop (8)** 6:10;12:2;
25:9;26:23;32:10;
35:3;54:21;58:10
**stopped (2)** 32:2,2
**stopping (1)** 19:21
**story (1)** 32:11
**straight (2)** 22:23;
67:5
**straightaway (1)** 61:2
**street (1)** 53:3
**stretch (1)** 7:15
**strives (1)** 70:9
**studying (1)** 10:23
**stuff (27)** 13:6;16:14;
29:21;33:17;34:24;
37:23;43:10;49:13,
15;50:2;53:11,12;
59:13;61:7,8;66:23,
25;71:1,6,8;73:8;
76:8;77:3,14;80:13;
88:2;89:6
**suck (1)** 27:14
**sucking (1)** 76:8
**supervisor (4)** 21:24;
66:2;68:4;72:3
**support (5)** 48:24;
50:9;75:20;76:4;
79:25
**supposed (1)** 27:22
**sure (23)** 6:2;7:4;
22:23;26:15,18;31:6;
32:11;35:10;39:9;
43:23;44:8;47:6;
48:24;49:5;53:7;
55:23;59:18;67:25;
69:13;72:23;82:25;
86:1;88:6
**surgery (1)** 76:10
**surrounded (1)** 54:15
**SWAT (1)** 38:7
**swelling (5)** 79:1;
89:2,3,8,9
**swollen (1)** 89:10
**sworn (2)** 5:2;83:25
**system (2)** 33:4;67:15

**T**

**tactical (12)** 27:5;
38:20;50:9;51:9,11,
20,21;75:19,23;

83:21;87:9,15
**talk (7)** 6:23;27:21;
28:17;46:20;80:11;
88:18;89:19
**talked (1)** 75:6
**talking (12)** 7:25;
28:18;35:4;55:13;
58:1,15;60:7,17;62:2,
4;72:23;81:8
**tap (1)** 82:25
**tasks (1)** 77:2
**taught (4)** 75:22,22;
77:16;78:13
**team (5)** 38:7,21;
42:24,24;59:17
**teams (1)** 72:9
**technique (1)** 78:10
**techniques (3)** 76:19;
77:14,15
**telephone (2)** 17:9;
25:7
**telling (4)** 22:22;
31:14;32:11;57:1
**tells (1)** 7:8
**ten (6)** 25:2;30:16;
33:15;43:5;75:10,20
**tenure (1)** 69:10
**terms (1)** 55:18
**testified (7)** 5:4;
21:11;22:24;26:10;
30:9;59:2;81:10
**testifying (1)** 88:1
**testimony (6)** 20:20;
44:2;51:23;55:17;
56:23;62:8
**Thanks (1)** 74:23
**There'd (1)** 78:25
**thigh (2)** 78:4,5
**third (3)** 26:5;51:15;
72:14
**thirty (3)** 39:8,8;43:4
**THOMPSON (15)**
5:1,9,13,16;24:18;
32:4;40:8;41:9;
59:24;69:6;70:2,8;
72:15;75:3;86:20
**Thompson's (1)** 71:23
**though (4)** 71:34:7;
36:9;62:9
**thought (2)** 41:14;
58:25
**threat (2)** 66:22;88:13
**three (52)** 12:18;13:1,
3,4,24;15:11,13;19:9;
21:10;23:21;27:17,
19,23,24;28:18,19,
19;29:9,10,13,17;
30:18;31:21;33:2;
36:10;37:21;39:2;
40:14,15;41:23;42:4,
16;43:12,13;51:24;
52:12;54:4,19,20;
56:18,19;57:10,11,

Garcia vs. Ryan
2:13-cv-1591-DJH(DMF)

