MARK BRNOVICH
ATTORNEY GENERAL

Michelle C. Lombino
Assistant Attorneys General
State Bar No. 016252
2005 North Central Avenue
Phoenix, Arizona 85004-1592
Tel: (602) 542-8170 •
Fax (602) 542-7670
Email: michelle.lombino@azag.gov

*Attorneys for Defendants Jasso, Pacheco, Thompson*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| David M. Garcia,<br><br>    Plaintiff,<br><br>v.<br><br>Charles Ryan, et al<br><br>    Defendants. | No. CV 13-01591-PHX-DJH (DMF)<br><br>**DEFENDANTS JASSO AND THOMPSON'S CONTROVERTING STATEMENT OF FACTS AND STATEMENT OF ADDITIONAL FACTS** |

Pursuant to Fed. R. Civ. P. 56 and LRCiv. 56.1(b), and in opposition to *Plaintiff's Separate Statement of Facts* (Doc. 300) ("PSOF"), Defendants Minerette Jasso and Ian Thompson file their *Controverting Statements of Facts and Statement of Additional Facts*. The paragraph numbers in Section I, Controverting Statement of Facts, correspond to the paragraph numbers in the PSOF.

**I.    CONTROVERTING STATEMENT OF FACTS.**

1.    The facts in paragraph 1 of the PSOF are undisputed only for purposes of responding to *Plaintiff's Motion for Partial Summary Judgment as to Count III of the Third Amended Complaint* (Doc. 299) (the "Motion").

2.    The evidence cited in paragraph 2 does not establish that Garcia must receive daily insulin shots, and so this alleged "fact" is disputed; Defendants otherwise do not dispute the facts in paragraph 2, but only for purposes of responding to the Motion.

3. The evidence cited in paragraph 3 does not establish that Garcia was unaccompanied by officers or staff, and so this alleged "fact" is disputed; Defendants otherwise do not dispute the facts in paragraph 3, but only for purposes of responding to the Motion.

4. The evidence cited in paragraph 4 does not establish that Garcia joined other inmates from yard 4 for chow after receiving his insulin shot on September 20, 2012, and so to the extent that Garcia's use of the language that "where he would join the inmates from Yard 4 for chow" suggests that he did, it is disputed; Defendants otherwise do not dispute the facts in paragraph 4, but only for purposes of responding to the Motion.

5. The facts in paragraph 5 are undisputed, but only for purposes of responding to the Motion.

6. The evidence cited in paragraph 6 does not establish that while walking toward the dining hall, Garcia saw African American inmates fighting Hispanic inmates, and so this alleged "fact" is disputed; for purposes of the Motion, Defendants do not dispute that while walking to the dining hall, Garcia heard a disturbance and saw a crowd of people on yard three (Doc. 303-1 at 5:8-9) and that he was looking at the riot (*id*. at 5:22).

7. The facts in paragraph 7 are undisputed, but only for purposes of responding to the Motion.

8. As to paragraph 8, Defendants do not dispute what Garcia thought that he saw from his "vantage point."

9. The evidence cited in paragraph 9 does not establish that (a) the inmates whom Garcia saw rush the gate were African American; (b) the inmates whom Garcia saw rush the gate came onto the main prison yard where he was, and so these alleged "facts" are disputed. Defendants do not dispute, but only for purposes of responding to the Motion, that Garcia saw "a whole bunch of people rush the gate." (*Id*. at 6:3-5.) Garcia was "separated by those inmates that was[sic] running out by the fence around the diamond." (Doc. 298-2 at 52:1-13.)

2

10. The facts in paragraph 10 are undisputed, but only for purposes of responding to the Motion.

11. The evidence cited in paragraph 11 does not establish that Garcia was prevented from getting inside Yard 4 only because the gates were closed, and to the extent that Garcia now implies otherwise, this alleged "fact" is disputed. Garcia testified that he could not get into his "house" (i.e., Yard 4) because inmates were fighting on Yard 4 and he did not see any officers who he could run to for help. (Doc. 303-1 at 13:1-18.)

12. The evidence cited in paragraph 12 does not establish that Garcia decided to head back to the "safety" of the medical unit and this characterization is disputed. Garcia decided to head to the medical unit when he could not get onto Yard 4 (*id*. at 6:24-25) and that he started walking back on the track back to the medical unit (*id*. at 7:1-3).

13. The evidence cited in paragraph 13 does not establish that while Garcia was en route to the medical unit, "a large crowd of African American inmates who had escaped through the open gate at Yard 3 began chasing [him]," and so paragraph 13 is disputed. Garcia testified that when he turned to walk back toward medical, he saw "a big ol' crowd, a bunch of people, and that's all I remember" (*id*. at 6:24-25; 7:1-6) and that "I tried to turn around and start going back to the medical building, and then I saw – I remember everything is blank after that" (*id*. at 13:12-14) and that "inmates ran around the track and they met [him] as [he was] heading back to medical" and that is all that he remembers (*id*. at 15:21-23).