Ian Thompson
November 29, 2018

15,24;59:4;64:7;
75:17;79:24;81:10,
12;82:2
**three-quarters (1)**
54:9
**Throughout (1)** 7:5
**thrown (3)** 53:4,13,14
**tiers (1)** 25:4
**times (4)** 18:5;30:14;
54:2;70:14
**today (3)** 5:9;20:20;
75:7
**today's (1)** 8:2
**together (1)** 46:15
**told (11)** 12:20;13:16;
14:11;17:12,13;
26:18,20;34:25;
35:18;41:9;58:22
**ton (2)** 83:3;88:22
**took (11)** 13:1;14:14,
21;17:16,24;21:6;
41:17;42:10;59:12;
84:4;85:8
**top (3)** 61:16,17;
72:14
**towards (1)** 41:18
**TPD (1)** 83:19
**track (3)** 18:11,12;
41:2
**Trails (1)** 73:11
**train (2)** 50:14,17
**trained (2)** 77:4;78:22
**trainer (1)** 6:2
**training (14)** 12:1;
72:11;75:7,8,25;
76:11,15,18,21,25;
79:6;83:17;84:18;
87:4
**trainings (1)** 50:23
**transfer (1)** 64:13
**transferred (1)** 49:21
**transit (1)** 50:1
**traumatic (1)** 80:19
**treat (2)** 51:16;76:7
**tried (7)** 13:10,19,20;
22:17;31:4;54:19;
56:18
**trouble (1)** 67:8
**true (1)** 18:7
**truth (3)** 5:3,3,4
**try (3)** 25:9;72:12;
83:5
**trying (18)** 11:4;
16:18;22:16,20;31:8,
11;35:22;37:17,18,
19,22;39:17;54:14;
55:5;61:13;75:15,18,
23
**TSU (6)** 49:11;50:6,
11,14;51:4;75:21
**Tucson (3)** 9:11;
73:13;87:16
**turn (1)** 33:24

**turned (5)** 10:25;34:7,
7;37:24;38:1
**TV (1)** 53:14
**TVs (3)** 53:3,13,14
**twenty (3)** 9:25;
72:10;75:4
**twenty-one (1)** 63:9
**two (21)** 20:4;25:1,3,
4;27:18,19,23;28:1;
29:6,13,17,20;30:5;
36:2;38:20,21;42:19;
47:9;64:6;65:17;
85:15
**types (1)** 8:4
**typical (1)** 53:3
**typically (4)** 33:16;
38:16;71:12;77:1

**U**

**ugly (1)** 16:19
**uh-huh's (1)** 6:21
**ultimately (1)** 67:20
**uncommon (1)** 82:14
**unconscious (3)**
77:23;79:22;80:9
**under (5)** 15:5;76:5;
77:24,24;85:6
**understood (2)** 6:16;
43:11
**unit (26)** 23:21,22;
34:11;49:17,20;50:1;
51:18;61:5;62:14;
63:22,23;64:3,12,16,
17;65:2,20,21;67:10;
74:7,8,10;75:16,20;
84:10,12
**units (2)** 19:11,19
**universities (1)** 10:21
**Unless (1)** 7:8
**unlocked (4)** 82:7,9,
14,15
**unpredictable (1)**
70:13
**unsecured (16)**
15:16,17;22:3;23:2;
51:25;52:1,9,12;
55:22,24;81:9,13,18,
19;82:4,6
**unsuccessful (1)**
56:24
**up (34)** 14:6,9;30:6;
31:18;32:13;37:21;
41:21;42:4,5;46:14,
14,19;47:3;49:6;
53:11;56:10,25;
58:19;59:1;60:2;
67:22;71:5;72:19,20;
73:5,11;74:5;78:6;
79:15;80:6;82:24;
85:5,6,6
**upon (2)** 82:17;84:4
**use (12)** 8:14;13:20;

17:3,4;32:15;39:21;
40:4;51:10;53:5;
73:21;78:14;89:11
**used (9)** 8:18,22;
18:10;39:25;40:9;
53:9;65:23;73:9;76:3
**using (2)** 52:24;78:10
**usual (1)** 82:25

**V**

**VA (1)** 80:20
**vehicle (5)** 19:4;29:7;
79:9,20,23
**vehicles (2)** 18:23;
29:21
**verbally (2)** 58:6;
88:19
**Verde (3)** 9:12,13,15
**versus (2)** 22:24;81:9
**via (1)** 60:3
**vicarious (3)** 66:2,9;
67:2
**vice-versa (1)** 71:20
**visitation (1)** 61:7
**visually (1)** 88:19,19

**W**

**wadi (3)** 79:16,18,19
**wait (1)** 35:8
**walkway (1)** 18:4
**wall (1)** 57:24
**warden (2)** 42:22,22
**Warrior (2)** 76:16;
77:2
**water (1)** 79:19
**way (12)** 13:20;
30:25;32:12;37:2,2,
19;47:16;50:9;54:9;
57:18;83:23;89:3
**ways (2)** 19:13;77:23
**weapon (2)** 78:12;
88:12
**weapons (3)** 52:24;
53:2,3
**week (1)** 65:11
**weight (1)** 35:20
**weird (3)** 17:21;65:1;
74:5
**welfare (1)** 51:13
**weren't (4)** 65:25;
67:22;71:1,9
**what's (6)** 9:5;17:15;
32:20,21;69:7;83:11
**wheelchair (3)** 48:6;
60:2,4
**whichever (2)** 37:19;
83:14
**white (2)** 14:4;32:7
**whites (2)** 26:2;39:18
**whole (10)** 5:3;20:15;
23:21,22;27:5,10,11;