14. The evidence cited in paragraph 14 does not establish that (a) African American inmates quickly caught up with Garcia and began violently assaulting him," or that (b) that the alleged assault caused damages, including significant brain trauma, and so paragraph 14 is disputed. Garcia testified that when he turned to walk back toward medical, he saw "a big ol' crowd, a bunch of people, and that's all I remember" (*id*. at 6:24-25; 7:1-6) and that "I tried to turn around and start going back to the medical building, and then I saw – I remember everything is blank after that" (*id*. at 13:12-14) and that "inmates ran around the track and they met [him] as [he was] heading back to

3

medical" and that is all that he remembers (*id*. at 15:21-23).

15. The evidence cited in paragraph 15 does not establish an "assault" occurred. Garcia testified that when he turned to walk back toward medical, he saw "a big ol' crowd, a bunch of people, and that's all I remember" (*id*. at 6:24-25; 7:1-6) and that "I tried to turn around and start going back to the medical building, and then I saw – I remember everything is blank after that" (*id*. at 13:12-14) and that "inmates ran around the track and they met [him] as [he was] heading back to medical" and that is all that he remembers (*id*. at 15:21-23).

16. The facts in paragraph 16 are undisputed.

17. The facts in paragraph 17 are undisputed.

18. The facts in paragraph 18 are undisputed.

19. The facts in paragraph 19 are undisputed.

20. The facts in paragraph 20 are undisputed.

21. The evidence cited in paragraph 21 does not establish that Jasso, Pacheco and Puri were the "sole" officers "responsible" for the inmates on Yard 3. During Jasso's shift on September 20, 2012, she, Pacheco and Puri were posted to Yard 3 and were responsible for the inmates on Yard 3. (Doc. 300-1 at 23:1-17; 25:18-25.)

22. The facts in paragraph 22 are undisputed.

23. The evidence cited in paragraph 23 does not establish that Jasso and Pacheco moved to the "safety" of the control room. When Jasso went to the control room, Puri "pointed out that the inmates were starting to group racially, by race." (*Id*. at 27:11-19.)

24. The facts in paragraph 24 are undisputed.

25. The evidence cited in paragraph 25 does not establish that Jasso initiated the Incident Command System ("ICS") "[d]ue to escalating violence." "COII Jasso initiated ICS due to grouping on yard three." (*Id*. at 27:4-6.)

26. The facts in paragraph 26 are undisputed.

27. The evidence cited in paragraph 27 does not establish that Jasso "explained

4

that inmates were grouping" when she initiated ICS on September 20, 2012. (*Id*. at 31:23-25; 32:1-6.)

28. The facts in paragraph 28 are undisputed.

29. The facts in paragraph 29 are undisputed.

30. The facts in paragraph 30 are undisputed.

31. The evidence cited in paragraph 31 does not establish that Thompson asked Runge to meet him at "the gate to Yard 3." After his call with Jasso, Thompson called Runge to come meet him "at the yard." (*Id*. at 70:5-14.)

32. Paragraph 32 is misleading; the evidence cited in paragraph 32 does not establish the facts stated. After Thompson told Jasso that he would be "right there," he stepped out of his office. As soon as he stepped out of his office, "that's when everything happened; the riot kicked off." Jasso activated ICS on the radio, and Thompson took off running to yard three. (*Id*. at 61:20-23.)

33. The facts in paragraph 33 are undisputed.

34. The facts in paragraph 34 are undisputed.

35. Paragraph 35 is disputed; moreover, the evidence cited in paragraph 35 does not establish that as a sergeant, Thompson was experienced in inmate fights and riots. Prior to September 20, 2012, Thompson had responded to a number of other disturbances while serving as a tactical officer, but the September 20, 2012 disturbance was his first one as "a regular line sergeant." (*Id*. at 98:5-17.)

36. Paragraph 36 is disputed; Defendants dispute that (a) multiple "supervisors" described Thompson as "unpredictable"; and (b) the one supervisor who used this term, unqualifiedly described him as "unpredictable." During one Performance Management Evaluation, one of Thompson's supervisors, Patrick Meehan, wrote under the category of "accountability" that Thompson can "be a bit unpredictable at times." (Doc. 298-7 at 104.) Under the category of Leadership and Supervision, Meehan wrote that Thompson "exceeds expectations," and that his "desire and willingness to go the extra mile or 10 miles, makes him a natural leader." (*Id*.) Meehan wrote that Thompson "has been leading

5

the way in many areas" and "helps elevate others around him to be better." (*Id*.)

37. The evidence cited in paragraph 37 does not establish that Thompson's enthusiasm overrode his better judgment during the events of September 20, 2012; this paragraph is disputed. During one Performance Management Evaluation, one of Thompson's supervisors, Patrick Meehan, wrote: "Sgt. Thompson displays a high level of integrity, although his enthusiasm sometimes overrides his better judgement [sic]." (*Id*. at 105.) Thompson received a lifesaving award from the Arizona Department of Corrections for carrying Garcia off the field and to the medical unit on September 20, 2012 (Doc. 298-8 at 3, ¶ 6; Doc. 298-8 at 6) and a personal letter of appreciation from Governor Jan Brewer (Doc. 298-8 at 3, ¶ 6.) Brewer thanked him for his "brave and heroic efforts" on September 20, 2012 (Doc. 298-8 at 8), and noted, among other things, that his "immediate response to a dangerous and sudden situation helped to save lives" (*id*.), and that he displayed "bravery and good judgment" in a "dangerous situation" (*id*.).