44:1;59:6;63:7
**wide (2)** 19:4;82:5
**wife (1)** 64:14
**Winchester (2)** 64:4,6
**wire (1)** 37:18
**without (2)** 71:25;
86:18
**WITNESS (12)** 16:24;
17:7;20:14;62:5,10,
13,18;63:2,4,6,11;
68:9
**words (2)** 26:21;77:9
**work (6)** 11:8;40:1,
12;63:22;64:24;
70:25
**worked (2)** 31:6;
64:11
**worker (1)** 20:7
**working (3)** 10:11;
12:2;63:21
**works (1)** 11:17
**worried (2)** 32:19,20
**wounded (1)** 76:7
**wounds (2)** 76:8,8
**Wow (1)** 10:1
**write (3)** 16:12;17:1,5
**wrote (2)** 48:3;54:22

**Y**

**yard (123)** 12:18;
13:1,3,4,5,7,8,24;
14:18,19,22;15:4,5,6,
11,13;16:9,12;17:10,
22,23;19:9;21:10,19;
23:3,4,5,16,18,20,20,
21,21,24,25;24:2,
14,23;25:5,11,13;
26:13;27:17,24;28:1,
19;30:6,18;31:21;
32:21;33:1;34:3,3,4,
6,10,23;36:9,10,16;
38:2;39:2;40:14,15,
19;41:6,6,23;42:6,9,
13,14,16,15,16,17,18,19,
21,22,23;43:6,12,13,
19;44:6,17;46:24,25,
25;47:8;48:19;51:24;
52:11;54:20;55:8;
56:19;57:10,11,15;
59:3,4,6,9,10;60:8;
61:3;65:3,12;67:6;
73:22;74:1,6,7,11,12;
81:10,12;82:1,2;
83:20;85:3;88:5
**yards (7)** 24:3;25:1;
33:15;36:11;51:6;
74:5,11
**year (6)** 10:12;12:5,5;
76:22,23;81:3
**years (14)** 9:25;10:7;
23:9;33:15;55:2,5;
64:7;72:10;75:4,10,

20;76:2,12,13
**yelled (1)** 34:22
**yelling (1)** 21:3

**0**

**012865 (1)** 70:1

**1**

**1 (4)** 16:5;61:18,19,
21
**106743 (1)** 59:25
**12865 (1)** 70:8
**12867 (1)** 72:14
**1713 (2)** 54:10,13
**180 (1)** 78:9

**2**

**2 (1)** 8:15
**2:57 (1)** 68:24
**200 (1)** 78:9
**2000 (1)** 76:4
**2002 (2)** 10:12;11:6
**2008 (1)** 81:5
**2009 (5)** 10:14;11:3,
6;64:1;81:5
**2012 (11)** 6:6;7:24;
12:8;18:7;44:10;
48:1;76:18,24;81:7;
82:16;87:13
**2017 (1)** 12:6
**20th (7)** 6:5;7:24;
12:8;76:17;81:7;
82:16;87:13

**3**

**3 (5)** 8:15,16,17;
53:24;61:16
**3:04 (1)** 68:24

**4**

**4 (4)** 63:15,15,17,19

**5**

**5 (3)** 69:2,4,8

**8**

**866 (1)** 70:1
**867 (1)** 70:1

**9**

**900 (1)** 75:17

CONFIDENTIAL - Attorney's Eyes Only

# Arizona Department of Corrections



1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov



JANICE K. BREWER
GOVERNOR

CHARLES L. RYAN
DIRECTOR

January 16, 2014

RECEIVED

JAN 1 6 2014

ADC
HR OPERATIONS

EIN: ▮▮▮▮

Mr. Ian Thompson
ASPC-Lewis, Morey Unit
▮▮▮▮▮▮▮

EX: _____ DATE 11/29/18
WITNESS: _Thompson_
NANCY P. RICHMOND, RPR

Job Classification: Correctional Sergeant

Dear Mr. Thompson:

This letter is official notice of your suspension without pay from the Arizona Department of Corrections (ADC).