38. The facts in paragraph 38 are undisputed.

39. The facts in paragraph 39 are undisputed.

40. Paragraph 40 is disputed; Jasso did not decide to leave the control room to "open the gate for Thompson" and the evidence cited in paragraph 40 does not establish the facts alleged in that paragraph. At Puri's suggestion, Jasso and Pacheco took a fogger (Doc. 298-5 at 38:5-19) when they walked out of the control room together (*id*. at 37:1-2); Jasso observed inmates grouping by race as she left the control room (*id*. at 35:3-10); when the inmates started fighting, she initiated ICS (*id*. at 36:14-21); Jasso and Pacheco were surrounded by inmates in the basketball area (*id*. at 37:2-4); Jasso and Pacheco were standing next to each other when Jasso reached for the fogger and Pacheco gave it to her (*id*. at 40:22-25; 41:1-6); she used chemical agents (i.e., the fogger) as soon as the inmates started fighting (*id*. at 37:6-7); she ran to the gate next to the building to let staff in (*id*. at 41:11-15); as she ran toward the gate, she saw Sgt. Thompson and somebody else heading toward the gate (*id*. at 41:24-25; 43:2-19) and she saw three inmates assaulting another inmate, another inmate with two pointed broom sticks, and other inmates (*id*. at 44:12-22);

1  when she got to the gate, Thompson was in front of her on the other side of the gate (*id*.
2  at 43:19-22); she did not open the gate (*id*. at 42:10-20); she unsecured the lock (*id*. at
3  42:25-43:1); in unsecuring the lock, her intention was to let Sgt, Thompson and the other
4  officer in (*id*. at 91:16-21).

5      41.    Paragraph 41 is disputed; Jasso did not decide to leave the control room to
6  open the gate for Thompson despite that inmates had begun fighting, and the evidence
7  cited in paragraph 41 does not establish the facts alleged in that paragraph.  At Puri's
8  suggestion, Jasso and Pacheco took a fogger (Doc. 298-5 at 38:5-19) when they walked
9  out of the control room together (*id*. at 37:1-2); Jasso observed inmates grouping by race
10 as she left the control room (*id*. at 35:3-10); when the inmates started fighting, she
11 initiated ICS (*id*. at 36:14-21); Jasso and Pacheco were surrounded by inmates in the
12 basketball area (*id*. at 37:2-4); Jasso and Pacheco were standing next to each other when
13 Jasso reached for the fogger and Pacheco gave it to her (*id*. at 40:22-25; 41:1-6); she used
14 chemical agents (i.e., the fogger) as soon as the inmates started fighting (*id*. at 37:6-7); she
15 ran to the gate next to the building to let staff in (*id*. at 41:11-15); as she ran toward the
16 gate, she saw Sgt. Thompson and somebody else heading toward the gate (*id*. at 41:24-25;
17 43:2-19) and she saw three inmates assaulting another inmate, another inmate with two
18 pointed broom sticks, and other inmates (*id*. at 44:12-22); when she got to the gate,
19 Thompson was in front of her on the other side of the gate (*id*. at 43:19-22); she did not
20 open the gate (*id*. at 42:10-20); she unsecured the lock (*id*. at 42:25-43:1); in unsecuring
21 the lock, her intention was to let Sgt, Thompson and the other officer in (*id*. at 91:16-21).

22     42.    The facts in paragraph 42 are undisputed.

23     43.    The evidence cited in paragraph 43 does not establish that Thompson had
24 his own set of keys to all of the gates and doors of Yard 3 and other yards.  Thompson had
25 keys for gates one and two of yard three.  (Doc. 300-1 at 73:15-25; 74:1-6.)

26     44.    The evidence cited in paragraph 44 does not establish that Jasso "should
27 have known that as the sergeant in charge, [Thompson] would have his own set of keys,
28 and this allegation is disputed.  Jasso did not know if Thompson had a key to the yard

7

1  three recreations or program room (Doc. 298-5 at 91:22-25; 92:1), and she thought that
2  he did not have a big key to open gate 2 (*id.* at 92:2-7).