This period of suspension will begin at 6:00 a.m. on Tuesday, February 11, 1014, and continue to 2:00 p.m. on Wednesday, February 12, 2014. You are to report to work at 6:00 a.m. on Thursday, February 13, 2013, following the suspension. This suspension constitutes 16 hours of leave without pay.

You are a Correctional Sergeant assigned to work at the Arizona State Prison Complex – Lewis and have been working in this capacity since June 23, 2012. As a Correctional Sergeant you are responsible for ensuring the safety and security of staff, the public and those inmates under your supervision. As an employee of the Arizona Department of Corrections (ADC), you are expected to support and comply with the Code of Ethics and Agency Guiding Principles established by the department. This requires that you conduct yourself in a respectful, professional and ethical manner at all times, obey state laws, and refrain from behavior which brings discredit or embarrassment to the department or the State of Arizona.

The specific reasons for your suspension are:

On December 13, 2013, you were assigned as the shift commander for the Morey Unit Day Shift. During that shift the inmates from housing unit 2 were sent to the dinning hall for their meal. Both of the housing unit 2 floor officers escorted the inmates to the chow hall. During this time you authorized the housing unit 2 A/B control room to be collapsed and sent COII ▮▮▮ to escort a medical run; this left housing unit 2 without any floor officers in the building and only one control room officer.

At 1014 hours, COII ▮▮▮ initiated the Incident Command System in housing unit 2 A/B for inmates fighting in cell 2B24. COII ▮▮▮ had overridden the manual "deadlock" to allow inmate ▮ to enter the cell. This cell was listed as a restricted movement cell; however, COII ▮▮▮ stated he was not aware that the cell was restricted movement.

In your response to the administrative inquiry, you admitted that you collapsed the housing unit 2 A/B control based on the assumption that the floor officers were present. In your information report, you admitted that you had not briefed your shift on which cells were restricted movement cells and that you failed to follow-up on which cells they were.

ADC/GARCIA012858

CONFIDENTIAL - Attorney's Eyes Only

Ian Thompson
January 16, 2014
Page 2

Your actions constitute neglect of duty for disregarding directives, policies, guidelines or procedures (class 4).

Your behavior was inappropriate and unacceptable, and does not conform to the standards of conduct for a state employee.

You are an uncovered employee in state service. The Personnel Rules do not provide uncovered employees with any avenue of appeal of disciplinary actions. Consequently, this action is not appealable within the agency or to the State Personnel Board.

Sincerely,

Doug Schuster, Deputy Warden
Arizona State Prison Complex – Lewis, Morey Unit

DS/ljb

cc:   Central Office Personnel File
      ADC Payroll Supervisor
      Employee Relations Unit
      Institution/Work Unit Personnel File
      File

I, _____, acknowledge receipt of this notice of suspension on __1.16.14__ .
   (Employee's signature)                                                   (Date)

ADC/GARCIA012859

CONFIDENTIAL - Attorney's Eyes Only

# New Appraisal Form - Supervisor for IAN THOMPSON

**Performance Review Period: July 1, 2016 - February 28, 2017**

## Performance Management Evaluation Form

## Employee Information

**Employee:** ████ IAN THOMPSON

**Organization Unit:** DC11G-11GC0

**Position:** SDC000007283

**Supervisor Name:** PATRICK MEEHAN

**Start Date:** 02/23/2009

## Performance Plan Acknowledgement

Performance Plan Acknowledgement

Selecting "Yes" below indicates that the supervisor and employee have discussed the performance plan and that the discussion included review of the competencies, performance period results and work standards upon which the employee will be evaluated.

**Manager:** Yes

**Manager Comments:** Performance plan for period 07/01/2016 - 02/28/2017

1) I expect you to treat all that you come in contact with in a respectful and professional manner.

2) I expect you to present a neat, well-groomed image and to hold your subordinates and cadets to the same standard.

3) I expect you to lead by example. Report to work when assigned, to follow COTA and Departmental Policies and Directives; and to hold staff and Cadets assigned to you accountable for their actions.

4) Document positive, as well as negative redirections in the individuals' MAP/ Cadet PACE as needed.

5) I expect you to ensure that Proper, Safe Correctional Practices be adhered to at all times, and...

6) That when an unsafe environment or unprofessional behavior is noted, immediate action is taken to correct the issue in a safe and professional manner.

## Statewide Competencies

Accountability - Accepts full responsibility for self and contribution as a team member; displays honesty and truthfulness; addresses problems quickly; displays a strong commitment to organizational success and inspires others to commit to goals; demonstrates a commitment to delivering on his/her public duty and presenting oneself as a credible representative of the agency to maintain the public's trust.