3      45.     The evidence cited in paragraph 45 does not establish that the control room
4  was "safe" and does not establish that Jasso intentionally "headed into inmate fighting";
5  these allegations are disputed.  At Puri's suggestion, Jasso and Pacheco took a fogger
6  (Doc. 298-5 at 38:5-19) when they walked out of the control room together (*id.* at 37:1-2);
7  Jasso observed inmates grouping by race as she left the control room (*id.* at 35:3-10);
8  when the inmates started fighting, she initiated ICS (*id.* at 36:14-21); Jasso and Pacheco
9  were surrounded by inmates in the basketball area (*id.* at 37:2-4); Jasso and Pacheco were
10 standing next to each other when Jasso reached for the fogger and Pacheco gave it to her
11 (*id.* at 40:22-25; 41:1-6); she used chemical agents (i.e., the fogger) as soon as the inmates
12 started fighting (*id.* at 37:6-7); she ran to the gate next to the building to let staff in (*id.* at
13 41:11-15); as she ran toward the gate, she saw Sgt. Thompson and somebody else heading
14 toward the gate (*id.* at 41:24-25; 43:2-19) and she saw three inmates assaulting another
15 inmate, another inmate with two pointed broom sticks, and other inmates (*id.* at 44:12-22);
16 when she got to the gate, Thompson was in front of her on the other side of the gate (*id.* at
17 43:19-22); she did not open the gate (*id.* at 42:10-20); she unsecured the lock (*id.* at 42:25-
18 43:1); in unsecuring the lock, her intention was to let Sgt, Thompson and the other officer
19 in (*id.* at 91:16-21).

20     46.     The facts in paragraph 46 are undisputed.

21     47.     Paragraph 47 is a confusing, misleading and compound sentence.  The
22 evidence cited in paragraph 47 does not establish the facts stated, the allegations in
23 paragraph 47 are misleading.  At Puri's suggestion, Jasso and Pacheco took a fogger (Doc.
24 298-5 at 38:5-19) when they walked out of the control room together (*id.* at 37:1-2); Jasso
25 observed inmates grouping by race as she left the control room (*id.* at 35:3-10); when the
26 inmates started fighting, she initiated ICS (*id.* at 36:14-21); Jasso and Pacheco were
27 surrounded by inmates in the basketball area (*id.* at 37:2-4); Jasso and Pacheco were
28 standing next to each other when Jasso reached for the fogger and Pacheco gave it to her

(*id*. at 40:22-25; 41:1-6); she used chemical agents (i.e., the fogger) as soon as the inmates started fighting (*id*. at 37:6-7); she ran to the gate next to the building to let staff in (*id*. at 41:11-15); as she ran toward the gate, she saw Sgt. Thompson and somebody else heading toward the gate (*id*. at 41:24-25; 43:2-19) and she saw three inmates assaulting another inmate, another inmate with two pointed broom sticks, and other inmates (*id*. at 44:12-22); when she got to the gate, Thompson was in front of her on the other side of the gate (*id*. at 43:19-22); she did not open the gate (*id*. at 42:10-20); she unsecured the lock (*id*. at 42:25-43:1); in unsecuring the lock, her intention was to let Sgt, Thompson and the other officer in (*id*. at 91:16-21).

48. The term "unsurprisingly" in paragraph 48 is not factual, but an opinion, and the opinion of only the author of that paragraph. The evidence cited in paragraph 48 does not establish that it was "unsurprising" that Jasso and Pacheco were surrounded by inmates after they left the control room; this allegation is disputed. Before September 20, 2012, Jasso was never in a disturbance before and could not predict that a racial disturbance would occur. (Doc. 298-5 at 29:20-25; 30:1-4.) When she called Thompson, she said, "Come to the yard. I don't know what's going on. They're starting to group." (*Id*. at 30:17-25.) Inmate grouping is not part of the training that she received in the academy. (*Id*. at 31:2-17.) A lot of inmates looked angry and upset when she went in the control room, but they were not yelling or screaming, and she did not know why they were upset. (*Id*. at 31:18-25; 32:1-10.)

49. Paragraph 49 is unclear and misleading insomuch as it does not state *when* Jasso recognized that inmates were fighting inmates of other races. The evidence cited in paragraph 49 establishes that Jasso recognized a "race disturbance between the whites and the blacks" when she and Pacheco were surrounded by inmates on the basketball court, with white inmates in front of them and black inmates behind them. (Doc. 300-1 at 33:1-19.)

50. The evidence cited does not support the facts as stated in paragraph 50. When asked: "did you feel it was dangerous for you to be there, between the whites and

9

1  blacks" (*id*. at 33:21-22), Jasso replied, "Yes" (*id*. at 33:23). When asked, "Did you feel
2  like if they started to fight, you'd be caught in the middle of it?" (*id*. at 33:24-25), she
3  replied, "I was afraid that they were going to assault my partner, COII Pacheco, or assault
4  me, or assault both of us. That was the reason for the chemical agents" (*id*. at 34:1-4).

        51.      The facts in paragraph 51 are undisputed.

        52.      The terms "sensibly" in paragraph 52 is not factual, but an opinion, and the opinion of only the author of that paragraph. The evidence cited in paragraph 52 does not establish whether or not Pacheco acted "sensibly" in making his way back to the control room, but only that he did return to the control room. (*Id*. at 47:2-10.) Garcia, however, makes an admission against interest in paragraph 52, which admission supports Pacheco's pending request for summary judgment. (Doc. 297 at 13-14, 19.)