**Manager:** Meets Expectations

**Manager Comments:** Sgt Thompson is a dichotomy. He is excellent at his job, strives to be the best at all he does, but also requires a high level

EX: 5 DATE 11/29/18

WITNESS: Thompson

NANCY P. RICHMOND, RPR

ADC/GARCIA012865

CONFIDENTIAL - Attorney's Eyes Only

New Appraisal Form - Supervisor for IAN THOMPSON  continued...

of scrutiny. Due to his high speed nature, and his desire to do better that all others around him, this also causes him to be a bit unpredictable at times.

**Customer Service -** Understands that all employees have external and/or internal customers and stakeholders that they provide services and information to; honors all of the agency's commitments to customers by providing helpful, courteous, accessible, responsive, and knowledgeable service.

     **Manager:** Meets Expectations

    **Manager Comments:** Once again, Sgt Thompsons desire to be the absolute best at everything, he sometimes pushes the envelope without seeking permission first.

**Leadership and Supervision (For Supervisors) -** Clearly establishes and communicates expectations and accountabilities; monitors and evaluates performance; provides effective feedback and coaching; identifies development needs and helps employees to achieve optimal performance and gain valuable skills that will translate into strong performance in future roles; plans for succession by identifying and developing emerging leaders.

     **Manager:** Exceeds Expectations

    **Manager Comments:** Sgt Thompsons desire and willingness to go the extra mile, or 10 miles, makes him a natural leader. Since he began here he has been leading the way in many areas including the "Class Call" which he brought to COTA. It is this type of thing that helps elevate others around him to be better also.

**Teamwork and Cooperation -** Cooperates with others to accomplish common goals; works with employees within and across his/her department to achieve shared goals; treats others with dignity and respect and maintains a friendly demeanor; values the contributions of others; is able to work effectively with people of diverse backgrounds and characteristics.

     **Manager:** Meets Expectations

    **Manager Comments:** Sgt Thompson is a natural team player, and team leader, whose enthusiasm lifts the whole team.

## Agency Specific Competencies

**Communication -** Respectfully listens to others to gain a full understanding of issues; comprehends written material; presents information in a clear and concise manner orally and in writing to ensure others understand his/her ideas; appropriately adapts his/her message, style, and tone to accommodate a variety of audiences.

     **Manager:** Meets Expectations

    **Manager Comments:** Sgt Thompson listens respectfully, and asks questions when he isnt sure

**Correctional Security and Safety Functions -** Understands and performs the job of a correctional professional and/or performs as appropriate and required within a correctional environment; is knowledgeable of and follows agency policies and directives; ensures custodial responsibilities are met; performs duties in a manner that protects public safety.

     **Manager:** Meets Expectations

    **Manager Comments:** Sgt Thompson understands his duties and responsibilities, and is currently in the process of learning his new duties as the COTA Armorer.

ADC/GARCIA012866

CONFIDENTIAL - Attorney's Eyes Only

New Appraisal Form - Supervisor for IAN THOMPSON  continued...

**Professional Ethics** - Demonstrates understanding of and integrity in adherence to professional code of conduct, organizational values, and professional responsibilities as warranted by the individual's education, training and experience.

    **Manager:**  Meets Expectations

**Manager Comments:**  Sgt Thompson displays a high level of integrity, although his enthusiasm sometimes overrides his better judgement.

## Performance Period Results

RESULTS ORIENTATION: Consistently delivers required business results; sets and achieves achievable, yet aggressive, goals; consistently complies with quality, service and productivity standards and meets deadlines; maintains focus on agency goals.

    **Manager:**  Meets Expectations

**Manager Comments:**  As I stated earlier in this appraisal, Sgt Thompson is a dichotomy. He is excellent at his job, strives to be the best at all he does, but also requires a high level of scrutiny. Due to his high speed nature, and his desire to do better that all others around him, this also causes him to be a bit unpredictable at times. If Sgt Thompson can learn to tame his enthusiasm in choosing when to push the envelope, and with his supervisors blessing, he will be a force to be reckoned with within ADOC.

## Employee SMAART Objectives

    **Manager:**  1) Remain professional at all times while dealing with inmates, cadets, and staff...Demonstrating by your actions the tenents of COTA 2) Become more familiar with the mission and duties of the COTA Armorer.

## Development Actions

Learning and Development:

    **Manager:**  1) Attend the Glock Armorer school. 2) Attend the Remington Armorer school

## Summary Section

ADC/GARCIA012867