        53.      The evidence cited does not support the facts stated in paragraph 53. The phrase that Jasso "heroically took it upon herself to run to the gate to open it" is the author's mischaracterization of Jasso's testimony. Jasso read from her report (Doc. 300-1 at 34:20-21): "I ran to the gate to let staff in. Some inmates started to climb over the fence by the programs" (*id*. at 34:22-24). When asked, "Were there staff waiting at the gate?" (*id*. at 36:23), Jasso said, "I saw Sergeant Thompson and somebody else heading towards the gate" (*id*. at 36:24-25). Jasso did not open the gate, she unlocked it. (Id. at 41:9-25.)

        54.      Garcia begins paragraph 54, with the phrase: "To do so." Given that the phrase "to do so" refers back to the statement in paragraph 53 that Jasso "heroically took it upon herself to run to the gate to open it," Defendants incorporate herein their response in paragraph 53 above. At Puri's suggestion, Jasso and Pacheco took a fogger (Doc. 298-5 at 38:5-19) when they walked out of the control room together (*id*. at 37:1-2); Jasso observed inmates grouping by race as she left the control room (*id*. at 35:3-10); when the inmates started fighting, she initiated ICS (*id*. at 36:14-21); Jasso and Pacheco were surrounded by inmates in the basketball area (*id*. at 37:2-4); Jasso and Pacheco were standing next to each other when Jasso reached for the fogger and Pacheco gave it to her (*id*. at 40:22-25; 41:1-6); she used chemical agents (i.e., the fogger) as soon as the inmates

1 started fighting (*id*. at 37:6-7); she ran to the gate next to the building to let staff in (*id*. at
2 41:11-15); as she ran toward the gate, she saw Sgt. Thompson and somebody else heading
3 toward the gate (*id*. at 41:24-25; 43:2-19) and she saw three inmates assaulting another
4 inmate, another inmate with two pointed broom sticks, and other inmates (*id*. at 44:12-22);
5 when she got to the gate, Thompson was in front of her on the other side of the gate (*id*. at
6 43:19-22); she did not open the gate (*id*. at 42:10-20); she unsecured the lock (*id*. at 42:25-
7 43:1); in unsecuring the lock, her intention was to let Sgt, Thompson and the other officer
8 in (*id*. at 91:16-21).

   55.   Paragraph 55 is unclear and misleading insomuch as it does not state *when* Jasso saw Thompson and another officer directly on the other side of the gate.  The evidence cited in paragraph 55 establishes that as Jasso was running to the gate, she could see Thompson from "far away" (Doc. 300-1 at 38:18-19) but when – as she got to the gate, Thompson was standing in front of her on the other side of the gate (*id*. at 38:19-22). At the time that she was unsecuring the gate, Thompson and another officer were "right in front of her."  (*Id*. at 39:1-6.)

   56.   The evidence cited does not establish the facts stated in paragraph 56. "Officer Runge's Report" is not in evidence; rather, Garcia's counsel purportedly reads from the report during Jasso's deposition.  (*Id*. at 51:25; 52:1-12.)

   57.   The evidence cited does not establish the facts stated in paragraph 57. "Officer Runge's Report" is not in evidence; rather, Garcia's counsel purportedly reads from the report during Jasso's deposition.  (*Id*. at 51:25; 52:1-12.)

   58.   Paragraph 58 is disputed.  When Thompson arrived at the yard three gate, the gate was unlocked.  (Doc. 298-7 at 82:24-25; 83:1-8.)

   59.   Paragraph 59 is disputed.  Thompson testified that when he says the gate was "open," he meant there was no security or lock on it.  (Doc. 300-1 at 87:23-25; 88:1-5; Doc. 298-7 at 82:6-25; 83:1-8.)

   60.   Paragraph 60 is disputed.  The evidence cited does not establish that Thompson "ordered" Jasso to exit Yard 3 nor does it establish that Thompson stepped in

1 through the gate and into the yard to get Jasso out.  Thompson could not recall if he told
2 Jasso to come out or if he went in the yard (Doc. 300-1 at 71:10-22), rather, he said that he
3 was "pretty sure" that he went in and that they got out (*id*. at 71:15-16) and he's sure that
4 he "told her something" (*id*. at 71:18-19) but he does not recall what his words were (*id*. at
5 71:20-21.)

6       61.    Paragraph 61 is disputed.  After Thompson got Jasso out of the yard (Doc.
7 298-7 at 14: 6-8), he and Jasso physically held the gate to secure it (*id*. at 14:10-11).  They
8 were holding the gate while inmates were chanting, "Just stab them."  (*Id*. at 35:18-25;
9 36:1-12.)  The inmates were referring to stabbing him and Jasso. (*Id*. at 36:1-12.)  He told
10 Jasso to get off the gate so that inmates could not stab her through it.  (*Id*. at 36:18-19; 39:
11 22-25.)  When Jasso released her weight on the gate, Thompson could no longer hold it
12 shut and the black inmates pushed the gate open.  (*Id*. at 36:20-22; 40:1-18.)  After the
13 black inmates flooded out the gate to yard three, inmates of other races followed them.
14 (*Id*. at 40:17-19; 58:1-8.)  Although Thompson does not recall it (*id*. at 40:20-25; 41:1-6),
15 the gate was then secured with Jasso's handcuffs (*id.* at 47: 23-25; 48:1-2).

16       62.    The evidence cited does not establish the facts stated in paragraph 62.  Jasso
17 did not testify that she did not know "what happened to the lock once she unsecured it.
18 She was asked, "after you unsecured the gate, did you continue watching the lock?"  (Doc.
19 300-1 at 50:15-16.)   She responded, "No. I'm not the lock's babysitter. No, I was not
20 watching the lock." (*Id.* at 50:17-18.)

21       63.    Paragraph 63 is undisputed.

22       64.    The evidence cited does not establish the facts stated in paragraph 64.  Jasso
23 "tried to hold the gate so no more inmates would get out."  (*Id*. at 43:2-3)  She was trying
24 to prevent Whites and Hispanics, Mexican, Mexican nationals from getting out.  (*Id*. at
25 43:16-20.)  Thompson testified that when the gate flooded open, it was dangerous for him
26 and Jasso because there were only two of them and there was a risk that they and other
27 staff members, and possibly other inmates could get hurt. (*Id*. at 76:22-25; 77:1-8.)

28       65.    The evidence cited does not establish the facts as stated in paragraph 65.

Thompson testified that they could not find the lock to secure the gate (Doc. 300-1 at 74:24) and he remembers that he and Jasso tried to hold the gate closed with their backs against the gate (*id*. at 75:4-9). He also testified that he thought that Jasso tried to handcuff the gate but he did not recall if that worked or not. (*Id*. at 75:4-6.) Jasso testified that the gate was secured with her handcuffs. (Doc. 298-5 at 47:23-25; 48:1-2.)

66. The evidence cited does not establish the facts as stated in paragraph 66. Thompson testified that after inmates threatened to stab him and Jasso, he told her to get off the gate (Doc. 300-1 at 75:9-15.) When Jasso released her weight on the gate, Thompson could no longer hold it (*id*. at 76:20-21) and "the gate flooded open. And at that point, the African American inmates ended up . . . on the fence line by the rec field" (*id*. at 75:16-19).

67. Paragraph 67 is undisputed.

68. Paragraph 68 is a mischaracterization of Jasso's testimony and therefore is disputed. When asked: "when you testified right now, the effort was to secure the gate so that no other inmates, white or Mexican or Mexican nationals, would get out and *hurt* the black inmates" (*id*. at 45:14-17 (italics added)), Jasso responded: "Correct" (*id*. at 45:18).

69. The term "obviously" in paragraph 69 is not factual, but an opinion, and the opinion of only the author of that paragraph. When asked if it was dangerous for inmates to flood out of the gate (*id.* at 76:22-23), Thompson said: "It's very dangerous" (*id*. at 76:24). When asked "[w]hy is it dangerous" (*id*. at 76:25), he said, "Why is it dangerous? For us. I mean, it's two of us against a hundred something inmates, like" (*id* at 77:1-3).

70. The evidence cited does not establish the facts as stated in paragraph 70; paragraph 70 is a mischaracterization of Thompson's testimony and therefore is disputed. In the cited testimony, Thompson said nothing about rioting inmates' access to David Garcia. (*Id*. at 77:1-8.) The incomplete question put to Thompson was: "Okay. So the risk that you could get hurt or staff members could get hurt – "(*id*. at 77:4-5), to which he responded: "Exactly" (*id*. at 77:6); this exchange was followed by another incomplete question: " –or other inmates that are outside" (*id*. at 77:7), to which he responded:

13

1 "Possibly" (*id.* at 77:8).

2     71.    The evidence cited does not establish the facts as stated in paragraph 71; paragraph 71 is disputed. Thompson testified that after the black inmates left the yard they gathered behind him and Jasso (*id.* at 80:3-4) and one black inmate asked him what he wanted them to do (*id.* at 80:4-9) and Thompson told him that they would secure them in the "rec. field" (*id.* at 80:9-10). Then inmate Peoples, who was a soldier for the Aryan brothers, started going at one of the black inmates again. (*Id.* at 80:11-14.) Thompson thought Peoples would grab Jasso, and everything erupted again right in the middle of the yard. (*Id.* at 80:14-16.) From that point the black inmates took off and headed towards main control and ended up corralling (*id.* at 80:17-21) in front of the administration building (*id.* at 82:11-16). Garcia was "separated by those inmates that was [sic] running out by the fence around the diamond." (Doc. 298-2 at 52:1-13.)

    72.    It is undisputed that Jasso did not know the names or mental health scores of the inmates that went through the gate but knew "they were all black." The evidence cited does not establish that Jasso did not know the criminal histories of the inmates because she did not know their names. Jasso was an officer on September 20, 2012 and did not have inmates' criminal history available to her. (Doc. 300-1 at 42:16-19).

    73.    Plaintiff fails to provide any evidence to support his characterization of events in paragraph 73, and his characterization is disputed. As Jasso was running to the gate, she saw Thompson and somebody else heading toward it. (*Id.* 36:22-25; 38:8-19.) She unsecured the lock but did not open the gate. (*Id.* 37:10-25; 38:1.) Her intention in doing so was to let in Thompson and the other officer, who were in front of her on the other side of the gate. (*Id.* 37:19-22; 39:1-6; 48:16-21; Doc. 298-5 at 108:5-18.) Her objective changed with the actions of those around her. (*Id.* at 108:19-21.)

    74.    Paragraph 74 is disputed. Moreover, the evidence cited does not establish the facts as stated in paragraph 74. Jasso was not aware that there were any inmates from yard one or yard four in the central yard because those yards were locked down. (Doc. 298-5 at 64:11-19.) She did not know Garcia before the disturbance, did not know his

1  location during the disturbance, and did not know that any inmates would be walking
2  from the medical unit to yard 4 at any point in time while the disturbance was active.
3  (Doc. 298-6 at 3, ¶¶ 5-7.)  She became aware that there were inmates on the recreation
4  field only after she exited yard three.  (*Id*. ¶ 8.)

5        75.    The evidence cited does not establish the facts as stated in paragraph 75;
6  paragraph 75 is disputed.  Inmates were trying to climb over the double gates.  (Doc. 298-
7  7 at 38:16-17.)  They were trying to climb over the barbed wire.  (*Id*. at 38:18.)  They
8  were trying to get out any way that they could.  (*Id*. at 38:19-20.)  They were trying to
9  jump the fence.  (Doc. 303-1 at 12:10-11.)

10        76.    Paragraph 76 is disputed; the evidence cited does not establish the facts as
11  stated in paragraph 76.

12        77.    Plaintiff fails to submit the purported evidence to support this alleged fact.

13        78.    Paragraph 78 is not fact but pure conjecture and is unsupported by the
14  evidence.

15        79.    Paragraph 79 is disputed; the evidence cited does not establish the facts as
16  stated in paragraph 79.  Garcia testified that "the officer lady, she ran to the gate and put,
17  like, that (demonstrating) and opened the lock on the gate" (Doc. 303-1 at 5:25; 6:1) and
18  that he didn't know "exact" who opened the gate but that it was Jasso because she
19  allegedly told him that she did (Doc. 298-3 at 7:7-25) and because the officer he saw
20  "looked female to him" (*id*. at 8:6-9).  Jasso testified: "I remember Sergeant Thompson
21  wanting to get in.  The gate opened, and as the gate opened, I walked through the gate."
22  (Doc. 300-1 at 40:20-22.)  When Thompson arrived at the yard three gate, the gate was
23  unlocked.  (Doc. 298-7 at 82:24-25; 83:1-8.)

24        80.    Paragraph 80 is disputed; the evidence cited does not establish the facts as
25  stated in paragraph 80.  Plaintiff presents no evidence that he was attacked by inmates
26  who "escaped" from yard 3.  He testified that when he started walking back to the medical
27  unit, he saw "a big ol' crowd, a bunch of people, and that's all I remember.  That's all I
28  remember."  (Doc. 303-1 at 6:24-25; 7:1-6.)  A crowd of mixed race inmates coming from

1 the direction of yard two rushed by Jasso after she had exited yard three. (298-5 at 65: 9-
2 10; 63:18-25; 64: 1-7, 21-23; 70: 21-25; 71:1-25; 72:1-25.) Half of yard two was out
3 because staff was going to take them to dining area one for chow when everything
4 happened. (*Id.* at 61:3-8.)

5   81.   Paragraph 81 is undisputed.

6   82.   Paragraph 82 is undisputed.

7   83.   Paragraph 83 is disputed. Thompson did not note "a couple of African
8 Americans near Garcia who was on the Dirt Track" when he arrived to help COII Luker.
9 Thompson testified that COII Luker was "a chow hall officer" (Doc. 298-7 at 45:18-19)
10 and "would have been in the chow hall" (*id*. at 45:21) and "when I met him where Garcia
11 was is the actual, like the lamp pole right outside the chow hall (*id*. at 45:23-25). When
12 asked, "What did you see when you got there and saw Garcia" (*id*. at 46:1-2), Thompson
13 said, "Garcia was out. Like, he was shaking, covered in blood, soaked in blood" (*id*. at
14 46:3-4). Thompson said, "When I ran, there was a couple of black inmates over here that
15 I don't know if they were assaulting him." (*Id*. at 46:24-25, 47:1.)

16   84.   Paragraph 84 is disputed; the evidence cited does not establish the facts as
17 stated in paragraph 84. The term "at that point" in paragraph 84 is imprecise and fails to
18 convey the series of events that preceded Thompson picking up Garcia, and the phrase:
19 "true to his 'act first, ask questions later approach" is not factual but is instead
20 argumentative, and the opinion of only the author of that paragraph. After first
21 encountering Garcia, Thompson did a tap to make sure that Garcia was conscious. (Doc.
22 298-7 at 83:24-25.) Garcia was mumbling so Thompson knew that he was. (*Id*. at 83:25;
23 83:1.) Garcia was breathing but had lost a lot of blood. (*Id*. at 84:1-2.) Thompson
24 checked Garcia for paralysis and found that he was not paralyzed and did not have a neck
25 injury. (*Id*. at 89:23-25; 90:21-25; 91:1-4.) Thompson made calls to medical personnel
26 but they still could not come on the yard because there was still rioting. (*Id*. at 47:20-25;
27 48:1; 84: 5-25.) Although yards three and four were calming down at this point, yards one
28 and two had started rioting. (*Id*. at 48:2-9.) Luker helped Thompson lift Garcia up from

behind under his armpits, and then Thompson employed the fireman's carry that he learned in the military to pick Garcia up. (*Id*. at 86: 2-20.) Thompson then carried Garcia most of the way to the medical unit, until he was met by corrections officer Petrick, who had a wheelchair. (*Id*. at 48:2-25; 49:1-25; 84:5-25; 85:1-21.) To pick up Garcia, Thompson used the same fireman's carry for which he had been recertified two months earlier (*id*. at 86:14-17) and the same fireman's carry that he employed on his injured comrade in Afghanistan (*id*. at 86:18-20). Thompson did not leave Garcia where he found him until medical could come to him, "Because [Garcia] a human being. I would expect somebody to do that for me." (*Id*. at 86:23-24.) Thompson is certain that if he left Garcia where he found him that he would have died because he had lost so much blood. (*Id*. at 86:24-25; 87:1-2.)

85. Paragraph 85 is disputed; the evidence cited does not establish the facts as stated in paragraph 85. Thompson carried Garcia most of the way to the medical unit, until he was met by corrections officer Petrick, who had a wheelchair. (*Id*. at 48:2-25; 49:1-25; 84:5-25; 85:1-21.)

86. With respect to paragraph 86, Thompson did not testify as a member of TSU; at the time that he was deposed, he no longer worked for ADC. (*Id*. at 13:2-7.) He testified that TSU has tactical priorities that served as guidelines during inmate disturbances. (*Id*. at 52:4-10.)

87. With respect to paragraph 87, Thompson testified that the first priority is "safety of the public, safety of staff. It's safety and welfare of the public, staff and inmates." (*Id*. at 52:12-14.) He did not add: "in that order."

88. With respect to paragraph 88, Thompson testified that the "second one would be isolate, stabilize and contain the incident." (*Id*. at 52:14-15). He did not place particular emphasis on any of the foregoing.

89. Paragraph 89 is undisputed.

90. Paragraph 90 is disputed; the evidence cited does not establish the facts as stated in paragraph 90. There is no evidence that Garcia sustained injuries "as a result of

Jasso and Thompson's deliberate actions"; this is argumentative and an unqualified opinion. The evidence cited does not establish that Garcia had two brain surgeries or that he spent two months in the hospital or that he has permanent damage that has impaired his memory.

91. Paragraph 91 contains a grammatical error that renders its meaning unclear. Garcia testified that after he got out of the hospital, Jasso "came and saw me with another sergeant." (Doc. 303-1at 16:3-11.)

92. Paragraph 92 is disputed; the evidence cited does not establish the facts as stated in paragraph 92. Paragraph 92 is argumentative, a mischaracterization of the testimony, and the opinion of the author of the paragraph. Garcia stated only: "I wanted to know why they opened the gate and let the people out." (Doc. 303-1 at 16:23-24.)

93. Paragraph 93 is disputed. Jasso did not open the gate. (Doc. 298-5 at 42:10-20); she unsecured the lock (*id.* at 42:25-43:1).

94. Paragraph 94 is disputed; the evidence cited does not establish the facts as stated in paragraph 94. Paragraph 94 is argumentative, a mischaracterization of the testimony, and the opinion of the author of the paragraph.

## II. STATEMENT OF ADDITIONAL FACTS

Defendants Minerette Jasso, Ian Thompson, and Martin Pacheco incorporate herein as their Statement of Additional Facts, their Statement of Facts (Doc. 298) and supporting documents (Doc. 298-1-298-8).

RESPECTFULLY SUBMITTED this 17th day of June, 2019.

**MARK BRNOVICH**
**ATTORNEY GENERAL**

s/Michelle C. Lombino
Michelle C. Lombino
Assistant Attorneys General
Attorneys for Defendants Jasso, Pacheco, Thompson

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of June, 2019, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Robert T. Mills, Esq.
Sean A. Woods, Esq.
Mills and Woods Law PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
*Attorney for Plaintiff*

Anthony J. Fernandez, Esq.
Dustin A. Christner. Esq.
Alyssa R. Illsley, Esq.
Quintairos, Prieto, Wood, & Boyer, P.A.
2390 E. Camelback Road, Suite 440
Phoenix, AZ 85016
Tel: (602) 954-5605
*Attorneys for Defendant Corizon Health, Inc.,
Smalley, Ende, Riaz, Rojas, Lewis and Tucker,
Ryan (limited), Moody (limited), McCutcheon (limited)*

s/Jennifer L. Navarro

7950059

19